IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-150-A |
| | ) | |
| DARLEEN A. DRUYUN, | ) | |
| | ) | |

CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

COUNT ONE

INTRODUCTION

At all times material herein, except as otherwise indicated:

1. The Department of the Air Force was a department of the executive branch of the United States Government. The office of the Secretary of the Air Force was a part of the Department of the Air Force.

2. The defendant Darleen A. Druyun was a member of the Senior Executive Service (SES) and Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management from 1993 until on or about November 15, 2002.

3. The defendant, as the Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management, supervised, directed and oversaw the management of Air Force acquisition programs and provided advice on acquisition matters to the Assistant Secretary of the Air Force for Acquisition, the Chief of Staff of the Air Force, and the Secretary of the Air Force. She chaired the Acquisition Professional Development Council which was responsible for recruiting, training, and retaining military and civilian acquisition personnel. She also was

chairperson of the NATO Airborne Early Warning and Control Program Management Board of Directors which managed the multi-billion dollar NATO E-3A program funded by twelve nations.

4. In January 2002, Congress approved the Department of Defense and Emergency Supplemental Appropriation for Recovery From and Response to Terrorist Attacks on the United States Act. Section 8159 of this act authorized the Air Force to make payments on a multi-year program for leasing not more than 100 general purpose Boeing 767 aircraft. Following a Request for Information in March 2002, the Boeing Company was selected by the Air Force as the sole source for negotiations to lease 100 Boeing KC 767A tanker aircraft. The defendant, in her position as Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management was responsible for overseeing the negotiations. The defendant oversaw the negotiation of the leasing of these aircraft from Boeing until her disqualification on November 5, 2002.

THE CONSPIRACY

From on or about September 23, 2002 through on or about November 5, 2002, in the Eastern District of Virginia, and elsewhere, Darleen A. Druyun, the defendant herein, did knowingly combine, conspire, confederate and agree with other persons to commit an offense against the United States of America, to wit:

To knowingly, intentionally and willfully participate personally and substantially as a government employee through decision, approval, recommendation, the rendering of advice, investigation and otherwise, in a contract and other particular matter, in which to her knowledge the Boeing Company, a company with whom she was negotiating concerning prospective

employment, had a financial interest in violation of Title 18, United States Code, Section 208(a) and 216(a)(2).

OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

1. On or about September 23, 2002 an E-mail was sent by the daughter of the defendant to a "senior executive" at the Boeing Company outlining the type of employment position the defendant would be interested in being offered by Boeing.

2. On or about October 5, 2002 a "senior executive" of the Boeing Company contacted the defendant by telephone to schedule an October 17, 2002 meeting between them in Orlando, Florida, to discuss employment.

3. On or about October 17, 2002 the defendant and a "senior executive" from the Boeing Company met in Orlando, Florida to discuss the hiring of the defendant by the Boeing Company.

4. On or about October 22, 2002 at the Pentagon in Arlington, Virginia, the defendant met with other government officials and participated personally and substantially in discussions concerning the terms and conditions of the KC 767A tanker lease from the Boeing Company.

(All in violation of Title 18, United States Code, Sections 371)

Respectfully submitted.

Paul J. McNulty
United States Attorney

By:

Robert W. Wiechering

Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED IN OPEN COURT
APR 20 2004
CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 04-150-A
)
DARLEEN A. DRUYUN, )
)
Defendant. )

STATEMENT OF FACTS

It is agreed by and between the parties that the following facts are true:

I. Introduction

The defendant, Darleen A. Druyun, was from 1993 until her retirement in November, 2002, the Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management. In that Senior Executive Service (SES) position, she supervised directed and oversaw the management of the Air Force acquisition program. In addition, she provided advice on acquisition matters to the Assistant Secretary of the Air Force for Acquisitions, the Chief of Staff of the Air Force, and the Secretary of the Air Force. The defendant also chaired the Acquisition Professional Development Council which was responsible for recruiting and training military and civilian acquisition personnel. An additional responsibility of the defendant was service as chairperson of the NATO Airborne Early Warning and Control Program Management Board of Directors. This board was chartered by the North Atlantic Council to manage the multi-billion dollar NATO E-3A AWACS program funded by twelve nations.



