THE DEFENDANT: Yes, your Honor.

THE COURT: And did any of this take place in the Northern Virginia area, that is, any discussions with Mr. Sears take place in the Northern Virginia area?

THE DEFENDANT: I believe it did, your Honor. Yes.

THE COURT: And did you receive a formal job offer from Boeing as a result of your discussions with Mr. Sears?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: Did you have discussions with this person, Mr. Sears, an executive at Boeing, about the efforts to conceal your conversations about a potential job offer from Boeing?

THE DEFENDANT: Yes, I did, your Honor.

THE COURT: Ms. Druyun, you may be seated now. I am going to have Mr. Wiechering now tell the Court what the government would prove were this matter to go to trial.

THE DEFENDANT: (Complies.)

THE COURT: Pay careful attention, Ms. Druyun, to what Mr. Wiechering says, because at the conclusion I will have you return to the podium and tell the Court whether everything he has said is true and correct in all respects.

All right, Mr. Wiechering.

GOVERNMENT'S OFFER OF PROOF

ATTORNEY WIECHERING: Your Honor, it is agreed by and between the parties that the following facts are true:

Section 1.

The defendant, Darleen A. Druyun, was, from 1993 until her retirement in November of 2002, the principal deputy assistant secretary of the Air Force for acquisition and management.

In that position she supervised, directed and oversaw the management of the Air Force Acquisition Program. In addition, she provided advice on acquisition matters to he Assistant Secretary of the Air Force, as well as the Chief of Staff of the Air Force and the Secretary of the Air Force.

In January 2003, the defendant was appointed by the Boeing Company as a vice president and deputy general manager of the Missile Defense System. MDS was a business unit was Boeing Integrated Defense Systems.

She entered this position following her retirement from the Air Force in late 2002. The defendant began negotiating the terms of this employment with a senior official of the Boeing Company on or about September 23, 2002, as more fully set forth in this statement of facts.

During the Summer of 2002, the defendant had reached the decision that she would retire from the Air Force late that year.

She was ordered not to publicly announce her decision to retire, but did notify her immediate supervisor, the Assistant Secretary of the Air Force for Acquisition, on or about August 20th, 2002.

It was the defendant's intention in the late Summer of 2002 to seek employment in the defense industry. This employment would begin following her retirement.

In order to explore employment opportunities with certain defense contractors, the defendant disqualified herself from all Air Force matters involving Lockheed-Martin and Raytheon. This was submitted in writing on August 26th, 2002.

The defendant then entered into employment discussions with Lockheed-Martin. These discussions resulted in the defendant's verbal agreement on October 16th, 2002, to accept a position at Lockheed-Martin which would begin after her retirement.

A major responsibility of the defendant in 2002 was overseeing the Air Force negotiations with the Boeing company to lease 100 Boeing KC-767A tanker aircraft. These tanker aircraft were to be extensively modified versions of Boeing's 767 commercial aircraft and were to have as their primary mission air refueling of other military aircraft. The total value of the contract was projected to be in the range of approximately $20 billion.

The defendant participated personally and substantially as a government official through decisions, approvals, disapprovals, recommendations and the rendering of advice in connection with the negotiations of this lease agreement with the Boeing Company.

Section 2, the negotiation.

A daughter of the defendant was employed by the Boeing Company in their student development program in St. Louis, Missouri. The daughter had been hired by the Boeing Company in November of 2000.

Prior to the daughter's hiring, the defendant had contacted a senior member of the management of Boeing, hereinafter in this statement "senior executive," seeking his assistance in obtaining employment for her daughter.

The senior executive contacted other executives at Boeing in an effort to obtain a position for the defendant's daughter. After interviewing with several executives, a position was created for her as a college recruiter for the Boeing Company.

On September 3rd, 2002, the defendant's daughter sent an encrypted e-mail over the Boeing Company Internet to the senior executive. The defendant's daughter did not personally know the senior executive, but was aware that her mother, the defendant, had known and had professional dealin' with the senior executive for a number of years.

