attention.

She is headed for North Carolina -- I mean South Carolina, where she and her husband have built a home. Her husband is having difficulty with his health, and they are going to spend the rest of their days teaching children, and nothing else. And I have great admiration for her for that, and I am just sorry that it has been such a difficult process for her, and I ask the Court for every consideration.

Thank you.

THE COURT: Mr. Wiechering?

ATTORNEY WIECHERING: Yes, your Honor.

ALLOCUTION BY THE GOVERNMENT

ATTORNEY WIECHERING: Let me first preface my comments by saying the failure of Ms. Druyun and her cooperation and the lies she told are not the fault of her attorneys. They have been have forthright and clear to her throughout this that she should be truthful and honest, and she was not. And it was not in an unimportant matter.

I would like to review the circumstances that bring us here, because they are quite different than when she pled guilty here in April. At that time she acknowledged the conflict, but as the Court pointed out it was more of a technical conflict, one in which she had done no harm, still acted, in her version of events, in the best interests of the government.

She has now acknowledged that that was not the truth, and she has also acknowledged other lies she told the government. She has acknowledged providing a journal to the government that she had altered to substantiate her story in a misleading fashion.

She has now acknowledged that when she negotiated the tanker lease with Boeing, at the same time she was negotiating her employment, she did not act in the best interests of the government. In fact, she agreed to a price on each aircraft that she thought was higher than appropriate, and that she did, in her own words -- she did that as a parting gift to Boeing and to ingratiate herself with that company.

She provided to them what she thought at the time was proprietary data from another aircraft manufacturer. At the same time, she was negotiating a settlement on behalf of NATO, where she chaired an important board on the AWACS program, and agreed to a $100 million settlement which she now acknowledges was higher than she knew it should have been at the time.

She acknowledges, in 2001, that she gave a multibillion procurement to Boeing on the C-130 on an Avionics upgrade, which she now concedes she was influenced by what they had done for her future son-in-law in offering him employment at her request, and that another selection

authority would not have taken Boeing on that procurement.

She acknowledges, in 2000, on the C17H22 Clause, negotiating an over $400 million settlement where, once again, she was influenced by her relationship to Boeing.

So her actions harmed the government, which is something she did not acknowledge before. And that's why in the Guidelines calculation we have asked for that four point enhancement which the Guidelines provide for; also, that she not receive acceptance, and that she have an obstruction enhancement for what she did.

Your Honor, there is always some danger in a sentencing hearing of the government overstating its case, but I think it's accurate here to say that we are at war at this time, and this individual was responsible for some of the most important weapons systems this country procures, and she did it in a way that violated the trust that had been given her, agreeing to a higher price than she knew was appropriate. And she did great harm to the government, and that harm continues now, because these programs will be reexamined, there will be many questions raised about these procurements, and others that she acted on that may have been perfectly proper, but there will be many questions raised and many investigations will result.

Given all that -- and we recognize the many good things she has done before and currently in her life. But

given all that, we feel that the upper end of the range of 16 months term of incarceration is appropriate for this in individual, even in light of all her other good deeds. Because she made some serious choices. She is a very mature, responsible person, and her choices harmed the United States, and because of that we ask for a period of 16 months of confinement.

THE COURT: Mr. Dowd, you may respond if you wish.

ATTORNEY DOWD: Your Honor, I have nothing further. Thank you.

IMPOSITION OF SENTENCE BY THE COURT

THE COURT: Ms. Druyun come to the podium.

THE DEFENDANT: (Complies.)

THE COURT: Ms. Druyun, you stand convicted of a very serious crime of violating -- conspiracy to violate conflict of interest regulations.

Your counsel correctly put it: This is a very difficult case. It's difficult because of your years of unblemished service. But the stain of this offense is very severe.

With high office and high responsibility comes the highest obligation to adhere to the highest standard of ethics. Mr. Wiechering does not overstate it. We are at war. We can't quite figure out what nation state to declare it

against, but there isn't any doubt that we are at war. Any denial of that would be countermanded by 3,000 stilled voices in New York and Pennsylvania and the Pentagon. So, we are at war, and your position was all the more important.

I did read all of these letters, and I was struck by the unanimity of feeling about the good service that you have performed. I was particularly impressed on the positive side with the letter from General Scancey. I was impressed with that because he specifically raised a case in which you penalized Boeing in a program. And he said that you had served with distinction for many years. And everyone said that.

I thought also particularly noteworthy was the observation of General Waldorf, who noted that nothing can undo the good things you have done. But you are right, it is a stain, it's a very serious offense.

I think your statement of contrition is genuine. And as you have heard, sitting in the courtroom, I say to all defendants: Life is making choices and living with the consequences. It's true for all of us. We write the pages of our own life story. You have written some very good pages, but this is a page that is not good and there will be consequences.

