**Agreed-Upon Redacted Copy – May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

No. 06-396 C
(Judge Williams)

L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.,
Plaintiff,

v.

UNITED STATES,
Defendant,

and

LOCKHEED MARTIN AERONAUTICS COMPANY,
Intervenor.

---

INTERVENOR LOCKHEED MARTIN'S MOTION TO DISMISS

---

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
DAVID B. ROBBINS
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
*Counsel for Intervenor, Lockheed Martin Aeronautics Company*
June 30, 2006

## TABLE OF CONTENTS


Page

BACKGROUND .... 2

ARGUMENT .... 6

A. The Applicable Standard Under RCFC 12(b)(1) .... 7

B. L-3 Communications' Protest Based On Alleged Procedural Irregularities Is Time-Barred .... 8

1. L-3 Communications' Potential Cause Of Action Accrued When It Had Notice Of, Or Reasonably Could Have Learned About, The Bases Of Its Protest .... 8

2. Each Of The Bases For L-3 Communications' Complaint Were Known Or Reasonably Could Have Been Known More Than Six Years Ago And Are Thus Time-Barred .... 10

a. L-3 Communications' Assertions That Its Weaknesses Were Misidentified Or Unequally Evaluated Cannot Support A Protest At This Time .... 11

b. The SSA's Decisions Regarding The Importance Of Certain Training Was Apparent From The SSDD Provided To Raytheon In 1999 And Does Not Now Support A Protest .... 15

c. L-3 Communications Had Express Notice Of The SSA's Ratings Changes .... 17

d. A Protest Based On The Specifics Of The Air Force's Delegation Of Authority To The SSA Cannot Be Maintained .... 21

e. L-3 Communications' Attempt To Attack The Evaluators' Documentation Of Their Analysis Is Flawed .... 23

C. To The Extent L-3 Communications' Bid Protest Is Not Time-Barred, It Fails To State A Claim For Which Relief Can Be Granted .... 25

CONCLUSION .... 30

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Air Masters Corp.*, B-249240, Nov. 2, 1992, 92-2 CPD ¶ 299 ....12, 13

*All Star-Cabaco Enter., Joint Venture*, B-290133, June 25, 2002, 2002 CPD ¶ 127 ....22

*Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002) ....25

*CACI, Inc.- Fed. v. United States*, 719 F.2d 1567 (Fed. Cir. 1983) ....26

*Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578 (Fed. Cir. 1995) ....25

*Cessna Aircraft Co.*, B-261953, Feb. 5, 1996, 96-1 CPD ¶ 132 ....18

*Dantec Elecs., Inc.*, B-243580, Nov. 12, 1991, 91-2 CPD ¶ 444, at 3 ....23

*Davidson v. United States*, 66 Fed. Cl. 206 (2005) ....7

*Four Points By Sheraton v. United States*, 66 Fed. Cl. 776 (2005) ....25, 28

*Global Eng'g & Constr., LLC*, B-290288.3, .4, Apr. 3, 2003, 2003 CPD ¶ 180 ....17

*Grass Valley Terrace v. United States*, 69 Fed. Cl. 341 (2005) ....8

*Heyer Prods. Co. v. United States*, 140 F. Supp. 409 (Ct. Cl. 1956) ....26

*Hoffman v. United States*, 16 Cl. Ct. 406, 410 (1989), *aff'd*, 894 F.2d 380 (Fed. Cir. 1990) ....26

*Islandwide Landscaping, Inc.*, B-293018, Dec. 24, 2003, 2004 CPD ¶ 9 ....22

*J & J Maint., Inc.—Recons.*, B-240802, *et al.*, Apr. 10, 1991, 91-1 CPD ¶ 364, at 2 ....24

*Jones v. United States*, 801 F.2d 1334 (Fed. Cir. 1986) ....7

*Kinsey v. United States*, 852 F.2d 556 (Fed. Cir. 1988) ....8

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ....4

*L-3 Communications Corp.*, B-281784.5, Feb. 17, 2004, 2004 CPD ¶ 40 ....17

*Labat-Anderson Inc.*, B-246071.5, Aug. 31, 1992, 92-2 CPD ¶ 136....................................14, 23

*Lockheed Martin Aeronautics Co.*, B-295401, *et al.*, Feb. 24, 2005, 2005 CPD ¶ 41....................................6, 27, 28

*Lockheed Martin Corp. Co.*, B-295402, Feb. 18, 2005, 2005 CPD ¶ 24............................6, 27, 28

*MacLean v. United States*, 67 Fed. Cl. 14 (2005) ....................................7

*Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003)............................9, 15, 24

*Maxwell Labs., Inc.*, B-249102, Oct. 27, 1992, 92-2 CPD ¶ 286 ....................................22

*MIL Corp.*, B-297508, .2, Jan. 26, 2006, 2006 CPD ¶ 34....................................13

*MW-All Star Joint Venture*, B-291170.4, Aug. 4, 2003, 2004 CPD ¶ 98 ..............................18

*Medical Serv. Corp. Int'l*, B-252801, Apr. 19, 1993, 93-1 CPD ¶ 335..................................26

*Mitchell v. United States*, 10 Cl. Ct. 63, 67 (1986) ....................................9, 23

*Park Tower Management, Ltd. v. United States*, 67 Fed. Cl. 548 (2005)..............................18

*Patton v. United States*, 64 Fed. Cl. 768 (2005) ....................................9, 23

*Pennsylvania Blue Shield*, B-203338, Mar. 23, 1982, 82-1 CPD ¶ 272..................................14

*Perez v. United States*, 156 F.3d 1366 (Fed. Cir. 1998)....................................7

*Resource Recycling Corp. v. United States*, 56 Fed. Cl. 612 (2003)......................................7

*Rogers v. United States*, 6 Cl. Ct. 829, 832-33 (1984)....................................7

*Sam Facility Mgmt., Inc.*, B-292237, July 22, 2003, 2003 CPD ¶ 147, at 3 ....................................29

*Space Age Eng'g, Inc. v. United States*, 4 Cl. Ct. 739, 744 (1984)....................................26

*Schaefer v. United States*, 633 F.2d 945, 948-49 (Ct. Cl. 1980) ....................................26

*Taylor v. United States*, 303 F.3d 1357 (Fed. Cir. 2002) ....................................7

*Tobacco & Allied Stocks, Inc. v. Transamerica Corp.*, 143 F. Supp. 323 (D. Del. 1956)....................................9

*Textron Marine Sys.*, B-255580.3, Aug. 2, 1994, 94-2 CPD ¶ 63 ....................................14

