# In The United States Court of Federal Claims

BID PROTEST
No. 06-396C
(Judge Williams)

---

**L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant,**

**and**

**LOCKHEED MARTIN AERONAUTICS COMPANY,**

**Intervenor.**

---

**OPPOSITION OF L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.
TO DEFENDANT'S AND INTERVENOR'S MOTIONS TO DISMISS**

---

Paul W. Searles
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5197
Telecopier: (214) 200-0705

Of Counsel:

Sharon N. Freytag
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5586
Telecopier: (214) 200-0450

## TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ........................................................................................... 1

ARGUMENT ........................................................................................................... 4

I. The Statute of Limitations Issue Is Properly Tested by a Motion to Dismiss for Failure to State a Claim, Not a Motion to Dismiss for Lack of Subject Matter Jurisdiction .......... 4

II. L-3's Complaint Grounded in Darleen Druyun's Manipulation of the Procurement Process Is Not Time-Barred ........................................................................ 5

A. At the earliest, L-3 learned in October 2004 that Druyun compromised the system ........................................................................................... 6

B. L-3 could not have filed in 1999 the protest it filed in 2006 ................................. 9

III. The Principle of Equitable Tolling Should Apply to Toll the Statute of Limitations....... 11

IV. The Accrual Suspension Rule Should Apply to Suspend the Statute of Limitations ....... 13

V. Intervenor Has Not Met Its Burden on Its Motion to Dismiss for Failure to State a Claim ........................................................................................... 13

CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Page**

Cases

*Ace Property & Casualty Ins. Co. v. United States*,
60 Fed. Cl. 175 (2005) ........ 5

*AmPro Protective Agency, Inc. v. United States*,
281 F.3d 1234 (Fed. Cir. 2002) ........ 10

*Ariadne Financial Services Pty. Ltd. v. United States*,
133 F.3d 874 (Fed. Cir. 1998) ........ 4

*Barrett v. Principi*,
363 F.3d 1316 (Fed. Cir. 2004) ........ 12

*Bailey v. West*,
160 F.3d 1360 (Fed. Cir. 1998) ........ 11

*Brice v. Secretary of Health and Human Services*,
240 F.3d 1367 (Fed. Cir. 2001) ........ 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 15

*Conley v. Gibson*,
355 U.S. 41 (1957) ........ 14

*Day v. McDonough*,
___ U.S. ___, 126 S. Ct. 1675 (2006) ........ 4

*Frazer v. United States*,
288 F.3d 1347 (Fed. Cir. 2003) ........ 11

*Godwin v. United States*,
338 F.3d 1374 (Fed. Cir. 2003) ........ 13

*Grass Valley Terrace v. United States*,
69 Fed. Cl. 341 (2005) ........ 4, 5

*Heyer Products Co. v. United States*,
140 F. Supp. 409 (Ct. Cl. 1956) ........ 14

*Irwin v. Department of Veterans Affairs*,
498 U.S. 89 (1990) ........ 11, 12

*Japanese War Notes Claimants Assoc. v. United States*,
373 F.2d 356, *cert. denied*, 389 U.S. 971 (1968) ........................................................ 13

*Lockheed Martin Aeronautics Company et al.*,
B-295401 *et seq.*, Feb. 24, 2005, 2005 CPD ¶ 41........................................................... 7

*MacLean v. United States*,
67 Fed. Cl. 14 (2005) ........................................................................................................ 5

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003).......................................................................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)........................................................................................................... 15

*Northwest Louisiana Fish & Game Preserve Commission*,
446 F.3d 1285 (Fed. Cir. 2006) ........................................................................................ 8

*Planning Research Corp. v. United States*,
4 Cl. Ct. 283 (1983) ......................................................................................................... 10

*Pratt v. United States*,
50 Fed. Cl. 469 (2001) ...................................................................................................... 8

*Rotella v. Wood*,
528 U.S. 549 (2000)............................................................................................................ 8

*Space Age Engineering, Inc. v. United States*,
4 Cl. Ct. 739 (1984) ........................................................................................................... 9

*United States v. Brokamp*,
519 U.S. 347 (1997)................................................................................................... 12, 13

*Wells v. United States*,
420 F.3d 1343 (Fed. Cir. 2005).......................................................................................... 11

