March 24, 2006

# Acquisition

## Procurement Procedures Used for F-16 Mission Training Center Simulator Services
(D-2006-065)

Department of Defense
Office of Inspector General

*Quality* *Integrity* *Accountability*

**Additional Copies**

To obtain additional copies of this report, visit the Web site of the Department of Defense Inspector General at http://www.dodig.mil/audit/reports or contact the Secondary Reports Distribution Unit, Audit Followup and Technical Support at (703) 604-8937 (DSN 664-8937) or fax (703) 604-8932.

**Suggestions for Future Audits**

To suggest ideas for or to request future audits, contact Audit Followup and Technical Support at (703) 604-8940 (DSN 664-8940) or fax (703) 604-8932. Ideas and requests can also be mailed to:

ODIG-AUD (ATTN: AFTS Audit Suggestions)
Department of Defense Inspector General
400 Army Navy Drive (Room 801)
Arlington, VA 22202-4704

DEPARTMENT OF DEFENSE hotline

**To report fraud, waste, mismanagement, and abuse of authority.**

Send written complaints to: Defense Hotline, The Pentagon, Washington, DC 20301-1900
Phone: 800.424.9098 e-mail: hotline@dodig.osd.mil www.dodig.mil/hotline

**Acronyms**

| | |
|---|---|
| ASC | Aeronautical Systems Center |
| FAR | Federal Acquisition Regulation |
| MTC | Mission Training Center |
| OIG | Office of Inspector General |
| ODIG-AUD | Office of the Deputy Inspector General for Auditing |

INSPECTOR GENERAL
DEPARTMENT OF DEFENSE
400 ARMY NAVY DRIVE
ARLINGTON, VIRGINIA 22202-4704

March 24, 2006

MEMORANDUM FOR AIR FORCE, OFFICE OF THE ASSISTANT SECRETARY (ACQUISITION)

SUBJECT: Report on Procurement Procedures Used for F-16 Mission Training Center Simulator Services (Report No. D-2006-065)

We are providing this report for information and use. We considered management comments on a draft of this report in preparing the final report.

Comments on the draft of this report conformed to the requirements of DoD Directive 7650.3 and left no unresolved issues. Therefore, no additional comments are required.

We appreciate the courtesies extended to the staff. Questions should be directed to Mr. James L. Kornides (614) 751-1400 extension 211 or Ms. Amy J. Frontz at (614) 751-1400 extension 213. See Appendix E for the report distribution. The team members are listed inside the back cover.

By direction of the Deputy Inspector General for Auditing:

Patricia A. Marsh
For Paul J. Granetto, CPA
Assistant Inspector General
Defense Financial Audit
Service

**Department of Defense Office of Inspector General**

**Report No. D-2006-065** **March 24, 2006**
(Project No. D2005-D000FJ-0171.000)

# Procurement Procedures Used for F-16 Mission Training Center Simulator Services

## Executive Summary

**Who Should Read This Report and Why?** This report should be read by Air Force contracting officers and senior acquisition officials. It discusses problems with using commercial acquisition procedures to acquire services unique to DoD. In addition, it discusses a modification to the contract for F-16 Mission Training Center simulator services to allow the contractor to recoup development costs.

**Background.** We performed this audit at the request of the Under Secretary of Defense for Acquisition, Technology, and Logistics. An internal study was commissioned in November 2004 in response to admissions by Darleen Druyun, Principal Deputy Assistant Secretary of the Air Force (Acquisition and Management) from 1993 to 2002, that she may have allowed personal interests to affect her judgment on acquisition decisions she made.

The F-16 Mission Training Center program was established to provide simulator services that include cockpits that simulate the form, fit, and function of the F-16 aircraft. The program also provides training services with 360 degree visual systems and high fidelity flight and weapon simulations. The Air Force used a firm-fixed-price, requirements-type contract to acquire the F-16 MTC services. The requirements were established as indefinite delivery and indefinite quantity. The minimum order would cost the Air Force $74.4 million to have the F-16 Mission Training Center developed and delivered to two sites and for hourly simulator services from December 2001 until the end of the basic contract term in June 2006. The maximum order quantity for F-16 Mission Training Center simulator services was a total of 61 cockpits at 18 individual sites. The 61 cockpits included a 4-cockpit mobile Mission Training Center. The basic contract term was 7 years with 8 additional award term years. The ceiling price for the contract was $359 million if the Air Force ordered the maximum quantity and exercised all 8 award term years.

**Results.** The Air Force elected to purchase F-16 Mission Training Center simulator services following procedures that are more frequently used by contracting officers to buy services in the commercial marketplace. These procedures restricted the Air Force from determining whether the price it was charged was reasonable for F-16 simulator services. Additionally, the Air Force placed itself at a disadvantage in the event of a contract dispute. Federal acquisition policy requires using a firm-fixed-price contract to acquire commercial services. By using a commercial services contract, the Air Force was prohibited from requesting certified cost and pricing data (finding A).

The Air Force improperly modified the firm-fixed-price contract for F-16 Mission Training Center services to pay for nonrecurring (developmental) costs claimed by the

contractor. As a result, the Air Force committed itself to pay $41.6 million above its minimum contract obligation prior to receiving additional F-16 Mission Training Center services. In addition, the Air Force received minimal value from the consideration package it negotiated with the contractor to justify the modification (finding B). See the Findings section of the report for the detailed recommendations.

**Management Comments.** The Military Deputy, Office of the Assistant Secretary of the Air Force (Acquisition) concurred with the recommendations and stated that the next F-16 Mission Training Service contract would be acquired using a contracting by negotiation strategy. In addition, the Air Force has eliminated and redistributed the Principal Deputy Secretary of the Air Force (Acquisition and Management) responsibilities to more appropriate levels of oversight consistent with the Federal Acquisition Regulation. The Deputy also will continue to review the acquisition process in order to implement effective management controls to prevent senior acquisition personnel from exerting inappropriate influence on contract actions. The Military Deputy, Office of the Assistant Secretary of the Air Force (Acquisition) comments were fully responsive. Therefore, no further comments are required. See the Finding section of the report for a discussion of management comments and the Management Comments section of the report for a complete text of the comments.

**Management Actions.** On August 19, 2005, we issued an interim results memorandum requesting that the Air Force discontinue using a commercial acquisition strategy to acquire F-16 Mission Training Center services. In response, the Air Force established a senior-level Acquisition Strategy Panel to review the acquisition strategy for the F-16 Mission Training Center. The Air Force agreed to use a noncommercial acquisition strategy to acquire future F-16 Mission Training Center services.

# Table of Contents

**Executive Summary** i

**Background** 1

**Objectives** 2

**Findings**

A. Use of Commercial Services Contract 3
B. F-16 Mission Training Center Contract Modification 7

**Appendixes**

A. Scope and Methodology 14
Prior Coverage 14
B. DoD IG Interim Results Letter 15
C. Air Force Response to DoD IG Interim Results Letter 19
D. Contractor Request for Equitable Adjustment 20
E. Report Distribution 22

**Management Comments**

Office of the Assistant Secretary of the Air Force (Acquisition) 25

## Background

We performed this audit at the request of the Under Secretary of Defense for Acquisition, Technology, and Logistics. An internal study was commissioned in November 2004 in response to admissions by Darleen Druyun, Principal Deputy Assistant Secretary of the Air Force (Acquisition and Management) from 1993 to 2002, that she may have allowed personal interests to affect her judgment on acquisition decisions she made. This audit focuses on a contract adjustment after the initial award.

