**Agreed-Upon Copy For Release – May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

No. 06-396 C
(Judge Williams)

L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

LOCKHEED MARTIN AERONAUTICS COMPANY,

Intervenor.

# INTERVENOR LOCKHEED MARTIN'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
DAVID B. ROBBINS
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
*Counsel for Intervenor, Lockheed Martin Aeronautics Company*
August 18, 2006

# TABLE OF CONTENTS

Page

ARGUMENT....................................................................................................2

A L-3 Communications' Arguments Regarding The Application Of RCFC 12(b)(1) To The Statute Of Limitations Bar Are Erroneous ................2

B. L-3 Communications Cannot Demonstrate That Its Claims Were Timely Filed ....................................................................................3

1. Plaintiff Improperly Relies On Inspector General Reports Instead Of Addressing The Deficiencies Of Its Complaint.................4

a. L-3 Communications' Improper Discussion And Reliance On Government Reports ............................................5

b. L-3 Communications Cannot Explain How, In January 1999, It Lacked Notice Of The Facts Underlying Its Complaint........................................................6

2. L-3 Communications Cannot Rely On Ms. Druyun's Unrelated "Shenanigans" That Post-Dated The C-5 AMP Award Decision.......................................................................13

3. Ms. Druyun's Actions With Respect To Unrelated Procurements And Other Matters In Which Lockheed Martin Was Involved Do Not Affect Dismissal Of This Protest .........................................................................................15

C. L-3 Communications Also Fails To Rebut Lockheed Martin's Showing That Ms. Druyun's Alleged Improprieties Related To The C-5 AMP Procurement Should Be Dismissed Under RCFC 12(b)(6) ..........18

CONCLUSION ..............................................................................................21

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*ABIC, Ltd.*, B-286460, Jan. 12, 2001, 2001 CPD ¶46 ....12

*Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002) ....14, 16

*Ball Aerospace & Technologies Corp.*, B298522, Aug. 11, 2006 ....9, 12

*Four Points By Sheraton v. United States*, 66 Fed. Cl. 776 (2005) ....20

*Grass Valley Terrace v. United States*, 69 Fed. Cl. 341 (2005) ....3

*Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994) ....20

*Heyer Products v. United States*, 140 F. Supp. 409 (1956) .... 19-20

*Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573 (Fed. Cir. 1988) ....3

*Jones v. United States*, 801 F.2d 1334 (Fed. Cir. 1986) ....2

*Kosmo v. United States*, – Fed. Cl. –, 2006 WL 2079102 (July 25, 2006) ....3

*Kramer v. Time Warner*, 937 F.2d 767 (2d Cir. 1991) ....20

*MacLean v. United States*, 67 Fed. Cl. 14 (2005) ....2

*MacLean v. United States*, – F.3d. –, 2006 WL 1897047 (Fed. Cir. July 12, 2006) ....3

*Pro-Mark, Inc.*, B-247248, *et al.*, May 18, 1992 ....8

*Sebastian v. United States*, 185 F.3d 1368 (Fed. Cir. 1999) ....20

*Speedy Food Service, Inc.*, B-258537, *et al.*, May 2, 1995, 95-2 CPD ¶ 111 ....8

*Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379 (2004) ....20

**Statutes and Regulations:**

18 U.S.C. § 208(a) .... 18-19

28 U.S.C. § 2501 ....2, 3

FAR 15.308 ........................................ 9

**Miscellaneous:**

Fed. R. Evid. 201 ........................................ 5

RCFC 12(b)(1) ........................................ 1, 3

RCFC 12(b)(6) ........................................ 1, 3, 18, 20

**Agreed-Upon Copy For Release – May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | | |
|---|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | No. 06-396 C |
| Defendant, | ) | (Judge Williams) |
| and | ) | |
| LOCKHEED MARTIN AERONAUTICS COMPANY, | ) | |
| Intervenor. | ) | |

**INTERVENOR LOCKHEED MARTIN'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

Pursuant to RCFC 12(b)(1) and 12(b)(6), intervenor, Lockheed Martin Aeronautics Company ("Lockheed Martin"), respectfully submits this reply memorandum in support of its motion to dismiss the bid protest of L-3 Communications Integrated Systems L.P. ("L-3 Communications"), and in support of the motion to dismiss submitted by defendant, the United States.

