# In The United States Court of Federal Claims

BID PROTEST

| | | |
|---|---|---|
| **L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 06-396C** |
| | § | **(Judge Williams)** |
| **THE UNITED STATES,** | § | |
| | § | |
| **Defendant.** | § | |

## FIRST AMENDED COMPLAINT

L-3 Communications Integrated Systems L.P. ("L-3") files this Amended Complaint against the United States as follows:

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1491(a) and (b). L-3 Communications Integrated Systems L.P., successor in interest to Raytheon E-Systems, Inc. ("Raytheon"), is an interested party as Raytheon was the unsuccessful bidder on the contract that is the subject of this Complaint. Raytheon and L-3 are hereinafter referred to together as "L-3."

## FACTUAL BACKGROUND

1. In 1998 the Air Mobility Command of the United States Air Force began an aggressive program to modernize the C-5 Galaxy aircraft: the C-5 Avionics Modernization Program ("C-5 AMP").

2. On August 18, 1998, the Air Force issued solicitation number F33657-98-R-0006, requesting proposals for C-5 AMP Engineering and Manufacturing Development ("EMD") and C-5 AMP Contractor Operated Supply Support ("COSS").

3. L-3 and Lockheed Martin Aeronautical Systems ("Lockheed Martin") were the only contractors that submitted proposals for the C-5 AMP.

4. The total price of Lockheed Martin's proposal was $64.1 million more than L-3's.

5. On January 22, 1999, the Air Force awarded contracts F33657-98-C-0006 and F33657-98-C-0007 for C-5 AMP EMD and COSS (collectively "the C-5 AMP contract") to Lockheed Martin.

6. Darleen Druyun ("Druyun") was the Source Selection Authority ("SSA") for the C-5 AMP acquisition.

7. Druyun was the Principal Deputy Assistant Secretary of the Air Force for Acquisition and Management from 1993 until she retired in November 2002. In that position she supervised, directed, and oversaw the management of Air Force acquisition programs.

8. On January 25, 1998, the Assistant Secretary of the Air Force (Acquisition) ("ASAF(A)") delegated to the Commander of the Aeronautical System Center the responsibility to serve as the Source Selection Authority for the C-5 AMP. Report of Department of Defense Office of Inspector General, "Acquisition Management: Source Selection Procedures for the C-5 Avionics Modernization Program (D-2006-058)" ("IG Report"), attached as Exhibit A and incorporated herein by reference, at 2.

9. In February 1998, the ASAF(A) was promoted. IG Report at 2. The position was then vacant; Druyun was not appointed to serve as acting ASAF(A) during this period.

10. On March 26, 1998, following the departure of the ASAF(A), Druyun issued a memorandum that, among other directives, rescinded the C-5 AMP SSA delegated to the Commander of the Aeronautical System Center and, instead, named herself SSA for the C-5 AMP. IG Report at 2.

11. Also in 1999, Druyun concluded the largest public-private partnership in Air Force history. The partnership, worth $10.1 billion, was between Lockheed Martin and the Air Force's Oklahoma City depot for engine repair work. Branstetter, *Darleen Druyun: An Evolving Case Study in Corruption, Power, and Procurement*, 34 Pub. Cont. L. J. 443, 451 (2005).

12. Also in 1999, Druyun emerged as the Pentagon's top advocate of the F/A-22, manufactured by Lockheed. Renae Merle, *Long Fall for Pentagon Procurement Star*, Washington Post, November 14, 2004.

13. Then in 2001 Druyun made history by supervising the award of the largest contract ever let by the Department of Defense---a $200 billion deal in which Lockheed Martin won the contract over Boeing to produce the F-35 Joint Strike Fighter Aircraft. Branstetter, *Darleen Druyun: An Evolving Case Study in Corruption, Power, and Procurement*, 34 Pub. Cont. L. J. 443, 451 (2005).

