**Agreed-Upon Copy For Release—May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

No. 06-396 C
(Judge Williams)

L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

LOCKHEED MARTIN AERONAUTICS COMPANY,

Intervenor.

---

# INTERVENOR LOCKHEED MARTIN'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

---

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006

*Counsel for Intervenor, Lockheed Martin Aeronautics Company*
March 27, 2007

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

EXPLANATION OF PLAINTIFF'S FLAWED ADDITIONAL ALLEGATIONS ................4

ARGUMENT.........................................................................................................7

A. L-3 Communications' Complaint Fails To Bolster Its Protest With Respect To Ms. Druyun's Status As SSA ..........................................8

1. L-3 Communications' Protest Based On Ms. Druyun's Reassignment Of The SSA Authority To Herself Is Legally Flawed ..........................................................................9

2. L-3 Communications Erroneously Describes The Manner In Which The SSA Delegation To Ms. Druyun Occurred ........................8

3. The FAR And AFFARS Provisions On Which L-3 Communications Relies Fail To Demonstrate Any Impropriety With Respect To Ms. Druyun's Delegation ..................13

B. L-3 Communications' Additional Uses Of The Phrase "Bad Faith" Do Not Constitute A Proper Allegation Of Such Conduct That Can Withstand A Motion To Dismiss ..........................................................15

CONCLUSION.....................................................................................................18

## TABLE OF AUTHORITIES

**Cases:**

*All Star-Cabaco Enter., Joint Venture,* B-290133, .2, June 25, 2002, 2002 CPD ¶ 127 .......... 9

*Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002) .......... 16

*CACI, Inc. – Fed. v. United States*, 719 F.2d 1567 (Fed. Cir. 1983) .......... 16

*Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578 (Fed. Cir. 1995) .......... 16

*Four Points By Sheraton v. United States*, 66 Fed. Cl. 776 (2005) .......... 4

*Heyer Prods. Co. v. United States*, 140 F. Supp. 409 (Ct. Cl. 1956) .......... 16

*Islandwide Landscaping, Inc.,* B-293018, Dec. 24, 2003, 2004 CPD ¶ 9 .......... 9

*Maxwell Labs., Inc.*, B-249102, Oct. 27, 1992, 92-2 CPD ¶ 286 .......... 9

*PBGC v. White Consol. Indus. Inc.*, 998 F.2d 1192 (3d Cir. 1993) .......... 11

*Space Age En'g, Inc. v. United States,* 4 Cl. Ct. 739, 744 (1984) .......... 16

*State of Mont. v. United States*, 33 Fed. Cl. 82 (1995) .......... 11

*United Enter. & Assoc. v. United States*, 70 Fed. Cl. 1 (2006) .......... 16

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429 (7th Cir. 1993) .......... 11

**Statutes and Regulations:**

18 U.S.C. § 208(a) .......... 7

48 C.F.R. 15.303(a) .......... 8-9, 13-14

AFFARS AA-105 .......... 9, 13

AFFARS AA-203 .......... 9, 14

**Agreed-Upon Copy For Release—May Be Made Public**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | No. 06-396 C |
| Defendant, | ) | (Judge Williams) |
| and | ) | |
| LOCKHEED MARTIN AERONAUTICS COMPANY, | ) | |
| Intervenor. | ) | |

**INTERVENOR LOCKHEED MARTIN'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

Pursuant to the Court's February 26, 2007 Order, Intervenor, Lockheed Martin Aeronautics Company ("Lockheed Martin"), respectfully submits this supplemental memorandum in response to Plaintiff, L-3 Communications Integrated System L.P.'s ("L-3 Communications"), First Amended Complaint ("First Am. Compl."), and in support of the pending motions to dismiss.

## INTRODUCTION

In January 1999, the Air Force awarded two contracts (collectively, the "C-5 AMP" contract) for modernizing the avionics in its C-5 Galaxy aircraft fleet. The non-

prevailing offeror, Plaintiff L-3 Communications, was debriefed on January 28, 1999. As the previous briefing with respect to Lockheed Martin's and the Government's motions to dismiss methodically demonstrated, L-3 Communications had clear notice of the facts underlying the allegations made in its Complaint by no later than the January 1999 debriefing. LM June 30, 2006 Mot. 8-28; LM Aug. 18, 2006 Reply Br. 3-13. Plaintiff did not file its bid protest at that time and instead waited more than seven years to do so. Because that delay runs afoul of the applicable statute of limitations, this bid protest is time-barred and should be dismissed.

