**AGREED-UPON COPY FOR RELEASE**
**MAY BE MADE PUBLIC**

No. 06-396C
(Bid Protest)
(Judge Williams)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P.,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

LOCKHEED MARTIN AERONAUTICS CO.,

Intervenor.

# DEFENDANT'S SUPPLEMENTAL BRIEF AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-1111
Attorneys for Defendant

Of Counsel:
BRYAN R. O'BOYLE
Senior Trial Attorney
Department of Air Force
Arlington, VA

March 27, 2007

## TABLE OF CONTENTS


ARGUMENT ..... 3

I. L-3's Action Accrued At Time Of Contract Award ..... 3

II. Alternatively, L-3's Claim Accrued At Time Of Debriefing ..... 4

III. The Statute Of Limitations May Not Be Tolled ..... 7

IV. Neither Equitable Tolling Nor Accrual Suspension Is Implicated By L-3's Amended Complaint ..... 9

A. L-3 Did Not File A Defective Pleading During The Six-Year Statute Of Limitations Period ..... 10

B. L-3's Injury Was Not Inherently Unknowable At The Accrual Date ..... 10

C. The Air Force Did Not Engage In Misconduct Or Conceal Its Actions From L-3 ..... 10

D. L-3 Failed To Exercise Reasonable Diligence ..... 13

V. Mrs. Druyun Was Properly Designated As The Source Selection Authority ..... 15

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

## CASES

Braude v. United States,
218 Ct. Cl. 270,
585 F.2d 1049 (1978) .......... 4, 6, 9

Brice v. Sec'y of Health and Human Servs.,
240 F.3d 1367 (Fed. Cir.), cert. denied,
534 U.S. 1040 (2001) .......... 8

Cedars-Sinai Med. Ctr. v. Watkins,
11 F.3d 1573 (Fed. Cir. 1993) .......... 7, 12

Federal Crop Insurance Corp. v. Merrill,
332 U.S. 380 (1947) .......... 12, 21, 22

Huntzinger v. United States,
9 Cl. Ct. 90 (1985) .......... 10

Irwin v. Dep't of Veterans Affairs,
498 U.S. 89 (1990) .......... 8, 9

Japanese War Notes Claimants Assoc. V. United States,
178 Ct. Cl. 630,
373 F.2d 356 (1967), cert. denied,
390 U.S. 975 (1968) .......... 5, 9

Kirkendall v. Dep't of the Army,
2007 WL 675744 (Fed. Cir. March 7, 2007) .......... 7, 8

MacLean v. United States,
454 F.3d 1334 (Fed. Cir. 2006) .......... 12, 13

Martinez v. United States,
333 F.3d 1295 (Fed. Cir.), cert. denied,
540 U.S. 1177 (2004) .......... 3, 4, 8, 9

McNutt v. Gen. Motors Acceptance Corp.,
298 U.S. 178 (1936) .......... 7

Mitchell v. United States,
10 Cl. Ct. 63 (1986) .......... 14

Moyer v. United States,
190 F.3d 1314 (Fed. Cir. 1999) ........ 7, 12

Nager Electric Co. v. United States,
177 Ct. Cl. 234,
368 F.2d 847 (1966) ........ 3, 4, 8, 9

Northwest Louisiana Fish & Game Preserve Comm. v. United States,
446 F.3d 1285 (Fed. Cir. 2006) ........ 3

Ocean S.S. Co. v. United States,
218 Ct. Cl. 87,
586 F.2d 774 (1978) ........ 10, 11

Patton v. United States,
64 Fed. Cl. 768 (2005) ........ 14

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) ........ 7, 12

Rotella v. Wood,
528 US. 549 (2000) ........ 4

Shubinsky v. United States,
203 Ct. Cl. 199,
488 F.2d 1003 (1973) ........ 11

United States v. Brockamp,
519 U.S. 347 (1997) ........ 8

United States v. Kubrick,
444 U.S. 111 (1979) ........ 4

Urie v. Thompson,
337 U.S. 163 (1949) ........ 10

Welcker v. United States,
752 F.2d 1577 (Fed. Cir. 1985) ........ 5, 6, 9

Wood v. Carpenter,
101 U.S. 135 (1879) ........ 14

## STATUTES

5 U.S.C. § 3330a(a) ........ 8

10 U.S.C. § 2304(a)(1)(A) and 48 ........ 3

10 U.S.C. § 8013 ........ 15, 16

28 U.S.C. § 2501 ........ passim

48 C.F.R. § 15.303(a) ........ 3, 20

48 C.F.R. § 15.303(b)(6) ........ 3

## MISCELLANEOUS

Lockheed Martin Aeronautics Co., L-3 Communications Integrated Systems, BAE Integrated Defense Solutions, B-295401.1 (Feb. 24, 2005) ........ 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>LOCKHEED MARTIN AERONAUTICS CO.,<br><br>Intervenor. | ) | No. 06-396C<br>(Bid Protest)<br>(Judge Williams) |

DEFENDANT'S SUPPLEMENTAL BRIEF
<u>AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>

Pending before the Court are the Government's and intervenor's motions to dismiss plaintiff's complaint as time-barred by the six-year statute of limitations, 28 U.S.C. § 2501. Intervenor Lockheed Martin Aeronautics Co. ("Lockheed") also asserted that the complaint should be dismissed for failure to state a claim.

