**Agreed-Upon Copy – May Be Made Public**

# In The United States Court of Federal Claims

BID PROTEST
No. 06-396C
(Judge Williams)

---

**L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant,**

**and**

**LOCKHEED MARTIN AERONAUTICS COMPANY,**

**Intervenor.**

---

**RESPONSE OF L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P. TO DEFENDANT'S SUPPLEMENTAL BRIEF AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND INTERVENOR LOCKHEED MARTIN'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

---

L-3 Communications Integrated Systems L.P. submits this response to support its position that there is no basis for dismissal of its claim. As a recent en banc decision of the Federal Circuit Court of Appeals observes, the question of whether a statute of limitations has run is not jurisdictional; thus, the burden is on the Movants seeking dismissal to demonstrate that the statute has run. They have not met that burden. The cause of action did not accrue until February 28, 2006, and the filing of the Complaint on May 15, 2006, less than three months later, was well within the six-year statute of limitations.

## I. The en banc Federal Circuit Court of Appeals has decided that time prescriptions are not jurisdictional.

In a March 2007 en banc decision, the Federal Circuit Court of Appeals decided, based on recent United States Supreme Court authority, that "time prescriptions, however emphatic, are not properly typed 'jurisdictional'." *Kirkendall v. Dept. of Army*, 2007 U.S. App. LEXIS 5418 (Fed. Cir. 2007) (en banc), quoting *Arbaugh v. Y & H Corp*., 546 U.S. 500, 126 S. Ct. 1235, 1242 (2006). It is significant that *Kirkendall* is a suit against the United States. Even in that context, the en banc Federal Circuit determined that the time limitation in the Veterans Employee Opportunity Act of 1998 was not jurisdictional.

The en banc Court in *Kirkendall* notes the Supreme Court's emphasis in *Eberhart v. United States*, 546 U.S. 12, 126 S.Ct. 403 (2005) that "[c]larity would be facilitated . . . if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." 126 S.Ct. at 405, quoting *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004). It is 28 U.S.C. § 1491, not 28 U.S.C. § 2501, that delineates the class of cases over which the Court of Federal Claims has subject matter jurisdiction. It is 28 U.S.C. § 1491 that waives sovereign immunity. *Suburban Mortgage Assoc., Inc. v. Dept. of Housing and Urban Development*, No. 06-1207 at 9 (Fed. Cir. Mar. 12, 2007). It is §1491 that is jurisdictional. Section 2501 is a time prescription "not properly typed jurisdictional." *Kirkendall*, 2007 U.S. App. LEXIS 5418 at *29.[1] Because the statute of limitations in this case is not jurisdictional, L-3 does not have the burden to demonstrate the timeliness of its protest. Rather, the burden is Movants' to demonstrate that the statute of limitations bars L-3's claim.

[1] The Court in *Kirkendall* found no distinction between statutes of limitation [like § 2501] and statutes of timing of review [like 5 U.S.C. § 3330a (d)(1)] when it found equitable tolling applied. 2007 U.S. App. LEXIS 5418 at *28.

In *P & V Enterprises v. United States*, 466 F. Supp.2d 134 (D.D.C. 2006), the court considered suits against the United States governed by the statute of limitations in 28 U.S.C. § 2401. That statute provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Noting that the statute is not substantively different from 28 U.S.C. § 2501, the statute applicable in this case, the court determined that it was not jurisdictional. *Id.* at 141. It relied upon *Arbaugh*, where the Supreme Court held that unless Congress "clearly states that a threshold limitation on a statute's scope shall count as jurisdictional . . . courts should treat the restriction as nonjurisdictional in character." 126 S.Ct. at 1237.

Given the en banc decision in *Kirkendall*, L-3 asks this Court to reconsider its ruling in *McLean v. United States*, 67 Fed. Cl. 14, 15 n.1 (2005), and determine that 28 U.S.C. § 2501 is nonjurisdictional. That conclusion is supported not only by the authorities discussed above but also by the very nature of "What is jurisdiction?" That concept is aptly described in Note, "The Jurisdictional Label: Use and Misuse," 58 Stan. L. Rev. 1457 (2006):

> For the most part, jurisdictional rules embody a deeply seated political principle of governance, namely that law-speaking authority is divided and distributed to multiple law-speaking institutions and that those institutions ought to be kept separate from one another. …. Rules like statutes of limitations are primarily intended to serve the interests of the parties and, in so doing, have the collateral effect of aiding the administration of justice in the aggregate and thus serving broader societal ends. Those broad societal ends are ancillary concerns of those rules, and, moreover, those ends can be accomplished in any number of ways. . . . . Jurisdictional rules, on the other hand, are primarily enacted to serve broad and important societal goals. By virtue of the fact that they allocate authority, jurisdictional rules are designed primarily to serve the function of institutional identity formation and preservation. To have an identity at all, an institution must be distinct from other institutions based on the issues of law it can decide and the processes it can use to decide them.