4

Prior to the defendant's service as the Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management, she had a lengthy government career that included various positions in the Air Force, the Office of Management and Budget (OMB) and the National Aeronautical and Space Administration (NASA). In 1991 she served as the Assistant Administrator for Procurement and Acquisition for NASA. From 1992 until 1993, she served as the Chief of Staff of NASA and was responsible for the daily management of the agency.

In January, 2003, the defendant was appointed by the Boeing Company as Vice-President and Deputy General Manager of the Missile Defense Systems (MDS). MDS was a business unit of Boeing Integrated Defense Systems. She entered this position following her retirement from the Air Force in late 2002. The defendant began negotiating the terms of this employment with a senior official of the Boeing Company on or about September 23, 2002, as more fully set forth below:

During the summer of 2002, the defendant had reached the decision that she would retire from the Air Force late that year. She was ordered not to publicly announce her decision to retire, but did notify her immediate supervisor, the Assistant Secretary of the Air Force for Acquisition, on or about August 20, 2002. It was the defendant's intention, in the late summer of 2002, to seek employment in the defense industry. This employment would begin following her retirement. In order to explore employment opportunities with certain defense contractors, the defendant disqualified herself from all Air Force matters involving Lockheed Martin and Raytheon. This was submitted in writing on August 26, 2002. The defendant then entered into employment discussions with Lockheed Martin. These discussions resulted in the defendant's verbal

agreement on October 16, 2002, to accept a position at Lockheed Martin which would begin after her retirement.

A major responsibility of the defendant in 2002 was overseeing the Air Force negotiations with the Boeing Company to lease 100 Boeing KC 767A tanker aircraft. These tanker aircraft were to be extensively modified versions of Boeing's 767 commercial aircraft, and were to have as their primary mission air refueling of other military aircraft. The total value of the contract was projected to be in the range of 20 billion dollars. The defendant participated personally and substantially as a government official through decisions, approvals, disapprovals, recommendations and the rendering of advice in connection with the negotiation of this lease agreement with Boeing Company. In the summer and fall of 2002 the defendant was also involved in negotiations with the Boeing Company in her position as Chairperson of the NATO Airborne Early Warning and Control Program Management Board of Directors. This involved the restructuring of the NATO AWACS program, and the addition of $100 million in funds.

**II. <u>The Negotiation</u>**

A daughter of the defendant was employed by the Boeing Company in their student development program in St. Louis, Missouri. The daughter had been hired by the Boeing Company in November 2000. Prior to the daughter's hiring, the defendant had contacted a senior member of the management of Boeing (hereinafter "senior executive") seeking his assistance in obtaining employment for her daughter.[1] The senior executive contacted other executives at

[1] The defendant had previously contacted the senior executive in 2000 seeking assistance in obtaining employment for the boyfriend of her daughter. The boyfriend was immediately contacted by the senior executive, was subsequently hired, and began employment at Boeing in September 2000.

Boeing, in an effort to obtain a position for the defendant's daughter. After interviewing with several executives, a position was created for her as a college recruiter for Boeing.[2]

On September 3, 2002 the defendant's daughter sent an encrypted E-mail over the Boeing Company intranet to the senior executive. The defendant's daughter did not personally know the senior executive but was aware that her mother, the defendant, had known and had professional dealings with the senior executive for a number of years. The subject line of the E-mail read "Please do not forward....RE: Darleen Druyun." In the E-mail she advised the senior executive that her mother would be retiring from the Air Force, had not publically announced that decision, and was interviewing with Lockheed Martin. The daughter encouraged the senior executive to recruit the defendant for a position at Boeing. The senior executive responded to the E-mail as follows:

> *...I met with your mom last week. She informed me of her plans, and I suggested that she and I chat. She said she needed to wait until she got some of our work completed before she should chat with me. Did I miss a signal or have the wrong picture? I'm with you. . .we need to be on her menu!*