The subject line of the e-mail read, "Please do not forward. Re: Darleen Druyun." In the e-mail she advised the senior executive that her mother would be retiring from the Air Force, had not publicly announced that decision, and was interviewing with Lockheed-Martin. The daughter encouraged the senior executive to recruit the defendant for a position at Boeing.

The senior executive responded to the e-mail as follows:

> I met with your mom last week. She informed me of her plans and I suggested that she and I chat. She said she needed to wait until she got some of our work completed before she could chat with me.
>
> Did I miss a signal or have the wrong picture? I am with you. We need to be on her menu.

The defendant's daughter responded minutes later, in part:

> Oh, I think she is referring to the tanker deal. It might be too much of a conflict right now. She hopes to have the tanker deal made or scrapped by early December. Seems like a long time off. Maybe she has to wait that long time before approaching us.
>
> It still makes me very worried that she is talking to Lockheed. She is visiting me tomorrow for a couple of days. I hope that we can get a better understanding. Anyway, we need to talk to her.

The defendant visited her daughter in St. Louis, Missouri, on September 4th, 2002, and they discussed her retirement. The defendant's visit resulted in the following September 5th, 2002, encrypted e-mail from the daughter to the senior executive at Boeing, and that e-mail, in part, reads:

As promised -- please forgive the length. It is the tanker lease that prevents her from talking to you right away. She said to contact her on October 1st.

Let me tell you what she is looking for.

1. Must be challenging, tough, lots of responsibility; does not want something that puts her on display.

2. Wants make a difference in make-up of the IDS organization in terms of females. She thinks it's shameful that in ALBA's family, there aren't women.

3. Would consider moving out of D.C., but would like to stay.

4. Absolutely does not want to be somewhere under Mullner. She wants to be over him, like at the Pentagon.

She told me point blank that she would think the perfect offer would be a COO-like position under ALBA. Bottom line, she wants to be able to make an impact in the company.

She is very interested in talking to us, but we would have to give her something that would blow her out of the water. She also mentioned that Boeing has her most admired quality, honest values.

Prior to September 23rd, 2002, the defendant was visited by her daughter, who advised the defendant of her e-mail exchanges with the senior executive. The defendant outlined for her daughter what the daughter should communicate to the senior executive regarding possible employment with Boeing.

On September 23rd, 2002, the defendant's daughter sent the senior executive the following:

I am fresh back from a visit to D.C. to see the parents, and, of course, mom and I discussed life after retirement. She announces it publicly on Friday, by the way.

I told her that I had contacted you about discussing later employment plans, and she is very, very excited. She still wants a COO-like position with IDS, and said that that is what Lockheed is doing for her right now in Bethesda.

She told me very frankly that if the salary and position were ideal from us, she would accept with Boeing and work her first year traveling back and forth from D.C.

She wants to know if this COO position is a

feasible creation with IDS, and I told her that I did not know. Is this a possibility?

She leaves for Brussels Tuesday and will return this weekend, so she would like to hear from you next week after the 1st.

Or about October 5th, 2002, the senior executive contacted defendant by telephone to schedule a meeting between them to further the employment discussions that had occurred in the earlier e-mails. It was agreed that the senior executive would meet the defendant in Orlando, Florida, on October 17th, 2002.

The senior executive took a private aircraft and flew to Orlando, Florida, for the purpose of meeting the defendant to discuss employment. The defendant was already in Orlando to attend a series of conferences.

She met alone with the senior executive in the private conference room at the general aviation terminal of the Orlando Airport. The meeting between the defendant and the senior executive lasted approximately 30 minutes.

The senior executive offered the defendant a position at Boeing as a deputy in the Missile Defense System, to be located in Washington, D.C.

They discussed salary, the amount of a signing bonus and other issues involving the employment, including t' starting date and when and where the formal offer of

indictment should be sent.

The defendant advised the senior executive at the Orlando meeting that she had not disqualified herself from matters involving Boeing.

He elected to continue the meeting and to discuss the terms of the employment.

At the conclusion of the meeting he stated to her, quote, "This meeting really didn't take place."