I have no doubt that you sincerely regret what you did, and I have no doubt that a sentence is not necessary

to be tailored to deter you in the future. However, this case must stand as an example, given the high office that you held.

It is the judgment of this Court that you be committed to the custody of the Bureau of Prisons for a period of nine months, and that upon release from confinement you serve a period of three years of supervised release.

As a special condition of the supervised release, you are to serve a period of six months of community confinement -- I beg your pardon -- seven months of community confinement; for a total of sixteen months, but seven of those months will be in community confinement.

Also as a special condition of the supervised release, you are to perform 150 hours of community service. And specifically what I would like that community service to be directed to -- and I think it would be better if you did it on your own, because coerced community service is never really community service. Community service should always be voluntary, because an essential ingredient of community is altruism; and if it's ordered, it isn't.

But I am going to put it in anyway, but I do so conscious of the fact that you might well do it. But I think you have the capability of doing something special. So I want the folks in South Carolina in this community service, I want you to speak to high school and college kids about the necessity for deciding what kind of life you want to lead now.

If you don't make a decision early in life, or even later in life, what kind of life you want to lead, what kind of person you are, what kind of standards you will adhere to, I promise you, all of us are occasionally seduced by the moment, as you are here.

And these young people need to know that, and they cannot know it any more credibly, any more movingly or feelingly, than from you. So I will impose that community service.

You will have to pay a special assessment of $100 --

Which I expect, Mr. Dowd, has been paid; is that right?

It was due to be paid, under the plea agreement, prior to sentencing. Is that right, Mr. Wiechering?

ATTORNEY WIECHERING: It was, your Honor. I don't know if it was. If not, they can pay it.

THE COURT: It is due and payable immediately.

The Court will also impose a $5,000 fine.

That sentence may be viewed by some as severe. It may be viewed by others as too lenient, given the importance of the work that you did and the significance of the violation.

But almost every sentence I impose is thought by some to be too severe and some to be too lenient. I believe

it is the right sentence. I do it because I think deterrence is needed in a general sense and an example needs to be set in a general way. I do not do it because I think that you need to be deterred.

And I am also think that it's important -- and I think it's good that these letters are made a part of the public record, because I think these letters reflect all the good things that you have done in the previous, now nearly 30 years of government service, and that should be on the record every bit as much as the violation.

The consequences of the good things that you have done, I hope will be some peace of mind to you, just as you should never forget that you did make that significant mistake.

Anything further to be accomplished in this matter today, Mr. Wiechering?

ATTORNEY WIECHERING: No, your Honor.

THE COURT: Mr. Dowd?

ATTORNEY DOWD: Your Honor --

THE COURT: And she may surrender voluntarily.

ATTORNEY DOWD: Thank you, your Honor.

THE COURT: And I will recommend a Level 1 institution, and I will recommend that it be in the South Carolina area.

ATTORNEY DOWD: Thank you very much, your Honor.

May the conditions of bail remain the same --

THE COURT: Yes, she continues to be released --

ATTORNEY DOWD: -- in South Carolina?

THE COURT: -- on the same conditions, and she may surrender voluntarily once there is a designation of a Level 1 institution.

Anything further?

ATTORNEY DOWD: No. Thank you, your Honor.

ATTORNEY WIECHERING: Thank you, your Honor. Nothing further.

THE COURT: I thank counsel for your cooperation. Good luck to you, Ms. Druyun.

THE DEFENDANT: Thank you, sir.

THE COURT: Court stands in recess for 15 minutes.

(Court recessed at 10:12 a.m.)

---

CERTIFICATE OF REPORTER

I, MICHAEL A. RODRIQUEZ, an Official Court Reporter for the United States District Court, in the Eastern District of Virginia, Alexandria Division, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had upon the sentencing hearing in the case of UNITED STATES OF AMERICA v. DARLEEN A. DRUYUN.

I further certify that I was authorized and did report by stenotype the proceedings in said sentencing hearing, and that the foregoing pages, numbered 1 to 29, inclusive, constitute the official transcript of said proceedings as taken from my machine shorthand notes.

IN WITNESS WHEREOF, I have hereto subscribed my name this 1st day of Feb., 2004.

Michael A. Rodriquez, RPR/CM/RMR
Official Court Reporter

FILED
IN OPEN COURT
OCT - 1 2004
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 04-150-A
)
DARLEEN A. DRUYUN, )
)
Defendant. )

# SUPPLEMENTAL STATEMENT OF FACTS

It is agreed by and between the parties that the following facts are true and that they supplement the Statement of Facts filed in the above referenced case.