*TruLogic, Inc.*, B-297252.3, Jan. 30, 2006, 2006 CPD ¶ 29 ....................17

*United Enter. & Assoc. v. United States*, 70 Fed. Cl. 1 (2006) ....................26

*United States v. Darleen A. Druyun*, Crim. No. 04-150-A (E.D. Va. Oct. 1, 2004) ....................4

*University Research Co.*, LLC, B-294358.8, *et al.*, Apr. 6, 2006, 2006 CPD ¶ 66 ....................13

*Urie v. Thompson*, 337 U.S. 163 (1949) ....................9

*Vons Companies v. United States*, 51 Fed. Cl. 1 (2001) ....................4

*Welcker v. United States*, 752 F.2d 1577 (Fed. Cir. 1985) ....................9, 15

**Statutes:**

4 C.F.R. § 21.2(a)(2) ....................12

18 U.S.C. § 208(a) ....................4, 28

28 U.S.C. § 2501 ....................7, 8

**Miscellaneous:**

RCFC 12(b)(1) ....................1, 7

RCFC 12(b)(6) ....................1, 7

**Agreed-Upon Redacted Copy – May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | | |
|---|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | No. 06-396 C |
| Defendant, | ) | (Judge Williams) |
| and | ) | |
| LOCKHEED MARTIN AERONAUTICS COMPANY, | ) | |
| Intervenor. | ) | |

**INTERVENOR LOCKHEED MARTIN'S MOTION TO DISMISS**

Pursuant to RCFC 12(b)(1), (6), intervenor, Lockheed Martin Aeronautics Company ("Lockheed Martin"), respectfully requests that this bid protest be dismissed. Plaintiff, L-3 Communications Integrated Systems L.P. ("L-3 Communications"), protests the January 22, 1999 decision of the United States Air Force Air Mobility Command ("Air Force") to award two contracts related to modernizing the avionics on the Air Force's C-5 Galaxy aircraft fleet. As we demonstrate below, plaintiff's protest is barred by the applicable statute of limitations, and, to the extent any of the claims

presented are not time-barred, they fail to state a claim for which relief can be granted. Accordingly, the entire protest should be dismissed.

## BACKGROUND

1. The C-5 Galaxy is a heavy-cargo transport airplane designed to provide strategic airlift for deployment and supply of combat and support forces. It is one of the largest airplanes in the world and has been part of the Air Force fleet for more than 35 years. *See* Complaint, Attachment at 1.

During the late 1990s, the Air Force determined that the avionics for the C-5 Galaxy required updating. To do that, the Government issued a request for proposals ("RFP"), solicitation number F33657-98-R-0006, seeking an "Avionics Modernization Program" for the C-5 (or "C-5 AMP"). Complaint, ¶ 1. The C-5 AMP had two parts. First, the contractor was required to design a prototype avionics package (the Engineering and Manufacturing Development ("EMD") component); perform flight testing, with various upgrades and revisions to follow; and provide crew training, production kits, and installation. Joint App. 144-45[1]; Complaint, ¶ 2. Second, the C-5 AMP RFP required the winning offeror to provide "Contractor Operated Supply Support," which "guarantees [an] annual AMP flying hour cost and a supply concept for the AMP components [and] functions to ensure support for 10 years." Joint App. 144-45.

---

[1] The documents relied on in this motion are included in the Joint Appendix that was filed by the Government on June 23, 2006. Pages 1-138 of that appendix were filed publicly; the remaining pages were filed under seal, pursuant to this Court's Protective Order.

Two contractors, Lockheed Martin and Raytheon E-Systems, Inc., which was later acquired by L-3 Communications, competed for the C-5 AMP contracts. Complaint, ¶ 3. (Unless context requires otherwise, we refer to protester as "L-3 Communications" throughout this motion.) After a "contract by negotiation" procedure, pursuant to FAR Part 15, the Air Force's Source Selection Evaluation Team ("SSET") determined, among other things, that Lockheed Martin's proposal: (1) scored better for "[redacted]; (2) provided a "technical approach [that] is [redacted]; (3) offered a "much stronger [redacted]; and (4) included "significant additional [redacted] which . . . will provide great benefit to the Air Force." Joint App. 140-43. The Government's Source Selection Authority ("SSA") largely agreed, finding that Lockheed Martin's proposal was [redacted] in virtually every material respect. *Id.* at 145, 147-48. Ultimately, the Air Force awarded both parts of the C-5 AMP (as separate contracts, numbered F33657-98-C-0006 and F33657-98-C-0007) to Lockheed Martin on January 22, 1999. Complaint, ¶ 5.

Although it received a fulsome debriefing, L-3 Communications did not protest the Air Force's C-5 AMP decision in 1999, when the contract was awarded. Subsequently, Lockheed Martin has performed the EMD portion of the C-5 AMP, and that process – which represents the majority of the work related to overall procurement – is virtually complete at this time.

**2.** The Air Force official who served as the SSA and ultimately determined which offeror was awarded the C-5 AMP contracts was the then Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management, Darleen Druyun. As described in the complaint, more than *five years after* the C-5 AMP contract was awarded, Ms. Druyun pleaded guilty to (and was convicted of) participating in a conspiracy to violate 18 U.S.C. § 208(a) in connection with her favoritism of Boeing. Complaint, ¶ 8.

As the facts were established in conjunction with her criminal proceedings, Ms. Druyun's daughter and future son-in-law became employees of the Boeing Company ("Boeing") in 2000, and Ms. Druyun also later became a Boeing employee. Joint App. 110.[2] Ms. Druyun eventually "acknowledge[d] that she did ***favor the Boeing Company*** in certain negotiations as a result of her employment negotiations and other favors provided by Boeing." *Id.* (emphasis added). The improper favoritism in which Ms. Druyun engaged included: (1) agreeing to ***pay Boeing*** "a higher price for [100 tanker] aircraft than she believed was appropriate"; (2) negotiating (in 2002) to make a "100

---

[2] Lockheed Martin properly relies on Ms. Druyun's "Supplemental Statement of Facts" in this motion. Joint App. 109-13. Although the facts described in that statement were not the bases of Ms. Druyun's conviction, that document was filed in the United States District Court for the Eastern District of Virginia, in conjunction with her supplemental plea agreement in *United States v. Darleen A. Druyun*, Crim. No. 04-150-A (E.D. Va. Oct. 1, 2004), and it is available at that court. (It is also posted at www.pogo.org/m/cp/cp-druyun-postpleaadmission-2004.pdf (last visited June 26, 2006). This Court should take judicial notice of the facts underlying Ms. Druyun's conviction as reflected in her supplemental statement of facts, because those facts were publicly admitted and are contained in documents submitted to the federal district court; they are thus matters of public record. *E.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("courts routinely take judicial notice of documents filed in other courts"); *Vons Companies v. United States*, 51 Fed. Cl. 1, 14 (2001).