Statutes, Rules and Regulations

18 U.S.C. § 208(a) .................................................................................................................. 2
28 U.S.C. § 1491...................................................................................................................... 5
28 U.S.C. § 2501......................................................................................... 4, 5, 11, 12, 13
RCFC 12(b)....................................................................................................................... 5, 15
48 C.F.R § 3.101 ...................................................................................................................... 9

L-3 Communications Integrated Systems L.P. ("L-3") submits its Opposition to the Defendant's and Intervenor's Motions to Dismiss as follows:

**STATEMENT OF FACTS**

1. Darleen Druyun ("Druyun") was the Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management from 1993 until she retired in November 2002. In that position she supervised, directed, and oversaw the management of Air Force acquisition programs. Druyun was the source selection authority ("SSA") for the C-5 Avionics Modernization Program ("C-5 AMP") acquisition. Joint App. 119.

2. Raytheon E-Systems, Inc. ("Raytheon", predecessor in interest to L-3 and referred to throughout as "L-3") and Lockheed Martin Aeronautical Systems ("Lockheed") were the only two contractors that submitted proposals for the C-5 AMP. Joint App. 2.

3. The C-5 AMP Source Selection Decision Document ("SSDD") that Druyun signed on January 21, 1999, reflected increases in certain ratings that Lockheed had received from the Source Selection Evaluation Team and the Source Selection Advisory Council, as documented in the undated Proposal Analysis Report ("PAR") concerning the proposals submitted by L-3 and Lockheed. Joint App. 139-50.

4. On January 22, 1999, the Air Force awarded to Lockheed contracts F33657-98-C-0006 and F33657-98-C-0007 for the C-5 AMP program. Joint App. 119.

5. Also in 1999, Druyun signed off on the largest public-private partnership ($10.1 billion) in Air Force history, involving Lockheed Martin and the Air Force's Oklahoma City depot. In 2001, she oversaw the awarding of the Pentagon's biggest contract ever, a $200 billion deal with Lockheed Martin to build the Joint Strike Fighter. *The Rise And Fall of A Maverick*, GovExec.com (Feb. 15, 2004) (www.govexec.com/features/0204/0204s1s1.htm).

6. In or about August 2002, Druyun entered into employment discussions with Lockheed Martin that resulted in her oral acceptance of a position at Lockheed Martin to begin after her retirement from the Air Force. Joint App. 17-18.

7. On April 20, 2004, Druyun entered a plea of guilty for conspiring to violate 18 U.S.C. § 208(a). She was sentenced to prison on October 1, 2004. Joint App. 72, 104.

8. As a part of her April 20, 2004 plea agreement, Druyun agreed to submit to a polygraph examination. Joint App. 45. Subsequently, Druyun submitted a supplemental statement of facts in which she acknowledged "that she had not been truthful in her prior cooperation" and that she had previously "provided false, misleading and untruthful information to government investigators." Joint App. 109-10. She acknowledged that, as a result of her loss of objectivity in acquisition actions, she took actions that harmed the United States. Joint App. 110.

9. In November 2004, the Acting Under Secretary of Defense for Acquisition, Technology, and Logistics commissioned a study of Air Force acquisition actions involving Druyun (the "Druyun Study"). Joint App. 117.

10. The Druyun Study identified eight contract actions, out of the 407 studied, for further investigation. Joint App. 117. The Acting Under Secretary of Defense for Acquisition, Technology, and Logistics requested the Department of Defense ("DoD") Inspector General to review those eight actions. One of those actions was the award of the C-5 AMP contracts to Lockheed. Joint App. 119.

11. The Druyun Study identified two actions that appeared irregular in the C-5 AMP procurement: (1) reassignment of SSA responsibilities by Darleen Druyun from the original

SSA to Druyun herself, and (2) proposal rating changes made by Druyun to support her source selection decision. Joint App. 119-20.

12. On February 28, 2006, the DoD Inspector General issued its report on the C-5 AMP acquisition. In its report, the DoD Inspector General summarized the findings of the Druyun Study, relating that the review had "raised concerns because of the level of interest and influence" that Druyun had over the C-5 AMP source selection:

> Specifically, the study states that the Principal Deputy [Druyun] withdrew the SSA delegation assigned by her superior to become the SSA herself *without justification*, and during the source selection she adjusted the Advisory Council's ratings *to better support the higher cost proposal presented by Lockheed Martin Aeronautical Systems.* The Principal Deputy justified the change in ratings in the Source Selection Decision Document *by disagreeing with the assessment* presented by the Advisory Council.