**F-16 Mission Training Center (MTC).** The F-16 MTC program was established to provide simulator services that include cockpits that simulate the form, fit, and function of the F-16 aircraft. The program is managed by the Aeronautical Systems Center (ASC) Headquarters Training Systems Product Group located at Wright Patterson Air Force Base in Dayton, Ohio. The F-16 MTC is intended to be part of a larger Distributed Mission Training system that integrates other physically separated and networked system simulations. Each F-16 MTC can contain up to four system simulations (cockpits) and their associated instructor operator stations, threat stations, modular control equipment workstations, and briefing/debriefing systems. The program also provides training services with 360 degree visual systems and high fidelity flight and weapon simulations.

**Contract for F-16 MTC Simulator Services.** In June 1999, the Air Force awarded a contract to Lockheed Martin Integrated Systems (hereafter referred to as the Contractor) for the acquisition of F-16 MTC simulator services using the commercial item acquisition procedures outlined in the Federal Acquisition Regulation (FAR) Part 12. The Air Force used a firm-fixed-price, requirements-type contract to acquire the F-16 MTC services. The requirements were established as indefinite delivery and indefinite quantity. The minimum order included one cockpit with limited F-16 MTC simulator services at Shaw Air Force Base beginning in December 2001. The minimum order also required an upgrade on the original cockpit to full simulation services, three additional cockpits with full simulator services at Shaw Air Force Base, and one cockpit with full simulator services at Mountain Home Air Force Base in April 2002. The minimum order would cost the Air Force $74.4 million to have the F-16 MTC developed and delivered to the two sites and for hourly simulator services for the basic contract term ending June 2006. The maximum order quantity included F-16 MTC simulator services for a total of 61 cockpits at 18 individual sites. The 61 cockpits included a 4-cockpit mobile Mission Training Center. The basic contract term covered 7 years with 8 additional award term years. The ceiling price for the contract was $359 million if the Air Force ordered the maximum quantity and exercised all 8 award term years.

The Contractor was required to develop and deliver F-16 MTCs that provide simulator services in accordance with Government-approved performance specifications. Although this was a contract for simulator services, preparatory services (development and testing) were also included in the acquisition to allow the Government to conduct training capability assessments and simulation service certification prior to the start of actual simulation services. For future orders, the

contract specified a 19-month lead time from the date an order was placed until the cockpits and simulation services began. The contract allowed for the Contractor to own all of the hardware and software and to be responsible for technology upgrades to keep the F-16 MTC consistent, or concurrent, with the current F-16 aircraft configuration.

**F-16 MTC Nonrecurring Costs.** The contract required the F-16 MTC simulator to be developed and tested at the Contractor's facility prior to delivery. The F-16 MTC was required to undergo an extensive system validation test in order to insure the simulator met training requirements. Upon satisfactory completion of the system validation testing, the Contractor's assessment was required to authorize shipment of the F-16 MTC to Shaw Air Force Base. The Contractor's nonrecurring costs occurred during the timeframe that covered development and testing until production began. Nonrecurring costs, then, represent development costs associated with fielding the F-16 MTC minimum contract quantity.

## Objectives

Our overall audit objective was to determine whether the restructuring of the contract for F-16 MTC simulator services was made in accordance with the FAR. Specifically, we evaluated whether the equitable price adjustment made on the contract was reasonable and in the best interest of the Government.

# A. Use of Commercial Services Contract

The Air Force improperly procured F-16 MTC simulator services using a commercial acquisition strategy. This option was used because contracting officials misinterpreted the definition of commercial services as defined by Federal acquisition policy. As a result, the Air Force restricted its ability to determine whether the price paid for F-16 simulator services was reasonable. In addition, the Air Force placed itself at a disadvantage in the event of a contract dispute. Specifically, Federal acquisition policy requires using a firm-fixed-price contract and prohibits requesting certified cost and pricing data for commercial acquisitions.

## Federal Acquisition Policy

The Federal Acquisition Streamlining Act of 1994 (Public Law 103-355) established acquisition policies encouraging the acquisition of commercial items and components.

Commercial item services, as defined by FAR Part 2, "Definitions of Words and Terms," include services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed under standard commercial terms and conditions. This does not include services that are sold based on hourly rates without an established catalog or market price for the specific service performed.

FAR Part 12, "Acquisition of Commercial Items," states that Government agencies must use firm-fixed-price contracts or fixed-price contracts with economic price adjustment for the acquisition of commercial items. FAR Part 12 prohibits the use of any other contract type to acquire commercial items. In addition, it requires agencies to complete market research to determine whether commercial items or nondevelopmental items are available that meet agency requirements.

FAR Part 16, "Types of Contracts," requires the use of firm-fixed-price type contracts when acquiring commercial items or services and allows the contracting officer to establish a reasonable price. Government agencies can establish the reasonable price for products and services using several methods:

- Identify adequate competition and compare all related costs.
- Compare prior purchases of the same or similar products or services supported by valid cost or pricing data or made on a competitive basis.
- Identify realistic estimates based on external cost or pricing data and on performance cost data.

- Identify uncertainties regarding performance costs, cost impact, and reasonable estimates as they pertain to the potential contractor; consider whether the potential contractor is willing to accept the risks as defined in a firm-fixed-price contract.

FAR Part 15, "Contracting by Negotiation," encourages obtaining fair and reasonable prices based on price competition. According to FAR Part 15, when a reasonable price cannot be established, the contracting officer may obtain cost or pricing data from the Contractor. Part 15 states that when cost or pricing data are required, the contractor must submit certified cost or pricing data. A major difference between a FAR Part 15 and a Part 12 acquisition is that Part 12 acquisitions prohibit the Government from obtaining cost or pricing data.

## Commercial Services Procurement Strategy

The Air Force improperly procured F-16 MTC simulator services using a commercial acquisition strategy. The Air Force used a commercial acquisition strategy because contracting officials misinterpreted the definition of commercial services as prescribed by the FAR.

**Air Force Determination of Commerciality for the F-16 MTC Requirement.** The contracting officer prepared an official memorandum documenting the determination of commerciality for F-16 MTC services. The contracting officer outlined a review of the requirement against the criteria established in FAR Part 2 and conducted market research. The market research identified simulator services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices. One example cited the Boeing-McDonnell Douglas training division that was under contract to provide simulation services on the F-15 aircraft to the Air Force on a commercial basis, utilizing hourly rates. For other examples, the Air Force contracting officer downloaded information from the Internet on a number of commercial vendors who provide simulator services to the general public. The services were provided on simulator devices owned by the vendors for a variety of commercial aircraft. The vendors included Reflectone, Flight Studies, Flight Safety, and United Airlines Flight Center.