In its Opposition to Defendant's and Intervenor's Motions to Dismiss ("Pl. Opp."), L-3 Communications focuses most of its attention on Ms. Druyun's 2000-2003 illegal behavior benefiting the Boeing Company. Clearly, plaintiff hopes to leverage the

bad facts related to those improprieties into an all-purpose attack on any procurement decisions in which Ms. Druyun participated during her long career with the Air Force. But there is no basis for plaintiff to maintain a protest of the Air Force's January 1999 C-5 Avionics Modernization Program ("C-5 AMP") award based on the subsequent conviction of the Source Selection Authority ("SSA") for procurement improprieties that occurred later in time and involved a different Government contractor.

More fundamentally, L-3 Communications' opposition brief fails to even address Lockheed Martin's point-by-point demonstration that by January 28, 1999 – more than seven years before the protest was filed – plaintiff had sufficient notice of virtually all the facts on which its complaint is based. L-3 Communications' cause of action accrued at that time and is thus barred by the statute of limitations.

**ARGUMENT**

**A. L-3 Communications' Arguments Regarding The Application Of RCFC 12(b)(1) To The Statute Of Limitations Bar Are Erroneous**

In *MacLean v. United States*, this Court applied long-established precedent and held that RCFC 26(b)(1) applies to motions to dismiss pursuant to 28 U.S.C. § 2501, because that statute imposes a jurisdictional bar to claims brought in an untimely manner. 67 Fed. Cl. 14, 15 n.1 (2005) (citing *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986)); *see* Intervenor Lockheed Martin's Motion to Dismiss ("LM Mot."), 7. L-3 Communications argues that the Court should reconsider its *MacLean* ruling and adopt the contrary rationale described in *Grass Valley Terrace v. United States*, 69 Fed. Cl. 341, 346 (2005), that motions to dismiss based on section 2501 should be resolved under

RCFC 12(b)(6). Pl. Opp. 4-5 & n.2. But this Court's *MacLean* decision applied binding Federal Circuit precedent that must be followed. Indeed, when the Federal Circuit recently affirmed this Court's *MacLean* decision, it again made clear: "In the Court of Federal Claims, the statute of limitations 'is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed.'" No. 05-5149, 2006 WL 1897047, at *2 (Fed. Cir. July 12, 2006) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988)); *see Kosmo v. United States*, No. 04-484C, 2006 WL 2079102, at 9 (Fed. Cl. July 25, 2006) (applying same rule); Pl. Opp. 5 n.2.

As we have demonstrated, the vast majority of the claims presented in plaintiff's complaint are time-barred. LM Mot. 8-25; *see* section B below. Those claims should be dismissed under RCFC 12(b)(1), which imposes the burden to establish jurisdiction on plaintiff. To the extent this Court determines that any issues are not barred by 28 U.S.C. § 2501, plaintiff's remaining claims should be dismissed pursuant to RCFC 12(b)(6).

**B. L-3 Communications Cannot Demonstrate That Its Claims Were Timely Filed**

In its motion to dismiss, Lockheed Martin focused primarily on the complaint's specific allegations and demonstrated that in January 1999, L-3 Communications had notice of the vast majority of the specific facts on which its protest is based – and its cause of action thus accrued at that time. In response, L-3 Communications largely fails to address our detailed factual analysis (of its complaint) and instead attempts to focus

on what appears to be a more inviting target: "the cumulative effect of Druyun's shenanigans." Pl. Opp. 10.

But none of the complaint's specific factual allegations in any way connect Ms. Druyun's 2000-2003, Boeing-related improprieties with the 1999 C-5 AMP award decision, in which Boeing was not involved. And neither plaintiff's bald assertions in its complaint and opposition brief, nor the discretionary decisions of the Air Force (and other Department of Defense offices) to investigate Ms. Druyun's actions provide a basis for this lawsuit to proceed.

**1. Plaintiff Improperly Relies On Inspector General Reports Instead Of Addressing The Deficiencies Of Its Complaint**

In its motion to dismiss, Lockheed Martin methodically demonstrated that by no later than the January 28, 1999 debriefing, plaintiff L-3 Communications had clear notice of the facts underlying virtually all of the allegations in its complaint – and thus the causes of action related to those allegations accrued at that time. LM Mot. 8-28. In its opposition brief, plaintiff largely ignores our analysis of its complaint, arguing that "L-3 did not know and could not have known that the selection process was tainted and that it was the victim of the taint" until a series of additional events occurred: "the Inspector General's investigation, which directly resulted from the Druyun Study targeting eight procurements, which directly resulted from Druyun's October 2004 confessions." Pl. Opp. 8. This argument is fundamentally flawed.