14. In August 2002 Druyun entered into employment discussions with Lockheed that resulted in a "handshake agreement" to join the ranks of Lockheed. She had apparently been focused on Lockheed as her future employer for some time. Branstetter, *Darleen Druyun: An Evolving Case Study in Corruption, Power, and Procurement*, 34 Pub. Cont. L. J. 443, 454 (2005).

15. Druyun later reneged on her agreement with Lockheed and accepted a position at Boeing after it had employed her daughter and son-in-law.

16. On April 20, 2004, Druyun entered a plea of guilty for conspiring to violate 18 U.S.C. § 208(a). She pled guilty to allowing personal interests to affect acquisition decisions. She was sentenced to prison on October 1, 2004. Joint Appendix 72, 104.

17. As a part of her April 20, 2004 plea agreement, Druyun agreed to submit to a polygraph examination. Joint Appendix 45. Subsequently, Druyun submitted a supplemental statement of facts in which she acknowledged "that she had not been truthful in her prior cooperation" and that she had previously "provided false, misleading and untruthful information to government investigators." Joint Appendix 109-110. She acknowledged that, as a result of her loss of objectivity in acquisition actions, she took actions that harmed the United States. Joint Appendix 110.

18. Secretary of State Rumsfeld said he was struck that, during the nine years in which Druyun had been a top Air Force weapons buyer, there had been heavy turnover among other senior managers who might have questioned some of her decisions if they had been on the job longer. From the time Druyun became the Air Force's deputy acquisition chief in 1993 until her retirement in 2002, Rumsfeld said the positions of secretary of the Air Force, assistant secretary for acquisition and senior military official for acquisition had all changed several times.

"So what you had with all these vacancies over a 10-year period . . . the only continuity was that single person, who's now pled guilty and is going to go to jail," he said. "When you have that long period of time, with . . . no one above her and no one below her, over time I'm told that what she did was acquire a great deal of authority and make a lot of decisions, and there was very little adult supervision." Thomas E. Ricks, Rumsfeld: Druyun Had Little Supervision; Defense Secretary Cites High Turnover in Procurement Woes, Washington Post, November 24, 2004.

19. After Druyun's confession, the Air Force acquisition chief stated that Druyun "hoarded information and kept the decisionmaking process a secret." Her concealment was

acknowledged by her superiors. Marvin R. Sambur, Long Fall for Pentagon Procurement Star (Nov. 14, 2004), http://corpwatch.org/article.php?id =11680.

20. The Commander of the Air Force's Materiel Command indicated that no one suspected what Druyun was doing, stating, "It was a surprise." Procurement Scandal Spawns 48 Air Force Reviews (Apr. 13, 2005), http://www.spacemart.com/reports/Boeing_Procurement Scandal Spawns 48 Air Force Reviews General.html.

21. The Under Secretary of Defense for Acquisition, Technology and Logistics stated that the Air Force was "stunned" to learn that Druyun had manipulated some contracts. Roundtable with Mike Wynne (Feb. 14, 2005), www.dod.mil/transcripts/2005.

22. In November 2004, in direct response to admissions by Druyun that she may have allowed personal interests to affect her judgment on acquisition decisions, the Acting Under Secretary of Defense for Acquisition, Technology, and Logistics commissioned a study on Air Force acquisition actions involving Druyun ("the Druyun Study"). The Druyun Study identified eight contract actions, out of the 407 studied, for further investigation. The Acting Under Secretary of Defense for Acquisition, Technology, and Logistics requested the Department of Defense ("DoD") Inspector General to review the eight actions identified. The investigations were not limited to Boeing. Four of the actions involved other contractors. Two of the actions involved Lockheed Martin. One of those actions was the award of the C-5 AMP contract to Lockheed Martin.

23. The Druyun Study identified two actions that appeared irregular in the C-5 AMP procurement: (1) reassignment of the SSA responsibilities by Darleen Druyun from the original SSA to Druyun herself, and (2) proposal rating changes made by Druyun to support her source selection decision. IG Report at 1-2.