L-3 Communications seeks to excuse its delay by relying on a February 28, 2006 report on the C-5 AMP award issued by the Department of Defense's ("DoD") Inspector General. That report resulted from the Air Force's need to investigate several management and internal control problems identified in the wake of the Darleen Druyun scandal, which came to light in 2004 when it was learned that Ms. Druyun had shown improper bias in favor of Boeing beginning in 2000 (and that she and her family members had received substantial benefits from that company). First Am. Compl., Attachment at 1-2. Although the Inspector General ultimately determined that the procedures applied by the Air Force in awarding the C-5 AMP contract raised questions regarding two possible irregularities, he did ***not*** conclude that any procurement law or regulation had been violated. Instead, as was its purpose, the Inspector General's report primarily explains that the Air Force needs to oversee source selection more carefully provides a series of recommendations for improving the Air Force's procurement procedures. *E.g.*, *id.* at 6-8, 10.

L-3 Communications contends that it neither knew nor could have known that the selection process was tainted by Ms. Druyun's alleged improprieties during the C-5 AMP contest until the Inspector General's report was issued. *E.g.*, Pl. July 31, 2006 Opp. 8. Not only did the Inspector General fail to conclude that any actionable taint existed, but the issuance of the Inspector General's Report was not a new event that could reopen the limitations period. As the Government and Lockheed Martin demonstrated in the briefing on the motions to dismiss, that report merely set forth facts and conclusions L-3 Communications either possessed or could have obtained by filing a timely protest in early 1999. LM June 30, 2006 Mot. 8-25; LM Aug. 18, 2006 Reply Br. 3-13.

Because the record on the motions to dismiss has been fully developed, and pursuant to the discussion during the February 26, 2007 status conference, Lockheed Martin will refrain from repeating factual points and legal arguments that were addressed in previous briefing. Instead, in this submission, we focus on the specific issues addressed in the Court's December 21, 2006 Order and raised by the additional allegations in L-3 Communications' First Amended Complaint.

The Court's December 21, 2006 Order sought clarification of two specific points on which L-3 Communications' original Complaint was unclear. First, the Court asked "what, if any, law, regulation, or other authority was violated" by Ms. Druyun's "reassignment of the Source Selection Authority (SSA) responsibilities . . . to herself." Second, L-3 Communications was instructed to amend its Complaint to explain "[w]hat specific actions taken by the agency are alleged to be in bad faith."

In response to the Court's SSA delegation question, L-3 Communications' First Amended Complaint relies on two sections of Appendix AA to the Air Force's Federal Acquisition Regulation Supplement ("AFFARS") and one FAR provision—all of which are purportedly inconsistent with Ms. Druyun's assignment of SSA responsibilities to herself. As we demonstrate below, those provisions do not support Plaintiff's claim.

L-3 Communications attempts to shore up its allegations regarding the Air Force's purported "bad faith" by using that phrase more frequently in its Amended Complaint to characterize the Government's actions. But simply throwing around additional references to bias and bad faith is not sufficient to sustain a protest. *See Four Points By Sheraton v. United States*, 66 Fed. Cl. 776, 784 (2005). None of L-3 Communications' additional allegations should restrain the Court from dismissing the First Amended Complaint at this time.

**EXPLANATION OF PLAINTIFF'S FLAWED ADDITIONAL ALLEGATIONS**

For the Court's convenience, we briefly explain which parts of the Amended Complaint have been addressed in previous briefing and oral argument, and which paragraphs contain additional allegations.

**1.** Most of the paragraphs contained in L-3 Communications' First Amended Complaint were copied, without material alteration, from the original Complaint. The paragraphs in the First Amended Complaint containing such copied allegations are

numbers 1-7, 16, 22-23, 25-29, 35-41, and 51-52.[1] As our motion and briefing regarding those allegations has already been provided to the Court, these paragraphs are not addressed in detail below.

Although many of the paragraphs in the First Amended Complaint may appear new when compared to the original Complaint, the facts alleged are actually repetitive of allegations made in Plaintiff's July 31, 2006 opposition to the Government's and Intervenor's motions to dismiss. That these erroneous allegations, which are found in paragraph numbers 11, 13-14, 17, 19-21, and 24 of the First Amended Complaint, do not support a viable protest was previously demonstrated in Lockheed Martin's and the Government's August 2006 reply briefs. Other than in the context of the two questions asked by the Court, we do not address the facts discussed in those paragraphs below.