Because it was unclear what plaintiff's grounds of protest were, the Court directed plaintiff, L-3 Communications Integrated Systems, L.P. ("L-3"), to "clarify its complaint by setting forth its grounds of protest in a more definite statement." Order dated December 21, 2006. The Court directed L-3 to amend its complaint and to clarify the following matters:

> 1. Whether Plaintiff is claiming that Darlene [sic] Druyun's reassignment of the Source Selection Authority (SSA) responsibilities from the original SSA to herself is a separate ground of protest, and what, if any, law, regulation, or other authority was violated by this action.
>
> 2. What specific actions taken by agency are alleged to be in bad

faith.

Order dated December 21, 2006.

On February 9, 2007, L-3 amended its complaint, which now specifically points to its protest grounds that are alleged in paragraphs 34, and 41 through 47. In paragraphs 48 and 50 of its amended complaint, L-3 alleges: "Through the actions cited in paras. 34, 41-47, the Air Force acted arbitrarily and capriciously," and "L-3 could not have known of these actions described in paras. 34, 41-47 until the Inspector General issued its report on February 28, 2006."

Paragraph 34 of the amended complaint, alleges, in detail, the following:

> 34. Darleen Druyun rescinded the properly authorized appointment of the Aeronautical System Center and made a unilateral and unjustified appointment of herself as SSA. She then proceeded to change ratings to favor Lockheed Martin to justify the selection of its higher cost proposal. By manipulating the procurement in this fashion, Druyun acted in bad faith. Both the appointment, not authorized by the Secretary of the Air Force, and the motivation for changing the ratings were concealed from L-3. L-3 was the victim of a manipulated source selection process directed by an unauthorized SSA.

Paragraphs 41 through 47 of the amended complaint summarize the allegations of the "protest grounds" as generally accomplished through Mrs. Druyun's allegedly "unauthorized reassignment and/or unjustified assumption of the SSA duties" (Am. Compl. ¶ 41), and her purported compromise of the "integrity of the procurement process by manipulating the evaluation and source selection" to favor Lockheed (Am. Compl. ¶ 41), all of which was not allegedly known or could not have been known to L-3 until the Department of Defense Inspector General ("DoD IG") released its report on the C-5 Avionics Modernization Program ("AMP") acquisition on February 28, 2006. Am. Compl. ¶ 50.

L-3 alleges the Air Force violated the following statutes and regulations:

> (1) 10 U.S.C. § 2304(a)(1)(A) and 48 C.F.R. § 15.303(b)(6) of the Federal Acquisition Regulation ("FAR") by disregarding evaluations and changing ratings to favor Lockheed (Am. Compl. ¶ 43);
>
> (2) FAR 15.303(a) and sections AA-105 and AA-203 of the Air Force Federal Acquisition Regulation Supplement ("AFFARS") through Mrs. Druyun's alleged unauthorized reassignment and/or unjustified assumption of the SSA duties (Am. Compl. ¶ 44); and
>
> (3) FAR 15.308 and AFFARS AA-107(a)(6) and AA-316(b) by the Air Force's alleged "failure to sufficiently document the source selection process . . ." (Am. Compl. ¶ 46).

## ARGUMENT

### I. L-3's Action Accrued At Time Of Contract Award

Notwithstanding L-3's amended complaint, as demonstrated in our moving and reply briefs to dismiss the original complaint, L-3's claim for bid preparation costs is barred by the six-year statute of limitations, 28 U.S.C. § 2501. L-3's claim accrued on January 22, 1999, when its predecessor in interest, Raytheon E-Systems, Inc. ("Raytheon"),[1] was advised by the Air Force that it had awarded the C-5 AMP contracts to Lockheed.

Under the Tucker Act, "a cause of action accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue for his money.'" Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir.) (en banc), cert. denied, 540 U.S. 1177 (2004), quoting Nager Electric Co. v. United States, 177 Ct.Cl. 234, 368 F.2d 847, 851 (1966); accord Northwest Louisiana Fish & Game Preserve Comm. v. United States, 446 F.3d

[1] Accordingly, we also refer to Raytheon as L-3.

1285, 1290 (Fed. Cir. 2006). At that point, the plaintiff has been injured and has the right to sue for relief.

On January 22, 1999, L-3 knew its proposal had been rejected and the Government had awarded the C-5 AMP contracts to its competitor, Lockheed. On that date, L-3 knew it had "been hurt and who has inflicted the injury," Rotella v. Wood, 528 US. 549, 555 (2000), and the six-year statute of limitations commenced to run. United States v. Kubrick, 444 U.S. 111, 123-24 (1979) (A cause of action accrues when plaintiff is "armed with the facts about the harm done to him"). "Discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Rotella, 528 U.S. at 555. On January 22, 1999, L-3 had the right to file suit and demand payment of its bid preparation costs. Martinez, 333 F.3d at 1303. The award of the contract to L-3's competitor fixed the alleged liability of the Government and marked the running of the limitations period, because, at that time, L-3 knew it had been injured and could have brought a claim against the Government.