A statute of limitations does not involve an allocation of authority among judicial institutions. A statute of limitations does not establish the jurisdiction of the court. Rather, it is a non-jurisdictional time prescription.

**II. Purposeful omissions and misrepresentations do not obscure the fact that the February 28 Inspector General Report first revealed Druyun's manipulations that form the basis of L-3's claim.**

L-3's Amended Complaint is grounded in the claim that it was the victim of the manipulation of the C-5 AMP source selection process. L-3 learned about Darleen Druyun's manipulation of the C-5 AMP source selection from the Inspector General's Report dated February 28, 2006, which first revealed (1) that the C-5 solicitation and award were "unnecessarily vulnerable to manipulation"; (2) that Druyun had rescinded the SSA delegation made by her superior to appoint herself as the SSA for the C-5 source selection "without sufficient justification"; and (3) that Druyun "adjusted the Advisory Council's ratings to better support the higher cost proposal" submitted by Lockheed Martin. Report at 4, 13. The Government's supplemental brief studiously avoids the Inspector General's observations, not even mentioning the observation concerning Druyun's motivation. Lockheed's memorandum mentions the statement not to address it but to attempt to discount it as unsupported speculation. Memorandum at 18. In addition, neither the Government nor Lockheed mention the Druyun Study discussed in the Inspector General's Report. Although the Government may want to distance itself from its own party admissions and Lockheed may wish to avoid key documents in this case, the Inspector General's findings and observations cannot be so easily ignored.

The Government attempts to ignore them not only by omitting any discussion in its briefing but also by failing to produce the complete materials concerning the Druyun Study. Page 13 of the Inspector General's Report summarizes the Druyun Study and reveals Darleen

Druyun's manipulation of the process by adjusting ratings to better support Lockheed's higher cost proposal and her actions in rescinding the properly appointed SSA's authority. This Court sought production of the document of which page 13 is a summary. Transcript of October 10, 2006 hearing at page 68, lines 18-25, and Order of December 21, 2006 ("Additionally, the Court directs Defendant to produce the 'Druyun Study' or documents memorializing the study.") The Government produced a summary document that mentions C-5 only in passing: "Ms. Druyun appeared to have exercised an unusual amount of detailed control over evaluation results" on the C-5 Avionics Modernization Program. Summary of Druyun Study at 4 ("Summary"). The Government did not produce the Anomaly Summaries, *see* Summary, page 3; the Team Reports, *see* Summary, pages 9, 13; the Situation Reports, *see* Summary, page 11; or any of the worksheets, *see* Summary, page 20; or other documents that contain the information about the C-5 AMP source selection referenced on page 13 of the Inspector General's Report. The Inspector General's Report specifically references the "C-5 AMP portion of the [Druyun] study." Report at 1. It is missing. The Government did not comply with the Court's Order.

Thus, there is much that the Government omits. Its attempt to skew the facts is further exhibited in what it states. For example, the Government makes these misstatements:

1. "Moreover, L-3's own notes and comments it made at the debriefing indicate that it knew Mrs. Druyun had changed evaluations for questionable reasons, and, as such, the evaluations had been arguably "manipulated" by her to support her award decision." Supplemental Brief at 5. *But L-3 did not know in January 1999 that the evaluations had been manipulated for questionable reasons.*

2. "Clearly, in January 1999, L-3 was aware that it had been denied the contract on grounds that it considered to be wrong and improper." Supplemental Brief at 6. *But L-3 did not know in January 1999 that the contract award had been made for improper reasons.*

3. "L-3 . . . had full information about all of the ratings, and their asserted basis in January 1999." Supplemental Brief at 6. *But L-3 did not know in January 1999 the real basis for the ratings.*