The defendant's daughter responded minutes later:

> *Oh! I think she is referring to the tanker deal--might be too much of a conflict right now. She hopes to have the tanker deal made or scrapped by early Dec--seems like a long time off, maybe she has to wait that long before approaching us. It still makes me very worried that she is talking to Lockheed! She is visiting me tomorrow for a couple days. . .I hope that I can get a better understanding then. . . she is also talking to Raytheon and L3 (formerly E-systems, I think?) Anyway, we need to talk to her...*

The defendant visited her daughter in St. Louis, Missouri on September 4, 2002 and they

---

[2] The defendant informed an Air Force ethics officer that her daughter had accepted employment with Boeing. This was found not to create a conflict, however, the defendant did not inform the ethics officer that the defendant had asked for the assistance of a senior executive at Boeing in securing the daughter's employment.

discussed her retirement. The defendant's visit resulted in the following September 5, 2002 encrypted E-mail from the daughter to the senior executive:

> *As promised. . . please forgive the length!*
> *It is the tanker lease that prevents her from talking to you right away. She said to contact her on October 1.*
> *Let me tell you what she is looking for:*
> *1. Must be challenging, tough, lots of responsibility. Does not want something that puts her on display. Wants to impact processes, cut bureaucracy.*
> *2. Want to make a difference in the makeup of the IDS organization in terms of females. . . she thinks it is shameful that in the Albaugh's family there aren't women.*
> *3. Would consider moving out of DC, but would like to stay.*
> *4. ABSOLUTELY does not want to be somewhere under Muellner. . .she wants to be over him like at the Pentagon.*
> *She told me point blank that she would think the perfect offer would be a COO-like position under Albaugh. Bottom line she wants to be able to make an impact in the company.*
> *She interviewed with Lockheed's Robert Stevens, and he outlined where they would like her to fit in–something like business and process reforms (she used the term "watchdog"). She liked the sound of it, and mentioned she had a good rapport with Stevens and seemed to like what he was saying.*
> *She is very interested in talking to us, but we would have to give her something that would blow her out of the water! She also mentioned that Boeing has her most admired quality: honest values.*

Prior to September 23, 2002 the defendant was visited by her daughter who advised the defendant of her E-mail exchanges with the senior executive. The defendant outlined for her daughter what the daughter should communicate to the senior executive regarding possible employment with Boeing. On September 23, 2002 the defendant's daughter sent the senior executive the following:

> *I am fresh back from a visit to DC to see the parents, and of course Mom and I discussed life after retirement. She announces it publically on Friday, by the way. I told her that I had contacted you about discussing later employment plans, and she is VERY, VERY excited. She still wants a COO like position with IDS, and she said that is what Lockheed is doing for her right now in Bethesda. She told me very frankly that if the salary and position were ideal from us, she would*

*accept with Boeing and work her first year traveling back and forth from DC (work 5 days in STL, fly back on weekends). . .*
*She wants to know if this "COO" position is a feasible creation with IDS, and I told her that I did not know. . . is this a possibility? She leaves for Brussels Tues, and will return this weekend, so she would like to hear from you next week after the 1st.*

On or about October 5, 2002 the senior executive contacted the defendant by telephone to schedule a meeting between them to further the employment discussions that had occurred in the earlier E-mails. It was agreed that the senior executive would meet the defendant in Orlando, Florida on October 17, 2002. The senior executive took a private aircraft and flew to Orlando, Florida for the purpose of meeting the defendant to discuss employment. The defendant was already in Orlando to attend a National Defense Industrial Association Conference as well as a NATO-AWACS conference. She met alone with the senior executive in the private conference room at the General Aviation terminal of the Orlando Airport.

The meeting between the defendant and the senior executive lasted approximately thirty minutes. The senior executive offered the defendant a position at Boeing as a Deputy in the Missile Defense System to be located in Washington, D.C. They discussed salary, the amount of a signing bonus, and other issues involving the employment including the starting date and when and where the formal offer of employment should be sent.