They agreed to keep the meeting to themselves. The defendant advised the senior executive that she had not decided whether to accept the Boeing offer or to instead work for Lockheed-Martin. She advised the executive that she had a handshake agreement to work for Lockheed.

The following day, October 18th, 2002, the senior executive sent the following e-mail to other executives at Boeing, outlining the results of his meeting with the defendant. The subject line of the e-mail read, "Employment," and the message did not reference the defendant by name. That e-mail reads, in part:

Howdy.

Had a "nonmeeting" yesterday re hiring Jim Abbott's deputy. Good reception to job, location, salary, longer term outlook. Recommend we put together a formal offer, job as we discussed, location defined as we discussed, salary, $250,000,

recruitment bonus, $50,000, start date, 3 January '03. FedEx offer to home 14 November arrival.

On or about November 4th, 2002, the senior executive contacted the defendant and suggested he meet with her on November 5th, 2002, at her Pentagon office -- and that would be here in the Eastern District of Virginia.

The defendant, on November 5th, 2002, submitted a letter to the Air Force stating that she intended to enter into employment negotiations with Boeing, and was disqualifying herself from any matters involving Boeing.

Later on November 5th, 2002, the defendant and the senior executive met and discussed the job in terms of employment that were essentially the same as those discussed on October 17th, 2002.

During the time period from September 23rd, 2002, until her disqualification letter of November 5th, 2002, the defendant participated personally and substantially as a government employee in decisions, approvals, recommendations, investigation and the rendering of advice in matters in which, to her knowledge, the Boeing company had a financial interest.

For example, on October 22nd, 2002, the defendant participated in a meeting at the Pentagon with Air Force staff and an official of the Office of Management and Budget regarding the terms and conditions of the KC-767A tanker program and a fair price for the Boeing aircraft.

Section 3, the concealment.

The defendant began her employment at the Boeing Company on January 2nd, 2003. In the Summer of 2003, press reports appeared raising questions about the tanker contract and the contemporaneous hiring of the defendant by Boeing.

In response to this criticism, counsel were retained by the Boeing Company to conduct a review of the circumstances surrounding the defendant's hiring.

The defendant was informed of the investigation and scheduled to be interviewed about the circumstances of her hiring. The interview was schedule for July 7th, 2003.

Unable to reach the senior executive by telephone, the defendant sent the following e-mail to him on July 4th, 2003, and it reads, in part:

I have an appointment on Monday with a lawyer hired by the company to review the process used by the company to insure that the rules were properly followed and to help offset any more negative comments.

I want to reverify my recollection of our first discussion of potential employment. You came to see me on 5 November, the day before I went on leave. I had ly signed a recusal letter and given it to my Air Force lawyer, since I thought that your meeting wit me would probably go into the area of potential

employment, since my announcement had been publicly made of my retirement in mid-October.

I also told you that I did not believe that I could work for Boeing because of my involvement in attending some of the 767 tanker negotiations.

You countered that it was possible for me to work for Boeing if I worked in an entirely different area.

The senior executive responded to the defendant's message later that day, in part, as follows:

Precisely as I can recall. You obviously take good notes, have good memory, much better than mine. We are all thrilled that things have worked out this way, re your employment choice. Enjoy the Fourth.

This July 4th, 2003, e-mail of the defendant to the senior executive was not truthful, as both she and the senior executive knew at that time.

The, quote, first discussion of potential employment occurred long before the November 5th, 2002, disqualification letter of the defendant. In fact, e-mail correspondence on the subject of employment and the meeting in October in Orlando discussed the specific position at Boeing.

The senior executive's e-mail response of July 4th, 2003, gave the defendant assurance that the senior executive would maintain the false story that the employment negotiations began on November 5th, 2002.

The defendant met with outside counsel for Boeing on July 7th, 2003. She provided untruthful answers in that interview, claiming that her first employment discussion with Boeing occurred on November 5th, 2002. She did not reveal the October 17th, 2002, Orlando meeting with the senior executive.