## The Defendant's Post-Plea Admissions

On April 20, 2004 the defendant entered a plea of guilty to conspiracy to violate Title 18, United States Code, Section 208(a) in the Eastern District of Virginia. As a part of that plea, the defendant entered into a plea agreement with the United States Attorney's Office for the Eastern District of Virginia. That agreement required the defendant to provide full, complete and truthful cooperation to the government. Prior to entering the plea agreement with the United States, the defendant entered into a proffer agreement with the United States to formulate an appropriate resolution of this case. On December 2, 2003 the defendant was interviewed by agents of the government as part of the proffer agreement. On April 23, 2004 the defendant was again interviewed by government agents as part of the cooperation required by her plea agreement. The defendant now acknowledges that she provided false, misleading and untruthful information to government investigators at both of those sessions.

On July 28, 2004 the defendant was reinterviewed by government agents and acknowledged, as a result of the government's investigation, that she had not been truthful in her prior cooperation. The defendant had previously maintained that she had always acted in the best interest of the United States during her negotiations with the Boeing Company while she was employed by the Air Force. She acknowledged a conflict of interest in negotiating employment with Boeing while at the same time negotiating with Boeing on behalf of the Air Force. However, the defendant had maintained that her relationship with Boeing did not influence her official actions or harm the government.

The defendant, since July 28, 2004, now acknowledges that she did favor the Boeing Company in certain negotiations as a result of her employment negotiations and other favors provided by Boeing to the defendant. Defendant acknowledges that Boeing's employment of her future son-in-law and her daughter in 2000, at the defendant's request, along with the defendant's desire to be employed by Boeing, influenced her government decisions in matters affecting Boeing.[1] That as a result of the loss of her objectivity, she took actions which harmed the United States to include the following:

1. In negotiations with Boeing concerning the lease agreement for 100 Boeing KC 767A tanker aircraft, the defendant agreed to a higher price for the aircraft than she believed was

[1] The defendant also acknowledges contacting a senior official of Boeing in 2002 concerning the continued employment of her daughter by Boeing. The defendant had been told by her daughter that she feared termination by Boeing for employment performance issues. The defendant contacted a senior official of Boeing, with whom she was negotiating the KC 767A tanker lease, to prevent any adverse action by Boeing against her daughter. The daughter was not terminated and instead was transferred to a new position. This same senior Boeing official routinely updated the defendant concerning the daughter's employment with Boeing, for example advising the defendant of pay increases received by the daughter.

appropriate. The defendant did so, in her view, as a "parting gift to Boeing" and because of her desire to ingratiate herself with Boeing, her future employer. The defendant also now acknowledges providing to Boeing during the negotiations what at the time she considered to be proprietary pricing data supplied by another aircraft manufacturer.

2. During 2002 the defendant, as chairperson of the NATO Airborne Early Warning and Control Program Management Board of Directors, was involved in negotiations with Boeing concerning a restructuring of the NATO AWACS program. The defendant negotiated a payment of 100 million dollars to Boeing as part of that restructuring. The defendant now acknowledges that at the time she believed a lower amount to be an appropriate settlement and she did not act in the best interest of the United States and NATO. Her agreement to the 100 million dollar settlement was influenced by her daughter's and son-in-law's relationship with Boeing and the employment negotiations.

3. The defendant was the selection authority in 2001 for the C 130 AMP which was an Air Force procurement of more than four billion dollars to upgrade the avionics of C-130 aircraft. The defendant selected Boeing from four competitors, and now acknowledges that she was influenced by her perceived indebtedness to Boeing for employing her future son-in-law and daughter. The defendant believes that an objective selection authority may not have selected Boeing.

4. During 2000 the defendant negotiated a settlement with Boeing concerning the C-17 H22 contract clause with a senior executive of Boeing. These negotiations occurred at the time the defendant was seeking employment at Boeing for her daughter's boyfriend. The defendant's decision to agree to a payment of approximately 412 million dollars to Boeing in connection with

the C-17 H22 clause was influenced by Boeing's assistance to the defendant.

The defendant has also acknowledged since July 28, 2004 that her earlier cooperation with the government was untruthful and misleading in other respects. For example, the defendant has revealed that a notebook she had provided to government investigators had been altered by her. This notebook contained what purported to be contemporaneous notes written by the defendant when she was employed by the Air Force. The defendant now acknowledges secretly adding notations to the notebook, before providing it to the government for the purpose of supporting her version of events.

Respectfully submitted,

Paul J. McNulty
United States Attorney

By:

Robert Wiechering
Assistant United States Attorney

After consulting with my attorneys and pursuant to the Supplemental Plea Agreement entered into this day between me and the United States, I hereby stipulate that the above Supplemental Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Darleen A. Druyun
Defendant

I am Darleen Druyun's attorney. I have carefully reviewed the above Supplemental Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

John M. Dowd
Counsel for the Defendant

February 28, 2006

# Acquisition Management

## Source Selection Procedures for the C-5 Avionics Modernization Program (D-2006-058)

Department of Defense
Office of Inspector General

Constitution of the United States

A Regular Statement of Account of the Receipts and Expenditures of all public Money shall be published from time to time.