million dollar" ***payment* "*to Boeing*** as part of [a] restructuring" of a significant NATO program; (3) ***selecting Boeing*** as the prevailing offeror for the C-130 AMP (in 2001), a $4 billion procurement, even though she "believe[d] that an objective [source] selection authority may not have selected Boeing"; and (4) negotiating the settlement of a dispute ***with Boeing*** and agreeing to pay "approximately 412 million dollars" (in 2000), even though that amount was "influenced by Boeing's assistance" with respect to hiring the boyfriend of Ms. Druyun's daughter. *Id.* at 110-12 (emphasis added). In sum, Ms. Druyun admitted that with respect to *other procurements* that occurred *after* the C-5 AMP contracts were awarded, she made several decisions that were not in the best interest of the Air Force as a result of her relationship with Boeing – a contractor that was *not* involved in this procurement and is *not* a party to this lawsuit. *See id.*; Complaint, Attachment at 1; Joint App. 110-12.

In November 2004, after Ms. Druyun's conviction, the Air Force commissioned a study of the acquisitions in which she had been involved. Complaint, Attachment at 1. Among other things, the Air Force's study resulted in the Department of Defense Office of the Inspector General ("Inspector General") conducting an analysis of eight procurements, one of which was the C-5 AMP award. *Id.* The Inspector General issued a report on the C-5 AMP on February 28, 2006. That report is attached to plaintiff's complaint, and plaintiff relies on it as the basis for the virtually all of its allegations. *Compare id.*, ¶¶ 1-26 *with id.*, Attachment at 1-3, 6-8.

None of the improper activities in which Ms. Druyun ultimately admitted participating (and of which she was found guilty) had anything to do with the C-5 AMP

award decision. Joint App. 13-15, 110-12. Indeed, all of the incidents of improper conduct to which Ms. Druyun admitted as part of her supplemental plea agreement with the Government occurred years *after* the C-5 AMP contract was awarded. *Id.*

More fundamentally, Lockheed Martin, which prevailed in the C-5 AMP competition at issue here, was not a participant in any of Ms. Druyun's improper conduct. Nor is there even an assertion in the Inspector General's report (upon which the complaint's allegations are based) that Ms. Druyun ever showed bias in favor of (or had any improper relationship with) Lockheed Martin. To the contrary, in other bid protest actions, the Government Accountability Office ("GAO") has determined that Lockheed Martin was *harmed* by Ms. Druyun's illegal conduct in favoring Boeing in at least two contract decisions. *See Lockheed Martin Aeronautics Co.*, B-295401, *et al.*, Feb. 24, 2005, 2005 CPD ¶ 41; *Lockheed Martin Corp. Co.*, B-295402, Feb. 18, 2005, 2005 CPD ¶ 24.

**ARGUMENT**

The majority of the issues raised by L-3 Communications' bid protest relate to mistakes the SSET or SSA purportedly made during the procurement process – or involve procurement decisions that were allegedly documented in an insufficient manner. Indeed, many of plaintiff's contentions relate to the SSA's purported failure to explain her decisions adequately in the SSDD. But the Source Selection Decision Document ("SSDD") and other relevant documents were provided to L-3 Communications (then Raytheon) during the January 1999 debriefing (*see* Joint App. 275), and thus L-3 Communications was aware of all of those issues and could have challenged the award of the contract in 1999 on many of the very same bases that it does

now. As we demonstrate below, any remaining issue could have been discovered during the course of a bid protest, had one been pursued soon after the debriefing occurred.

The C-5 AMP award occurred more than seven years ago. Because these protest issues accrued at that time, they are now time-barred. Any remaining issues presented in L-3 Communications' protest fail to state a claim for which relief can be granted and, accordingly, should also be dismissed.

### A. The Applicable Standard Under RCFC 12(b)(1)

The statute of limitations applicable in this Court bars claims against the Government unless "the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. That limitations period applies to bid protest actions, such as the claims submitted by L-3 Communications. *Resource Recycling Corp. v. United States*, 56 Fed. Cl. 612, 618-19 (2003); *Rogers v. United States*, 6 Cl. Ct. 829, 832-33 (1984).

This Court and the Federal Circuit have long held that the limited waiver of sovereign immunity set forth in 28 U.S.C. § 2501 imposes a jurisdictional bar for untimely claims. *E.g., Davidson v. United States*, 66 Fed. Cl. 206, 208-09 (2005); *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986). Because the section 2501 bar is jurisdictional, this Court treats motions to dismiss on statute of limitations grounds as being "brought pursuant to RCFC 12(b)(1)." *MacLean v. United States*, 67 Fed. Cl. 14, 15 n.1 (2005). Under that Rule, although well-pleaded allegations are accepted as true, L-3 Communications bears the burden of establishing jurisdiction, *i.e.*, that this action was

timely filed. *See Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998); *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002).[3]

**B. L-3 Communications' Protest Based On Alleged Procedural Irregularities Is Time-Barred**

L-3 Communications' protest is based almost entirely on its paraphrasing or quoting (usually without attribution) parts of the Inspector General's report. But the Inspector General's assertions do not support a protest here, because all of plaintiff's allegations in the complaint (which are based on the report) were known from documents and other information that the Air Force gave L-3 Communications (then Raytheon), or that could have been discovered with reasonable diligence in early 1999, when the award decision was made and when L-3 Communications received an extensive debriefing by the Air Force. Because L-3 Communications knew or had reason to know about the bases of its protest more than six years ago, its cause of action accrued at that time and is now barred.

**1. L-3 Communications' Potential Cause Of Action Accrued When It Had Notice Of, Or Reasonably Could Have Learned About, The Bases Of Its Protest**

A cause of action accrues for purposes of 28 U.S.C. § 2501 "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988). As this

---

[3] Some Judges of this Court consider motions to dismiss claims as time-barred under RCFC 12(b)(6), reasoning that "the statute of limitations issue goes to the sufficiency of plaintiffs' claims, not the subject matter jurisdiction of this Court." *Grass Valley Terrace v. United States*, 69 Fed. Cl. 341, 345-46 (2005). L-3 Communications' protest should be dismissed regardless of which Rule is applied.