Joint App. 131 (emphasis added).

13. The C-5 AMP debriefing, SSDD, and PAR given to L-3, as documented in the Joint Appendix, did not inform L-3 that in her SSDD Druyun had, in order to support the higher cost of Lockheed's proposal, increased certain of Lockheed's ratings above those assigned in the PAR to Lockheed's proposal.

14. The DoD Inspector General concluded that Air Force acquisition executives had not recognized the source selection process as a high risk area and, therefore, had not validated the effectiveness of the internal controls over the source selection process. As a result, the C-5 AMP solicitation and contract award were left unnecessarily vulnerable to manipulation. Joint App. 122, 125.

## ARGUMENT

### I. The Statute of Limitations Issue Is Properly Tested by a Motion to Dismiss for Failure to State a Claim, Not a Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Both the Air Force and Lockheed Martin argue that the court has no subject matter jurisdiction to hear this bid protest. In *Grass Valley Terrace v. United States*, 69 Fed. Cl. 341, 346 (2005), Judge Damich observed that the Federal Circuit has been inconsistent on whether the statute of limitations issue is properly tested by a motion to dismiss for lack of subject matter jurisdiction or whether it is properly tested for failure to state a claim. In one line of cases, the Federal Circuit has found that the timeliness of a claim is not a matter of subject matter jurisdiction; in another line of cases, it has found that the statute of limitations issue is jurisdictional. *Id.* (collecting cases) After reviewing these cases, Judge Damich determined that the language of 28 U.S.C. § 2501 supports the view that the untimeliness of an action does not remove the court's subject matter jurisdiction. The statute provides: "Every claim of which the United States Court of Federal Claims *has jurisdiction* shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2005)(emphasis added).[1] The Federal Circuit in *Ariadne Financial Services Pty. Ltd. v. United States*, 133 F.3d 874, 878 (Fed. Cir. 1998), decided that this italicized language is significant, confirming that the question of a time bar on a plaintiff's claim does not affect the subject matter jurisdiction of the Court of Federal Claims. Judge Damich concluded, "This plain English interpretation of the statute is supported by the Federal Circuit cases that have *closely examined* this issue." 69 Fed. Cl. at 346 (emphasis in original). *See also Day v. McDonough*, ___ U.S. ___, 126 S. Ct. 1675, 1681 (2006) (statute of limitations defense is not jurisdictional).

[1] The claims barred are untimely filed claims over which the court already has jurisdiction.

This conclusion is the most colorable under the law. The Court of Federal Claims has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491. Its jurisdiction does not disappear as time passes. The court simply cannot exercise that jurisdiction when a bid protest action is not timely filed. Therefore, the proper vehicle for testing the statute of limitations issue is a motion to dismiss for failure to state a claim. 69 Fed. Cl. at 347-48. On a motion to dismiss for failure to state a claim, the movant has the burden of proof. *Id.* at 345. Moreover, when matters outside of the pleadings have been presented, the motion to dismiss should be treated as one for summary judgment, RCFC 12(b), and, not only must the movants demonstrate no genuine issue of material fact, but the court must resolve any doubts regarding factual issues in favor of the nonmoving party and draw all reasonable inferences in its favor. *Id*. at *20.

Even if the court treats the motion to dismiss as testing the court's jurisdiction,[2] placing the burden to demonstrate "jurisdiction" on L-3, the motion must be denied.[3] The bid protest was timely filed as discussed below.

## II. L-3's Complaint Grounded in Darleen Druyun's Manipulation of the Procurement Process Is Not Time-Barred.

> "[*W]e were stunned to learn that she claimed manipulation of some contracts*." Michael Wynne, Acting Under Secretary of Defense for Acquisition, Technology and Logistics. Roundtable with Mike Wynne (Feb. 14, 2005) www.dod.mil/transcripts/2005
>
> "*It was a surprise*." General Gregory Martin, Commander of the Air Force's Materiel Command, indicating no one suspected what Darleen Druyun was doing. Procurement Scandal Spawns 48 Air Force Reviews (Apr. 13, 2005)

---

[2] This court determined before the *Grass Valley Terrace* decision that compliance with section 2501 is jurisdictional. *MacLean v. United States*, 67 Fed. Cl. 14, 15 n.1 (2005).