For example, the memorandum specifically identified "dry" training services provided by Reflectone as being analogous to the F-16 MTC program. The dry training services involve the vendor making the simulator available to customers who provide their own training and do not require instructors or courseware. The cockpits and simulator services are owned and operated by Reflectone. Trainees use the simulators at Reflectone training centers in Tampa, Florida, and Washington, D.C.; both centers operate under the Reflectone Training Center division. Reflectone documentation states that one hour of dry full flight simulator time averages $400 before quantity discounts.

**Commerciality of F-16 MTC Services.** The F-16 MTC program fails to meet the FAR definition of a commercial service for several reasons. A commercial market did not exist for the F-16 MTC simulator service to establish a reasonable

price by the forces of supply and demand. Although other simulator services are available in the commercial marketplace, the F-16 MTC simulator is military specific, complex in nature, and required significant funding and time for development.

Commercial simulator services, such as those provided by Reflectone, are provided at the vendor's facilities in flight simulators that have already been developed. In contrast, the F-16 MTC did not exist at the time of the acquisition and the Contractor did not offer or sell F-16 simulator services competitively in the commercial marketplace. Thus, the Air Force was the sole customer for F-16 MTC simulator services. The Contractor was required to develop and deliver F-16 MTCs that provide simulator services to U.S. Air Force bases in accordance with Government-approved performance specifications. The contract was awarded in June 1999 but the delivery of the first cockpit simulator was not scheduled until December 2001. The long lead time allowed the Contractor to sufficiently develop and test the F-16 MTC to ensure it provided the required simulator services. The Air Force determination of commerciality did not address the significant development costs required to produce the F-16 MTC prior to the availability of simulator services. As part of the contract modification, the Air Force paid $73.3 million in nonrecurring development costs claimed by the Contractor. (See finding B for the discussion regarding the contract modification.)

In addition, the hourly rates for F-16 MTC simulator services did not have established catalog or market prices for the specific service performed. One hour of dry full flight simulator time offered by Reflectone, described as analogous to the F-16 MTC program in the Air Force determination of commerciality, averaged $400 before quantity discounts. In contrast, the minimum contract value allowed for 18,948 simulator hours and resulted in an hourly rate of over $3,900.

## Status of the F-16 MTC Contract

On August 3, 2005, we briefed officials from the ASC Training Systems Product Group on our concerns with the use of FAR Part 12 commercial acquisition procedures to procure the F-16 MTC simulator services. ASC officials informed us that they were preparing to re-compete the F-16 MTC requirement in 2006 again using the FAR Part 12 commercial item acquisition procedures. On August 19, 2005, we issued a memorandum to the Air Force stating that we disagree that the F-16 MTC requirement meets the definition of a commercial service (see Appendix B). Air Force officials provided a written response to our memorandum in December 2005 (see Appendix C). The Office of the Secretary of the Air Force (Acquisition) held a senior-level Acquisition Strategy Panel and determined that a FAR Part 15 services contract is the preferred approach.

## Conclusion

The use of a commercial item acquisition strategy and contract type was not appropriate for obtaining F-16 MTC simulator services. The strategy placed the

Air Force at a disadvantage because the Air Force was required to use a firm-fixed-price contract and was subsequently prohibited from requesting certified cost and pricing data. F-16 MTC simulator services do not exist in the commercial marketplace, and the Air Force restricted its ability to determine whether the price paid for F-16 simulator services was reasonable. Although the Air Force paid for the development and testing of the F-16 MTC simulator services (as well as invested significant time and indirect costs), the Contractor owns all the hardware and software. An appropriate procurement strategy and contract type should be used in accordance with FAR acquisition requirements.

## Recommendation and Management Comments

**A. We recommend the Assistant Secretary of the Air Force (Acquisition) review and determine the appropriate use of commercial item procurement strategies when procuring future simulator services for Air Force unique weapons systems.**

**Management Comments.** The Military Deputy of the Office of the Assistant Secretary of the Air Force (Acquisition) concurred with the finding and recommendation. The Deputy stated that the Air Force agrees with the recommendation to review the use of commercial item procurement strategies for future simulator services. The Deputy stated the Headquarters Air Force review group determined that a Federal Acquisition Regulation Part 15 Services contract would be the preferred approach to recompete the F-16 Mission Training Center contract.

## B. F-16 MTC Contract Modification

The Air Force did not comply with Federal acquisition policy when it modified a firm-fixed-price contract for F-16 MTC services to pay for nonrecurring (developmental) costs claimed by the Contractor. The modification occurred after nearly 2 years of deliberations between the contracting office and the Contractor because Darleen Druyun directed the modification. As a result, the Air Force committed itself to pay $41.6 million over its minimum contract obligation prior to receiving additional F-16 MTC services. In addition, the Air Force received minimal value from the consideration package it negotiated with the Contractor to justify the modification.

### FAR Part 16 Requirements

FAR Part 16, "Types of Contracts," provides specific guidance on firm-fixed-price, requirements-type contracts. A firm-fixed-price contract, which best utilizes the basic profit motive of an enterprise, must be used when the risk involved is minimal or can be predicted with an acceptable degree of certainty. However, when a reasonable basis for firm pricing does not exist, other contract types should be considered. A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs resulting in profit or loss.

According to FAR Part 16, a requirements-type contract (in this case, a firm-fixed-price contract) allows a Government agency to procure supplies or services during a specified contract period with deliveries or performance to be scheduled by placing orders with the contractor. An indefinite quantity requirements-type contract may be used when the Government cannot predetermine, above a specified minimum, the precise quantities of products or services that will be required during the contract period, and when it is inadvisable for the Government to commit itself for more than a minimum quantity. The contracting officer must give contractors a realistic estimated total quantity of supplies or services in the solicitation and resulting contract. The FAR specifically states that this estimate is not a representation to a contractor that the estimated quantity will be required or ordered, or that conditions affecting requirements will be stable or normal. FAR Part 16 states that an indefinite-quantity contract should be used only when a recurring need is anticipated.

### Events Leading to the Contract Modification

Darleen Druyun directed a restructure of the firm-fixed-price, requirements-type contract that was used to acquire F-16 MTC services. Numerous events occurred

between the time the Contractor raised concerns in August 2000 about the Air Force intent to order fewer simulators than originally anticipated and the time the modification was signed in June 2002.

**F-16 MTC Contract Requirements.** When the contract for F-16 MTC simulator services was signed in June 1999, the requirements were established as indefinite delivery and indefinite quantity. The minimum order involved limited F-16 MTC simulator services in one cockpit at Shaw Air Force Base beginning in December 2001. The minimum order also required an upgrade on the original cockpit to full simulation services, three additional cockpits with full simulator services at Shaw Air Force Base, and one cockpit with full simulator services at Mountain Home Air Force Base in April 2002. The minimum order cost the Air Force $74.4 million to have the F-16 MTC developed and delivered to the two sites and for hourly simulator services for the basic contract term ending June 2006. The maximum order quantity was for F-16 MTC simulator services in a total of 61 cockpits at 18 individual sites. The 61 cockpits included a 4-cockpit mobile Mission Training Center. In August 2000, the Contractor raised concerns about the scope of the contract because the Air Force no longer anticipated ordering the maximum order quantity. The Contractor stated that it would incur substantial losses because it spread its nonrecurring development costs across the maximum schedule.