**a. L-3 Communications' Improper Discussion And Reliance On Government Reports**

After Ms. Druyun's illegal actions were revealed, the Air Force (and DoD) initiated a series of investigations to determine the extent of any improprieties and whether the Air Force's failure to detect irregularities revealed a need for structural changes within the Services. *E.g.*, Joint App. 119-20; Joint App. 138g[1]; Pl. Opp. 7 n.5 (citing report of the Defense Science Board). Although it is true that a Government audit (or investigation) of a past contract award decision is likely to reveal new information about the details (and propriety) of the subject procurement decisions, it does not follow (as plaintiff erroneously argues) that L-3 Communications lacked sufficient information to protest before the investigation was initiated and the report was released.

The relevant question is *not* what L-3 Communications learned from the Inspector General (and DoD) reports, but whether the information revealed to L-3 Communications in January 1999 by the SSDD and other contemporaneous documents provided an adequate basis for a bid protest that should have been pursued, if at all, at

[1] Throughout its brief, plaintiff cites to publicly-available Government reports regarding procurements other than C-5 AMP, even including one of the documents with its brief and marking it as a supplemental appendix. Pl. Opp. 7 n.4; Joint App. 138a-138ff. These non-C-5 AMP-related reports are irrelevant to the procurement at issue in this protest. What is more, although L-3 Communications fails to address the issue (*see* LM Mot. 4 n.2), Lockheed Martin objects to any request that the Court take judicial notice with respect to any facts described in these reports. Although such findings represent the conclusions of Executive Branch officials, they do not qualify for judicial notice because they are not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). We cite these materials solely in response to plaintiff's arguments.

that time.[2] A review of the complaint demonstrates that the specific allegations that L-3 Communications now makes consist primarily of allegations regarding purported failures or shortcomings in the SSDD itself or in other documentation that L-3 Communications was provided in 1999. There is no scienter applicable to those alleged procurement irregularities on which the complaint is based, and thus Ms. Druyun's alleged state of mind, which plaintiff erroneously asserts is revealed by the Inspector General's reports, is irrelevant.

**b. L-3 Communications Cannot Explain How, In January 1999, It Lacked Notice Of The Facts Underlying Its Complaint**

Plaintiff fails to meaningfully respond to our demonstration that Air Force's contemporaneous documents, which were provided to L-3 Communications in January 1999, provided ample notice of the facts underlying most of the allegations set forth in the complaint. And to the extent L-3 Communications attempts to muster arguments supporting parts of its complaint, they are wholly inadequate.

*First*, L-3 Communications fails to rebut our demonstration that during the January 1999 debriefing, the Air Force provided all the documents and information that

[2] L-3 Communications improperly speculates that "the government did not believe that Druyun's manipulation of the system was limited to awards favoring Boeing" and makes erroneous assertions regarding the specific reasons the Inspector General decided to exercise his discretion to investigate issues related to the F-16 Maintenance Training Center ("MTC") contract. Pl. Opp. 7. The Government properly determined that it needed to investigate the extent of recently discovered improprieties, and there is nothing in its public statements regarding those investigations asserting that the Government had made any conclusions before the investigations began. *See* Joint App. 119-20, 138d. Thus, plaintiff's assertions are inappropriate and irrelevant.

purportedly supports the protest allegations regarding a misidentified weakness,[3] unequal treatment regarding weaknesses, and misevaluation of training to be provided by the offeror. *See* LM Mot. 10-17. Plaintiff should thus be deemed to have conceded that it had sufficient information to present a protest regarding each of those issues on January 28, 1999.

*Second*, with respect to the SSA's changes to proposed ratings of the Source Selection Evaluation Team ("SSET"), L-3 Communications argues that its ability to protest these changes was triggered in 2006, not when it first learned about the ratings changes and was provided the SSDD, which explained the rationale for those decisions. LM Mot. 19-21. Initially (*i.e.*, in 1999), plaintiff asserts that because an "SSA has the authority to change ratings, . . . L-3 could not protest changes made purportedly in good faith in the ordinary course of a procurement." Pl. Opp. 9 (citing LM Mot. 18). Plaintiff then argues that in 2006, the "Inspector General revelations significantly changed the January 1999 landscape" because "L-3 can protest . . . the manipulation of the system by a SSA whose motivation was to change Lockheed [Martin]'s ratings 'to better support the higher cost proposal presented by Lockheed Martin Aeronautical Systems.'" *Id.* at 9-10 (citing Joint App. 131).[4] Both parts of this argument are wrong.