24. On February 28, 2006, the Inspector General issued its report. In its report, the DoD Inspector General summarized the findings of the Druyun Study, relating that the review had "raised concerns because of the level of interest and influence" that Druyun had over the C-5 AMP source selection:

> Specifically, the study states that the Principal Deputy [Druyun] withdrew the SSA delegation assigned by her superior to become the SSA herself without justification, and during the source selection she adjusted the Advisory Council's ratings to better support the higher cost proposal presented by Lockheed Martin Aeronautical Systems. The Principal Deputy justified the change in ratings in the Source Selection Decision Document by disagreeing with the assessment presented by the Advisory Council.

IG Report at 13.

25. The IG Report concluded that the decision process used to award the C-5 AMP contract was not documented in accordance with the requirements of FAR Part 15 and AFFARS Appendix AA. IG Report at 6-7.

26. The IG Report concluded that there was no support for Druyun's decision to rescind the Assistant Secretary of the Air Force's original SSA delegation and instead delegate the position to herself. Upon the departure of the Assistant Secretary of the Air Force for Acquisition, the Acting Secretary of the Air Force expanded Druyun's responsibilities to include her designation as the SSA for all agency-level procurement actions, but not command-level actions (such as the C-5 AMP source selection). IG Report at 6.

27. The IG Report concluded that Druyun changed ratings in favor of Lockheed Martin without justification. IG Report at 6-7.

28. The IG Report concluded that Druyun unjustifiably disregarded evaluated strengths and weaknesses presented by the Advisory Council. IG Report at 7.

29. The IG Report determined that the C-5 AMP solicitation and contract award were unnecessarily vulnerable to manipulation. IG Report at 7, 9.

30. Also in November 2004, the Under Secretary of Defense for Acquisition, Technology and Logistics established a Defense Science Board Task Force to study acquisition decisions in response to Druyun's admission that favoritism affected her acquisition decisions.

31. The Task Force issued its report in March 2005, available at www.acq.osd.mil/dsb/reports/2005-03-MOAO-Report-Final.pdf. It found a confluence of factors contributing to Druyun's manipulation of acquisition decisions, including:

a. Long tenure in her position;

b. Gradual accretion of acquisition and personnel management authorities;

c. Little oversight because of no immediate supervisor; and

d. Behind closed doors decisions.

32. The Task Force also found that, because of Druyun's considerable influence over careers and promotions of both military and civilian personnel, she appeared able to control subordinates and suppress criticism and dissent.

33. L-3's discovery of the tainted C-5 AMP procurement directly resulted from the IG's investigation and Report, which directly resulted from the Druyun Study targeting eight procurements and from Druyun's October 2004 confessions.

**THE AGENCY'S ACTIONS WERE ARBITRARY AND CAPRICIOUS, IN BAD FAITH AND UNREASONABLE**

34. Darleen Druyun rescinded the properly authorized appointment of the Commander of the Aeronautical System Center and made a unilateral and unjustified appointment of herself as SSA. She then proceeded to change ratings to favor Lockheed Martin to justify the selection of its higher cost proposal. By manipulating the procurement in this

fashion, Druyun acted in bad faith. Both the appointment, not authorized by the Secretary of the Air Force, and the motivation for changing the ratings were concealed from L-3. L-3 was the victim of a manipulated source selection process directed by an unauthorized SSA.

35. By these actions, effectively predetermining Lockheed Martin as the awardee, the Air Force acted in bad faith.

36. The Air Force award of the C-5 AMP contract to Lockheed Martin was arbitrary and capricious. The Air Force lacked a reasonable basis for awarding the contract to Lockheed Martin.

**PREJUDICE**

37. The Inspector General concluded that the Air Force cannot provide compelling evidence to justify Druyun's bias in favor of Lockheed Martin. As Druyun was biased in favor of Lockheed Martin and served in the key position as SSA, the need to maintain the integrity of the procurement process requires sustaining a protest to the award when the agency cannot produce compelling evidence that the protester was not prejudiced. This is especially so when the record is incomplete, making a conclusion of no prejudice impossible.