**2.** The additional allegations in L-3 Communications' First Amended Complaint fall into three groups.

*First*, L-3 Communications characterizes several additional irrelevant media and DoD task force reports concerning Ms. Druyun's improprieties and influence when she worked for the Air Force. The First Amended Complaint adds citations to an article about Ms. Druyun's role in the award of the F/A-22 Raptor (fighter aircraft) to Lockheed Martin and a *Washington Post* article reporting that former Secretary Rumsfeld was "struck" by the breadth of Ms. Druyun's authority. First Am. Compl. ¶¶

[1] L-3 Communications changed the format of its pleading when it filed its First Amended Complaint, and as a result, the allegations set forth the paragraph numbers listed above are not found in the same paragraph numbers in the original Complaint.

12, 18. These articles are no more relevant than the several articles concerning other contract awards in which Ms. Druyun's and Lockheed Martin's "paths crossed in transactions other than the C-5 AMP procurement" or articles reporting the "surprise" of other military officials when they learned of the extent of Ms. Druyun's misconduct. *See* LM Aug. 18, 2006 Reply Br. 15-16; First Am. Compl. ¶¶ 17, 19-21; Pl. July 31 Opp. 5-6; *see also* First Am. Compl. ¶¶ 30-31 (describing a Defense Science Board study, which was addressed previously).

*Second*, to support its assertion that Ms. Druyun's redelegation of SSA authority to herself was improper, Plaintiff provides an incomplete recitation of the manner in which Ms. Druyun was appointed SSA for the C-5 AMP procurement. First Am. Compl. ¶¶ 8-10. L-3 Communications also provides citations to two AFFARS appendix sections and one FAR provision that were purportedly violated by the delegation of SSA authority to Ms. Druyun. *Id.* ¶ 44. We correct Plaintiff's factual description and explain its legal errors in section A below.

*Third*, L-3 Communications attempts to add heft to its "bad faith" allegations by combining its principal allegations—*i.e.*, that Ms. Druyun improperly delegated authority to herself and that she purportedly changed ratings in favor of Lockheed Martin—in a single paragraph and asserting that these actions were performed in "bad faith." First Am. Compl. ¶ 34; *see* Pl. July 31 Opp. 9-10. L-3 Communications also expands the "Protest Grounds" section of its First Amended Complaint by using the

phrase "bad faith" (or not "in good faith") several additional times to characterize Ms. Druyun's and the Agency's conduct. First Am. Compl. ¶¶ 42, 47.[2]

**ARGUMENT**

Before addressing the two relatively narrow issues that are the subject of the Court's December 21 Order, Lockheed Martin notes its strong objection to L-3 Communications' continued and expanded attempts to tar Lockheed Martin with improprieties Ms. Druyun committed in favor of a different contractor during a time period ***after*** the C-5 AMP award was made and announced. In its original Complaint, Plaintiff devoted a substantial amount of space to discussions of media and other sources describing Ms. Druyun's improper conduct, and L-3 Communications' amended pleading adds more sources of this type. *Id.* ¶¶ 12, 18. But there is no basis to maintain a protest on the notion that because she committed illegal acts in favor of Boeing beginning in 2000, Ms. Druyun's 1998-1999 C-5 AMP determination that Lockheed Martin offered the best value solution was in any way suspect.

As we have explained, the conduct for which Ms. Druyun pleaded guilty of conspiring to violate 18 U.S.C. § 208(a), and her admissions that she favored Boeing, did *not* criminalize every procurement decision she made during her long tenure as a Government employee. *See* LM Aug. 18, 2006 Reply Br. 13-14; Joint App. 110-12.

---

[2] L-3 Communications also alleges that other statutory and regulatory provisions were violated by the SSA's decisions to change ratings and failure to sufficiently document the Agency's decision. *See* First Am. Compl. ¶¶ 43, 45-46. These issues are outside the scope of the Court's December 21 Order and, in any event, were addressed in previous briefing. *E.g.*, LM Aug. 18, 2006 Reply Br. 8-9 (addressing failure to document procurement decision allegation); *see* First Am. Compl. ¶ 46.