II. Alternatively, L-3's Claim Accrued At Time Of Debriefing

In the alternative, L-3's claim accrued on January 28, 1999, when L-3 received a complete debriefing from the Air Force of the source selection process, including charts with evaluation information, the Source Selection Decision Document ("SSDD"), and the Proposal Analysis Report. At that time, if not earlier, L-3 was put on inquiry that it had a potential claim against the Government. In Braude v. United States, 218 Ct.Cl. 270, 585 F.2d 1049, 1054 (1978), the statute of limitation was held to have begun to run as soon as "plaintiff acquired information and evidence which should have, and in the eyes of the law did, place her upon inquiry . . . that she had a potential claim." Further,

> "[d]efendant is not required to wait until plaintiff has started

> substantiating his claims by discovery of evidence. Once plaintiff is on inquiry that it has a potential claim, the statute can start to run."

Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985) (quoting Japanese War Notes Claimants Ass. v. United States, 178 Ct. Cl. 630, 373 F.2d 356, 358-59 (1967), cert. denied, 390 U.S. 975 (1968)).

L-3 knew the factors that were to be used to evaluate the proposals as they were set forth in Section M of the solicitation. App. 285-91, 294, 296. L-3 received a full, detailed debriefing by the Air Force, that fully apprised it that Mrs. Druyun had changed the ratings for various evaluation factors for both offerors, App. 276-77, 270, and that "[redacted]" App. 251, 255. L-3 also received Mrs. Druyun's unredacted SSDD that advised how she evaluated the L-3 proposed schedule to grow [redacted], how certain matters for Lockheed Martin were not evaluated by her as weaknesses, and how she changed the evaluations for the software development schedules for both Lockheed Martin and L-3. App. 145, 147-48. Simply by considering the materials and information provided by the Air Force at the debriefing, L-3 would have had reason to question the contract award and notice of a potential cause of action.

Moreover, L-3's own notes and comments it made at the debriefing indicate that it knew Mrs. Druyun had changed evaluations for questionable reasons, and, as such, the evaluations had been arguably "manipulated" by her to support her award decision. App. 255 [redacted]), 276-77 ("[redacted]."). It was plain that Mrs. Druyun changed the evaluations based, in part, upon her own alleged "personal knowledge" and without any other

support. App. 145, 147-48, 198, 209, 265, 270, 276-77. Clearly, in January 1999, L-3 was aware that it had been denied the contract on grounds that it "considered to be wrong and improper. This was enough to start the running of the six-year span of limitations." Welcker, 752 F.2d at 1580.

Although L-3 may not have known all of the facts surrounding Mrs. Druyun's appointment as the SSA for this procurement, L-3's knowledge of her appointment as the SSA and of her rating decisions and asserted justification for those decisions should have led, by the exercise of due diligence, to the awareness that L-3 "had a potential claim." Braude, 585 F.2d at 1054. Accord Welcker, 752 F.2d at 1580. It is not necessary that a plaintiff know, or have reason to know, all of the relevant facts before the cause of action accrues.

L-3 could have raised the same alleged irregularities in the procurement process in January 1999. Even under its interpretation of the statute of limitations, L-3 is barred from contending that the various ratings made by Mrs. Druyun were arbitrary, capricious, an abuse of discretion, or made in bad faith, because it had full information about all of the ratings, and their asserted basis, in January 1999.

L-3's assertions in the amended complaint that Mrs. Druyun acted in bad faith, and arbitrarily and capriciously, by rescinding the appointment of the Aeronautical System Center and making an appointment to herself as SSA and then changing the ratings to favor Lockheed Martin does not change anything. Am. Compl. ¶ 34. As demonstrated, in January 1999, L-3 knew both that Mrs. Druyun was appointed as the SSA and that she had changed the ratings and thereby justified her decision in favor of a higher cost proposal. It was not necessary for L-3 to know or have reason to know all of the various facts surrounding a procurement before its bid protest action accrued.

L-3's assertion in paragraph 54 of the amended complaint that it "could not have known of these actions described in paras. 34, 41-47 until the Inspector General issued its report on February 28, 2006" is disputed. The Government has challenged jurisdiction, and L-3 cannot rely merely upon allegations in the complaint, but must bring forth relevant, competent proof to establish jurisdiction and that it could not have known of the alleged actions until the DoD IG issued its report. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). When considering a motion to dismiss for lack of subject matter jurisdiction, this Court examines relevant evidence in order to resolve factual disputes. Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993); Reynolds, 846 F.2d at 747.

Indeed, under L-3's statute of limitations theory, assuming that the DoD IG had never issued its February 28, 2006 report, L-3's cause of action still would not have even accrued. Am. Compl. ¶ 50. This makes no sense, as L-3 admittedly knew in December 1999 that Mrs. Druyun was the SSA and that she had changed the ratings and relied upon her own experience thereby supporting her ultimate contract award decision.

III. The Statute Of Limitations May Not Be Tolled

As demonstrated in our previous briefs, equitable tolling may not apply to 28 U.S.C. § 2501, and, even if it may apply, the facts of this case are insufficient to toll the application of the six-year time bar of 28 U.S.C. § 2501.