4. "Similarly, in January 1999, L-3 was aware of the reasons why it was not awarded the contracts. . . ." Supplemental Brief at 11. *But L-3 was not aware in January 1999 of the real reason it was not awarded the contract.*

Then Lockheed weighs in with its own misstatement:

> "The only thing L-3 Communications knows now that it did not know in January 1999 is that Ms. Druyun engaged in illegal conduct with respect to Boeing beginning in 2000." Memorandum at 17. *But L-3 now knows that Druyun improperly rescinded the SSA delegation to self-appoint as SSA and changed ratings to better support Lockheed's higher cost proposal.*

In January 1999, L-3 knew that the C-5 AMP contract had been awarded to Lockheed and that Druyun had changed certain ratings. While an award of a contract to a competitor is a business injury, neither the award nor the change in ratings is an actionable injury when done in the ordinary course of contract solicitation and award. *See Raytheon Company*, B-291449, January 7, 2003, 2003 CPD ¶ 54 (SSA has broad discretion to change ratings). L-3's cause of action did not accrue in January 1999. *See Pratt v. United States*, 50 Fed. Cl. 469, 476-77 (2001) ("the inquiry becomes when plaintiff knew, or should have known of his cause of action . . . ."). L-3 did not learn of Druyun's previously concealed manipulations in the C-5 AMP source selection until February 28, 2006. That fact is not a naked allegation in a Complaint, as the Government claims. *See* Supplemental Brief at 7, 12. It is substantiated by the contents of a government document, the Inspector General's Report. Its contents were not public information until February 28, 2006. Before a cause of action accrues, there must be sufficient evidence in the public domain to permit a plaintiff to file a good faith complaint. Once L-3 learned about the information in the Inspector General's Report, it acted with due diligence, filing its Complaint less than three months later.

The case of *Ball Aerospace and Technologies*, B-298522, August 11, 2006, 2006 CPD ¶ 113, shows that discovery for purposes of the statute of limitations does not occur at contract

award. Rather, more information is necessary to form a claim. In *Ball*, the GAO determined that Druyun's admission of bias in October 2004, coupled with Ball's review of the evaluation record at the time of contract award when its initial protest was filed and then withdrawn, put Ball on notice of protest grounds. Here, the Inspector General's report put L-3 on notice because it raised for the first time the unauthorized assignment and Druyun's motivation with regard to Lockheed.

**III. L-3 learned on February 28, 2006 of the Inspector General's conclusion that Druyun was not the properly designated SSA for the C-5 AMP source selection.**

The Inspector General's Report concluded that there was no basis for Druyun to rescind the ASAF(A)'s SSA delegation and delegate the position to herself. Report at 6. Nothing in January 1999 put L-3 on notice that Druyun had redelegated SSA to herself. In fact, Government's counsel told the Court, "We do not see in the debriefing materials any indication she had delegated the power to herself." Transcript of October 10, 2006 at 98, lines 3-5. L-3 did not learn of Druyun's unauthorized action until February 28, 2006.[2] Both the Government and Lockheed attempt to go beyond the facts necessary to determine a motion to dismiss by arguing the merits of Druyun's appointment. They insist that they have filed a 12(b)(1) motion based on a statute of limitations defense, but they also insist upon reaching the merits. The positions are directly contradictory.

Even reaching the merits, however, the March 17, 1998 letter upon which they rely does not rescind the previous SSA delegation to the ASC/CC by the ASAF(A). Supplemental Appendix at 318. Darleen Druyun did that. Neither the regulations nor the March 17, 1998 letter give Druyun the authority to rescind a properly-delegated appointment of a SSA. The

[2] Lockheed's statement that L-3 is "deemed" to have knowledge in January 1999 is made with a glaring absence of supporting authority. Memorandum at 8. Further, Lockheed's position that Druyun's improper redelegation makes no difference ignores the core principle that L-3 had a right to an impartial evaluator. *See, e.g.*, FAR 3.101.

Inspector General had possession of the March 17, 1998 letter, Report at 14 n*, and concluded that Druyun improperly rescinded the SSA delegation made by the ASAF(A). The Inspector General is the Government's voice. The Inspector General has not retracted that statement. Moreover, the Air Force commented on the Inspector General's Report and did not dispute the finding that Druyun improperly rescinded the C-5 AMP SSA delegation. Inspector General's Report at 19-20.