The defendant advised the senior executive at the Orlando meeting that she had not disqualified herself from matters involving Boeing. He elected to continue the meeting and to discuss the terms of the employment. At the conclusion of the meeting he stated to her that "This meeting really didn't take place." They agreed to keep the meeting to themselves. The defendant advised the senior executive that she had not decided whether to accept the Boeing offer, or to instead work for Lockheed Martin. She advised the senior executive that she had a handshake agreement to work for Lockheed Martin.

The following day, October 18, 2002, the senior executive sent the following E-mail to other executives at Boeing, outlining the results of his meeting with the defendant. The subject line of the E-mail read "Employment" and in the message he did not reference the defendant by name.

> *Howdy. Had a "non-meeting" yesterday re: hiring Jim Evatt's deputy. Good reception to job, location, salary, longer-term outlook. Recommend we put together a formal offer:*
> ** Job as we discussed*
> **Location defined as we discussed*
> **Salary $250K (assuming that fits)*
> **Recruitment bonus $50K (important dimension of offer: could get by with $40K)*
> **Start date 3Jan03 (and immediately travel to Desert meeting)*
> *FedEx offer to home for 14Nov arrival. . .*

On or about November 4, 2002 the senior executive contacted the defendant and suggested he meet with her on November 5, 2002 at her Pentagon office. The defendant on November 5, 2002 submitted a letter to the Air Force stating she intended to enter into employment discussions with Boeing and was disqualifying herself from any matters involving Boeing. Later on November 5, 2002, the defendant and the senior executive met and discussed a job and terms of employment that were essentially the same as those discussed on October 17, 2002.

On November 14, 2002 Boeing sent the formal job offer to her home. On November 15, 2002 the defendant retired from government service. On December 16, 2002 the defendant formally accepted Boeing's employment offer by signing their offer letter.

During the time period from September 23, 2002 until her disqualification letter of November 5, 2002, the defendant participated personally and substantially as a government employee in decisions, approvals, recommendations, investigation and the rendering of advice in matters in which, to her knowledge, the Boeing Company had a financial interest. For example,

on October 22, 2002 the defendant participated in a meeting at the Pentagon with Air Force staff and an official of the Office of Management and Budget (OMB) regarding the terms and conditions of the KC 767A tanker program and a fair price for the Boeing aircraft.

III. <u>The Concealment</u>

The defendant began her employment at the Boeing Company on January 2, 2003. In the summer of 2003 press reports appeared raising questions about the KC 767A tanker contract and the contemporaneous hiring of the defendant by Boeing. In response to this criticism, counsel were retained by the Boeing Company to conduct a review of the circumstances surrounding the defendant's hiring. The defendant was informed of the investigation, and scheduled to be interviewed about the circumstances of her hiring. That interview was scheduled for July 7, 2003. Unable to reach the senior executive by telephone the defendant sent the following E-mail to him on July 4, 2003:

> *I have an appointment on Monday with Judy . . ., a lawyer hired by the company to review the process used by the company to ensure that the rules were properly followed and to help offset anymore negative comments. I wanted to reverify my recollection of our first discussion of potential employment. You came into see me on 5 Nov, the day before I went on leave. I had signed a recusal letter and given it to my AF lawyer since I thought that your meeting with me would probably go into the area of potential employment since my announcement had been publicly made of my retirement in mid October. As I recall at that meeting you lectured me about not jumping at my first job offer because I mentioned that I believed I had a verbal agreement with the COO of Lockheed (Bob. . .) although I did not expect anything in writing in terms of a job offer until the day I retired which was November 14, 2002. I also told you that I did not believe that I could work for Boeing because of my involvement in attending some of the 767 tanker negotiations. You countered that it was possible for me to work for Boeing if I worked in an entirely different area. I also stated that I could not be mobile because of my spouses employment for a few years and that there was nothing in this area that Boeing could offer to which you countered the company employed over 3000 people in the greater DC area. You also told me that you could not see me working in another staff job which is what Bob. . .had probably discussed and that I should consider a P&L job. As you can recall I said I would very much be interested in working for a company that could offer me a P&L in the DC area. You mentioned missile defense as one of the opportunities and generically*