The defendant spoke with the senior executive by telephone in late August or September of 2003. She informed him that she had been advised that e-mails inconsistent with their version of events had been discovered and that counsel for Boeing had requested to reinterview her on these matters.

The senior executive urged the defendant to hang tough, and stated that their first discussion of employment occurred on November 5th. He stated that any conflicting e-mails reflected preplanning efforts by Boeing to make an employment offer to the defendant.

The defendant clearly understood from the conversation that the senior executive wished for her to maintain their false story.

Later, in September 2003, the defendant and senior executive had another telephone conservation. He once again urged her to hang tough.

On October 14th, the defendant's attorney sent a letter to the Inspector General of the Department of Defense, stating that the defendant was represented and understood th she was the subject of an investigation by the DOD-IG. The

letter also stated, "Mrs. Druyun and I look forward to cooperating with your investigation."

Or about October 20th, 2003, the defendant and the senior executive discussed the investigation by telephone. The defendant was aware at that point in time that a DOD-IG subpoena had been served on the Boeing Company in connection with a criminal investigation of the hiring of the defendant. The defendant and the senior executive discussed the pending criminal investigation.

He advised her that his story would continue to be that any conflicting e-mails reflected preplanning by Boeing and not employment negotiations. As he had done previously, the senior executive urged her to hang tough.

The defendant was interviewed by outside counsel for Boeing on November 11th and 17th, 2003. During these interviews the defendant acknowledged that she had not been truthful in her previous July 7th, 2003, interview.

The defendant was terminated for cause by the Boeing Company on November 24th, 2003.

The defendant acknowledges that she willfully engaged in the conduct outlined in the statement of facts which constitutes a conspiracy to violate Title 18 United States Code, Section 208.

THE COURT: Ms. Druyun, return to the podium, please.

THE DEFENDANT: (Complies.)

ENTRY OF PLEA BY THE DEFENDANT

THE COURT: Is that recitation of facts true and correct in all respects?

THE DEFENDANT: Yes, your Honor.

THE COURT: Ms. Druyun, how do you now plead to the charge against you in the criminal information, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: The Court, in the case of United States against Darleen A. Druyun, finds that the defendant is fully competent and capable of entering an informed plea, that your plea of guilty is knowing and voluntary, and that it is supported by an independent basis in fact containing each of the elements of the offense charged against you in the criminal information. Accordingly, the Court accepts your plea and adjudges you now guilty of the offense in the criminal information.

FURTHER PROCEEDINGS

THE COURT: Ms. Druyun, the Court will order the preparation of a Presentence Investigation Report. This is a vitally important document, because it is the document on which the Court will chiefly rely in imposing an appropriate sentence. So you should pay careful attention to the preparation of this report.

You will be asked to give the probation officer information so that he or she may prepare the report. You will be asked to give, for example, information about your background, your family, your work experience, your education, your financial condition, your health condition, any criminal history that you may have, your version of the offense conduct and, indeed, anything else that may be material in any way to the Court's sentencing decision. And you may have your counsel, Mr. Dowd, with you when you provide that information to the probation officer.

Now, when the report is completed, Ms. Druyun, you'll be furnished with a copy, as will your counsel, and you'll have an opportunity to review it with your counsel and to call to the Court's attention any objections or corrections you have to any portions of the report.

If any of the objections or corrections that you raise are disputed by the government and material to the Court's sentencing decision, that is, the Court would have to resolve the disputed objection or correction before the Court could determine what an appropriate sentence would be, then in that event the Court will hold a hearing and you'll be afforded the opportunity of offering evidence and cross-examining any evidence the government offers with respect to the disputed objection or correction. And then before imposing sentence the Court will issue findings

resolving the disputed objection or correction.

Now, at the time of sentencing, Ms. Druyun, you'll be given the opportunity to allocute. That means you'll be given the opportunity to address the Court and to say anything at all you wish to the Court by way of extenuation, mitigation or, indeed, anything at all you wish to say. You are not required to say anything, but you will have the opportunity to do so at the time of your sentencing, as will your counsel.