Article I, Section 9

**Additional Copies**

To obtain additional copies of this report, visit the Web site of the Department of Defense Inspector General at http://www.dodig.mil/audit/reports or contact the Secondary Reports Distribution Unit, Audit Followup and Technical Support at (703) 604-8937 (DSN 664-8937) or fax (703) 604-8932.

**Suggestions for Future Audits**

To suggest ideas for or to request future audits, contact Audit Followup and Technical Support at (703) 604-8940 (DSN 664-8940) or fax (703) 604-8932. Ideas and requests can also be mailed to:

ODIG-AUD (ATTN: AFTS Audit Suggestions)
Department of Defense Inspector General
400 Army Navy Drive (Room 801)
Arlington, VA 22202-4704

DEPARTMENT OF DEFENSE
hotline
To report fraud, waste, mismanagement, and abuse of authority.
Send written complaints to: Defense Hotline, The Pentagon, Washington, DC 20301-1900
Phone: 800.424.9098 e-mail: hotline@dodig.osd.mil www.dodig.mil/hotline

## Acronyms

| | |
|---|---|
| AFFARS | Air Force Federal Acquisition Regulation Supplement |
| AMP | Avionics Modernization Program |
| FAR | Federal Acquisition Regulation |
| SSA | Source Selection Authority |
| USD (AT&L) | Under Secretary of Defense (Acquisition, Technology, and Logistics) |

INSPECTOR GENERAL
DEPARTMENT OF DEFENSE
400 ARMY NAVY DRIVE
ARLINGTON, VIRGINIA 22202-4704

February 28, 2006

MEMORANDUM FOR ASSISTANT SECRETARY OF THE AIR FORCE (FINANCIAL MANAGEMENT AND COMPTROLLER)
ASSISTANT SECRETARY OF THE AIR FORCE (ACQUISITION)

SUBJECT: Report on the Source Selection Procedures for the C-5 Avionics Modernization Program (Report No. D-2006-058)

We are providing this report for your information and use. We considered management comments on a draft of this report in preparing the final report.

Comments on the draft of this report conformed to the requirements of DoD Directive 7650.3 and left no unresolved issues. Therefore, no additional comments are required.

We appreciate the courtesies extended to the staff. Questions should be directed to Mr. Douglas P. Neville at (703) 428-1061 (DSN 328-1061) or Ms. Amy L. Mathews at (703) 428-1094 (DSN 328-1094). See Appendix D for the report distribution. The team members are listed inside the back cover.

By direction of the Deputy Inspector General for Auditing:

Paul J. Granetto
Assistant Inspector General
Defense Financial Auditing
Service

**Department of Defense Office of Inspector General**

**Report No. D-2006-058** (Project No. D2005-D000FP-0174.000) **February 28, 2006**

# Source Selection Procedures for the C-5 Avionics Modernization Program

## Executive Summary


**Who Should Read This Report and Why?** Civilians and uniformed officers who are involved in the Air Force acquisition decision-making process should read this report because it identifies issues related to the source selection procedures used by the Air Force in the acquisition of the C-5 Avionics Modernization Program.

**Background.** In November 2004, the Acting Under Secretary of Defense (Acquisition, Technology, and Logistics) commissioned a study to review acquisition-related actions taken by the former Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management (Principal Deputy). As a result of that study, the Acting Under Secretary of Defense (Acquisition, Technology, and Logistics) identified eight actions for further investigation and requested that the Department of Defense Inspector General review them. This audit focuses on one of these actions relating to the award of the C-5 Avionics Modernization Program contract to Lockheed Martin Aeronautical Systems on January 22, 1999.

**Results.** Air Force personnel did not adequately document the decision process used to award the C-5 Avionics Modernization Program contract to Lockheed Martin Aeronautical Systems. Specifically, the Source Selection Advisory Council and the Source Selection Authority did not document their rationale for the initial selection evaluation results and subsequent changes to those results, and the Air Force did not provide the oversight needed to ensure the decisions were documented. As a result, the C-5 Avionics Modernization Program solicitation and contract award were unnecessarily vulnerable to manipulation. Identifying the source selection process as a high risk area and establishing a review process that tests the effectiveness of the controls over the process will provide the oversight needed to reduce the likelihood of manipulation. We also reviewed the managers' internal control program as it related to the source selection oversight process. (See the Finding section for details.)

**Management Comments.** The Military Deputy, Office of the Assistant Secretary of the Air Force (Acquisition) concurred with the recommendations; therefore, no further comments are required. See the Finding section of the report for a discussion of management comments and the Management Comments section of the report for a complete text of the comments.