Court has explained, "[t]he assumption underlying the 'all events' test is that an individual will act with reasonable diligence in the protection of his interests and in so doing, the individual will become aware of acts of another that . . . injure his interests." *Patton v. United States*, 64 Fed. Cl. 768, 774 (2005) (citing *Mitchell v. United States*, 10 Cl. Ct. 63, 67 (1986), and *Urie v. Thompson*, 337 U.S. 163 (1949)).

At bottom, a cause of action accrues when the potential plaintiff knows or should know about the basis of his claims. The only way to avoid this rule is "either [to] show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or [plaintiff] must show that its injury was 'inherently unknowable' at the accrual date." *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (quoting *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985)). This Court's precedent does not permit a plaintiff to be passive but "charge[s] [plaintiff] with notice" of any "facts an inquiry appropriate to the circumstances would have uncovered." *Patton*, 64 Fed. Cl. at 774 (quoting *Mitchell*, 10 Cl. Ct. at 68 ). Indeed, "[c]onstructive knowledge of a cause of action" is "all that is required to trigger the running of the statute of limitations." *Id.*; *see id.* at 774-75 ("[F]acts demanding further action are not just those that reveal the existence of a cause of action with certainty. Even rumors or vague charges may demand pursuit 'if of sufficient substance to arouse suspicion.'" (quoting *Tobacco & Allied Stocks, Inc. v. Transamerica Corp.*, 143 F. Supp. 323, 331 (D. Del. 1956))).

### 2. Each Of The Bases For L-3 Communications' Complaint Were Known Or Reasonably Could Have Been Known More Than Six Years Ago And Are Thus Time-Barred

After the C-5 AMP contract was awarded to Lockheed Martin, on January 28, 1999, the Air Force provided L-3 Communications (then Raytheon) an extensive debriefing regarding the source selection procedure and final decision. Joint App. 275-77. At least 30 representatives from L-3 Communications and its subcontractors attended that debriefing. *Id.* at 3-8. The Air Force provided L-3 Communications with a substantial (99-slide) presentation (*id.* at 151-249), and provided the offeror with unredacted copies of the SSET's Proposal Analysis Report ("PAR"), and the SSA's SSDD. *Id.* at 139-43; *id.* at 144-50; *see id.* at 275. As demonstrated by the documents L-3 Communications received after award, the protester was clearly on notice of the bases of its potential claims by the end of the January 28, 1999 debriefing. For instance, L-3 Communications complains in this bid protest that "[Ms.] Druyun changed ratings" of the SSET in several areas "in favor of Lockheed Martin *without providing justification* for these changes *in the C-5 AMP SSDD.*" Complaint, ¶ 20 (emphasis added). But L-3 Communications (then Raytheon) indisputably was given the SSDD in January 1999, and if the SSDD's explanation of certain issues was inadequate – as the complaint now asserts – plaintiff was on notice of that deficiency at that time. Moreover, to the extent L-3 Communications lacked clear notice on the face of the documents it received, a protest filed on the bases of the information it did possess (and/or must be charged with having known) at the time would have revealed any additional basis for a claim.

Accordingly, L-3 Communications' cause of action accrued at the time of contract award (or shortly thereafter), and the current lawsuit is time-barred.

**a. L-3 Communications' Assertions That Its Weaknesses Were Misidentified Or Unequally Evaluated Cannot Support A Protest At This Time**

1. L-3 Communications asserts that the Air Force's SSDD "identified weaknesses for the unsuccessful offeror [L-3 Communications] although other documentation showed that the weaknesses had been resolved." Complaint, ¶ 22; *id.*, Attachment at 7. But in 1999, L-3 Communications was given explicit notice of each weakness the Air Force perceived with its proposal. The protester knew its proposal and thus should have known whether the assessed weaknesses had merit. The purpose of a debriefing is to advise the contractor of the Government's assessment of its proposal, including weaknesses, and the documents reveal that the Air Force did that. L-3 Communications had ample notice of its weaknesses, as the Government perceived them, and should have been able easily to conclude – as it now alleges – whether any assessed weakness was the result of improper evaluation by the Air Force. To the extent L-3 Communications believed that the Air Force was mistaken with respect to the evaluation of some aspect of L-3 Communications' proposal, plaintiff could and should have pursued such an action more than seven years ago.

There are nine different [redacted] with respect to L-3 Communications' proposal that are identified in the SSDD, *see* Joint App. 146-48,[4]

---

[4] In the SSDD, the SSA identified these [redacted] with L-3 Communications' proposal: (1) it provided "[redacted]," which was [redacted] than Lockheed

almost all of which correspond to [redacted] described in the debriefing slides that were also presented to L-3 Communications in January 1999. *Id.* at 214-15, 225. The Inspector General's report did not identify the specific weakness that was purportedly misidentified by the SSA in the SSDD (Complaint, Attachment at 7), and when it drafted its complaint, L-3 Communications neglected to go beyond paraphrasing the Inspector General's report, even though it presumably knows the weakness that was purportedly misidentified. *Id.*, ¶ 22. But plaintiff cannot hide behind an ambiguous pleading because at the relevant time, *i.e.*, during the debriefing, L-3 Communications must have known the exact nature of the claimed misidentification of its weakness.

L-3 Communications clearly was aware of the strengths and weaknesses assigned to its proposal by the Air Force at the time of contract award and debriefing. Similarly, plaintiff must have known whether the identified strengths and weaknesses accurately reflected the merits of its proposed approach. To the extent the SSDD described a purported weakness erroneously (as L-3 Communications now alleges), such an error would have been immediately apparent to L-3 Communications from

---

Martin, Joint App. 146; (2) the unique architecture involved with the avionics upgrade was [redacted] "[redacted]" *id.*; (3) the architecture [redacted], *id.*; (4) the proposed [redacted] Global Positioning Satellite system would [redacted] *id.*; (5) there was a high likelihood that the delivery schedule would [redacted], *id.*; (6) the "[redacted]" *id.* at 147; (7) there was "[redacted]" *id.* at 148; (8) the timing of various audit procedures was [redacted], *id.*; and (9) L-3 Communications had "[redacted] the flight test program and [redacted]" *id.*

reviewing the document and, if actionable, would have provided L-3 Communications a basis to protest the Air Force's decision.

Because L-3 Communications must have known of the purportedly misidentified weaknesses in 1999, this Court should impute actual knowledge of this basis for a bid protest to plaintiff at that time. In any event, such an error was "inherently []knowable" to L-3 Communications at the time and, as such, provided the disappointed offeror a basis to pursue a protest. *E.g.*, 4 C.F.R. § 21.2(a)(2) (GAO regulation mandates protest be filed within 10 days of knowing basis for claim); *see Air Masters Corp.*, B-249240, Nov. 2, 1992, 92-2 CPD ¶ 299, at 3; *University Research Co.*, LLC, B-294358.8, *et al.*, Apr. 6, 2006, 2006 CPD ¶ 66, at 11 (requiring protest grounds to be raised within 10 days of when protester knew, or should have known, the basis for the protest); *MIL Corp.*, B-297508, .2, Jan. 26, 2006, 2006 CPD ¶ 34, at 4. Accordingly, L-3 Communications' claim with respect to this issue clearly accrued at that time.