[3] On a motion to dismiss for lack of subject matter jurisdiction, "the Court considers as true all facts alleged in the Complaint, including all attachments to the Complaint, and makes 'all reasonable inferences in favor of the nonmovant.'" *Ace Property & Casualty Ins. Co. v. United States*, 60 Fed. Cl. 175 (2005) (citations omitted).

http://www.spacemart.com/reports/Boeing_Procurement_Scandal_Spawns_48_Air_Force_Reviews_General.html

"*Druyun hoarded information and kept the decisionmaking process a secret*." Marvin R. Sambur, Air Force acquisition chief. Long Fall for Pentagon Procurement Star (Nov. 14, 2004) http://corpwatch.org/article.php?id=11680

If Druyun's colleagues had no idea she was manipulating the decisionmaking process in some acquisitions over which she had control, how then could L-3?

**A. At the earliest, L-3 learned in October 2004 that Druyun compromised the system.**

L-3 could not have known before October 2004, at the earliest, that Darleen Druyun improperly manipulated the procurement process to play favorites. In October 2004 she submitted a supplemental statement of facts (following a polygraph exam) acknowledging favoring Boeing in acquisition decisions. Joint App. 109. It was *after* this revelation that the Department of Defense decided to study 407 acquisition actions where Druyun was the Source Selection Authority to determine whether she had manipulated the process. Joint App. 117. The DoD targeted eight procurements. Joint App. 117. The investigation was not limited to Boeing awards. Indeed, two of the eight involved Lockheed Martin companies.

In addition to Lockheed's C-5 AMP award, another of the eight contracts identified for investigation after Darleen Druyun's October 2004 admissions was a restructuring of the June 1999 award to Lockheed Martin Integrated Systems for F-16 Mission Training Center Simulator Services. The Inspector General's report concerning the F-16 contract adjustment in Lockheed Martin's favor stated that the investigation of that contract adjustment for Lockheed was in direct response to "admissions by Darleen Druyun, Principal Deputy Assistant Secretary of the Air Force (Acquisitions and Management) from 1993 to 2002, that she may have allowed personal interests to affect her judgment on acquisition decisions she made." March 24, 2006

Report of Inspector General at i, Exhibit A hereto.[4] Clearly, the government did not believe that Druyun's manipulation of the system was limited to awards favoring Boeing. Rather, in direct reaction to Druyun's concession that she played favorites, the Inspector General investigated the F-16 contract restructure benefiting Lockheed Martin. The Inspector General's report on this restructure states: "Druyun directed a contract restructure *although she acknowledged that it might not be legal*. As a result, the Contractor was directed to submit a letter formally requesting a contract restructure along with the rationale to Druyun and Air Force General Counsel." March 24, 2006 Report of Office of Inspector General at 8 (emphasis added). Darleen Druyun manipulated the contract restructure to benefit Lockheed Martin. As a result, the Inspector General recommended that the Assistant Secretary of the Air Force (Acquisition) establish management controls to prevent senior acquisition personnel from directing contract adjustments that are not in accordance with federal acquisition policy. March 24, 2006 Report of Office of Inspector General at 13.

Druyun exercised unprecedented control over procurements;[5] Druyun used that power to compromise the system's integrity.

L-3's overarching claim is stated in paragraph 33 of its Complaint:

> The Air Force [through Druyun] improperly compromised the integrity of the procurement process by manipulating the evaluation and source selection. Its actions impaired the objectivity of the selection process.

L-3's injury is that it was the victim of this manipulation of the process. It is far too simplistic to argue that L-3's injury was the award of the C-5 AMP contract to Lockheed. (*See*

[4] L-3 submits this document as Tab 10A, p. 138a through 138ff to the Joint Appendix.

[5] *Lockheed Martin Aeronautics Company et al.*, B-295401 *et seq.*, Feb. 24, 2005, 2005 CPD ¶ 41; Report of the Defense Science Board Task Force on Management Oversight in Acquisition Organizations, March 2005, available at www.acq.osd.mil/dsb/reports/2005-03-MOAO_Report_Final.pdf.