**Joint ASC and Contractor Briefing to Darleen Druyun**. On May 4, 2001, ASC contracting officials and Contractor representatives briefed Druyun and requested direction on whether to restructure the contract or execute it as written. Contractor officials indicated that if the contract was executed as written, the Contractor would be unable to accept additional orders. However, after discussions with her staff and ASC senior contracting officials, Druyun directed a contract restructure although she acknowledged that it might not be legal. As a result, the Contractor was directed to submit a letter formally requesting a contract restructure along with the rationale to Druyun and Air Force General Counsel.

**Contractor Request for Equitable Adjustment.** On May 17, 2001, the Contractor submitted a formal request for a restructure of the F-16 MTC contract (see appendix D). However, the Contractor did not certify the request for equitable adjustment. On May 23, 2001, Druyun outlined her decision to ASC senior contracting officials to proceed with the restructure. Druyun indicated that the Contractor was required to offer something of value (consideration) in order for the Air Force to perform the contract restructure. However, Druyun then stated that the Contractor's decreased ability to recover nonrecurring costs and lost opportunity costs, resulting from the Government's funding constraints to execute the original plan, provided the majority of consideration to justify the restructure. ASC senior contracting officials agreed to document Druyun's direction and send a restructure justification package to her office for signature.

Druyun did not sign the direction package. The Contractor continued to pursue the contract restructure and, in August 2001, sent memorandums to both the contracting officer and Druyun. The Contractor indicated that even though Druyun had made a decision in May 2001 to restructure the F-16 MTC contract, the contracting officer had not yet issued a contract modification. The Contractor

informed Druyun that further delay in restructure and activation of additional sites would seriously impact the viability of the F-16 MTC program. The Contractor requested Druyun encourage a sense of urgency in the adoption of the proposal. Both Druyun's staff and senior contracting officials indicated they were unable to document further direction for a contract restructure that would not violate contract and appropriation laws.

**Annual Business Base Adjustment Provision.** On September 27, 2001, the ASC Director of Contracting chaired a meeting between the Contractor and ASC contracting and program management officials. They agreed on a solution that would incorporate a provision into the contract enabling annual adjustment payments. The adjustment amount would be the difference between the nonrecurring costs had all sites been activated (the maximum contract requirement) and the nonrecurring costs recouped from actual site activations. In order to execute the solution, the Contractor would need to identify the nonrecurring costs for each year and for all sources. Air Force contracting officials wrote a contract clause and established a funding mechanism to pay the adjustment each year.

On October 3, 2001, the Contractor provided a letter to the Director of Contracting requesting that the contracting team contribute to a quick and mutually satisfactory closure of this issue. Specifically, the Contractor requested the Air Force to proceed diligently with drafting an equitable adjustment clause for the recovery of the nonrecurring investment. This involved conducting and completing an audit to establish a mutually agreed-upon baseline for the Contractor's nonrecurring cost and defining a mutually acceptable and appropriate approach to the issue of consideration.

As a result of the meeting and the letter from the Contractor, the ASC Director of Contracting signed a memorandum for record that was provided to the contracting officer. The memorandum stated:

> The contractor should not be required to absorb nonrecurring costs which cannot be recovered at all (i.e., failure to order predicted requirements) or which are recovered later than anticipated (i.e., delayed ordering of predicted requirements). To remedy this situation I have advised the Contracting Officer to amend the contract with a special provision which will permit an annual adjustment to the contract, which will account for any documented harm associated with the contractor's inability to recover nonrecurring costs during the prior year, according to the circumstances cited above. I have further advised the program team to "baseline" the contractor's proposed and actual nonrecurring costs and planned recoupment profile, for use in any annual adjustment necessary at some later time(s). Lastly, I have encouraged the program team to obtain consideration from the contractor in exchange, and as authority, for this contract modification.

In response to the memorandum, the contracting officer developed a draft Business Base Adjustment provision to address the Contractor's recoupment of the nonrecurring costs.

## Validation of Nonrecurring Costs

The Contractor indicated in the request for equitable adjustment that it had incurred approximately $73.3 million in nonrecurring costs. Because this requirement was procured as a FAR Part 12 commercial service, the Air Force was prohibited from requiring actual and certified cost or pricing data (finding A). However, the contracting officer attempted to obtain other cost and pricing data to support the Contractor's claimed nonrecurring costs. The contracting officer stated that prior to a contract modification, the Contractor must provide audit quality cost information to verify that the budgeted nonrecurring costs were reasonable. The contracting officer also stated that cost information should detail the Contractor's original budget for the initial contract, the actual cost, and the estimate to complete for each identified work element. In response, the Contractor indicated that the request implied that the Government intended to go beyond an audit of the nonrecurring baseline and conduct a pricing audit. The Contractor did not understand the purpose and value of this exercise and believed they had provided sufficient details of nonrecurring costs and a breakdown of work elements to support an audit of the nonrecurring baseline.

The contracting officer requested that the Defense Contract Audit Agency perform an agreed-upon procedures review of the nonrecurring baseline costs. The review focused on the budgeted nonrecurring costs rather than actual costs incurred. The review concluded that $24.6 million in nonrecurring costs could not be verified to subcontracts and purchase orders.

This was the second time Air Force contracting officials received information that showed that the nonrecurring costs were not supported by costs incurred by the Contractor. Prior to the joint ASC and Contractor briefing provided to Druyun in May 2001, ASC contracting officials performed a review of the Contractor's nonrecurring costs. ASC officials indicated that not only were they skeptical whether the Contractor's nonrecurring costs actually totaled as much as $73.3 million, but also confident that the costs did not exceed that amount. This skepticism was based in large part on the fact that the majority of the components for the F-16 MTC were commercially available or nondevelopmental. ASC officials indicated there was little visibility into the Contractor's recurring versus nonrecurring costs associated with products or services subcontracted. The subcontracted amounts made up over half of the value of the stated nonrecurring costs.

## Modification of the F-16 MTC Contract

On June 28, 2002, contracting officials signed modification number P00008 to the contract for F-16 MTC services. The modification established four contract line items for the payment of annual nonrecurring adjustments for 2002 through 2005. The Director of Contracting believed that the action was a "no cost" modification because the contract ceiling price would not be increased and the Contractor was providing consideration. The contract modification was made based on a clause contained in the contract which stated that changes in the terms and conditions of

the contract could be made only by written agreement of the parties. However, the modification required the Air Force to pay $41.6 million above its minimum contract obligation prior to receiving additional F-16 MTC services. In addition, we determined that the Air Force received minimal value from the consideration package it negotiated with the Contractor to justify the modification.