---

[3] In its opposition brief, plaintiff continues its inexplicable failure to identify the weakness that was purportedly misidentified by the SSA in the SSDD (and described in the debriefing slides). *See* LM Mot. 12.

[4] Plaintiff asserts that in addition to changing ratings, Ms. Druyun "feigned disagreement and offered different reasons in the SSDD shown to the disappointed bidder." *Id.* (citing Joint App. 131). But the Inspector General did not conclude that Ms. Druyun "feigned disagreement" with the SSET; to the contrary, Ms. Druyun's disagreement with respect to several issues is clearly evidenced by her alteration of the

L-3 Communications erroneously asserts that it could not have pursued a protest based on ratings changes in 1999 because "the acts of assigning weaknesses and strengths – by themselves – do not provide grounds for a bid protest." Pl. Opp. 9; *see id.* at 8 ("Reading the SSDD and the PAR and participating in the debriefing for the C-5 AMP contract award could not have revealed to L-3 what was hidden to the rest of the world."). Although it is true that "Source selection officials are not bound by the recommendations of lower-level evaluators" – and thus this Court and GAO generally defer to "the high-level official's judgment" – that deference does not result in the absolute bar to a protest asserted by plaintiff. To the extent a protester could demonstrate that ratings were changed in an "unreasonable or improper" manner, as with any other violation of procurement law, a disappointed offeror could maintain a protest. *See Speedy Food Service, Inc.*, B-258537, *et al.*, May 2, 1995, 95-2 CPD ¶ 111, at 4; *Pro-Mark, Inc.*, B-247248, *et al.*, May 18, 1992, 92-1 CPD ¶ 448, at 3.

The complaint alleges that Ms. Druyun improperly changed ratings "without providing justification . . . in the C-5 AMP [SSDD]." Complaint ¶ 20 (citing Joint App. 125). Even assuming (for the sake of argument) that plaintiff is correct that Ms. Druyun failed to provide a sufficient explanation of her ratings changes on the face of the SSDD, L-3 Communications provides no explanation in its opposition brief why it could not have maintained a protest on such grounds, *if timely filed*.

---

proposed ratings (among other things). There is similarly no basis for L-3 Communications' assertion that the SSA "offered different reasons in the SSDD shown to the disappointed bidder." *See* LM Mot. 19-20 (demonstrating consistency between the SSDD and the debriefing slides).

Nor could plaintiff make such a showing. An SSA is unquestionably required to document the rationale for award decisions, *see* FAR 15.308, and that obligation includes explaining the rationale for rejecting proposed ratings of evaluators. Although a timely protest claiming insufficient documentation of such changes may not ultimately prevail on the merits (*see* LM Mot. 18), there is no reason such a claim would not survive a motion to dismiss – and thus allow for the examination of the agency's administrative record. For instance, in *Ball Aerospace & Technologies Corp*., B-298522, Aug. 11, 2006, 2006 WL 2346015, at *2, a recently decided Druyun-related bid protest, the GAO explained that in an earlier protest (which had been pursued immediately after the award decision was made), the protester had obtained the administrative record based, in part, on the allegation that "the agency had improperly changed [the protester's] evaluation ratings and that [protester's] and Boeing's proposals had not been evaluated in an 'even-handed manner.'" *Id.*[5] Had L-3 Communications pursued a timely protest based on its allegation that the SSDD provided insufficient documentation of the ratings changes (*see* Complaint ¶¶ 20-21), and if its attorneys had

[5] The initial protest in *Ball Aerospace* was unilaterally withdrawn by the protester "[a]fter its attorneys received a copy of the agency's evaluation record, pursuant to [a GAO] protective order." *Id*. The second *Ball Aerospace* protest, which is the subject of the cited opinion, was dismissed the protest as untimely. In that case, the Air Force (with Ms. Druyun acting as SSA) had awarded the "CMIS Program" contract to Boeing. GAO determined that the protester's actions accrued in that case when Ms. Druyun's supplemental statement of facts was released in October 2004. *Id.* at *4. Although consistent with Lockheed Martin's argument presented above, *Ball Aerospace* is notably distinguishable from the facts here, in that L-3 Communications' complaint is based on the contention that the SSDD and the Air Force's contemporaneous documents – of which plaintiff had notice in January 1999 – were inadequate, whereas the *Ball Aerospace* claims were not tied to such contemporaneous materials.

reviewed the record and believed there was a basis to proceed, there is no reason plaintiff could not have done so at that time.