38. Alternatively, L-3 was prejudiced. L-3 was the only other offeror on the C-5 AMP. Had Druyun not manipulated the process, L-3 would have had a substantial chance of obtaining the award.

**THE DEPARTMENT OF DEFENSE INVITED THIS PROTEST**

39. When the C-5 AMP contract was referred to the Inspector General, the Defense Contract Management Agency noted, "If investigators find that Druyun manipulated other contracts, DoD will allow contractors to appeal." DCMA News Service, February 15, 2005.

40. Further, Michael Wynne, Acting Under Secretary of Defense for Acquisition, Technology and Logistics, stated,

> Following their investigation if they find that these non- or process findings or process issues in fact turn into findings, it is my intention to ask the contractors to in fact file a protest if they so desire. And make sure that they are alerted, which I understand we are alerting all of them that these contracts are being referred to the Inspector General, and as I say, if these process issues turn into findings then we would invite all the participants to review their position and determine whether or not they would like to file a protest similar to the way we have done it on the current package of pleadings.

DoD News Transcript, Roundtable with Mike Wynne, February 14, 2005.

**PROTEST GROUNDS**

41. Through the unauthorized reassignment and/or unjustified assumption of the SSA duties by Druyun, coupled with Druyun's unjustifiably disregarding evaluations and/or changing ratings to favor Lockheed Martin *to justify the selection of its higher cost proposal*, the Air Force improperly compromised the integrity of the procurement process by manipulating the evaluation and source selection. Its actions impaired the objectivity of the selection process.

42. Through Druyun's unjustifiably disregarding evaluations and/or changing ratings to favor Lockheed Martin to justify the selection of its higher cost proposal, the Air Force breached its implied contract to treat proposals fairly, honestly, and in good faith.

43. Through Druyun's unjustifiably disregarding evaluations and/or changing ratings to favor Lockheed Martin to justify the selection of its higher cost proposal, the Air Force violated 10 U.S.C. § 2304(a)(1)(A) and FAR 15.303(b)(6).

44. Through the unauthorized reassignment and/or unjustified assumption of the SSA duties by Druyun, the Air Force violated FAR 15.303(a) and AFFARS AA-105 and AA-203.

45. Through the unauthorized reassignment and/or unjustified assumption of the SSA duties by Druyun, coupled with Druyun's unjustifiably disregarding evaluations and/or changing

ratings to favor Lockheed to justify the selection of its higher cost proposal, the Air Force violated FAR 3.101.

46. Through the failure to sufficiently document the source selection process, the Air Force violated FAR 15.308 and AFFARS AA-107(a)(6) and AA-316(b).

47. Through the unauthorized reassignment and/or unjustified assumption of the SSA duties by Druyun, coupled with Druyun's unjustifiably disregarding evaluations and/or changing ratings to favor Lockheed to justify the selection of its higher cost proposal, the Air Force acted in bad faith.

48. Through the actions cited in ¶¶ 34, 41-47, the Air Force acted arbitrarily and capriciously.

49. There was no reasonable basis for the Air Force's award of the C-5 AMP contract to Lockheed Martin.

50. L-3 could not have known of these actions described in ¶¶ 34, 41-47 until the Inspector General issued its Report on February 28, 2006.

## REQUESTED RELIEF

51. WHEREFORE, L-3 seeks relief in the form of bid preparation and proposal costs in the amount of $2,564,397.

52. L-3 seeks further relief in the form of bid protest costs.

53. L-3 seeks such other and further relief to which it may be justifiably entitled.

Respectfully submitted,

Dated: February 9, 2007

/s/ Paul W. Searles
Paul W. Searles
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5197
Telecopier: (214) 200-0705
**ATTORNEYS FOR L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.**

Of Counsel:

Sharon N. Freytag
Jeremy D. Kernodle
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5000
Telecopier: (214) 200-5940

D-1497120_4.DOC