Similarly, Ms. Druyun's conviction and admissions do not give rise to a bid protest ground for all the unrelated procurement decisions she made during her career. There is simply no basis to infer any improprieties with respect to the January 1999 C-5 AMP award decision in favor of Lockheed Martin from her ***subsequent*** conviction and post-plea admissions related to pro-Boeing conduct that post-dated the C-5 AMP award decision by more than one year. L-3 Communications' attempt to conflate Ms. Druyun's post-2000 Boeing-favoring conduct with the Air Force's January 1999 award decision cannot result in a sustainable protest and should be rejected at this time.

### A. L-3 Communications' Complaint Fails To Bolster Its Protest With Respect To Ms. Druyun's Status As SSA

#### 1. L-3 Communications' Protest Based On Ms. Druyun's Reassignment Of The SSA Authority To Herself Is Legally Flawed

In January 1999, when it received a debriefing regarding the Air Force's award decision, L-3 Communications was aware that Ms. Druyun had served as SSA for the C-5 AMP award. *See* LM June 30, 2006 Mot. 21-22; LM Aug. 18, 2006 Reply Br. 11-12. To the extent there was anything improper regarding Ms. Druyun's assignment of SSA duties to herself, any bases for a protest related to this issue were known (or could have been discovered and pursued) at that time. Because L-3 Communications must be deemed to have knowledge of, and could have litigated, any challenge to Ms. Druyun's status more than six years before this protest was filed, the action is time-barred.

What is more, Ms. Druyun's decision to act as SSA for the C-5 AMP decision cannot provide L-3 Communications a basis for a sustainable bid protest, because an

offeror does not have a right to review by any particular evaluator. *E.g.*, *Maxwell Labs., Inc.*, B-249102, Oct. 27, 1992, 92-2 CPD ¶ 286, at 5 ("evaluator qualifications are within the contracting agency's sound discretion and we will not object to the agency's use of particular evaluators"); *see* LM June 30, 2006 Mot. 22. Because offerors do not have a right for the award decision to be made or not made by any particular individual, even if the SSA delegation had been technically flawed, such an error would have had no more effect than a failure to follow a source selection plan, which is not a valid basis for a protest. *See Islandwide Landscaping, Inc.,* B-293018, Dec. 24, 2003, 2004 CPD ¶ 9, at 3; *All Star-Cabaco Enter., Joint Venture,* B-290133, .2, June 25, 2002, 2002 CPD ¶ 127, at n.1.

### 2. L-3 Communications Erroneously Describes The Manner In Which The SSA Delegation To Ms. Druyun Occurred

In its First Amended Complaint (¶ 44), L-3 Communications contends that "[t]hrough the unauthorized reassignment and/or unjustified assumption of the SSA duties by [Ms.] Druyun, the Air Force violated FAR 15.303(a) and AFFARS AA-105 and AA-203." Putting aside the fact that a technically defective delegation of authority would not cure either the time bar or other problems with this claim (as described above), Ms. Druyun's delegation of SSA authority was not procedurally defective, as L-3 Communications asserts.

To describe the events by which Ms. Druyun was delegated SSA authority, L-3 Communications paraphrases part of the Inspector General's Report, asserting:

- On January 25, 1998, the Assistant Secretary of the Air Force for Acquisition ("ASAF(A)") delegated to the Commander of the Aeronautical Systems Center the responsibility to serve as SSA for the C-5 AMP award. First Am. Compl. ¶ 8.

- In February 1998, the Assistant Secretary of the Air Force ("AFAF(A)") was promoted, and Ms. Druyun was not promoted to serve in the position, which was left vacant. *Id.* ¶ 9.

- On March 26, 1998, Druyun issued a memorandum that rescinded the C-5 AMP SSA delegation to the Commander of the Aeronautical Systems Center and named herself SSA for the program. *Id.* ¶ 10.

*See also* First Am. Compl., Attachment (Inspector General's Report), at 2. Based on that understanding of the facts, the Inspector General stated that "Air Force personnel could not provide documentation to support" Ms. Druyun's "decision to rescind the [January 25, 1998] delegation and instead delegate the position to herself." *Id.*; *see* First Am. Compl. ¶ 26 (incorporating Inspector General's conclusion); Joint App. 312. The Inspector General questioned the delegation because, as L-3 Communications further alleges, "the Acting Secretary of the Air Force [had] expanded [Ms.] Druyun's responsibilities to include her designation as the SSA for all agency-level procurement actions, but not command-level actions (such as the C-5 AMP source selection)." First. Am. Compl. 26; *id.,* Attachment at 6.