Kirkendall v. Dep't of the Army, 2007 WL 675744 (Fed. Cir. March 7, 2007)(en banc), does not undermine our position that 28 U.S.C. § 2501 is not subject to the equitable tolling or to suspension of the accrual date. There, the Federal Circuit held that equitable tolling was

available under the Veterans Employment Opportunity Act ("VEOA"), which provides administrative review by the Department of Labor ("DOL") of an alleged agency violation of certain veteran's rights under any statute or regulating relating to veterans' preference. 5 U.S.C. § 3330a(a). The statute further provides that the individual may appeal the violation to the MSPB, "except that in no event" may the appeal be filed earlier than 60 days after filing the complaint with DOL or later than 15 days after receipt of DOL's notice that the matter was closed. The court of appeals found that the presumption of equitable tolling set forth in Irwin v. Dep't of Veterans Affairs, 498 U.S. 89 (1990), was not rebutted there. 2007 WL 675744 at *9.

Unlike the VEOA, the statute of limitations in 28 U.S.C. § 2501 sets forth explicit exceptions to its six-year bar on asserting claims. In Kirkendall, the Federal Circuit distinguished other statutes of limitations which "contain explicit exceptions to the . . . filing deadlines." 2007 WL 675744 at *7; Slip op. 15 ("Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003) (en banc) (finding that 28 U.S.C. § 2501 contains an explicit exception for "persons 'under legal disability'")"). Because section 2501 "sets forth explicit exceptions to its basic time limits, and those very specific exceptions do not include 'equitable tolling,'" the Court lacks authority to toll section 2501's limitations period. United States v. Brockamp, 519 U.S. 347, 351-52 (1997); see also Brice v. Sec'y of Health and Human Servs., 240 F.3d 1367, 1373 (Fed. Cir.) ("When an Act includes specific exceptions to a limitations period, we are not inclined to create other exceptions not specified by Congress."), cert. denied, 534 U.S. 1040 (2001). For the same reasons, the Court also lacks authority to toll section 2501's limitations period thereby suspending application of the accrual date. Id.

Further, in Kirkendall, the Federal Circuit also emphasized the "extraordinarily short" 15-day filing period under 5 U.S.C. § 3330a(d)(1)(B), which contrasts with the six-year statute of

limitations in 28 U.S.C. § 2501. 2007 WL 675744 at *7; Slip op. 15. The Federal Circuit also relied upon the purpose of VEOA to assist veterans in obtaining employment with the Federal government and to provide a mechanism for enforcing this right, the fact that the VEOA was adopted after the Supreme Court's decision in Irwin, asserting that Congress must be presumed to draft limitations periods in light of the Irwin presumption, and the fact that veterans often proceed "without the benefit of representation." 2007 WL 675744 at *7; Slip op. 15-16. None of those factors are pertinent to the application of 28 U.S.C. § 2501.

IV. Neither Equitable Tolling Nor Accrual Suspension Is Implicated By L-3's Amended Complaint

The facts of L-3's case are insufficient to establish equitable tolling or accrual suspension, assuming that either was applicable to 28 U.S.C. § 2501. Equitable tolling against the Federal government is allowable, if at all, only where (1) "the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period," or (2) "the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." Irwin, 498 U.S. at 458. Similarly, accrual suspension addresses circumstances where "an accrual date has been ascertained, but plaintiff does not know of his claim." Japanese War Notes Claimants Assoc., 373 F.2d at 358-59. Ignorance of rights of action which should be known is not enough. The accrual suspension rule is

> strictly and narrowly applied: "Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date."

Welcker, 752 F.2d at 1580 (quoting Japanese War Notes Claimants Assoc., 373 F.2d at 359); see also Martinez, 333 F.3d at 1319. As explained in Braude, 585 F.2d at 10549, the plaintiff may not wait until evidence is actually at hand which proves the claim. A statute of limitations

begins to run as soon as the "plaintiff acquired information and evidence which should have, and in the eyes of the law did, place her upon inquiry ... that she had a potential claim." Id.

A. L-3 Did Not File A Defective Pleading During The Six-Year Statute Of Limitations Period

The first circumstance does not apply here. L-3 did not file a defective pleading during the statutory period.

B. L-3's Injury Was Not Inherently Unknowable At The Accrual Date

As demonstrated in our previous motion to dismiss at page 26, there was nothing "inherently unknowable" about the nature of L-3's injury, and that narrow doctrine is applicable only when no specific point in time was "the date of injury inasmuch as the injurious consequences of the exposure [were] the product of a period of time." Urie v. Thompson, 337 U.S. 163, 170 (1949). On January 22, 1999, L-3 knew both that it had been denied award of the C-5 AMP contracts and that they had been awarded to a competitor. L-3's injury was manifest on that date.

C. The Air Force Did Not Engage In Misconduct Or Conceal Its Actions From L-3

Even assuming that tolling were applicable to 28 U.S.C. § 2501, in order to successfully toll a statute of limitations, under a concealment theory, plaintiffs must plead affirmatively and demonstrate "deceptive or fraudulent concealment that induces justifiable reliance and delay in bringing an action." Huntzinger v. United States, 9 Cl. Ct. 90, 95 (1985) (citing Ocean S.S. Co. v. United States, 218 Ct. Cl. 87, 586 F.2d 774 (1978)). In Huntzinger, the plaintiff asserted that the statute of limitations was tolled by concealment because the Government had withheld "vital information" by not releasing a copy of an Inspector General's report. Id. The Court rejected that argument emphasizing that plaintiff was on inquiry notice of a potential cause of action, and

the Army "did not conceal any critical facts that would keep the plaintiff from knowing that he had a claim" on his discharge date. Id. at 96. The Court held:

> The plaintiff was aware at the time of his discharge of the reasons why he was discharged. This information was more than adequate to make plaintiff aware of his cause of action within the six-year statute of limitations period. It goes without saying, of course, that once a lawsuit is filed, the parties have the right to discovery , and any hitherto unknown relevant matters must be and would be released.