At the very least, there is a genuine issue of material fact as to the propriety of Druyun's actions. If the Government and Intervenor insist upon relying upon the documents in the Supplemental Appendix to argue the merits,[3] they must meet the summary judgment standard and demonstrate that no genuine issue of material fact exists concerning whether Druyun properly rescinded the SSA and reassigned it. RCFC 12(b). The Government's own Inspector General's Report demonstrates she acted improperly. At the very least, it creates a genuine issue of material fact.

The Government suggests that it was L-3's responsibility to assure that Darlene Druyun was properly appointed as the SSA for the C-5 source selection. It cites *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947) for that proposition. However, the authority issue discussed in *Merrill* involves an agent of the Government going beyond the substantive provisions of a statute, not whether procedurally the agent of the Government improperly rescinded a duly authorized appointment to another official. *Merrill* involves the question of whether the United States government can be equitably estopped by the conduct of its agents. In *Merrill*, the agent told the farmer that he was insured for spring wheat reseeded on winter wheat

[3] Contrary to Intervenor's claims, these are not documents relied upon by L-3 in its Complaint. Memorandum at 10-11 n. 3. L-3 relies upon the Inspector General's Report. Moreover, Intervenor acknowledges that these documents do not go to the issue of jurisdiction when it argues, "[T]hose documents may be considered by the Court in deciding whether to dismiss the complaint for *failure to state a claim*." Memorandum at 10-11 n. 3 (emphasis added).

acreage. However, federal regulations provided that spring wheat reseeded on winter wheat acreage was ineligible for insurance. Therefore, the agent went beyond what the statute authorized in substantive relief. The *Merrill* principle is inapplicable to this case, where L-3 claims not that the Government made a promise that it is estopped from withdrawing but that Darlene Druyun was not the authorized SSA to make the decision concerning the C-5 contract award.

Even if the *Merrill* estoppel principle applied to the facts of this case, that principle has been eroded in the face of later Supreme Court precedents that state that an open issue exists whether estoppel lies against the Government if a party proves "affirmative misconduct" on the part of a government agent. *See Schweiker v. Hansen*, 450 U.S. 785, 101 S. Ct. 1468, 1470-71 (1981)(denial of welfare benefits); *INS v. Hibi*, 414 U.S. 5, 8-9, 94 S. Ct. 19, 21-22 (1973)(denial of citizenship); *Montana v. Kennedy*, 366 U.S. 308, 314-15, 81 S. Ct. 1336, 1340-41 (1961)(denial of citizenship). *See also Lavin v. Marsh*, 644 F.2d 1378 (9th Cir. 1981)(adopting affirmative misconduct exception). Here, according to the Government's Inspector General, Darlene Druyun engaged in misconduct.

**IV. The Inspector General's findings of improper delegation and the manipulation of ratings support L-3's claim of bad faith.**

Not only do the improper delegation and the manipulation of ratings violate applicable regulations,[4] they constitute bad faith by a government official.

The Inspector General's Report found an improper delegation and ratings changes in an environment of manipulation. L-3 relies upon that finding to challenge Druyun's good faith. L-

[4] Lockheed launches into the merits of L-3's claims, arguing that Druyun followed the regulations by rescinding the properly delegated SSA and self-delegating that authority. Even if the court were to reach the merits in the context of motions to dismiss, the regulations were violated. AFFARS AA-105 does not allow a Principal Deputy to rescind the delegation of the ASAF(A). AFFARS AA-203 provides that delegation of source selection authority shall be an agenda item at the Acquisition Strategy Panel. It does not permit a Principal Deputy to rescind the delegation of the ASAF(A). Further, FAR 15.303(a) does not allow a Principal Deputy to rescind the delegation of the ASAF(A). Druyun's actions violated all three provisions.

3 is not challenging the actions of Lockheed, as Lockheed protests. Memorandum at 7. Moreover, Lockheed's claim that Druyun's 2004 behavior is irrelevant is wrong. Ms. Druyun's actions in October 2004 gave rise to the Inspector General's investigations that revealed for the first time Druyun's manipulative behavior in 1999. The Inspector General found the 2004 behavior relevant to the study of her 1999 actions. Report at 1.