*described Boeings Executive level compensation program. You strongly recommended that I discuss this with my lawyer in the AF and asked if you could send me a job offer and I said on my last day of work which was 14 Nov 02. I did receive a job offer from you on or about 14/25 Nov 02 which I discussed with the AF lawyer. His first reaction was the he did not see an issue. He then set about reviewing it in detail after my discussion with him and concluded around 5 Dec in writing that it would be in full compliance with the rules. It is my belief that he discussed it with Boeing lawyers. I believe it was not until 16 Dec that I officially made up my mind and called you and then faxed the paperwork to the company. I see Judy at 0900 Monday AM and wanted to verify with you that this was also as you remember it. I expect that she might call you. Please let me know ... if I have captured everything that we discussed. Hope you are enjoying Great Britain and get some aircraft sales!*

The senior executive responded to the defendant's message later that day, in part as follows:

*Precisely as I can recall. You obviously take good notes/have good memory... much better than mine.*
*And we're all thrilled that things have worked out this way re: your employment choice!!!*
*Enjoy the 4th! ....*

The July 4, 2003 E-mail of the defendant to the senior executive was not truthful as both she and the senior executive knew at the time. The "first discussion of potential employment" occurred long before the November 5, 2002 disqualification letter of the defendant. In fact, E-mail correspondence on the subject of employment, with the assistance of the defendant's daughter, was exchanged in September 2002. The defendant and the senior executive met in Orlando, Florida on October 17, 2002 and discussed a specific position at Boeing, salary, bonus, and other details. The senior executive's E-mail response of July 4, 2003, gave the defendant assurance that the senior executive would maintain the false story that the employment negotiations began on November 5, 2002.

The defendant met with outside counsel for Boeing on July 7, 2003. She provided untruthful answers in that interview, claiming that her first employment discussion with Boeing

occurred on November 5, 2002. She did not reveal the October 17, 2002 Orlando meeting with the senior executive. The defendant spoke with the senior executive by telephone in late August or September 2003. She informed him that she had been advised that E-mails inconsistent with their version of events had been discovered, and that counsel for Boeing had requested to reinterview her on these matters. The senior executive urged the defendant to "hang tough" and stated that their first discussion of employment occurred on November 5. He stated that any conflicting E-mails reflected "pre-planning" efforts by Boeing to make an employment offer to the defendant. The defendant clearly understood from the conversation that the senior executive wished her to maintain their false story.

Later in September 2003, the defendant and senior executive had another telephone conversation. He once again urged her to "hang tough."

On October 14, 2003 the defendant's attorney sent a letter to the Inspector General of the Department of Defense stating that the defendant was represented and understood she was the subject of an investigation by the DOD-IG. The letter also stated, "Mrs. Druyun and I look forward to cooperating with your investigation."

On or about October 20, 2003 the defendant and the senior executive discussed the investigation by telephone. The defendant was aware at that point in time that a Department of Defense (DOD) Inspector General subpoena had been served on the Boeing Company in connection with a criminal investigation of the hiring of the defendant. The defendant and the senior executive discussed the pending criminal investigation.[3] He advised her that his story would continue to be that any conflicting E-mails reflected pre-planning by Boeing and not

---

[3]The senior executive was notified by E-mail on October 15, 2003 by Boeing of the DOD-IG criminal investigation.

employment negotiations. As he had done previously, the senior executive urged her to "hang tough."[4]

The defendant was interviewed by outside counsel for Boeing on November 11 and 17, 2003. During those interviews, the defendant acknowledged she had not been truthful in her previous July 7, 2003 interview. She revealed many of the facts concerning her pre-November 5, 2002 employment negotiations with the senior executive. This included the October 17, 2002 Orlando, Florida meeting which they had agreed not to disclose. The defendant also discussed the two July 4, 2003 E-mails with the senior executive where in they agree to maintain a false story. The defendant was terminated for cause by the Boeing Company on November 24, 2003.