I told you a few minutes ago that I would give you an opportunity to say anything further. Now, you'll have a full opportunity at the time of sentencing, but if you wish to say something further now, you may consult with Mr. Dowd, and I'll permit you to do so.

THE DEFENDANT: Once again, your Honor, I would just like to apologize for my actions and apologize to my family and to my nation.

THE COURT: All right. You may be seated, Ms. Druyun.

THE DEFENDANT: (Complies.)

THE COURT: All right, this is the defendant's first appearance. What's the government's view, first of all, on whether she should be released on a personal recognizance bond with certain conditions?

ATTORNEY WIECHERING: Your Honor, we concur with

the Pretrial Services report. We think a personal recognizance bond would be appropriate.

THE COURT: All right.

Mr. Dowd?

ATTORNEY DOWD: Yes, your Honor.

I would ask that, with the appropriate notification of Pretrial Services, she be permitted to travel outside the district. She was going to take a brief period of time off with her husband after this, if she could. She will advise the Pretrial Services of the itinerary and where she will be and when she returns, if that is acceptable to the Court.

THE COURT: I will accept that. For what length of time does she intend to be away from the area?

ATTORNEY DOWD: Five days, your Honor.

THE COURT: All right. That's appropriate.

I will impose a $50,000 personal recognizance bond.

That means, Ms. Druyun -- you may come back to the podium.

THE DEFENDANT: (Complies.)

THE COURT: That does not mean have to post any bond, but what it does mean is if you violate any of the terms and conditions of your release pending sentencing, that you will be indebted to the government in the sum of $50,000. But

that's a very minor -- that will be minor compared to what else will happen to you, because you will be promptly arrested and incarcerated.

Let me change that. Let me change that to $25,000, a $25,000 bond, that she doesn't have to post. It is a personal recognizance bond.

The other conditions I am going to impose on you, Ms. Druyun, are the following: You must avoid any excessive use of alcohol. And of course, you may not violate any state, local or federal law. And of course, you must avoid any use of illegal narcotics.

Do you own a firearm?

THE DEFENDANT: No, your Honor.

THE COURT: All right. You may not possess or handle any firearm of any sort. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Were there other conditions, Mr. Wiechering?

ATTORNEY WIECHERING: No, your Honor.

THE COURT: All right.

And she will have to report -- there is no need for this defendant to be subjected to any substance abuse testing. There is no history of substance abuse.

Anything else in there matter today, Mr. Dowd?

ATTORNEY DOWD: No, thank you.

ATTORNEY WIECHERING: Did we set a sentencing date, your Honor.

THE COURT: No, I didn't. I meant to set August the -- I can do the 6th or the 13th, Mr. Dowd. Are you available?

ATTORNEY DOWD: I will be available, certainly, your Honor, whatever is convenient to the Court.

THE COURT: All right. We'll set it for -- let's set it for August 6th at 9:00 a.m.

Anything further in this matter today, Mr. Wiechering or Mr. Dowd?

ATTORNEY WIECHERING: No, your Honor.

ATTORNEY DOWD: No, your Honor.

THE COURT: All right.

Ms. Brown and Mr. Osborne, I wanted to be sure I greeted you as well.

ATTORNEY OSBORNE: Thank you, your Honor.

THE COURT: Anything further?

Court stands in recess -- yes, let's have the bond oath administered to Ms. Druyun, and then we will recess until 11:00 o'clock, at which time the trial will reconvene.

(Personal recognizance bond oath administered)

THE COURT: Is the Pretrial Services officer present in the courtroom?

THE PRETRIAL SERVICES OFFICER: Yes, your Honor.

THE COURT: All right. She has permission to go on her vacation. She will notify you of the anticipated departure and arrival dates, and she will check in with you when she returns.

On any other request to leave the district, ask the Pretrial Services officer and it will be passed on to me, and if there is a valid reason for it, certainly that will be permitted.

I thank counsel. We will resume in the trial of United States of America versus Otika Wells.

(Court recessed at 10:50 a.m. in USA v. Druyun)

---