**2.** L-3 Communications also complains that the SSA "exclusively cited the unsuccessful offeror for a weakness while other documentation showed Lockheed Martin shared the same weakness." Complaint, ¶ 23; *id.*, Attachment at 7. L-3 Communications never identifies the alleged "other documentation" to which it refers, and fails to address the fact that the Air Force provided detailed information to L-3 Communications regarding the identified strengths and weaknesses for both L-3 Communications and Lockheed Martin.

Although plaintiff may not have known Lockheed Martin's purported weaknesses before contract award, L-3 Communications was given express notice of

those weaknesses as part of the debriefing. Joint App. 146-48; *id.* at 198, 209; *see id.* at 142-43. Specifically, the 99-page set of slides contains a detailed discussion of the strengths and weaknesses of the Lockheed Martin approach. Although such information about an awardee is not commonly provided to unsuccessful offerors in debriefings, the Air Force gave it to L-3 Communications. Plaintiff was also given notice of the manner in which Lockheed Martin's purported weaknesses did or did not affect the final award decision. *Id.* at 198, 209. Accordingly, even assuming there was an adequate basis for an unequal treatment claim, plaintiff was given clear notice of the Air Force's ratings of Lockheed Martin's proposal and the rationale the Government applied in making its decision; to the extent the facts supported a protest, plaintiff clearly could have initiated that action at the conclusion of its debriefing.

To the extent L-3 Communications did not recognize the purportedly unequal treatment from the face of the decision documents it was provided during the debriefing, a timely filed bid protest based on the numerous issues relied on in its current protest would have provided the same basis for a challenge that plaintiff now mounts based on the Inspector General's report. Because plaintiff clearly had notice of those issues in 1999, this protest is time-barred.

Bid protest precedent makes clear that a protesting party challenging one error in the procurement process cannot focus single-mindedly on that issue to the exclusion of other potential grounds that are presented by the record. Instead, the protester must seek information regarding any additional potential bases to challenge the award and to present them, if at all, as soon as they are (or could reasonably be) known. *See Labat-*

*Anderson Inc.*, B-246071.5, Aug. 31, 1992, 92-2 CPD ¶ 136, at 2 ("To ensure those timeliness requirements are met, a protester challenging an award on one basis has an affirmative obligation to diligently pursue information which may reveal additional grounds of protest); *Textron Marine Sys.*, B-255580.3, Aug. 2, 1994, 94-2 CPD ¶ 63, at 13. This rule not only avoids piecemeal presentation of disputes by forcing a plaintiff such as L-3 Communications to present all discoverable bases for a bid protest action in the same lawsuit (*see Pennsylvania Blue Shield*, B-203338, Mar. 23, 1982, 82-1 CPD ¶ 272), it also triggers the operation of the statute of limitations upon those causes of action, as they are "inherently []knowable" at that time. *Martinez*, 333 F.3d at 1319 (quoting *Welcker*, 752 F.2d at 1580).

Even assuming the allegations in its complaint are true for purposes of this motion, L-3 Communications received express notice of several potential grounds for a bid protest during the debriefing, including the purported misevaluation of its weaknesses. Because it did not pursue the bases of a claim and obtain the record describing further details of the purported unequal treatment when that information was available – in 1999 – L-3 Communications should be precluded from doing so now.

**b. The SSA's Decisions Regarding The Importance Of Certain Training Was Apparent From The SSDD Provided To Raytheon In 1999 And Does Not Now Support A Protest**

L-3 Communications recognizes that the C-5 AMP was "comprised of an upgrade to autopilot capabilities and avionics" related to global air traffic management, and plaintiff complains that:

> *In the SSDD*, [Ms.] Druyun introduced a third upgrade to the aircrew and maintenance training system that further tailored the source selection decision in favor of Lockheed Martin's proposal. Druyun did not document why she elevated the upgrades to the aircrew and maintenance training devices to become a significant enhancement for the C-5 AMP.

Complaint, ¶ 25 (emphasis added); *id.*, Attachment at 7; *see id.* ¶ 13. This alleged procurement error is based specifically – and solely – on the SSDD, and thus was obvious from the documents received during the 1999 debriefing; it may not support a bid protest now.

L-3 Communications' complaint with respect to the "aircrew and maintenance training system" evaluation is based on the notion that the SSA erroneously relied on a previously unspecified criterion (*i.e.*, upgrades to the training systems) when she made her award decision. To evaluate this aspect of the protest, the Court would be required to compare the contract requirements, as specified in the RFP, with the emphasis on this factor applied by the SSA in awarding the contract.

The fundamental flaw with L-3 Communications' protest on this issue is that all of the information needed to evaluate the claim was known at the time of award and debriefing, more than six years ago. As the Inspector General's report makes clear, the SSA's explanation of her reliance on aircrew maintenance training appears on the face of the SSDD, which L-3 Communications received at the time of award (Complaint, Attachment at 7); indeed, that information was featured prominently on page 1 of that document.

2. [redacted]

. . .

c. [redacted]

Joint App. 144.

L-3 Communications, of course, was in possession of the RFP when it was provided the SSDD during the debriefing. Accordingly, to the extent (as plaintiff now alleges) Ms. Druyun (as SSA) "introduced a third upgrade to the aircrew and maintenance training system" and that "third upgrade" was not required as part of the RFP (or the weight it was given was "elevated" in the award decision), L-3 Communications unquestionably possessed all necessary information to protest the award based on the purportedly unspecified criteria in January 1999. There is no basis to allow plaintiff to file and maintain a protest based on this allegation more than seven years later. *See, e.g., Global Eng'g & Constr., LLC*, B-290288.3, .4, Apr. 3, 2003, 2003 CPD ¶ 180 (GAO dismissed protest grounds because protester failed to diligently pursue information giving rise to additional protest issues and, instead, presented piecemeal claims for relief); *L-3 Communications Corp.*, B-281784.5, Feb. 17, 2004, 2004 CPD ¶ 40, at 3 n.1.