Defendant's Motion to Dismiss at 19).[6] When the award was made to Lockheed, L-3 was a disappointed bidder, as is the losing party in any procurement, but L-3 did not know and could not have known that the selection process was tainted and that it was the victim of the taint. The discovery of the tainted C-5 AMP procurement directly resulted from the Inspector General's investigation, which directly resulted from the Druyun Study targeting eight procurements, which directly resulted from Druyun's October 2004 confessions. And, as the Air Force states, it is "discovery of the injury . . . [that] starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000); Defendant's Motion to Dismiss at 21. *See also Northwest Louisiana Fish & Game Preserve Comm'n*, 446 F.3d 1285, 1290 (Fed. Cir. 2006) (accrual occurs under section 2501 "when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence"); *Pratt v. United States*, 50 Fed. Cl. 469, 476-77 (2001) ("the inquiry becomes whether plaintiff knew, or should have known of his cause of action against the Government . . . ."). Given Druyun's startling confession in October 2004 and the subsequent investigations resulting in the revelations in the Inspector General's February 2006 report, all of the events necessary to state a claim had not occurred in January 1999.

Reading the SSDD and the PAR and participating in the debriefing for the C-5 AMP contract award could not have revealed to L-3 what was hidden to the rest of the world until Druyun's confessions, which prompted the full-scale investigation into awards not only to Boeing but to Lockheed Martin as well.

No information given during the debriefing or in the Source Selection Decision Document gave any clue that Druyun had orchestrated her ability to make the final decision

[6] In the C-130 AMP bid protest, the GAO did not consider the award of the contract to trigger its timeliness rules. *Id*.

concerning the C-5 AMP source selection by removing the previous Source Selection Authority and placing herself in that position. The Inspector General found this maneuvering to be significant. Joint App. 124. That maneuvering gave Druyun a position of power that, as later revealed, she used to engage in the manipulation L-3 now challenges.

L-3 may not be able to name its SSA, *see* Intervenor's Motion to Dismiss at 22, but it is entitled to one who honors the integrity of the process.[7]

**B. L-3 could not have filed in 1999 the protest it filed in 2006**.

Lockheed Martin and the Air Force argue that L-3 knew that Druyun changed ratings and should have therefore filed a bid protest in January 1999 when it received that information. As Lockheed states, a SSA has the authority to change ratings, Intervenor's Motion to Dismiss at 18, so in 1999 L-3 could not protest changes made purportedly in good faith in the ordinary course of a procurement. What L-3 can protest in 2006 is the manipulation of the system by a SSA whose motivation was to change Lockheed's ratings "to better support the higher cost proposal presented by Lockheed Martin Aeronautical Systems," Joint App. 131, but who feigned disagreement and offered different reasons in the SSDD shown to the disappointed bidder. That Druyun changed the ratings so Lockheed could win the competition is information L-3 did not learn until the Inspector General released its report.

Lockheed Martin and the Air Force argue that L-3 knew in January 1999 that Druyun assigned strengths to Lockheed and weaknesses to L-3. However, the acts of assigning weaknesses and strengths ---- by themselves ---- do not provide grounds for a bid protest. Rather, a SSA enjoys discretion and operates under a presumption of good faith. *See Space Age*

[7] "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct . . . ." 48 C.F.R. § 3.101.

*Eng'g Inc. v. United States*, 4 Cl. Ct. 739 (1984); *AmPro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002). It is not an individual rating change or an individual attribution of a weakness but rather the cumulative effect of Druyun's shenanigans, as revealed under the 2004-2006 spotlights, that compromised the process. It is because of Druyun's intent to manipulate that the changes in ratings and the allocation of strengths and weaknesses have a significance that in a garden variety protest they would not.

Moreover, the argument that Lockheed Martin and the Air Force make is grounded in their assumption that had L-3 filed a bid protest in January 1999 based on the knowledge it had then, it would have gotten the administrative record and therefore been able to make the identical claims it makes in 2006. First, that conclusion is pure fiction, as Druyun was tight-lipped until nearly six years later. Second, alleging irregularities in the procurement process does not automatically allow access to the administrative record. The court in *Planning Research Corp. v. United States*, 4 Cl. Ct. 283 (1983) emphasized:

> The Court believes that it would be opening a Pandora's box of frivolous lawsuits intended only to gain access to the full administrative record or to delay or unduly burden agency actions were the court to rule that *any* disgruntled, unsuccessful bidder could gain access to the record merely by alleging some irregularity in the procurement process. Such carte blanche access to the administrative record is not intended.