**Increase of Minimum Contract Obligation by $41.6 Million.** The minimum order obligated the Air Force to pay $74.4 million to have the F-16 MTC set up at two sites and for hourly simulator services for the basic contract term ending June 2006. Because this was a firm-fixed-price, requirements-type contract for commercial simulator services, the minimum obligation did not specifically address nonrecurring development costs. However, the Contractor claimed that it had incurred $73.3 million in nonrecurring costs and that it had only recovered $31.7 million of these costs through preparatory services at the two initial sites included as part of the minimum order. The Contractor claimed that it had spread its nonrecurring costs across all 18 sites in the maximum schedule and that the modification would allow recovery of the remaining portion. Because this was a requirements-type contract, the Air Force only received additional simulator services when it placed orders for additional site activations. However, the modification obligated the Air Force to pay the remaining $41.6 million of nonrecurring costs but did not cover any additional site activations or additional simulator services to be provided by the Contractor.

**Consideration Justifying the Contract Modification.** The contracting officer made a decision to accept all the nonrecurring costs claimed by the Contractor and offset the $24.6 million of questionable costs identified by the Defense Contract Audit Agency with a consideration package. The contracting officer worked with the F-16 MTC program manager, the Air Combat Command user representative, and Distributed Mission Training engineers to identify potential items of value (consideration) to the Air Force to justify a contract restructure. The three items negotiated with the Contractor were assigned a total value of $26.5 million and included unclassified software loads, engine run training, and a release of all future claims.

The unclassified software loads were assigned a value of $4 million and were intended to be used to demonstrate simulator capabilities to persons lacking appropriate security clearances to the simulator environment. The engine run training capability was assigned a value of $5 million and was intended to allow F-16 operation crew chiefs and engine specialists to use the simulator to become qualified and certified on ground-based normal and emergency engine operating procedures. The release of all future claims was assigned a value of $17.5 million and allowed for language to be included in the modification indicating that the supplement agreement constitutes full and final settlement of any and all claims that may arise as result of any changes to the estimated simulation service schedule of the contract.

**Value Received from the Consideration Package.** We determined that the Air Force received minimal value from the consideration package negotiated with the Contractor. The ASC General Counsel official who reviewed the consideration package informed us that she did not substantiate the value assigned to the consideration package and relied on contracting officials who determined that it

was adequate. In our opinion, the unclassified software loads did not represent an additional capability or benefit because the purpose of the F-16 MTC was to provide the capability to train pilots in combat situations. In addition, the methodology used to calculate the value for the engine run training was improperly based on an assumption that all 18 sites on the maximum schedule would be activated. However, when we contacted officials in November 2005, only four sites were activated and none of these sites were using the engine run training capability. Further, the value assigned to the release of claims was unsubstantiated. The Air Force purchased F-16 MTC simulation services through a requirements-type contract with a specified minimum quantity. At the time of the modification, the Air Force had ordered the required minimum quantity and had met its contractual obligations. The requirements contract did not obligate the Air Force to pay Contractor costs unless additional requirements were ordered.

## Conclusion

The Air Force did not comply with Federal acquisition policy when it modified the firm-fixed-price contract for F-16 MTC services to pay for nonrecurring (developmental) costs that were claimed by the Contractor. The modification occurred after nearly two years of deliberations between the contracting office and the Contractor because Darleen Druyun directed the modification. The FAR states that the price in a firm-fixed-price contract is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. The Contractor agreed to a firm-fixed-price contract and accepted the associated risks. The use of a commercial item acquisition strategy prohibited the Air Force from obtaining certified cost data to support whether the nonrecurring costs claimed by the Contractor were reasonable. As a result, the Air Force committed itself to pay $41.6 million over its minimum contract obligation prior to receiving additional F-16 MTC services. In addition, the Air Force received minimal value from the consideration package it negotiated with the Contractor to justify the modification.

## Other Matters of Interest

In addition to Shaw and Mountain Home Air Force Bases, the Air Force only activated two other sites. Therefore, only 14 cockpits at 4 sites were activated of the 61 total cockpits at 18 sites estimated in the maximum schedule. The Air Force made a decision in July 2004 not to activate additional sites because of concurrency and performance issues. The existing contract for F-16 MTC simulator services is scheduled to expire in June 2007. The Air Force is in the process of preparing a new solicitation package for the F-16 MTC requirement. As part of the memorandum we issued in August 2005, we requested that the Air Force perform a thorough review of the contract modification prior to making the final nonrecurring adjustment payment. The Air Force agreed to conduct the review. The Air Force determined that it would breach the contract if it did not make the final payment even though the modification was not in the best interest

of the Government. We continue to review the Air Force management and oversight of the contract and plan to summarize the results in a separate report.

## Recommendation and Management Comments

**B. We recommend the Assistant Secretary of the Air Force (Acquisition) establish management controls to prevent senior acquisition personnel from directing contract adjustments that are not in accordance with Federal acquisition policy.**

**Management Comments.** The Military Deputy of the Office of the Assistant Secretary of the Air Force (Acquisition) concurred with the finding and the recommendation. The Deputy stated that the Principle Deputy Assistant Secretary of the Air Force position has been eliminated, and the responsibilities of that office have been redistributed to more appropriate levels of oversight consistent with the Federal Acquisition Regulation. The Air Force has created an ombudsman and strengthened the contract clearance process to ensure compliance with Federal Acquisition Policy. The Deputy stated the Air Force will continue to review the acquisition process and implement more effective management controls to prevent senior acquisition personnel from exerting inappropriate influence on contract actions.

# Appendix A. Scope and Methodology

The audit was preformed at the request of the acting Under Secretary of Defense for Acquisition, Technology, and Logistics. For this audit, we determined whether the restructuring of the contract for F-16 MTC simulator services was in accordance with the FAR.

We performed this audit at ASC Headquarters, Air Combat Command Headquarters, and Shaw and Mountain Home Air Force Bases from May 2005 through January 2006 in accordance with generally accepted government auditing standards.

We reviewed the FAR and the Defense FAR Supplement. We reviewed the F-16 MTC simulator service request for proposal, contractor solicitations, contract files, briefing charts, memorandums, and relevant correspondence. We interviewed ASC personnel including the Chief of Contract Management, Contracting Officer, Program Manager, and General Counsel. We also interviewed personnel from the Defense Contract Audit Agency and Defense Contract Management Agency. We analyzed the F-16 MTC simulator service pricing schedules to determine a minimum and maximum contract value. Our scope was limited in that we did not verify the accuracy of the nonrecurring costs claimed by the contractor. In addition, the scope of the audit was limited in that we did not review the managers' internal control program.

**Use of Computer-Processed Data.** We did not use computer-processed data to perform this audit.

**Government Accountability Office High-Risk Area.** The Government Accountability Office has identified several high-risk areas in DoD. This report provides coverage of the DoD Contract Management high-risk area.

## Prior Coverage

During the last 5 years, the Air Force Audit Agency has issued two reports discussing the F-16 MTC. Air Force Audit Agency reports can be accessed over the Internet at http://www.afaa.hq.af.mil.