As explained above, L-3 Communications also argues that "the February 2006 Inspector General revelations significantly changed the January 1999 landscape" by finding that Ms. Druyun intended to manipulate the system on Lockheed Martin's behalf. Pl. Opp. 10. But the Inspector General's report did not contain anything that qualifies as a revelation (in 2006) to L-3 Communications. Instead, the relevant parts of the Inspector General's report focused on the SSDD and other documents that L-3 Communications was provided in January 1999. The report thus did not *reveal* anything new, but simply commented on materials that plaintiff unquestionably possessed more than seven years before the complaint was filed.

Plaintiff also mischaracterizes the Inspector General's findings. The Inspector General did not find that Ms. Druyun had any improper "intent to manipulate . . . the changes in ratings and the allocation of strengths and weaknesses." *Id.* Instead, he recognized that Ms. Druyun had changed ratings – which was indisputably known in 1999 by L-3 Communications, as demonstrated by the verified debriefing notes (Joint App. 270) – and determined that she had done so "without providing justification for these changes in the C-5 AMP SSDD." Complaint ¶ 20; Joint App. 125; *see* Pl. Opp. 1 & ¶ 3. Finding that ratings changes were not adequately explained in the

contemporaneous record is very different from finding improper manipulation, as L-3 Communications erroneously asserts.[6]

In sum, plaintiff's argument that it needed the Inspector General's report to elevate its claims from "a garden variety protest" is unsupported. That is true because the Inspector General's conclusions only provide support for an insufficient documentation claim. Such a claim is not only a plain-vanilla bid protest issue, but it is one that plaintiff could have pursued when it received the SSDD in January 1999.

*Third*, L-3 Communications fails to explain why its claims with respect to Ms. Druyun's status as SSA are not time-barred. In its opposition brief, plaintiff asserts that Ms. Druyun "exercised unprecedented control over procurements" and that she "orchestrated her ability to make the final decision concerning the C-5 AMP source selection by removing the previous [SSA] and placing herself in that position." Pl. Opp. 7-9. However, Ms. Druyun's domineering and ambitious personality did not violate procurement law or afford plaintiff any basis to protest the Air Force's procurement decision.

In its opposition brief, plaintiff does not dispute that in January 1999, it knew Ms. Druyun had been the SSA for the C-5 AMP award. *See* LM Mot. 21-23. Because the

---

[6] Plaintiff also asserts that Ms. Druyun changed ratings "in order to support the higher cost of Lockheed [Martin]'s proposal" and "so Lockheed [Martin] could win the competition." Pl. Opp. 3 (¶ 13), 9. But the Inspector General did not find that Ms. Druyun had either of those motivations. Indeed, the SSA did not need to change ratings for Lockheed Martin to win the competition, as the SSET also believed Lockheed Martin's proposal was superior. Joint App. 140-43. Ms. Druyun apparently believed that the SSET did not realize the extent of the superiority of Lockheed Martin's proposal, and the presumption of good faith applies to that conclusion.

legal efficacy of her serving in that capacity has not changed since that time, and any challenge to the legitimacy of her status as the Air Force's deciding official is time-barred.

And *fourth*, L-3 Communications argues it is "pure fiction" to assume that it could have discovered any grounds of its current protest not revealed by contemporaneous documents in its possession in January 1999 by filing a timely protest and obtaining access to the Air Force's administrative record. That is so, plaintiff contends, primarily because protesters do not always obtain access to the agency's administrative record.

Although legally defective bid protests can be (and frequently are) dismissed prior to production of the administrative record – as plaintiff's current protest should be – several of the grounds of this protest would have presented a viable, *had the action been timely filed*. It is true that the unanimous agreement of the evaluators and the SSA that Lockheed Martin's proposal was superior would have presented L-3 Communications substantial difficulty in proving prejudice, but that issue affects the ultimate merits; it would not require resolution at the motion to dismiss stage. With respect to sufficiency of pleading, plaintiff fails to explain why its claims of, for example, undocumented ratings changes or misevaluated weakness would not at least resulted in receipt of the administrative record, *i.e.*, why the protest would not have survived a motion to dismiss. *See*, *e.g.*, *Ball Aerospace & Technologies Corp.*, 2006 WL 2346015, at *2 (administrative record produced in initial protest alleging improperly changed ratings); *ABIC, Ltd.*, B-286460, Jan. 12, 2001, 2001 CPD ¶ 46, at 4-6 (claim of misevaluated

weakness rejected after review of record). If timely filed, such claims would presumably result in the production of the administrative record.