With respect to Plaintiff's assertion that Ms. Druyun lacked authority to rescind the SSA delegation and designate herself for that role, L-3 Communications and the Inspector General misinterpret the documents referenced in (and incorporated as part of) the Inspector General's Report.[3] For instance, in a March 17, 1998 memorandum,

---

[3] We understand that Government counsel will submit an additional appendix of documents concurrently with the filing of Defendant's supplemental brief in support of

(cont'd)

then-Acting Secretary of the Air Force Peters delegated to Ms. Druyun the authority to act as SSA in procurements such as the C-5 AMP. Joint App. 318-19.[4] Specifically, he stated that, among other things, Ms. Druyun "will . . . act as the [SSA] for all procurement actions that require an SSA at the SAF/AQ level." *Id.* Accordingly, Ms. Druyun possessed the authority to designate herself as SSA for any Major procurement such as the C-5 AMP award, as she did in the March 26, 1998 memorandum. Joint App. 320.

As noted above, the Inspector General indicated (and thus Plaintiff alleges) that Ms. Druyun's authority allowed her to serve as SSA "for all agency-level procurement actions, but not command-level actions (such as the C-5 AMP source selection)." First Am. Compl. ¶ 26; *id.* Attachment at 6. Ms. Druyun's delegated authority could not have been constrained in that manner.

When the Acting Secretary of the Air Force delegated the authority to act as SSA "for all procurement actions that require an SSA at the SAF/AQ level," that grant of

(...cont'd)
its motion to dismiss this lawsuit. The Inspector General's Report was filed with and incorporated into the Complaint (and First Amended Complaint), and relying on documents on which that Report is based is appropriate, and not beyond the pleadings, *i.e.*, those documents may be considered by the Court in deciding whether to dismiss the complaint for failure to state a claim. *See State of Mont. v. United States*, 33 Fed. Cl. 82, 88 n.4 (1995) (citing *PBGC v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

[4] Although the March 17, 1998 memorandum is not described by date in the Inspector General's description of the designation (and redesignation) of "Source Selection Authority" (First Am. Compl. Attachment at 2), it is cited later in the Report and was clearly provided to the Inspector General. *See id.* at 14 n.*.

authority clearly allowed Ms. Druyun to serve as SSA for any procurement at the described level or lower. After all, authority to make more substantial decisions assumes one is competent and empowered to act in smaller-value procurement actions as well.

What is more, the manner in which the authority was transferred following a personnel change makes clear that Ms. Druyun possessed the relevant authority to act as SSA. When the ASAF(A) left his position with the Agency during February 1998, Acting Secretary Peters initially assumed all of the decision-making authority formerly held by the ASAF(A). Joint App. 317. The ASAF(A)'s authority clearly included the ability to act as SSA in a C-5 AMP level procurement, as demonstrated by, AFFARS AA-105(a), which assigned SSA responsibility to the ASAF(A) for procurements in which the AA-101 matrix was applicable, and the AA-101 matrix, which applies to procurements the size of the C-5 AMP award. Joint App. 297, 299, 308. The ASAF(A)'s authority to act as SSA in this procurement is also confirmed by the fact that the ASAF(A) had previously delegated his authority to act in that capacity to the Commander of the Aeronautical Systems Center. Joint App. 308-12. Clearly, the Assistant Secretary could not have delegated an authority he did not possess.

When Acting Secretary Peters delegated his authority to act as SSA for high level procurements to Ms. Druyun, that delegation clearly included all of the authority he had assumed from the ASAF(A), including the authority to act as SSA in procurements such as the C-5 AMP award. To conclude otherwise, one would have to make the illogical assumption that the Acting Secretary of the Air Force delegated authority to act

as SSA in the largest (highest level) procurements to his subordinate, while retaining a lower level procurement award authority for himself.

### 3. The FAR And AFFARS Provisions On Which L-3 Communications Relies Fail To Demonstrate Any Impropriety With Respect To Ms. Druyun's Delegation

As demonstrated above, contrary to L-3 Communications' allegations (and the question raised by the Inspector General), Ms. Druyun did possess authority to act as SSA for competitions such as C-5 AMP. But even if then-Acting Secretary Peters had not delegated that authority to Ms. Druyun, neither the AFFARS provisions on which L-3 Communications relies nor FAR 15.303(a) undermines Ms. Druyun's authority in any way.