Id.

Similarly, in January 1999, L-3 was aware of the reasons why it was not awarded the contracts, the available information was more than adequate to alert L-3 to a potential cause of action, and the release of the administrative record, upon its filing of a bid protest, would have provided further relevant matters. Id. At the debriefing, the Air Force provided extensive information about the procurement process, including detailing the various changes that Mrs. Druyun made and her rationales for those changes. App. 140, 145, 147-48, 175, 181, 198, 251, 255, 265, 270, 276-77. L-3 does not claim, or attempt to demonstrate, that any of the statements made by the Air Force at the debriefing were false.

Shubinsky v. United States, 203 Ct. Cl. 199, 488 F.2d 1003 (1973), also is instructive. In that case, the agency's misrepresentation that the employee's veterans preference rights did not obtain persuaded the employee that an appeal would be futile. The Court of Claims held that, despite the agency's timely notification of the employee's appeal rights, the agency's misrepresentation constituted good cause for waiver of the time limit as long as the employee "acted with adequate promptness to perfect his appeal upon learning that [his veterans preference] rights might still be available to him." 488 F.2d at 1006. Unlike the agency in Shubinsky, the Air Force did not misrepresent any facts to L-3.

L-3 attempts to come within the narrow exception for tolling by making the conclusory assertion that, "Both the appointment, not authorized by the Secretary of the Air Force, and the motivation for changing the ratings were concealed from L-3." Am. Compl. ¶ 34. This assertion also is disputed. L-3 cannot rest upon its complaint and must come forth with relevant evidence to demonstrate Government concealment. Moyer, 190 F.3d at 1318; Cedars-Sinai Med. Ctr., 11 F.3d at 1584; Reynolds, 846 F.2d at 747. Moreover, L-3 fails even to allege any particular facts that, if proven, would amount to the Government concealing its acts from L-3.

The record already demonstrates that, in January 1999, L-3 knew that Mrs. Druyun was appointed as the SSA, and that the Air Force gave L-3 a full and complete briefing, including the decision document written by Mrs. Druyun, the proposal analysis report, and debriefing slides detailing the changes that Mrs. Druyun made in the ratings for both offerors. In January 1999, L-3 had ample knowledge and information available to it to file a complaint, which in all likelihood would have included all of L-3's present factual allegations except perhaps those involving Mrs. Druyun's alleged unauthorized appointment as the SSA. Am. Compl. ¶ 34. L-3's failure to learn of circumstances surrounding Mrs. Druyun's appointment as the SSA does not demonstrate any concealment upon the part of the Government.

Moreover, L-3 ignores its own duty to ascertain the basis for Mrs. Druyun's authority to act as the SSA. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384 (1947). The time for L-3 to inquire about Mrs. Druyun's authority to act as the SSA was in January 1999.

MacLean v. United States, 454 F.3d 1334 (Fed. Cir. 2006), also is decisive here. There, a former service member contended that the six-year statute of limitations was tolled by Government concealment because the Government had concealed the "essential fact" that his commanding officer was biased against him. Id. at 1338. The Federal Circuit rejected that

argument emphasizing that the plaintiff was "fully aware of the injury he had suffered at the time he was separated from active duty," and the fact that he later acquired "sounder support for his claim" did not establish equitable tolling. Id. at 1338-39. The fact that a plaintiff learned some facts later did not demonstrate that such facts had been concealed by the Government.

The same is true here. The fact that L-3 learned in 2006 of additional circumstances relating to Mrs. Druyun's appointment as the SSA from the DoD IG report, including the fact that Mrs. Druyun rescinded the prior appointment of the Aeronautical System Center (ASC/CC) as the SSA and stated that she would be the SSA, App. 320, does not demonstrate that the Government concealed any facts from L-3. In January 1999, the Air Force gave L-3 a full and detailed debriefing, and L-3 did not ask then or later questions about the circumstances surrounding Mrs. Druyun's appointment as SSA.

Further, L-3's identification of a fact that it did not know in January 1999 - Mrs. Druyun's rescission of the prior appointment of the Aeronautical System Center and statement that she would be the SSA - does not demonstrate that the Government wrongfully concealed that fact, or any other, from L-3. L-3 does not alleged any facts, nor provided any evidence, demonstrating that the Government's misconduct or concealment induced or tricked it into allowing the filing deadline to pass.

D. L-3 Failed To Exercise Reasonable Diligence

L-3 also has failed to demonstrate "the reasonable diligence on [its] part in discovering [its] claim" that is a condition restricting the application of tolling of a statute of limitations. MacLean, 454 F.3d at 1339 (refusing to apply equitable tolling "where plaintiff has shown neither fraudulent concealment by the government nor reasonable diligence on his part in discovering his claim"). Reasonable diligence requires that "where there is reason to suspect[,]

there is reason to inquire and, therefore, '[w]hatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice of everything to which such inquiry might have led.'" Mitchell v. United States, 10 Cl. Ct. 63, 67 (1986) (quoting Wood v. Carpenter, 101 U.S. 135, 141 (1879)). A claimant "is charged with notice of whatever facts an inquiry appropriate to the circumstances would have uncovered." Id. at 68; accord Patton v. United States, 64 Fed. Cl. 768, 774 (2005).