L-3's claims of Druyun's bad faith are sufficient to withstand a motion to dismiss. Lockheed asserts that L-3 must offer clear and convincing proof of bad faith, Memorandum at 17, but that is not the standard on a motion to dismiss. Rather, in order to withstand a motion to dismiss for failure to state a claim, a plaintiff must allege facts that would, if they were ultimately established, permit relief as a matter of law. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). *See also International Resource Recovery, Inc. v. United States*, 61 Fed. Cl. 38 (2004)(allegations of bad faith "sufficiently well grounded" to allow supplementation of record and discovery even though not sufficient to constitute clear and convincing evidence). L-3, along with the Inspector General, has alleged that Druyun manipulated the source selection process by improperly designating herself SSA and by improperly changing ratings to favor Lockheed Martin's higher cost proposal. Those allegations, once established, permit relief as a matter of law.

**V. Equitable tolling applies to toll the statute of limitations.**

The en banc decision of the Federal Circuit Court of Appeals in *Kirkendall v. Dept. of Army*, 2007 U.S. App. LEXIS 5418 (Fed. Cir. 1007) (en banc) supports equitable tolling in this case. There, the Court determined that even though the statute at issue provided that "in no event" could the time prescription be altered, equitable tolling applied. *Id.* at *22. The Court noted that that phrase, taken with the remaining factors set out in *United States v. Brockamp,* 519

U.S. 347 (1997), required the conclusion that the *Irwin* presumption in favor of equitable tolling was not rebutted. *Kirkendall* underscores the impact of the *Irwin* presumption. The statute in *Kirkendall*, despite its "in no event" language, was not technical and was not part of a detailed elaborate statutory scheme that would be disrupted by equitable tolling. Likewise, 28 U.S.C. § 2501, which is not technical and not part of a detailed statutory scheme, *Martinez v. United States*, 333 F.3d 1295, 1318 (Fed. Cir. 2003), should be equitably tolled in this case. The "exceptions" that the Government argues appear in § 2501 are not exceptions to suits under § 1491. There is nothing in § 1491 (or § 2501) to suggest that Congress did not want equitable tolling to apply to suits brought under
§ 1491.

The Department of Defense invited protests by bidders like L-3 affected by Druyun's actions, a clear sign that equitable tolling is appropriate. By extending the invitation, Michael Wynne, Acting Under Secretary of Defense for Acquisition, Technology & Logistics, acknowledged the equity of allowing a protest to proceed based upon the Inspector General's report.

The facts support equitable tolling. The Air Force did not reveal to L-3 either that Druyun had improperly rescinded the ASAF(A)'s delegation of SSA to the ASC/CC or that Druyun had changed ratings to better support Lockheed's higher priced proposal. In fact, the Air Force did not reveal those facts to anyone in the public. It took an Inspector General's investigation to uncover and reveal those irregularities. The contents of his report expose the Government's concealment.

The Government relies upon *Huntziger v. United States*, 9 Cl. Ct. 90 (1995), an Army discharge case, to support its argument that the Air Force did not conceal any facts from L-3. In

*Huntziger*, however, the plaintiff knew the reasons he was discharged at the time of his discharge. L-3 did not know the reason for losing the award at the time of the award. The reasons L-3 was given at the debriefing by the Air Force are not the reasons revealed in the Inspector General's Report. The reasons revealed in Inspector General's Report gave L-3 a basis to file suit.

**VI. Accrual suspension applies to suspend the statute of limitations.**

Druyun concealed her manipulative actions even from her superiors. Amended Complaint at ¶¶ 19, 20, 21. This case presents a classic example of the type of concealment that justifies accrual suspension. *Cf. Lockheed Martin Aeronautics Company*, B-295401, *et. al*., Feb. 24, 2005 CPD ¶ 41.

## CONCLUSION

Druyun's actions generated the Druyun Study and the Inspector General's investigation. L-3 Communications did not know the taint that infected the C-5 AMP source selection until the Inspector General published his Report on February 28, 2006. The statute of limitations has not run, and Defendant's and Intervenor's requests for dismissal of Plaintiff's Complaint should be denied.

Respectfully submitted,

Dated: April 18, 2007

s/ Paul W. Searles

Paul W. Searles
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5197
Telecopier: (214) 200-0705
**ATTORNEYS FOR L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P.**

Of Counsel:

Sharon N. Freytag
HAYNES AND BOONE, LLP
901 Main Street
3100 Bank of America Plaza
Dallas, Texas 75202
Telephone: (214) 651-5586
Telecopier: (214) 200-0450

D-1520998_1.DOC