The defendant acknowledges that she willfully engaged in the conduct outlined in this Statement of Facts which constitutes a conspiracy to violate Title 18, United State Code, Section 208(a) and Section 216(a)(2).

Respectfully submitted,

Paul J. McNulty
United States Attorney

By: [signature]
Robert Wiechering
Assistant United States Attorney

[4]On October 22, 2003 the senior executive was interviewed by new outside counsel engaged by Boeing to assist in responding to the pending DOD-IG criminal investigation of the hiring of the defendant.

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Darleen A. Druyun, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Darleen A. Druyun
Defendant

I am Darleen A. Druyun's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, his/her decision to stipulate to these facts is an informed and voluntary one.

John M. Dowd, Esquire
Attorney for Darleen A. Druyun

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | |
| v. | ) | CRIMINAL ACTION |
| DARLENE DRUYUN, Defendant. | ) | 1:04-Crim-150 |

REPORTER'S TRANSCRIPT

MOTIONS HEARING
(Change of Plea)

Tuesday, April 20, 2004

---

BEFORE: THE HONORABLE T.S. ELLIS, III
Presiding

APPEARANCES: OFFICE OF THE UNITED STATES ATTORNEY
BY: PAUL MCNULTY, USA
ROBERT WIECHERING, AUSA

For the Government

JOHN DOWD, ESQ.
NELL BROWN, ESQ.
JAMES OSBORNE
KELLY SCALLOTA, ESQ.

For the Defendant

---

MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria Division

INDEX

COURT QUESTIONS OF DEFENDANT 5
GOVERNMENT'S OFFER OF PROOF 32
ENTRY OF PLEA 45
FURTHER PROCEEDINGS 45

(Court recessed)

---

PROCEEDINGS

(Court called to order at 9:50 a.m. in USA v. Druyun)

THE COURT: Good morning. I apologize for the delay in commencing, but like all of us I have to wait on a doctor now and then, once a year.

All right, who is here on behalf of the government?

ATTORNEY WIECHERING: Good morning, your Honor. Bob Wiechering for the United States, along with Paul McNulty, the United States Attorney.

THE COURT: All right. Good morning.

ATTORNEY SCALLOTA: Good morning, your Honor. Kelly Scallota on behalf of the defendant. With me today, John Dowd, James Osborne and Nell Brown. Before you, you have a written motion for their pro hac vice admission.

THE COURT: Yes. Those motions are granted. We are glad to have you here.

Mr. Dowd, I take it you will be speaking for the defendant.

ATTORNEY DOWD: I will. Good morning, your Honor. It's nice to be here.

THE COURT: I am surprised, Mr. Dowd, as many times as you have appeared in this Court, that you're not

already a member of the Bar of this Court.

ATTORNEY DOWD: Well, your Honor, I -- there is a difficulty with the application in Virginia, in that I would have to commit that I would only practice the majority of my practice in Virginia. And I am not about to misrepresent that, so --

THE COURT: Yes, I --

ATTORNEY DOWD: I have been before this Court for many years and it's always a pleasure to be here.

THE COURT: All right. The motions are granted.

All right, the matter is before the Court on a plea. Ms. Druyun, good morning.

THE DEFENDANT: Good morning.

THE COURT: Do I pronounce your name correctly?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

Are these papers, Mr. Wiechering, essentially identical to those earlier delivered to chambers?

ATTORNEY WIECHERING: They are identical, your Honor.

THE COURT: Ms. Druyun, you may come to the podium.

THE DEFENDANT: (Complies.)

THE COURT: Clerk, you may administer the oath the defendant.

(Defendant sworn by clerk)

QUESTIONING OF THE DEFENDANT BY THE COURT

THE COURT: Ms. Druyun, do you understand that you are now under oath and that if you answer any of the Court's questions falsely you may be prosecuted for perjury or for making a false statement?

THE DEFENDANT: I do, your Honor.

THE COURT: Ms. Druyun, there are three reasons why the Court will ask you a series of questions and it is important that you understand those three reasons.