**c. L-3 Communications Had Express Notice Of The SSA's Ratings Changes**

As noted above, L-3 Communications also complains that the SSDD did not adequately explain the basis of the SSA's changes to "proposal ratings presented by the SSAC." Complaint, ¶ 20. Specifically, plaintiff contends:

> AFFARS Appendix AA requires that the SSA include the supporting rationale *in the SSDD*. Druyun disregarded performance/capability and risk proposal ratings presented by the SSAC without documenting why she made the changes, other than to cite her personal experience. Specifically, Druyun changed ratings in [several] areas . . . in favor of Lockheed Martin *without providing justification* for these changes *in the C-5 AMP SSDD.*

*Id.* (emphasis added); *id.*, Attachment at 7.

In addition to being untimely, the notion that the SSA violated procurement law by disagreeing with evaluators is fatally flawed. Indeed, "source selection officials are not bound by the evaluation judgments of lower level evaluators; they may come to their own reasonable evaluation conclusions." *TruLogic, Inc.*, B-297252.3, Jan. 30, 2006, 2006 CPD ¶ 29, at 7; *see Cessna Aircraft Co.*, B-261953, .5, Feb. 5, 1996, 96-1 CPD ¶ 132, at 4 ("[S]ource selection officials have broad discretion in determining the manner and extent to which they will make use of the technical and cost evaluation results"); *MW-All Star Joint Venture*, B-291170.4, Aug. 4, 2003, 2004 CPD ¶ 98, at 2 n.3. L-3 Communications' allegations simply do not constitute a proper ground for a bid protest. *See Park Tower Management, Ltd. v. United States*, 67 Fed. Cl. 548, 556, 567-68 (2005) (affirming GAO dismissal of protest alleging SSA failed to follow recommendation of two of three evaluators in making award).

Even assuming that L-3 Communications could protest the SSA's decision to change some of the ratings proposed by the SSET, this basis of the plaintiff's complaint is barred by the statute of limitations for at least two reasons.

*First*, because L-3 Communications had clear notice of the SSA's changes to the SSET's ratings proposals at the time of award, any bid protest based on those changes accrued at that time. L-3 Communications' own contemporaneous documents make clear that its employees understood that ratings had been changed as a result of the SSA's disagreements with the evaluators. Specifically, the debriefing notes taken by one of the L-3 Communications' executives, Mr. Robert Harp, explained that during the debriefing: "[redacted]" Joint App. 270 (emphasis added). To the extent that an SSA's decision to change ratings proposed by evaluators can be the proper subject of a bid protest, L-3 Communications had everything it needed to present such a protest more than six years ago; it is thus barred from doing so now.

In addition to the express notice of ratings changes, the SSDD itself provided L-3 Communications with the SSA's explanations (or lack thereof, as L-3 Communications now alleges) as to why she disagreed with weaknesses assessed by the SSET against Lockheed Martin's proposal. Needless to say, the SSA's explanation of her disagreements with the SSET's assignment of weaknesses explained, in large part, her rationale for altering the final proposal ratings.

For instance, with respect to "[redacted]" and "[redacted]," the SSDD explained that the SSA "[redacted]" Joint App. 146. The evaluators had believed that using the "[redacted]" to "[redacted]" was a [redacted]. *Id.* at 198. But the

SSA disagreed with that assessment because such [redacted] *Id.* at 146. She also noted that "Lockheed [Martin] identified a credible and extensive back-up plan for [redacted] if they encountered problems" with its [redacted]. *Id.* The SSA also disagreed with the evaluators' assessment of a [redacted] related to Lockheed Martin's proposed use of a "[redacted]" *id.* at 198, explaining not only that this cannot be [redacted] but also the ways Lockheed Martin would mitigate risk associated with [redacted]. *Id.* at 146-47.

The SSDD also explained the SSA's disagreement with the evaluators' assessment of two [redacted] related to [redacted] Contrary to the evaluators, she believed that Lockheed Martin's [redacted] and provided a detailed explanation for why that was so. *Id.* at 148; *see id.* at 209. The SSA explained that she did [redacted] because [redacted] *Id.* at 148; *see id.* at 209.

As explained above, the SSA's decisions to change ratings proposed by the SSET do not provide a proper basis for a bid protest. But, even assuming for the sake of argument only that they do, the fact that L-3 Communications had express notice of the ratings changes and of the disagreements that caused those changes in early 1999 requires dismissal of this aspect of plaintiff's protest as untimely.

*Second*, L-3 Communications attempts to support its protest by relying on statements in the Inspector General's report that the ratings changes were not

"justifi[ed]" in the SSDD and could not be explained by Air Force personnel that were interviewed in conjunction with the Inspector General's investigation. Complaint, ¶ 21; *id.*, Attachment at 7. Although the ratings changes were not addressed directly in the SSDD, as explained above, the SSA's disagreements with respect to various weaknesses were well-described in that document, and L-3 Communications clearly knew that those disagreements had resulted in changes being made by the SSA to proposed ratings. *See* Joint App. 270. That knowledge clearly provided L-3 Communications a sufficient basis for a protest, and any protest based on the allegedly improper ratings changes would have resulted in the discovery of the purported failure of the existing record to document the award decision adequately. Accordingly, this lack-of-documentation basis for the protest was clearly knowable at the time of award and debriefing, and because those events occurred more than six years ago, the protest is barred now.

**d. A Protest Based On The Specifics Of The Air Force's Delegation Of Authority To The SSA Cannot Be Maintained**

The Inspector General's report explains that when Ms. Druyun's superior, the Assistant Secretary of the Air Force (Acquisition), left Government service prior to the C-5 AMP award, the Acting Secretary of the Air Force expanded Ms. Druyun's duties to include SSA responsibilities related to agency-level, but not command-level procurements, such as the C-5 AMP. Complaint, Attachment at 6. However, the Inspector General could not determine why Ms. Druyun had "rescind[ed] the Assistant Secretary of the Air Force's original SSA delegation [which apparently characterized the

C-5 AMP as a command-level procurement] and instead delegate[d] the position to herself." *Id.* L-3 Communications attempts to use the purported question regarding whether Ms. Druyun had proper authority to act as SSA for the C-5 AMP award as a basis of its bid protest, claiming that "[t]here was no support for [Ms.] Druyun's decision to . . . delegate the [SSA] position to herself." Complaint, ¶ 18.

As with the others parts of its lawsuit, L-3 Communications' bid protest regarding the propriety of SSA delegation is time-barred. L-3 Communications had clear notice that Ms. Druyun acted as the SSA for the C-5 AMP procurement at the time of contract award. *E.g.*, Joint App. 157. Nothing has changed with respect to the authority the SSA had been delegated when she made the decision to award the C-5 AMP contract to Lockheed Martin. Even assuming that proper delegation of authority to the source selection authority provides a proper basis for a bid protest (which we deny), if the delegation of authority to Ms. Druyun was somehow defective, that is an issue that could have been protested at the time. A protest on that basis now is time-barred.