*Id*. at 298 (emphasis in original). Moreover, the October 2004 Druyun confessions and the February 2006 Inspector General revelations significantly changed the January 1999 landscape.[8]

---

[8] The Government refused to file the administrative record before its motion to dismiss is resolved. Transcript of May 24, 2006 hearing at 22. Intervenor likewise represented to the court that a motion to dismiss could be fairly resolved without resort to the administrative record. Transcript of May 24, 2006 hearing at 24-26. L-3 relies on those representations to the court in its presentation of this Opposition, written without access to the administrative record,

**III. The Principle of Equitable Tolling Should Apply to Toll the Statute of Limitations**.

The Federal Circuit has not yet decided whether equitable tolling applies to the limitations period in 28 U.S.C. § 2501. *See Wells v. United States*, 420 F.3d 1343 (Fed. Cir. 2005); *Frazer v. United States*, 288 F.3d 1347 (Fed. Cir. 2003).

However, the United States Supreme Court decided in *Irwin v. Department of Veterans Affairs,* 498 U.S. 89 (1990), that a rebuttable presumption exists that equitable tolling applies to actions against the United States, *id*. at 95-96, and that equitable tolling would apply "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period" or "where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Id*. at 96. The Federal Circuit decided in *Bailey v. West*, 160 F.3d 1360 (Fed. Cir. 1998), that government misconduct is not a requirement for equitable tolling. It held, "Although there is no suggestion of misconduct, such as tricking Bailey into missing the 120-day filing deadline, we nevertheless conclude that a veteran's inducement by an adversary's conduct is akin to grounds sufficient to toll a limitations period in a private suit." *Id*. at 1365. In this case, L-3 was induced to believe that the Government acted properly in the evaluation process when, in fact, the process was being manipulated by Darleen Druyun, unbeknownst even to the Air Force. Not until the release of the Inspector General's Report did L-3 learn that Druyun's "adjustments" to the ratings during the source selection were "to better support the higher cost proposal presented by Lockheed Martin Aeronautical Systems." Joint App. 131.

Moreover, the Federal Circuit in the context of a veteran's appeal has determined that equitable tolling is not limited to the two circumstances identified in *Irwin*. The Federal Circuit

---

but reserves the right to seek access if the Air Force or Lockheed Martin take a position that the absence of the record undercuts L-3's position.

concluded, "A careful study of Supreme Court precedent, as well as that of the regional circuits . . . reveals that equitable tolling is available in a variety of circumstances. . . ." *Barrett v. Principi*, 363 F.3d 1316, 1318 (Fed. Cir. 2004). It should be available in this circumstance as well. Equitable tolling is particularly appropriate in this situation where the SSA involved in the contract award had excessive control over acquisition actions and duped even the Air Force about the unfairness of her selection techniques. *See* Report of the Defense Science Board Task Force on Management Oversight in Acquisition Organizations, March 2005, available at www.acq.osd.mil/dsb/reports/2005-03-MOAO_Report_Final.pdf.

Defendant argues that the rebuttable presumption of *Irwin* is rebutted by Congress' intent not to permit equitable tolling, which, it argues, is demonstrated by the listing of other exceptions in section 2501 not including equitable tolling. Defendant's Motion to Dismiss at 32-33. It relies upon the U.S. Supreme Court decision in *United States v. Brokamp*, 519 U.S. 347 (1997). But in *Brokamp* the presence of exceptions to the statute of limitations was only one of five factors the Court considered. Of primary importance was the underlying subject matter: tax. That Court observed: "Tax law, after all, is not normally characterized by case-specific exceptions reflecting individualized equities." *Id*. at 352. The Court also considered the statute's detail, its technical language, and the iteration of the limitations in both procedural and substantive forms, as well as the explicit listing of exceptions and the underlying subject matter -- all taken together -- to conclude that equitable tolling did not apply.

Section 2501 is not extraordinarily technical, is not part of a detailed elaborate statutory scheme that would be disrupted by equitable tolling, and does not include multiple iterations of the limitations period. *See Martinez v. United States*, 333 F.3d 1295, 1381 (Fed. Cir. 2003)("section 2501 appears to have more in common with the statute at issue in *Irwin* that

with the statute at issue in *Brokamp* . . . ."). Moreover, section 2501 is an omnibus statute that applies to myriad causes of action, including bid protest actions; it is not specific to certain types of claims, such as tax claims (as in *Brokamp*) or vaccine injury claims (as in *Brice v. Secretary of Health and Human Services*, 240 F.3d 1367 (Fed. Cir. 2001)). Therefore, there is more reason for the principles of equity to apply to individual causes of action, such as a bid protest reacting to the recent revelation of manipulation in Air Force procurement processes. L-3 is not asking the court to enjoin the award of the contract to Lockheed. L-3 is asking for money damages, a remedy that does not disrupt the procurement process.