### Air Force

Air Force Audit Agency Report No. F2005-0039-FBN000, "F-16 Simulators, 366th Fighter Wing, Mountain Home Air Force Base, ID," May 2, 2005

Air Force Audit Agency Report No. F2004-0051-FDM000, "Flight Simulator Utilization, 20th Fighter Wing, Shaw Air Force Base, SC," May 5, 2004

# Appendix B. DoD IG Interim Results Letter

INSPECTOR GENERAL
DEPARTMENT OF DEFENSE
400 ARMY NAVY DRIVE
ARLINGTON, VIRGINIA 22202-4704

AUG 19 2005

MEMORANDUM FOR DIRECTOR, SIMULATOR SYSTEMS GROUP

SUBJECT: Audit of the Procurement Procedures Used for the F-16 Mission Training Center (Project No. D2005-D000FJ-0171.000)

In April 2005 the Department of Defense Office of Inspector General initiated an audit to determine whether the restructure of the F-16 Mission Training Center (MTC) contract was made in accordance with the Federal Acquisition Regulation (FAR). Our audit of the F-16 MTC program identified two areas of concern requiring a review by the Air Force. One is a scheduled contract payment and the other is the procurement procedures to be used in awarding the new F-16 MTC contract.

Specifically, we believe that the Air Force should perform a through review of the Contractor's actual costs and contract performance before making the calendar year 2005 non-recurring adjustment payment (Contract No. F3365799D2025 Line Item 0103AE). In addition, we disagree that the F-16 MTC requirement meets the definition of a commercial service in FAR 2.101, "Commercial Item." Our detailed discussion of these areas is included in the attachment.

We are providing this information before issuing a formal audit report to allow the Air Force time to take corrective action prior to making the final non-recurring adjustment payment and awarding a new contract. Once our field work is completed, we will follow-up with a formal audit report, which will incorporate this memorandum and any actions taken by the Air Force. We request that the Air Force provide a response within 30 days and describe the actions taken or planned in response to this memorandum.

If you have any specific questions or need additional information for this audit or memorandum, please contact Mr. James L. Kornides at (614) 751-1400, extension 211 (jkornides@dodig.osd.mil) or Ms. Amy Frontz at (614) 751-1400, extension 213 (afrontz@dodig.osd.mil).

Paul J. Granetto, CPA
Assistant Inspector General
Defense Financial Auditing
Service

For Official Use Only

**Attachment**

**Background.** In June 1999, the Air Force awarded a FAR Part 12 commercial fee-for-service firm fixed price requirements-type contract to Lockheed Martin Integrated Systems for the F-16 MTC capability and simulation environment. The contract term was seven years with eight additional award term years. The program provides training services with high fidelity flight and weapon simulations, the ability to network with other aircraft simulators, and the ability to network with constructive and actual command control, and intelligence systems. The contract allowed the Air Force to buy a service (trainer time) that reflects the actual use of the aircrafts configurations and realistic scenarios. The contract allowed for the contractor to own all of the hardware and software and be responsible for all trainer concurrency and technology upgrades with the current aircraft configuration. The simulators are required to be developed and physically setup at Air Force bases. The minimum contract requirement was for five seat activations at two sites. The requirements contract allowed for the Air Force to unilaterally exercise orders for additional seat activations. The 'notional schedule' or best estimate in the contract called for the activation of sixty-one seats at eighteen sites through 2006 if the Air Force exercised all orders.

In early 2000 the Air Force informed Lockheed that the funding for the F-16 MTC program had been reduced and that it could impact future seat activations. Lockheed indicated that it would be requesting a contract restructure because it would incur substantial losses. Lockheed had made a business decision to spread their non-recurring costs over all anticipated simulator activations instead of the minimum simulator activations specified in the contract. Lockheed claimed they would not be able to recoup these costs because they anticipated the Air Force not activating all requirements in the contract. Lockheed also claimed senior Air Force personnel verbally assured them activation of requirements would closely resemble the notional schedule. Lockheed requested a contract restructure to allow them to recoup their non-recurring (development) costs. Lockheed claimed $73 million total non-recurring costs, of which $31 million had already been paid.

**Contract Restructure.** Contracting officials initially indicated to Lockheed that a contract restucture was not warranted because the Air Force had met the minimum requirements for seat activations. Lockheed requested a meeting to discuss the contract restructure with the Office of the Air Force Principal Deputy Assistant Secretary for Acquisition and Management. In preparation for the meeting, Air Force established a review team that worked with Lockheed to develop options for proceeding with the contract. Lockheed threatened default claiming the contract was financially unviable and cited losses of $100 million. The option selected by the Principal Deputy was a contract restructure despite the fact that the review team was unable to determine the validity of the non-recurring costs. The rationale was the contractor should not incur losses because of Air Force's budget shortfall and it would be less costly to pay the $42 million then incur litigation costs.

This attachment contains contractor information that may be company confidential or proprietary. Section 1905, title18, United States Code, and section 423, title 41, United States Code, provide specific penalties for the unauthorized disclosure of company confidential or proprietary information. This attachment must be safeguarded in accordance with DoD Regulation 5400.7-R July 2005

For Official Use Only

1

**Attachment**

Contracting officials did not take immediate action because the Air Force had complied with the minimum contract terms. Lockheed continued to contact Air Force senior officials, and finally the Director of Contracting informed the contracting officer to obtain consideration and restructure the contract. The contracting officer worked with the F-16 MTC program manager, user representatives, and engineers to identify potential items of value to the Air Force (consideration). The Air Force assigned a subjective value of $26.5 million to the consideration package, which consisted of $4 million for unclassified software loads, $5 million for engine run training, and $17.5 million for release of all future claims. In addition, the contracting officer requested the Defense Contract Auditing Agency to review the non-recurring costs. The review identified approximately $24.6 million of questionable non-recurring costs claimed by Lockheed. Contracting officials indicated that the consideration package would offset the questionable non-recurring costs. Contract modification P00008 was issued in June 2002 and established line items to pay non-recurring adjustments for calendar years 2002 through 2005. The Air Force made non-recurring adjustment payments for 2002, 2003, and 2004.

The DoD OIG review concluded that firm fixed price contracts are not subject to any adjustment on the basis of the contractor's cost experience in performing the contract (FAR Part 16.202-1). In addition, the requirements clause contained in the contract clearly states: "if the Government's requirements do not result in orders in the quantities described as 'estimated' or 'maximum' in the schedule, that fact shall not constitute the basis for an equitable adjustment" (FAR Part 56.216-21). We question the subjective value assigned to the negotiated consideration package and further determined that the Air Force has received little additional value from the unclassified software loads, engine run training, and release of claims. The unclassified software loads are unrelated to the purpose of the F-16 MTC, which is to provide the capability to train in combat situations as part of the distributed mission training's realistic, full spectrum training environment. The methodology used to develop the estimated value for the engine run training was inadequate because it was based on the assumption that all seats and sites would be activated and Lockheed has since refused to accept orders for additional seat activations. The value assigned to the release of claims is questionable because the Air Force had met the terms of the original contract at the time of the modification. In addition, our review raised questions on whether Lockheed is adhering to the terms of the original contract. As a result, the Air Force should perform a through review of the contractor's actual costs and contract performance before making the calendar year 2005 non-recurring adjustment payment.