### 2. L-3 Communications Cannot Rely On Ms. Druyun's Unrelated "Shenanigans" That Post-Dated The C-5 AMP Award Decision

L-3 Communications explains that its "overarching" claim is that Ms. Druyun "'improperly compromised the integrity of the procurement process by manipulating the evaluation and source selection,'" and that plaintiff "was the victim of this manipulation of the process." Pl. Opp. 7 (quoting Complaint ¶ 33). Although that selection process ended more than seven years before plaintiff filed its bid protest, L-3 Communications contends that "all of the events necessary to state a claim had not occurred in January 1999." *Id.* at 8. The central reason L-3 Communications argues that this Court has jurisdiction to consider its belated claims is that the "taint" of Ms. Druyun's actions, as it purportedly affected the C-5 AMP award process and decision, was purportedly only knowable when her illegal conduct related to Boeing became publicly known, and the Air Force investigated that conduct and issued reports concerning several of the contract decisions in which she had been involved during her career. *Id.* at 6-10.

But there is no "taint" associated with the C-5 AMP procurement process, and plaintiff's implication that improprieties existed with respect to that award is unsupported and misleading. L-3 Communications attempts to focus Court's attention on the fact of Ms. Druyun's bad conduct – while downplaying the timing of that conduct (all of which occurred more than one year *after* the C-5 AMP award decision

was made). Essentially, plaintiff asks the Court to allow this lawsuit to proceed based on the assumption that because she engaged in criminal activity at the end of her Government career, Ms. Druyun must have engaged in improper, taint-creating conduct throughout her Government service.

L-3 Communications provides no precedent supporting the proposition that the "strong presumption that government contract officials exercise their duties in good faith" does not apply to actions taken at one point of a Government official's career simply because that official became involved in improprieties at a later point in time and with respect to a different company. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002); *see* LM Mot. 26. Nor is there any logical reason that the Court would not apply this controlling presumption in this case. Ms. Druyun may have been powerful figure who "exercised unprecedented control over [Air Force] procurements" throughout much of her career, but being a domineering person does not violate procurement law. Indeed, there is no evidence – or, more importantly, anything other than bare (unspecified) allegations – that any of Ms. Druyun's inappropriate conduct occurred prior to 2000.

As plaintiff notes in its brief, the Inspector General's report on the C-5 AMP procurement explained that during her tenure as Principal Deputy Assistant Secretary of the Air Force from 1993-2002, there were at least "407 acquisition actions [that] potentially [had her] involvement." Joint App. 119.[7] In the vast majority of those

[7] Plaintiff erroneously reports that the Inspector General "decided to study 407 acquisition actions where Druyun was the [SSA]." Pl. Opp. 6 (mis-citing Joint App.

procurements, there is no basis to assume that Ms. Druyun's actions did anything other than serve the best interests of the United States. More importantly, there is no legal justification to distinguish among those procurements in the bid protest context – or to limit the presumption of good faith applicable to her actions as a Government official.

### 3. Ms. Druyun's Actions With Respect To Unrelated Procurements And Other Matters In Which Lockheed Martin Was Involved Do Not Affect Dismissal Of This Protest

In its opposition brief, L-3 Communications raises three additional red herrings, apparently hoping to create sufficient suspicion regarding a purportedly improper relationship between Ms. Druyun and Lockheed Martin. These vague claims are unsubstantiated, unexplained, and completely irrelevant to the issues involved with the Government's and Lockheed Martin's motions to dismiss this action. Moreover, even if these allegations had any substance – and they do not – they are not before the Court in this lawsuit, and L-3 Communications would not have been an "interested party" in a position to complain about them in a bid protest related to the subject procurement actions.

*First*, plaintiff describes two unrelated contract awards in which Lockheed Martin prevailed and with respect to which Ms. Druyun either "signed off" or "oversaw the award[ ]." Pl. Opp. 1 (¶ 5). L-3 Communications fails to explain the purported relevance of these transactions in the remainder of its brief – and thus appears to be attempting to create the impression that Ms. Druyun had an ongoing

---

117). The report does not indicate that the investigations scope was limited to procurements in which Ms. Druyun was the SSA; instead, it included acquisitions in which she had been "potentially . . . involve[d]." Joint App. 119.

relationship that improperly benefited Lockheed Martin. There is no support for such an inference in the complaint, which is at issue in the Government's and Lockheed Martin's motions to dismiss, or in the materials on which L-3 Communications relies. Nor does anything in those materials undermine the fact that Lockheed Martin prevailed in the referenced procurements on the merits.