*First*, AFFARS AA-105(b) makes clear that "***normally***," the Secretary of the Air Force will serve as SSA for competitions such as the C-5 AMP award, and other "Major, Selected, and Other Programs." Joint App. 299 (emphasis added); *see id.* at 297 (defining categories); *id.* at 312 (projected size of C-5 AMP contract). That Appendix provision's repeated use of the word "normally" makes clear that the Air Force intended to provide substantial flexibility in effecting delegation decisions regarding who will serve as an SSA. Section AA-105(b) reveals additional flexibility regarding redelegation, *e.g.*, "[r]edelegation can be made on either a case-by-case basis or by blanket delegation and shall be in writing." Joint App. 299. These flexible procedures are required because, as occurred during the C-5 AMP procurement, appointed officials often take new positions (and leave) before an award decision is finalized. For the agency's procurement process to move forward, and not be stymied each time someone accepts a new job, flexibility is

required. L-3 Communications cannot maintain a protest based on the notion that the Air Force violated an Appendix to an internal regulation that expressly affords decision-makers this degree of flexibility.

*Second*, AFFARS AA-203 is no more helpful to L-3 Communications' cause. That provision sets out the ministerial procedures regarding how delegation decisions will be made, *e.g.*, request will be in writing and addressed as an agenda item at a meeting of the Acquisition Strategy Panel. Joint App. 305 (AA-203(a), (b)). L-3 Communications' Complaint does not allege that any of these requirements were not followed. Moreover, when Ms. Druyun rescinded the delegation to the contracting officer and assigned the duties to herself, as she has been authorized to do, she expressly followed the provisions of AA-203 applicable to the denial of a delegation request (which is akin to the rescission of an earlier delegation). *See* Joint App. 305 (AA-203(b)(2)); *id.* at 320 (designating SSAC Chairperson).

*Third*, nothing that occurred during the C-5 AMP competition ran afoul of FAR 15.303(a). That provision relates to run-of-the-mill procurement decisions in which the "contracting officer is designated as the source selection authority, unless the agency head appoints another individual for a particular acquisition or group of acquisitions." 48 C.F.R. 15.303(a). Not only are the AFFARS Appendix provisions relied on by L-3 Communications (and discussed above) relevant to the circumstance of a large Air Force procurement such as C-5 AMP, but section 15.303(a) expressly permits the appointment of a contracting officer's superior, which Ms. Druyun clearly was, as the SSA. And nothing in section 15.303(a) restricts the ability of an agency head to replace a

contracting officer with his superior, or delegate the authority to make such a replacement.

**B. L-3 Communications' Additional Uses Of The Phrase "Bad Faith" Do Not Constitute A Proper Allegation Of Such Conduct That Can Withstand A Motion To Dismiss**

**1.** Throughout its original Complaint, L-3 Communications quoted (or paraphrased) the Inspector General's assertions, and it summarized those points in a single paragraph near the end, ¶ 27. Then, Plaintiff baldly asserted that these actions revealed the Air Force's "bad faith." Complaint ¶¶ 28-29; *see id.* ¶ 30 (alleging "arbitrary and capricious" decision-making and "bias in favor of Lockheed Martin"). Presumably because L-3 Communications' "bad faith" allegation was not tied to a specific act (or acts), the Court's December 21 Order sought clarification of which "specific actions taken by the agency are alleged to be in bad faith."

L-3 Communications' First Amended Complaint attempts to connect its assertion of "bad faith" to two sets of allegations made throughout its original and First Amended Complaints. Specifically, Plaintiff contends that Ms. Druyun acted in bad faith when she (1) "rescinded the properly authorized appointment of the Commander of the Aeronautical System Center and made a unilateral and unjustified appointment of herself as SSA," and (2) "then proceeded to change ratings to favor Lockheed Martin to justify the selection of its higher cost proposal." First Am. Compl. ¶¶ 34, 47; *see id.* ¶ 42 (alleging the same acts "breached [the] implied contract to treat proposals fairly, honestly, and in good faith"). Plaintiff similarly contends that "[b]y manipulating the

procurement in this fashion" and "effectively predetermining Lockheed Martin as the awardee, the Air Force acted in bad faith." *Id.* ¶¶ 34-35.