L-3 did not exercise reasonable diligence in bringing its action given its extensive knowledge as a result of the debriefing, including knowledge of the changes that were made by Mrs. Druyun in the evaluation process, and her assertion that they were based upon her personal experience. App. 140, 145, 147-48, 175, 181, 198, 251, 255, 265, 270, 276-77. L-3 was fully apprised it that Mrs. Druyun had changed the ratings for various evaluation factors for both offerors, App. 276-77, 270, and that "[redacted]" App. 251, 255. In January 1999, L-3 had "reason to inquire" and is charged with "notice of everything to which such inquiry might have led," including circumstances relating to Mrs. Druyun's authority to act as the SSA. Mitchell, 10 Cl. Ct. at 67.

L-3 also knew or should have known that Mrs. Druyun pled guilty to a charge of participation in a criminal conspiracy in April 2004. App. 109-13. On October 1, 2004, before the six-year statute of limitations upon L-3's bid protest action had yet to expire, Mrs. Druyun made her various admissions of "loss of her objectivity," although none of them implicated the C-5 AMP contract awards. App. 109-113. Still, L-3, knowing all of Mrs. Druyun's actions and extensive involvement in the C-5 AMP procurement, did nothing to bring its bid protest lawsuit or to raise additional questions with the Air Force about the C-5 AMP procurement. After Mrs. Druyun's October 2004 admissions, L-3 brought a bid protest action on November 10, 2004,

before the GAO, challenging Mrs. Druyun's alleged bias in the C-130 AMP contract awards. Lockheed Martin Aeronautics Co., L-3 Communications Integrated Systems, BAE Integrated Defense Solutions, B-295401.1 (Feb. 24, 2005). In November 2004, L-3 apparently believed that Mrs. Druyun was biased, but took no action with regard to the C-5 AMP contract awards. Had L-3 filed a lawsuit challenging the C-5 AMP contract awards in April 2004, October 2004, or November 2004, it would have been within the six-year statute of limitations period, which expired in January 2005. Instead, L-3 took no action. L-3 has failed to allege or prove any facts that amount to either concealment by the Government or reasonable diligence on its part in discovering its claim.

V. Mrs. Druyun Was Properly Designated As The Source Selection Authority

Further, Mrs. Druyun's appointment as the SSA was authorized by F. Whitten Peters, the Acting Secretary of the Air Force. App. 318. L-3's claim that Mrs. Druyun improperly exercised source selection authority has no basis in fact or law, and, accordingly, should be denied. L-3's amended complaint principally alleges that Mrs. Druyun's reassignment or assumption of duties as the SSA was unauthorized, unjustified, and violated FAR 15.303(a) and AFFARS AA-105 and AA-203. As we demonstrate below, Mrs. Druyun was authorized by the Acting Secretary of the Air Force to serve, at that time, as the SSA for major Air Force acquisitions, and her assumption of SSA responsibility for the C-5 AMP acquisition did not violate pertinent regulations.

Pursuant to 10 U.S.C. § 8013(b), the Secretary of the Air Force is "responsible for, and has the authority necessary to conduct, all affairs of the Department of the Air Force, including the following functions: . . . (3) Supplying. (4) Equipping (including research and development. . . . and (11) The construction, outfitting and repair of military equipment. . . ." The Secretary of

the Air Force is also authorized and

> may - (1) assign, detail, and prescribe the duties of members of the Air Force and civilian personnel of the Department of the Air Force; (2) change the title of any officer or activity of the Department of the Air Force not prescribed by law; and (3) prescribe regulations to carry out his functions, powers, and duties under this title [Title 10, United States Code].

10 U.S.C. § 8013(g).

By memorandum dated February 23, 1998, F. Whitten Peters, the Acting Secretary of the Air Force, announced that the Assistant Secretary of the Air Force for Acquisition, Art Money, had departed for another senior position with the Office of the Assistant Secretary of Defense. App. 317. With Mr. Money's departure, Mr. Peters stated he "[would] assume the authorities and duties of the Air Force Acquisition Executive (SAE), Senior Procurement Executive (SPE) and Head of Contracting Activity (HCA) for Air Force acquisition programs." Id. Mr. Peters's memorandum dated February 23, 1998, specifically advised that Mrs. Darleen Druyun, the Principal Deputy (Acquisition and Management) would report directly to Mr. Peters. Id. The memorandum also stated that Lt. General George Muellner, Principal Deputy Assistant Secretary of the Air Force, Acquisition, and Mrs. Druyun should "refer to me those acquisition matters that by law or regulation must be acted upon by the SAE, SPE, or HCA, or by an Assistant Secretary or a Presidential Appointee confirmed by the Senate." Id.