First, the Court will ask you a series of questions to determine from your answers whether your waiver of your right to compel the government to proceed against you on this charge by way of a grand jury indictment is a knowing and voluntary waiver; that is, that you understand all that that right entails and nonetheless wish to give it up freely, willingly and voluntarily.

Second, the Court will ask you a series of questions to determine from your answers whether your plea of guilty is knowing and voluntary; that is, that you understand all of the consequences of pleading guilty to this charge and nonetheless wish to go ahead freely, willingly and voluntarily.

And finally, the Court will ask you a series of questions to determine from your answers whether there is a

factual basis for your plea, namely that you actually did what you are pleading guilty to, because in this Court, Ms. Druyun, you may not plead guilty to something you did not do.

Do you understand those as the three reasons the Court will ask you a series of questions?

THE DEFENDANT: Yes, I do, your Honor.

THE COURT: State your full name.

THE DEFENDANT: Darleen and Druyun.

THE COURT: What is your age?

THE DEFENDANT: Fifty-six.

THE COURT: Where were you born?

THE DEFENDANT: Vallejo, California.

THE COURT: And did you graduate from high school?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you attend college or university?

THE DEFENDANT: Yes, your Honor.

THE COURT: And did you earn a degree?

THE DEFENDANT: Yes, your Honor.

THE COURT: In what discipline?

THE DEFENDANT: In history and political science.

THE COURT: And did you thereafter pursue graduate studies?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you earn a graduate degree?

THE DEFENDANT: I did not complete it.

THE COURT: Where and when did you pursue a graduate degree?

THE DEFENDANT: University of Kentucky; completed all of my studies except for my thesis.

THE COURT: What discipline?

THE DEFENDANT: History and political science; finished in 1970.

THE COURT: What has been your employment history in the last five years?

THE DEFENDANT: The last four years I worked for the United States Air Force in the area of acquisition, and my last year, up until 24 November, I was with the Boeing Company in missile systems defense.

THE COURT: Have you ever been treated for mental illness or addiction to narcotic drugs of any kind?

THE DEFENDANT: No, your Honor.

THE COURT: Have you ever been treated for alcohol abuse?

THE DEFENDANT: No, your Honor.

THE COURT: When prior to this morning is the last time that you had an alcoholic beverage?

And I ask that question in order to insure that you are not here this morning under the influence of any alcoholic beverage.

THE DEFENDANT: I last had a taste of wine approximately a week ago.

THE COURT: Are you currently taking any drug or medication, whether prescribed or otherwise?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. List for me, if you would, please, the drugs or medications that you are taking and the dosages.

THE DEFENDANT: I take Theophylline. I'm not sure. It's the standard dosage for asthma. I take Albuterol inhaler. I take the standard dose, which is two puffs four times a day. I take Bumex. I believe it's 25 milligrams. I take Maxzide. I believe it's 25 milligrams. I take Estrace, two milligrams. I take Kalite, 50 milligrams. And I take Flokay, 20 milligrams, and omega-3 on a daily basis.

THE COURT: All right. Do any of those medications make you drowsy or alter your ability to observe or understand anything?

THE DEFENDANT: No, your Honor.

THE COURT: You take them on a daily basis?

THE DEFENDANT: Yes, I do your Honor.

THE COURT: Is there any reason today why your powers of observation or understanding or perception might be impaired in any way?

THE DEFENDANT: None whatsoever, your Honor.

THE COURT: Do you feel all right?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you feel as though you can make decisions about your future today?

THE DEFENDANT: Yes, your Honor.

THE COURT: Have you been furnished with a copy of -- furnished a copy of the criminal information, that is, the charge against you by the United States Attorney in this case?

THE DEFENDANT: Yes, your Honor.

THE COURT: Have you read it?

THE DEFENDANT: Yes, your Honor.

THE COURT: Have you reviewed it with your counsel, Mr. Dowd?

THE DEFENDANT: Yes, your Honor.

THE COURT: And are you fully satisfied with the advice and counsel that he has provided you in this case?