In any event, Ms. Druyun's decision to act as SSA for the C-5 AMP award does not provide L-3 Communications a basis for a sustainable bid protest, because an offeror does not have a right to review by any particular evaluator. *E.g.*, *Maxwell Labs., Inc.*, B-249102, Oct. 27, 1992, 92-2 CPD ¶ 286, at 5 ("evaluator qualifications are within the contracting agency's sound discretion and we will not object to the agency's use of particular evaluators"). For the same reason, no offeror has a right for the award decision to be made or not made by any particular individual. Indeed, even if the SSA

delegation had been technically flawed for some reason (and, again, it was not), such an error would have had no more effect than a failure to follow a source selection plan, which is simply not a valid basis for a protest. *Islandwide Landscaping, Inc.*, B-293018, Dec. 24, 2003, 2004 CPD ¶ 9, at 3 ("[S]ource selection plans provide internal agency guidelines and, as such, do not give parties any rights. It is the evaluation scheme in the RFP, not internal agency documents such as source selection plans, to which an agency is required to adhere in evaluating proposals and in making the source selection." (internal citations omitted)); *All Star-Cabaco Enter., Joint Venture*, B-290133, .2, June 25, 2002, 2002 CPD ¶ 127, at n.1.[5]

**e. L-3 Communications' Attempt To Attack The Evaluators' Documentation Of Their Analysis Is Flawed**

Finally, L-3 Communications claims that in documenting the C-5 AMP evaluation findings, the Air Force failed "to support the management, technical, and cost data contained in the SSAC's Proposal Analysis Report" (or PAR). Complaint, ¶ 15. Plaintiff contends that the lack of "a clear auditable trail to support the SSAC's evaluation" renders the C-5 AMP award decision defective because the Air Force purportedly failed to adhere to the procedures required by the Service's own procurement regulations, *i.e.*, Appendix AA to the Air Force Federal Acquisition Regulation Supplement. *Id.*, ¶¶ 16-17; *see id.*, Attachment at 6.

---

[5] That Air Force personnel reportedly could not explain Ms. Druyun's rationale for changing the SSA delegation is irrelevant. Complaint ¶ 19, Attachment at 6. We are aware of no authority supporting the proposition that the propriety of the Government's action is measured by whether her subordinates can explain her rationale for that action more than seven years after it occurred.

As we explained above, a potential bid protester may not sit on his hands, because he will be "charged with notice" of any "facts an inquiry appropriate to the circumstances would have uncovered." *Patton*, 64 Fed. Cl. at 774 (quoting *Mitchell*, 10 Cl. Ct. at 68). A potential plaintiff/protester must diligently pursue a protest when grounds for one are presented; otherwise, he will be precluded from later protesting issues that were knowable at an earlier date, *i.e.*, could have been discovered through a protest of the presented grounds. *E.g.*, *Dantec Elecs., Inc.*, B-243580, .2, Nov. 12, 1991, 91-2 CPD ¶ 444, at 3 (supplemental protest dismissed as untimely where protester could have discovered the claims through diligent pursuit of initial protest grounds); *Labat-Anderson Inc.*, 92-2 CPD ¶ 136, at 2; *J & J Maint., Inc.—Recons.*, B-240802, *et al.*, Apr. 10, 1991, 91-1 CPD ¶ 364, at 2; *see Martinez*, 333 F.3d at 1319.

Plaintiff contends that there were numerous sufficient grounds for its protest. As we have demonstrated above, assuming for the sake of argument that those issues provided adequate bases to litigate a bid protest, L-3 Communications possessed information sufficient to proceed with that action in early 1999. If L-3 Communications had brought a bid protest in 1999 with respect to issues such as the alleged failure of the SSDD to justify the elevation in importance of the aircrew and maintenance training system (or Ms. Druyun's purportedly improper decision to disregard some of the weaknesses assessed to Lockheed Martin's proposal by the SSET) – issues that the Air Force specifically described to plaintiff at the time and on which it bases this action – the Air Force would have produced the underlying record in response. Had it done so, L-3 Communications could have evaluated that record and made all the same

arguments regarding alleged insufficiency of support for the evaluators' conclusions in the PAR by means of a supplemental (or amended) protest. Accordingly, because L-3 Communications failed to diligently pursue legal claims that could have been discovered and pursued more than six years ago, a cause of action based on those issues is untimely.[6]

**C. To The Extent L-3 Communications' Bid Protest Is Not Time-Barred, It Fails To State A Claim For Which Relief Can Be Granted**

**1.** As explained above, L-3 Communications' complaint consists primarily of paraphrasing the Inspector General's report and bootstrapping the assertions made in that report to – indeed, using them as the bases for – plaintiff's belated bid protest. After L-3 Communications completes its recitation of the Inspector General's assertions, it summarizes them in one paragraph, ¶ 27, then makes a string of bald assertions that the Air Force's C-5 AMP award was "arbitrary and capricious," "in bad faith," and the product of "bias in favor of Lockheed Martin." Complaint, ¶¶ 28-29; *see id.*, ¶ 30.[7]

Plaintiff's allegations here are similar to those recently characterized – and rejected – by this Court as consisting of "manifold scattershot challenges to th[e] award," which involve criticisms of various decisions of the source selection authorities followed by a "bald allegation of bias" and other improprieties. *Four Points By Sheraton v. United States*, 66 Fed. Cl. 776, 784 (2005). It is insufficient as a matter of law to simply

---

[6] Plaintiff includes a section of its protest entitled "The Department Of Defense Invited This Protest." Complaint, ¶¶ 31-32. A member of the Executive Branch may not create or expand jurisdiction in this Court for claims that are time-barred.

[7] In the cited paragraphs, L-3 Communications also reiterates its contention that the Air Force's decision "lacked a reasonable basis." As explained above, that reason for plaintiff's bid protest is clearly time-barred.

assert bias or bad faith on the part of a Government employee, without anything – or even the allegation of anything – to substantiate such charges.

The law applicable in this Circuit is clear: a "strong presumption that government contract officials exercise their duties in good faith" is applied. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002); *see Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("We assume the government acts in good faith when contracting."). Indeed, in *Am-Pro*, the Federal Circuit stated that "for almost 50 years this court and its predecessor have repeated that we are 'loath to find the contrary [of good faith], and it takes, and should take, well-nigh irrefragable proof to induce us to do so.'" 281 F.3d at 1239 (quoting *Schaefer v. United States*, 633 F.2d 945, 948-49 (Ct. Cl. 1980)); *see United Enter. & Assoc. v. United States*, 70 Fed. Cl. 1, 24 (2006).