## IV. The Accrual Suspension Rule Should Apply to Suspend the Statute of Limitations.

When the defendant conceals its acts with the result that the plaintiff is unaware of their existence or when the injury was inherently unknowable at the accrual date, the accrual suspension rule applies. *Japanese War Notes Claimants Assoc. v. United States*, 373 F.2d 356, 359, *cert. denied*, 389 U.S. 971 (1968). It applies here. As explained above, L-3's injury is that it was the victim of manipulation of the procurement process. It could not have known when the contract was awarded to Lockheed Martin that Darleen Druyun manipulated that process. It could not have known that the C-5 AMP would be one of eight contracts awarded by the Air Force targeted as influenced by Druyun's prejudice. Darleen Druyun concealed the critical facts from the Air Force. And they were certainly concealed from L-3. *See* Part II *supra.*

## V. Intervenor Has Not Met Its Burden on Its Motion to Dismiss for Failure to State a Claim.

Lockheed argues that L-3 does not state a claim for bias or bad faith. When the court considers a 12(b)(6) motion, it must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Godwin v. United States*, 338 F.3d 1374 (Fed. Cir. 2003). Dismissal for failure to state a claim is proper only when "it appears beyond doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

L-3's Complaint is based upon the findings of the Department of Defense Inspector General in its report of February 28, 2006. The Inspector General concluded that Druyun appointed herself Source Selection Authority, changed ratings, and assigned strengths and weaknesses, all without justification. Joint App. 114. The Inspector General noted that the ratings were changed to better support the higher cost award to Lockheed. Joint App. 131. The Inspector General concluded that the C-5 AMP solicitation and the contract award were "unnecessarily vulnerable to manipulation." Joint App. 122. The Inspector General's report and the reasonable inferences the court is required to draw from the report in L-3's favor preclude a dismissal of the Complaint. In an analogous situation, a plaintiff relied upon a report of a Senate committee investigating procurement policies at the Ordnance Tank Automotive Center ("OTAC") of the United States Army. *See Heyer Products Co. v. United States*, 140 F. Supp. 409, 410 (Ct. Cl. 1956). The Senate committee's conclusions were incorporated in the plaintiff's petition claiming bad faith. The committee concluded that "for some reason unknown to it, OTAC wished to favor Weidenhoff, or to eliminate Heyer. The evidence . . . permits no other inference, unless it be attributed to gross incompetence." *Id.* at 412. The court concluded that the plaintiff's petition based on the Senate committee's report "contains sufficient allegations to make out a case of discrimination against it . . . ." *Id.*[9] Here, too, L-3's Complaint based on the Inspector General's report contains sufficient allegations to make out a case of bad faith and bias.

[9] The court limited the plaintiff to an implied contract claim. *Id.*

If matters outside of the pleading are presented to and not excluded by the court, the motion to dismiss is treated as one for summary judgment. RCFC 12(b). Lockheed made a reference to Joint App. 110-12, the Supplemental Statement of Facts filed by Darleen Druyun on October 1, 2004, in its failure to state a claim argument contained in its Motion to Dismiss. If the court treats Intervenor's motion as one for summary judgment, all evidence must be construed in the light most favorable to L-3. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 601 (1986). If its motion were converted to one for summary judgment, Intervenor would have the burden to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Lockheed Martin made no effort to do so. In fact, the Inspector General's Report, at the very least, raises a genuine issue of material fact concerning Druyun's bad faith and bias.

This is not a situation where a plaintiff makes unsupported allegations. This is a situation where L-3's allegations are grounded firmly in the Inspector General's report that contains the conclusion that Darleen Druyun manipulated the procurement process to favor Lockheed.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendant's and Intervenor's requests for dismissal of Plaintiff's Complaint be denied in their entirety.

Respectfully submitted,

Dated: July 31, 2006

s/ Paul W. Searles

Paul W. Searles
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5197
Telecopier: (214) 200-0705
**ATTORNEYS FOR L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.**

Of Counsel:

Sharon N. Freytag
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5586
Telecopier: (214) 200-0450

D-1455701_1.DOC