**FAR Part 12 Commercial Fee-for-Service Acquisition.** The FAR defines commercial services as: "Services of a type offered and sold competitively in substantial quantities in the commercial marketplace based on established catalog or market prices for specific tasks performed under standard commercial terms and conditions. This does not include services that are sold based on hourly rates without an established catalog or market price

This attachment contains contractor information that may be company confidential or proprietary. Section 1905, title18, United States Code, and section 423, title 41, United States Code, provide specific penalties for the unauthorized disclosure of company confidential or proprietary information. This attachment must be safeguarded in accordance with DoD Regulation 5400.7-R July 2005

**Attachment**

for a specific service performed" (FAR Part 2.101). Additional clarification provided by the Under Secretary of Defense for Acquisition and Technology in a January 2001 memorandum specifies that "of a type" is not intended to allow the use of commercial acquisition procedures to acquire sole-source, military unique items that are not closely related to items already in the marketplace.

The Air Force performed market research and determined the F-16 Commercial Training Simulation Service was "of a type" commercially available. The Air Force used the following as the basis for the commercial fee-for-service contract;

- Boeing-McDonnell Douglas training division was currently under contract to provide simulation services on the F-15 to the Air Force on a commercial basis, utilizing flying hours.
- Simulator services are provided on a variety of Boeing, Jetstream, Airbus, Metro, C-130H, and DC-10 aircraft.
- Commercial simulator services have published prices with ordering instructions at published rates.
- Private industry is bidding on this effort and the program was published in the commerce business daily.

Based on our review of the F-16 MTC program we concluded that the F-16 simulator service does not meet the definition or intent of a commercial service. The Air Force suggests that the F-16 MTC simulator qualifies as a commercial service because it is of a type offered and sold competitively in the commercial marketplace. However, comparable hourly rates based on established catalog or market prices do not exist. The F-16 MTC simulator services are not offered or sold competitively to anyone other than the Air Force. The F-16 MTC simulator is military specific, complex in nature, and requires setup at Air Force bases across the world. The Air Force is the only customer and paid all of the F-16 MTC development costs, which represented 98 percent of the total minimum contract value. As such, the Air Force should use FAR Part 15, "Contracting by Negotiation," to award the next F-16 MTC contract.

This attachment contains contractor information that may be company confidential or proprietary. Section 1905, title18, United States Code, and section 423, title 41, United States Code, provide specific penalties for the unauthorized disclosure of company confidential or proprietary information. This attachment must be safeguarded in accordance with DoD Regulation 5400.7-R July 2005

# Appendix C. Air Force Response to DoD IG Interim Results Letter

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AERONAUTICAL SYSTEMS CENTER (AFMC)
WRIGHT-PATTERSON AIR FORCE BASE, OHIO

2 Feb 06

MEMORANDUM FOR THE ASSISTANT INSPECTOR GENERAL–DFAS
400 ARMY NAVY DRIVE
ARLINGTON VA 22202-4704

FROM: ASC/CC
1846 4th Street
Wright-Patterson AFB OH 45433-7126

SUBJECT: Audit of the Procurement Procedures Used for the F-16 Mission Training Center (Project No D2005-D000FJ-0171 000) (Your Memo, 19 Aug 05)

1 The referenced memorandum identified two areas of concern requiring review by the Air Force: one being the scheduled 2005 business base adjustment payment, and the second being the procurement procedures to be used in awarding the new F-16 Mission Training Center (MTC) contract The following describes actions the Air Force has taken in response to this memorandum

a. In accordance with the subject contract, the Air Force had until 31 December 2005 to issue the business base adjustment payment for calendar year 2005 Failure to do so would constitute a breach of contract by the Air Force After careful and thorough review of all the relevant information used in developing and negotiating the business base adjustment clause, the Air Force had determined Lockheed Martin has met the intent of the agreement by providing the prior negotiated consideration (unclassified loads, release of claims, and engine run capability).

b In regard to the upcoming F-16 MTC acquisition, the Air Force held a senior level panel in October 2005 to review the program's Business Case Analysis (BCA). The panel reviewed multiple contract types supported by BCA, comparing service-based solutions and traditional procurement to determine the best solution in providing a timely training capability to the warfighter. A FAR Part 15 services contract was determined to be the preferred approach and the Air Force is coordinating that position with key stakeholders. The draft request for proposal was released on 4 January 2006 with SAF/AQ concurrence

2 I trust you will find these actions responsive to your concerns. If you require further assistance, feel free to contact Ms. Carol Zelczak at 937-255-7388, ext 3252

John L Hudson
JOHN L HUDSON
Lieutenant General, USAF
Commander

# Appendix D. Contractor Request for Equitable Adjustment

Lockheed Martin Corporation
Naval Electronics & Surveillance Systems
2323 Eastern Boulevard Baltimore, MD 21220-4207
Telephone 410 682 1100 Facsimile 410 682 1117

LOCKHEED MARTIN

Joseph D. Antinucci
President

May 17, 2001

Ms. Darleen Druyun
Principal Deputy Assistant of the Air Force
Acquisition & Management
1060 Air Force Pentagon
Washington, DC 20330-1060

Subject: Lockheed Martin Request for Contract Restructure for F-16 MTC

Reference: (1) F-16 DMT CISS Options ASC/YW & Lockheed Martin IPT Brief 04 May 2001

Dear Ms. Druyun,

This letter is provided for purposes of establishing a formal request for contract restructure for the F-16 MTC program. Lockheed Martin has substantially developed an outstanding training capability in direct support of USAF requirements. In order to realize the DMT program vision, we must find a mutually acceptable way to convert these assets into training services. This request is written in the spirit of mutual cooperation and is consistent with previous discussions between our staffs.

In addressing this request, it is important to recall the environment and expectations when this contract was awarded. The acquisition model was intended to establish a revolutionary path for providing the USAF with world class training services in a more commercially oriented manner. This capitalization/investment type program was intended to have industry assist the USAF in financing their training requirements on a fee for service basis.

The F-16 MTC contract was aggressively competed on an essentially winner take all basis. The terms and conditions of the RFP limited Government obligations, but we were assured by the AF SAB and the former ACC Commander that the USAF was committed to their "best estimated service requirements and schedule". Moreover, the USAF had made clear that they intended to fund the entire DMT program via discretionary use of 3400 money by fencing 10% of flying hours to support training needs. Government intentions had been clearly established.

The RFP funding limitations required the Contractor to make significant investment at the inception of the program and to structure a bid that would enable the Contractor to recover its non-recurring investment, as well as continuous recurring investment in site assets and O & M support, over the program life. The Contractor's bid could only be based upon reasonable and realistic assumptions concerning the USAF's intention to award Task Orders per the advertised requirements schedule. To assume otherwise would have resulted in a proposal that would not be commercially reasonable or affordable to the USAF.