Lockheed Martin is a large Government contractor that has successfully competed for and performed numerous, substantial contracts with the Air Force. Ms. Druyun was, for many years, a high-level procurement official with the Air Force. It should be no surprise that before her retirement from the Air Force, Ms. Druyun's and Lockheed Martin's paths crossed in transactions other than the C-5 AMP procurement. But it is baseless and rank speculation to assert – or imply, as plaintiff attempts to do – that simply because Lockheed Martin engaged in business transactions with the Government (in which Ms. Druyun was involved) that something improper occurred. Indeed, the legal presumptions that this Court is bound to apply in this area of the law require the contrary conclusion. *See Am-Pro*, 281 F.3d at 1239; LM Mot. 26-27.

*Second*, plaintiff asserts that in August 2002, Ms. Druyun "entered into employment discussions with Lockheed Martin that resulted in her oral acceptance of a position at Lockheed Martin to begin after her retirement from the Air Force." Pl. Opp. 2 (¶ 6). Again, L-3 Communications fails to explain any purported relevance of this fact.

As an initial matter, as recounted by the statement of facts submitted in conjunction with Ms. Druyun's plea agreement, the discussions regarding her potential

employment with Lockheed Martin began no earlier than Summer 2002, more than three years *after* the C-5 AMP award decision. In short, Ms. Druyun's potential employment with Lockheed Martin is temporally irrelevant to this protest. Joint App. 17-18.

What is more, and as also recounted in the statement of facts from the plea agreement (but omitted from plaintiff's brief), Ms. Druyun fully complied with all legal restrictions applicable to senior Government officials with respect to seeking employment with Lockheed Martin, *i.e.*, she followed certain notification requirements and "disqualified herself from all Air Force matters involving Lockheed Martin and [another contractor]." *Id.* at 17. The fact that Ms. Druyun complied with applicable regulations in order to seek employment with Lockheed Martin several years after the procurement at issue in this protest does not advance L-3 Communications' cause.

*Third*, plaintiff makes the unsupported accusation that Ms. Druyun "manipulated the contract restructure" related to another Air Force contract, *i.e.*, the F-16 MTC, "to benefit Lockheed Martin." Pl. Opp. 7. But the Inspector General report on which plaintiff relies does not reach that conclusion – which is false. *See* Joint App. 138n. To the contrary, the part of the Inspector General's report related to the F-16 MTC on which L-3 Communications relies actually undermines its position.

In its opposition brief, plaintiff quotes the Inspector General's report, ominously emphasizing the fact that when Ms. Druyun "directed a contract restructure, . . . *she acknowledged that it might not be legal*." Pl. Opp. 7 (quoting Joint App. 138n; plaintiff's emphasis). However, the next sentence in the report explains that in conjunction with

her decision to direct the contract restructure, "the Contractor was directed to submit a letter formally requesting a contract restructure along with the rationale to Druyun *and Air Force General Counsel*." *Id.* (emphasis added). Ms. Druyun was not an attorney. She required that the contractor seek review of the matter from the appropriate Air Force attorney, and there is no reason to find that the restructure would have been completed had the Air Force General Counsel determined, in advance, that it was not legal.[8] In sum, there was nothing improper regarding the manner in which Lockheed Martin or Ms. Druyun proceeded in the F-16 MTC matter, which is thus unhelpful – and in any event irrelevant – to plaintiff's protest.

**C. L-3 Communications Also Fails To Rebut Lockheed Martin's Showing That Ms. Druyun's Alleged Improprieties Related To The C-5 AMP Procurement Should Be Dismissed Under RCFC 12(b)(6)**

**1.** In its motion to dismiss, Lockheed Martin demonstrated that to the extent this Court determines that any part of L-3 Communications' bid protest was timely filed, it nevertheless fails to state a claim for which relief could be granted and thus should be dismissed under RCFC 12(b)(6). In short, plaintiff failed to allege any facts that would overcome the presumption of good faith applied to the actions of Government officials by the Federal Circuit, and there is no legal basis under which plaintiff can leverage Ms. Druyun's conviction for participating in a conspiracy to

---

[8] Although the Inspector General's after-the-fact report on the F-16 MTC contract noted that the contract modification on which the Air Force and Lockheed Martin ultimately agreed "did not comply with Federal acquisition policy" and implied that the modification was technically inconsistent with part of the FAR (Joint App. 138r), it did not conclude that either Ms. Druyun or Lockheed Martin had intended to do anything improper or illegal, or that Ms. Druyun had demonstrated any improper bias or favoritism toward Lockheed Martin.

violate 18 U.S.C. § 208(a) during the post-2000 period into a basis to attack the January 1999 procurement in which Boeing was not involved. LM Mot. 25-29.