**2.** As we have explained, the Federal Circuit applies a "strong presumption that Government contract officials exercise their duties in good faith." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002); *see Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("We assume the government acts in good faith when contracting."). There is no basis to maintain a legal action on the bare allegation that because a Government official like Ms. Druyun became involved in improprieties with respect to a specific contractor at a specific time in her career, decisions she made with respect to different contractors during different times in her career lose the presumption of regularity. *See* LM Aug. 18, 2006 Reply Br. 13-14; LM June 30, 2006 Mot. 26-27.

Because of the substantial requirements to substantiate a claim of bad faith or bias in bid protests, plaintiffs must offer "clear and convincing proof" of such conduct to show some impropriety on the part of the Government, and inferences and allegations alone fail to satisfy that standard. *Space Age Eng'g, Inc. v. United States,* 4 Cl. Ct. 739, 744 (1984) (quoting *Heyer Prods. Co. v. United States*, 140 F. Supp. 409, 414 (Ct. Cl. 1956)). This Court has explained: "determining that the possibility and appearance or suspicion and innuendo of impropriety, without 'hard facts' to support misconduct, is an inadequate basis" for the Court to sustain a protest. *United Enter. & Assoc. v. United States*, 70 Fed. Cl. 1, 24 (2006) (describing ruling in *CACI, Inc. – Fed. v. United States*, 719 F.2d 1567, 1581-82 (Fed. Cir. 1983)).

**3.** L-3 Communications' bald assertions of bad faith cannot satisfy this Court's requirements or support a sustainable protest. With respect to Plaintiff's "redelegation as bad faith" allegation, we have explained above (and in previous briefs) that there was nothing improper with respect to the manner in which Ms. Druyun designated herself SSA—and that even if there were, such an error is not actionable ground for a bid protest. L-3 Communications' attempt to label perfectly legal actions as "bad faith" adds nothing to its Complaint and does not preclude dismissal.

L-3 Communications' contention that it can maintain a protest based on its allegation that Ms. Druyun changed the technical ratings proposed by the evaluators in bad faith fares no better. It must first be noted that Plaintiff's ratings change protest ground is clearly time-barred, as L-3 Communications was given clear notice that Ms. Druyun had not accepted the evaluators' proposed ratings during the January 1999 debriefing. *See* Joint App. 270, 275-77; LM Aug. 18, 2006 Reply Br. 10-11. To the extent a disappointed bidder can demonstrate that proposed ratings were changed in an unreasonable or improper manner, a protest could be maintained, if timely filed. As L-3 Communications had notice of the ratings changes and did not pursue them in early 1999, it cannot do so now. *See* LM Aug. 18, 2006 Reply Br. 7-9.

The only thing L-3 Communications knows now that it did not know in January 1999 is that Ms. Druyun engaged in illegal conduct with respect to Boeing beginning in 2000. But as explained above and in earlier briefs, there is no basis to conclude that Ms. Druyun's inappropriate conduct had anything to do with Lockheed Martin at the time

of the C-5 AMP contract award (or at any other time). A bid protest action cannot be sustained based on such rank speculation.

In its First Amended Complaint, as it had done in its July 31 Opposition brief (at 9-10), L-3 Communications tries to create a sustainable "bad faith" claim by linking its assertions regarding Ms. Druyun's redelegation and ratings changes. But allegations that do not constitute sustainable protest grounds separately do not become any more sustainable by linking them together. Putting aside the fact that Lockheed Martin was repeatedly revealed to be the victim of Ms. Druyun's pro-Boeing bias (*see* LM June 30, 2006 Mot. 27-28), L-3 Communications' assertion that Ms. Druyun's bias in favor of Lockheed Martin caused her to seek out the C-5 AMP SSA responsibility so that she could improperly change ratings to support the decision is unsupported speculation. Such allegations cannot support a protest.

**CONCLUSION**

For the reasons set forth above and in Lockheed Martin's and the Government's previous briefing on their motions to dismiss, we respectfully ask that L-3 Communications' bid protest be dismissed at this time.

Respectfully submitted,

s/ Marcia G. Madsen

MARCIA G. MADSEN
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 Facsimile

Of Counsel:
DAVID F. DOWD
LUKE LEVASSEUR
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, D.C. 20006

*Counsel for Intervenor, Lockheed Martin Aeronautics Company*
March 27, 2007