Less than one month later, Mr. Peters, Acting Secretary of the Air Force, superseded his memorandum dated February 23, 1998, and made "Further Assignment of Responsibilities in the Absence of an Assistant Secretary for Acquisition." App. 318-19. This new assignment memorandum created new duties for both Lt. General Muellner and Mrs. Druyun. Id. Lt. General Muellner received "primary responsibility for the day-to-day operation of the Office of

the Assistant Secretary, Acquisition, and will assume the authorities and duties of the Chief Information Officer for the Air Force." App. 318.

This new assignment of responsibilities memorandum, dated March 17, 1998, stated that Mrs. Darleen Druyun, Principal Deputy (Acquisition and Management), would report directly to Mr. Peters, and that she

> will assume responsibility for oversight and execution of Program Executive Officer (PEO) programs. The PEOs and Deputy Assistant Secretary for Contracting will report to her. She will continue to chair all Acquisition Strategy Panels and will chair all Acquisition Portfolio Reviews of PEO programs; she will also act as the Source Selection Authority (SSA) for all procurement actions that require an SSA at the SAF/AQ level. Mrs. Druyun will have primary responsibility for all matters relating to public-private competitions at Air Force depots, and the Director of Depot Maintenance (AQD) will report to her. She will retain her duties as Chair of the Air Force Acquisition Professional Development Council, the Air Force Contract Adjustment Board, the Civilian Appraisal Quality Review Committee, and the Independent Research and Development Council.

App. 318-19 (emphasis added). The memorandum concluded that "Lt Gen Muellner and Mrs. Druyun should refer to Mr. Peters "those acquisition matters that by law or regulation must be acted upon by the SAE, the SPE, the HCA or an Assistant Secretary or by a Presidential Appointee confirmed by the Senate . . . .," and that both Lt. General Muellner and Mrs. Druyun would "jointly work new acquisition policy initiatives, including acquisition reform." App. 319.

At about this same time, the Air Force was engaged in planning and commencing its proposed acquisition for the C-5 AMP. By memorandum dated December 8, 1997, the Commander of the Air Force's San Antonio Air Logistics Center ("SA-ALC"), Major General James Childress, requested that the Assistant Secretary of the Air Force, Acquisition, delegate SSA for the C-5 AMP to the SA-ALC. Major General Childress estimated the C-5 AMP

acquisition at $662 million. App. 308. He requested delegation of SSA because the C-5 AMP "was selected as a trial case for a streamlining initiative designed to simplify and accelerate the source selection process. . ., and [i]n order to meet the aggressive acquisition schedule and support the source selection streamlining trial. . .," he advised that he had the "unique ability to oversee both the logistic and acquisition process to ensure no disconnects occur." Id.

Contrary to Major General Childress's request and just prior to his departure, Arthur Money, Air Force Assistant Secretary for Acquisition, delegated SSA not to the Commander of the SA-ALC, but to the Commander of the Aeronautical Systems Center ("ASC") at Wright-Patterson Air Force Base, Ohio. App. 311. By his memorandum dated January 25, 1998, Mr. Money formally delegated the estimated $662 million acquisition for the C-5 AMP to the Commander, ASC. App. 311.

About two months later, and nine days after Mr. Peters, Acting Secretary of the Air Force, had delegated SSA authority for Headquarters, Air Force level acquisitions to Mrs. Druyun, Mrs. Druyun informed the ASC Commander that she would perform the duties of the SSA for the C-5 AMP, and that the previous delegation dated January 25, 1998, was "rescinded." App. 320. By her memorandum dated March 26, 1998, she also designated the SA-ALC Commander to act as the Chairman for the C-5 AMP Source Selection Advisory Council. Id.

Mrs. Druyun's role as SSA for the C-5 AMP complied with the delegation of authority dated March 17, 1998 from Mr. Peters, Acting Secretary of the Air Force. App. 318-19. The Source Selection Plan, dated July 10, 1998, estimated the C-5 AMP's cost plus award fee and firm-fixed price options as an "$834M moderate risk program." App. 335. The earlier SSA delegation request by the SA-ALC Commander, dated December 8, 1997, estimated the acquisition at "$662M." App. 308.

Pursuant to the Air Force Federal Acquisition Regulation Supplement ("AFFARS"), Appendix AA-105(a) dated July 31, 1996, entitled "Source Selection Authority," the "ASAF(A) [Assistant Secretary of the Air Force (Acquisition)] "[was] the SSA for those contract actions where the application of this appendix is mandatory under AA-101." App. 299 (page 7 of AFFARS Appendix AA). AFFARS Appendix AA-101 made the appendix applicable to all competitive negotiated procurements for "contract actions estimated at $500 million or more." App. 297.

Because the C-5 AMP was estimated to exceed $500 million, Mrs. Druyun acted within the delegation of authority memorandum, dated March 17, 1998, from the Acting Secretary of the Air Force, and the AFFARS AA-101 and AA-105 by serving as the SSA for the C-5 AMP. By the Acting Secretary of the Air Force's delegation memorandum, dated March 17, 1998, Mrs. Druyun had the authority to "act as the Source Selection Authority (SSA) for all procurement actions that require an SSA at the SAF/AQ level." App. 318 (emphasis added). Because the C-5 AMP was estimated to exceed $500 million, the acquisition was a Headquarters Air Force level acquisition - not an installation level acquisition - pursuant to AFFARS AA-101 and AA-105. App. 318.