THE DEFENDANT: Yes, your Honor.

THE COURT: You understand that the charge against you in the criminal information is essentially the following: That from in or about September 23, 2002, through in or about -- or on or about November 5, 2002, in the Eastern District of Virginia and elsewhere, that you knowingly combined, conspired, confederated and agreed with other persons to commit an offense against the United States of

America, to wit: knowingly, intentionally and willfully to participate, personally and substantially, as a government employee, through decision approval, recommendation, the rendering of advice, investigation and otherwise, in a contract and other particular matter in which, to your knowledge, the Boeing Company, a company with whom you were negotiating concerning prospective employment, had a financial interest, in violation of Title 18 U.S. Code, Section 208(a) and 216(a)(2).

Do you understand that that is the offense charged against you, essentially the charge of conspiracy in violation of U.S. Code Section 371?

THE DEFENDANT: Yes, your Honor.

THE COURT: Ms. Druyun, that's a serious felony charge, and ordinarily the government could not proceed against you on such a charge without first obtaining an indictment, that is, an accusation against you by a grand jury. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: And do you understand that's a constitutional right that you hold and that you may insist upon that right?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you also understand that a grand jury is composed of at lease 16 and not more than 23 persons,

and if you insisted, as is your right, on having the government proceed by way of a grand jury indictment in this case, then the government in that event would have to present its evidence to a grand jury, and at least 12 members of the grand jury would have to conclude that there was probable cause to believe that a crime was committed and that you committed it before an indictment would issue. And in those circumstances, an indictment may or may not issue. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: And do you understand, also, that if you waive your right to compel the government to proceed by way of a grand jury indictment, the government will not have to present its evidence to a grand jury and seek an indictment, but rather will be able to proceed against you solely on the basis of the criminal information prepared and signed by the United States Attorney?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you wish to waive your right to compel the government to proceed by way of a grand jury indictment, Ms. Druyun?

THE DEFENDANT: Yes, your Honor.

THE COURT: Mr. Dowd, do you know of any reason why your client should not waive that right?

ATTORNEY DOWD: I do not, your Honor.

THE COURT: The Court finds, in the case of United States against Darleen A. Druyun, that the defendant is fully competent and capable of waiving her right to compel the government to proceed by way of a grand jury indictment, and that her waiver of that right is a knowing and a voluntary waiver.

You may now execute the waiver of indictment form and I will endorse it.

THE DEFENDANT: (Complies.)

THE COURT: Ms. Druyun, it is important that you understand all of the consequences that may occur to you as a result of your plea of guilty to this charge, so I am going to list those consequences for you now.

First, you could be sentenced to a maximum term of imprisonment of five years, that is, five years in prison without parole. That's the worst that could happen to you.

A fine of up to $250,000 could also be imposed on you. An order making full restitution to any victims of your offense could also be entered.

You will be required to pay a special assessment of $100. And you could be required to serve 3 years of supervised release to follow any period of incarceration. And if you were to violate any of the conditions of the supervised release while on supervised release, you could be returned to prison for the full supervised release term.

Do you understand that all of those are possible consequences of your plea of guilty in this case?

THE DEFENDANT: Yes, your Honor.

THE COURT: Ms. Druyun, you have a plea agreement with the government. Have you read that plea agreement?

THE DEFENDANT: Yes, I have your Honor.

THE COURT: And have you reviewed it with your counsel, Mr. Dowd?

THE DEFENDANT: Yes, I have, your Honor.

THE COURT: I am going to have the court security officer now show you what appears to be your plea agreement. I want you to look at it and tell the Court whether that is your plea agreement and whether that is your signature appearing at the conclusion of it, signifying that you have read, understood and agreed to the terms and conditions of the plea agreement.

THE MARSHAL: (Complies.)

THE DEFENDANT: Yes, it is, your Honor.

THE COURT: Is that your plea agreement, Ms. Druyun?

THE DEFENDANT: Yes, sir.

THE COURT: And is that your signature on page ten?

THE DEFENDANT: Yes, sir.

THE COURT: And does your signature appearing