Because of the high requirements to substantiate a claim of bad faith or bias in a bid protest, plaintiffs have long been required by this Court to offer "clear and convincing proof" of such conduct to show some impropriety on the part of the Government . This Court and the Court of Claims have explained that inferences and allegations alone fail to satisfy that standard. *Space Age Eng'g, Inc. v. United States*, 4 Cl. Ct. 739, 744 (1984) (quoting *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 414 (Ct. Cl. 1956)). This Court has further explained: "determining that the possibility and appearance or suspicion and innuendo of impropriety, without 'hard facts' to support misconduct, is an inadequate basis" for the Court to sustain a protest. *United Enter.*, 70

Fed. Cl. at 24 (describing ruling in *CACI, Inc. v. United States*, 719 F.2d 1567, 1581-82 (Fed. Cir. 1983)).

Applying the controlling precedent to this case, "mere contentions of imputed bias" and other improprieties cannot "constitute proof," *Hoffman v. United States*, 16 Cl. Ct. 406, 410 (1989), *aff'd*, 894 F.2d 380 (Fed. Cir. 1990), and should not preclude dismissal of this bid protest. Thus, to survive a motion to dismiss its complaint, L-3 Communications was required to allege facts that, alone or cumulatively, could constitute bias or bad faith. *See Medical Serv. Corp. Int'l*, B-252801, Apr. 19, 1993, 93-1 CPD ¶ 335 (GAO dismissed as speculative a protest alleging bias without specific information supporting the allegation.). In stark contrast with the 2005 GAO bid protests involving Ms. Druyun's conduct, in which protesters alleged harm from her admitted bias in favor of Boeing (*i.e.*, the prevailing offeror in the relevant procurements) and resulting from favors she solicited and received from Boeing,[8] L-3 Communications has failed to allege any facts that support a finding of bias or bad faith by Ms. Druyun in favor of Lockheed Martin with respect to the C-5 AMP competition.

As explained above, in paragraph 27 of the complaint, L-3 Communications summarizes the allegations it repeated from the Inspector General's report in preceding paragraphs. But those allegations, even if substantiated, do not amount to bias or bad faith. For instance, L-3 Communications complains that the SSA changed SSET's proposed ratings, but as explained above, the ultimate source selection authority is entitled to change ratings. Accordingly, plaintiff's allegation that such changes

---

[8] *See Lockheed Martin*, 2005 CPD ¶ 41; *Lockheed Martin*, 2005 CPD ¶ 24.

supports claims of bad faith or bias is simply mistaken. This is particularly true in light of the fact, explained above, that the SSA explained the reasons she disagreed with many of the weaknesses assigned by the evaluators, disagreements that clearly affected the SSA's conclusions regarding ratings. Joint App. 146, 148.

The remaining allegations summarized in paragraph 27 of the complaint – misattribution of weaknesses to L-3 Communications and strengths to Lockheed Martin, insufficient documentation of other issues, and the SSA's allegedly improper appointment as SSA – are similarly insufficient to support a claim of bias or bad faith. Even assuming that these claims could be substantiated, at most, they would constitute erroneous decisions that violated governmental procurement rules; there is no reason that any of them would constitute bad faith or evidence of bias. Simply making that bald allegation is not enough. *See Four Points*, 66 Fed. Cl. at 784.

**2.** L-3 Communications apparently hopes to leverage Ms. Druyun's conviction for participating in a conspiracy with Boeing to violate 18 U.S.C. § 208(a) into a universally-applicable basis to challenge any procurement decision she made (or in which she participated) during her long tenure as a Government official. The logic of plaintiff's protest would open all of Ms. Druyun's decisions to scrutiny regardless of when those decisions were made and regardless of whether there is any basis to believe that the contractor that won the competition received any improper benefits from Ms. Druyun.

Although some award decisions involving Boeing in which Ms. Druyun was involved have been the subjects of successful protests,[9] Ms. Druyun's conspiracy to violate section 208(a) conviction and admissions that she favored Boeing – actions that were based on benefits that contractor provided to her daughter and future son-in-law at her request beginning in 2000 – did *not* criminalize every procurement decision she made during her long period of Government service. *See* Joint App. 110-12. Nor did Ms. Druyun's conviction and admissions give rise to a bid protest ground for all of those unrelated procurement decisions. There is simply no basis to infer any improprieties with respect to the January 1999 C-5 AMP award decision in favor of Lockheed Martin from her subsequent conviction and post-plea admissions related to pro-Boeing conduct that post-dated the C-5 AMP award decision. That is particularly true in light of the fact that, in the C-5 AMP decision, the SSA generally concurred with the conclusions of the SSET, no member of which has been accused of any improprieties in the complaint (or elsewhere). The Court should not, as plaintiff implicitly requests, ignore the fact that Ms. Druyun's illegal activities occurred well after the C-5 AMP decision and involved Boeing.

**3.** Finally, L-3 Communications then tries to reverse the pleading requirements it must satisfy by asserting that "the need to maintain the integrity of the procurement process requires sustaining a protest to the award when the agency cannot produce compelling evidence that the protester was not prejudiced." Complaint, ¶ 29. But the GAO imposed that burden on the agency in the Boeing/Druyun protests it

---

[9] *See Lockheed Martin*, 2005 CPD ¶ 41; *Lockheed Martin*, 2005 CPD ¶ 24.

considered because the allegations were based on *her admitted bias in favor of Boeing*. No such admissions with respect to selection of Lockheed Martin for the C-5 award exist. Here, the protester must bear the relatively high burden of demonstrating that a Government's award decision lacked a reasonable basis, or that it was not consistent with stated evaluation criteria and applicable statutes and regulations. *E.g.*, *Sam Facility Mgmt., Inc.*, B-292237, July 22, 2003, 2003 CPD ¶ 147, at 3. Moreover, when, as here, bias or bad faith is alleged, the higher burdens discussed above must be satisfied. Allegations related to Ms. Druyun's subsequent conduct favoring a different contractor in different procurements fail to satisfy that requirement.

## CONCLUSION

For the reasons set forth above, we respectfully ask that L-3 Communications' bid protest be dismissed.

Respectfully submitted,

s/ Marcia G. Madsen

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:

DAVID F. DOWD
LUKE LEVASSEUR
DAVID B. ROBBINS
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006

*Counsel for Intervenor, Lockheed Martin Aeronautics Company*
June 30, 2006