Unfortunately, shortly after the June 1999 award the environment surrounding the DMT program changed. As we learned, in September 1999 the USAF lost its ability to utilize flying hours to pay for DMT and the lack of a secure budget plan resulted in a catastrophic shortfall to the DMT program's viability. In August of 2000, more than a year later, Lockheed Martin was officially notified of the USAF's budget problems and the likelihood that the USAF could not meet its previous intentions to the F-16 MTC contract.



In support of customer needs, Lockheed Martin continued to invest in good faith in the development of training systems and support for the USAF's requirements. At the same time we were told by the USAF that the funding problem would be addressed and that they were committed to the vision of the DMT program.

The challenge of today is that the USAF funding problem has not been solved and Lockheed Martin has committed nearly $70M in non-recurring investment to a program where the original requirements schedule has been reduced and stretched to approximately 50% of that anticipated by the original contract. Our business case was based on a return to cash positive by FY'03 and a break-even by approximately the FY'07 time frame. The current notional road map of requirements, for which there is no guarantee, would result in a small return to cash positive by FY '05 and never reaching a break-even in the fifteen years of the program. This results in Lockheed Martin underwriting the USAF's training requirements.

Additional adverse cost impacts that have been realized by Lockheed Martin as a result of budget impacts during the course of performance are as follows:

- Recurring cost impacts (hardware, site databases, support) due to schedule stretch, notional estimate of $15M-$20M
- Lack of funding to support ECPs affecting user satisfaction (NVG, JHMCS, etc)
- Lack of funding to support ECP required for Block 40 activation (40%+ seats impacted)
- Lost opportunity cost for Lockheed Martin due to substantial investment and delayed/doubtful recovery

Lockheed Martin has sought a win-win solution to resolve the financial impact of these changes and it is our expectation that the financial impact will be addressed in the process of mutually establishing adequate consideration for the proposed restructure.

The net result of the aforementioned is that the F-16 MTC program is no longer financially viable as structured. This not only creates a problem for Lockheed Martin but also for the USAF and their vision of achieving DMT through innovative acquisition strategies. Potential alternative program approaches or acquisition strategies will result in significant delays and assured increased cost to the USAF. Accordingly, the option to restructure this contract as presented by the ASC/YW – Lockheed Martin IPT represents the best "win/win" solution for all parties concerned.

The recommended option restructures early training availability services rates for sites under contract task order in FY'01 and subsequent site preparation rates for future activation. The result of the requested change would be an increase in contract work scope as reasonable consideration, a reduction in Lockheed Martin's risk for recovery of non-recurring investment, an improvement in the commercial viability of the USAF's DMT acquisition strategy, and preservation of the total program price.

Lockheed Martin wants to support the USAF and serve its needs with the world's best training services. We have continued to invest and perform, and we have worked in the spirit of resolving this dispute for our mutual benefit. We believe, however, on the basis of fundamental fairness and the strong desire of the Air Force to provide training service, that we jointly restructure this program. We are committed to joint success.

Thank you for your continued support in addressing this issue of significant mutual concern.

Sincerely,

Joseph D. Antinucci
President

cc: ASC/CC (LGen Raggio)

# Appendix E. Report Distribution

## Office of the Secretary of Defense

Under Secretary of Defense for Acquisition, Technology, and Logistics
  Director, Acquisition Resources and Analysis
  Director, Defense Procurement and Acquisition Policy
Under Secretary of Defense (Comptroller)/Chief Financial Officer
  Deputy Chief Financial Officer
  Deputy Comptroller (Program/Budget)

## Department of the Army

Assistant Secretary of the Army (Financial Management and Comptroller)
Auditor General, Department of the Army

## Department of the Navy

Assistant Secretary of the Navy (Manpower and Reserve Affairs)
Naval Inspector General
Auditor General, Department of the Navy

## Department of the Air Force

Assistant Secretary of the Air Force (Acquisition)
Assistant Secretary of the Air Force (Financial Management and Comptroller)
Auditor General, Department of the Air Force

## Other Defense Organizations

Director, Defense Contract Management Agency

## Non-Defense Federal Organization

Office of Management and Budget

## Congressional Committees and Subcommittees, Chairman and Ranking Minority Member

Senate Committee on Appropriations
Senate Subcommittee on Defense, Committee on Appropriations
Senate Committee on Armed Services
Senate Committee on Governmental Affairs
House Committee on Appropriations
House Subcommittee on Defense, Committee on Appropriations
House Committee on Armed Services
House Committee on Government Reform
House Subcommittee on Government Management, Finance, and Accountability, Committee on Government Reform
House Subcommittee on National Security, Emerging Threats, and International Relations, Committee on Government Reform

# Office of the Assistant Secretary of the Air Force (Acquisition) Comments

DEPARTMENT OF THE AIR FORCE
WASHINGTON DC

OFFICE OF THE ASSISTANT SECRETARY

8 MAR 2006

MEMORANDUM FOR DEPARTMENT OF DEFENSE INSPECTOR GENERAL
ATTN: MR. JAMES KORNIDES

FROM: SAF/AQ

SUBJECT: DOD IG Draft Report, "Procurement Procedures Used for F-16 Mission Training Center Simulation Services" (Project No. D2005-D000FJ-0171.000, 2 Feb 06)

The Air Force appreciates the opportunity to review and comment on this draft DOD IG report. While we do not fully agree with all of the details in the report, we concur with the recommendation to "review and determine the appropriate use of commercial item procurement strategies for future simulator services for Air Force unique weapons systems." In fact, we have already made significant progress in that direction. Specifically, a Headquarters Air Force review group evaluated the program and determined a services contract negotiated in accordance with FAR Part 15 would be the preferred approach to recompete the F-16 Mission Training Center (MTC) Contract.

With regard to your second recommendation, we concur that the process could have been structured more rigidly and additional management controls could have been in place to provide additional checks and balances through the acquisition chain of command. In that regard, we have already eliminated the Principal Deputy Assistant Secretary of the Air Force (Acquisition and Management) position, and redistributed the responsibilities of that office to more appropriate levels of oversight consistent with the Federal Acquisition Regulation and its supplements. Also, in response to this and other reports, the Air Force has put in place a series of fixes such as creating an ombudsman and strengthening the contract clearance process (to ensure negotiations are consistent with laws, regulations and policy as well as providing an independent review). We will continue to review the acquisition process and implement more effective management controls and policy, when appropriate, to prevent senior acquisition personnel from exerting inappropriate influence on contract actions. We would be happy to discuss any suggestions you may to have to put additional controls in place.

If you require further assistance, feel free to contact my staff, Mr Tony Peasant 703-588-7711 or Maj Ted Gatlin at 703-588-7724.

DONALD J. HOFFMAN, Lt Gen, USAF
Military Deputy, Office of the Assistant Secretary
of the Air Force (Acquisition)

# Team Members

The Department of Defense Office of the Deputy Inspector General for Auditing, Defense Financial Auditing Service prepared this report. Personnel of the Department of Defense Office of Inspector General who contributed to the report are listed below.

Paul J. Granetto
Patricia A. Marsh
James L. Kornides
Amy J. Frontz
Anthony C. Hans
James C. Darrough
Brian M. Stumpo
Erin S. Hart
Ann Thompson