L-3 Communications responds by re-listing the allegations from its complaint and making the conclusory assertion that "[t]he Inspector General's report and the reasonable inferences the [C]ourt is required to draw from the report in L-3's favor preclude a dismissal of the Complaint." Pl. Opp. 14. In fact, the allegations listed in the preceding sentences in plaintiff's brief – *i.e.*, failing to provide sufficient written justification for ratings changes, the SSA appointment, and the assignment of strengths and weaknesses – would, if asserted in a timely protest, constitute run-of-the-mill procurement irregularities, at most.[9] *Id.* Although such allegations may have supported a timely filed protest, they do not support a finding of "bad faith."

Plaintiff's reliance on the Court of Claims' decision in *Heyer Products Co. v. United States*, 140 F. Supp. 409 (1956), is misplaced. In that case, a congressional committee investigated two procurements in which an Army buyer had rejected the proposals of numerous lower-price offerors in favor of an offeror whose price was almost twice as high as the low-price offer (which satisfied the contract requirements). *Id.* at 411-12. The first congressional report on the procurements explained that "[t]he [Army]

[9] The impression that Ms. Druyun's intended to favor Lockheed Martin that plaintiff improperly creates by characterizing the Inspector General's report as having "noted that the ratings were changed to better support the higher cost award to Lockheed [Martin]" (Pl. Opp. 14) is debunked above. Moreover, plaintiff's allegation that the "C-5 AMP solicitation and the contract award were 'unnecessarily vulnerable to manipulation'" (*id.* quoting Joint App. 122)) raises a policy issue regarding the manner in which the Air Force may choose to restructure its procurement process; it does not demonstrate manipulation or rebut the presumption of good faith applicable in this context.

representatives . . . who appeared before [the] committee to explain * * * why the [plaintiff's] bids had been rejected did not give convincing explanations," *id.* at 411, and the second congressional report explicitly concluded that the Army officials "wished to favor [the winning bidder] or to eliminate [the plaintiff]." *Id.* at 412.

The Inspector General made no comparable finding with respect to any alleged favoritism of Lockheed Martin regarding the C-5 AMP award. Thus, unlike *Heyer Products*, L-3 Communications' allegations of bias and bad faith have no foundation whatsoever. Accordingly, plaintiff's bid protest is based on nothing but "bald allegation[s] of bias" and should be dismissed under RCFC 12(b)(6). *Four Points By Sheraton v. United States*, 66 Fed. Cl. 776, 784 (2005); *see* LM Mot. 25-26.

**2.** L-3 Communications contends that by referencing "the Supplemental Statement of Facts filed by [Ms.] Druyun on October 1, 2004 [with respect to her guilty plea], in its failure to state a claim argument," Lockheed Martin converted its motion into "one for summary judgment." Pl. Opp. 15. But plaintiff does not – and cannot – dispute that "courts routinely take judicial notice of documents filed in other courts." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see* LM Mot. 4 n.2. Nor can plaintiff dispute that consideration of "public records," such as the documents filed with the District Court for the Eastern District of Virginia in conjunction with Ms. Druyun's criminal proceedings, "do[es] not convert [a party's] motion under 12(b)(6) to one for summary judgment." *Stockton East Water Dist. v. United States*, 62 Fed. Cl. 379, 381 n.1 (2004); *see Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999); *Henson v. CSC Credit Services*, 29 F.3d 280, 284 (7th Cir. 1994).

**CONCLUSION**

For the reasons set forth above and in Lockheed Martin's and the Government's motions to dismiss, we respectfully ask that L-3 Communications' bid protest be dismissed.

Respectfully submitted,

s/ Marcia G. Madsen

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:

DAVID F. DOWD
LUKE LEVASSEUR
DAVID B. ROBBINS
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006

*Counsel for Intervenor, Lockheed Martin Aeronautics Company*
August 18, 2006