The DoD IG report, dated February 28, 2006, criticized the Air Force and Mrs. Druyun's role as the SSA as follows:

> Air Force personnel could not provide support for the Principal Deputy's decision to rescind the Assistant Secretary of the Air Force's original SSA delegation and instead delegate the position to herself. Upon the departure of the Assistant Secretary of the Air Force (Acquisition), the Acting Secretary of the Air Force expanded the responsibilities of the Principal Deputy to include her designation as the SSA for all agency-level procurement actions, but not command-level (such as the C-5 AMP source selection). Air Force personnel involved in the C-5 AMP provided the

> following rationale for the change in the SSA delegation: the C-5 AMP designation as a test case for new source selection procedures, requirements expansion and cost growth, and a possible request from warfighter representatives for additional oversight. However, Air Force personnel could not provide documentation to support any of these rationales.

App. 124 (emphasis added). This criticism is unfounded because the C-5 AMP was <u>not</u> a command-level acquisition, but an Air Force headquarters level acquisition pursuant to AFFARS AA-101 and AA-105, since it was estimated to exceed $500 million. App. 335. The Source Selection Plan itself identified the C-5 AMP as a Air Force headquarters level acquisition. App. 335 ("The C-5 AMP dollar value qualifies it as an agency-level review program, <u>i.e.</u>, SAF/AQ"). Moreover, nothing in the AFFARS or the Acting Secretary of the Air Force memorandum, dated March 17, 1998, required Mrs. Druyun, or anyone else, to document why she assumed duties as the SSA.

Likewise, L-3's amended complaint is wrong to allege that Mrs. Druyun acted in an unauthorized manner to reassign and act as the SSA for the C-5 AMP. Am. Complaint ¶¶ 41, 44. The Federal Acquisition Regulation states that

> [a]gency heads are responsible for source selection. The contracting officer is designated as the source selection authority, unless the agency head appoints another individual for a particular acquisition or group of acquisitions.

48 C.F.R. § 15.303(a). Here, the Acting Secretary of the Air Force memorandum, dated March 17, 1998, specifically designated Mrs. Druyun as the source selection authority for all acquisitions requiring an SSA at Air Force headquarters. App. 318. Pursuant to AFFARS AA-101 and AA-105, C-5 AMP, an acquisition estimated to exceed $500 million, was an Air Force headquarters level acquisition. App. 297. Thus, Mrs. Druyun was duly designated as the SSA.

Nothing in the AFFARS required Mrs. Druyun to document her reasons for rescinding the

earlier delegation of SSA authority for the C-5 AMP. In paragraph 44, L-3's amended complaint cites AFFARS AA-203, but nothing in that regulation applies to a decision to rescind an earlier delegation of SSA authority for a specific acquisition. App. 305. Mrs. Druyun documented her decision to assume SSA duties for the C-5 AMP in her memorandum dated March 26, 1998. App. 320. Nothing more was required in light of the specific delegation of authority she had received by the Acting Secretary of the Air Force's memorandum, dated March 17, 1998, and the AFFARS, AA-101 and AA-105. App. 297, 299, 318.

For all of these reasons, the Court should find that Mrs. Druyun was authorized to act as the SSA for the C-5 AMP. Further, L-3's claim is time-barred by the six year statute of limitations, 28 U.S.C. § 2501. L-3, based upon the DoD IG report dated February 28, 2006, wishes to establish liability upon the part of the Air Force for Mrs. Druyun's allegedly improperly exercising authority as the SSA for the C-5 AMP. However, "[w]hatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Federal Crop Insurance Corp., 332 U.S. at 384.

Here, L-3's claim accrued at the latest on January 29, 1999, when it was debriefed of the C-5 AMP source selection process, received a unredacted copy of Mrs. Druyun's source selection decision document ("SSDD"), learned that Mrs. Druyun acted as the SSA and changed the ratings for various evaluation factors, learned of the evaluations reflected in the agency Proposal Analysis Report, and Mrs. Druyun's reasons for having selected Lockheed Martin as the successful contractor for the C-5 AMP. App. 276-77, 251, 255, 145-48, 198, 209, 265, 270. Neither Mrs. Druyun nor the Air Force concealed the facts relating to Mrs. Druyun's appointment as the SSA. Indeed, L-3 does not allege facts that demonstrate the Air Force or Mrs.

Druyun improperly concealed her role as SSA or her alleged lack of authority. L-3 also ignores its own duty to ascertain Mrs. Druyun's authority to act as the SSA. Federal Crop Insurance Corp., 332 U.S. at 384. The time to inquire about her authority was in January 1999.

## CONCLUSION

For the reasons above and those stated in our original motion to dismiss the complaint and reply brief, L-3's amended complaint should be dismissed because it is barred by the statute of limitations. Further, there is no basis in fact or law for L-3's assertion that Mrs. Druyun did not possess legal authority to act as the SSA for the C-5 AMP contracts. The time for L-3 to inquire about Mrs. Druyun's authority to act as the SSA was in January 1999.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

Of Counsel:
BRYAN R. O'BOYLE
Senior Trial Attorney
Department of Air Force
Arlington, VA

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit,
8th Floor, 1100 L. St., N.W.
Washington, D.C. 20530
Tele: (202) 307-1111
Attorneys for Defendant

March 27, 2007