# In the United States Court of Federal Claims

**No. 06-396C**
**(Filed Under Seal November 16, 2007)**
**(Reissued November 26, 2007)**[1]
**(Bid Protest)**

| | |
|---|---|
| **L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P.,** | |
| **Plaintiff,** | **Post-Award Bid Protest; Breach of Implied Duty of Fair Dealing; 28 U.S.C. § 1491(b); Jurisdiction; Statute of Limitations; 28 U.S.C. § 2501; Accrual of Cause of Action; Accrual Suspension Rule; RCFC 12(b)(1); RCFC 12(b)(6); Presumption of Good Faith; Hearsay; Judicial Notice.** |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **LOCKHEED MARTIN AERONAUTICS COMPANY,** | |
| **Intervenor.** | |

Paul W. Searles, Haynes and Boone, LLP, 901 Main Street, 3100 Bank of America Plaza, Dallas, TX for Plaintiff.

Domenique Kirchner, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, 1100 L Street, NW, 8th Floor, Washington, DC for Defendant.

Marcia G. Madsen and Luke Levasseur, Mayer Brown, LLP, 1909 K Street, NW, Washington, DC for Intervenor.

---

## OPINION AND ORDER DENYING DEFENDANT'S AND INTERVENOR'S MOTIONS TO DISMISS

---

**WILLIAMS**, Judge

[1] An unredacated version of this opinion was issued under seal on November 16, 2007. The Opinion and Order issued today incorporates the parties' jointly proposed redactions, correcting errata. This redacted material is indicated by brackets **[ ]**.

In this post-award bid protest, L-3 Communications Integrated Systems, L.P. (L-3) challenges the Air Force's award of two contracts to Lockheed Martin Aeronautics Company (Lockheed Martin) to modernize the C-5 Galaxy aircraft (C-5 AMP) and seeks its bid preparation and proposal costs of $2,564,397.[2] This protest was filed in the wake of the former Principal Deputy Secretary of the Air Force's conviction for violating conflict of interest laws. Specifically, the former Principal Deputy Secretary, Darleen Druyun, admitted that she allowed her personal interest to influence her procurement decisions with respect to the Boeing Company -- she, her daughter and son-in-law negotiated for employment with Boeing while she was a top Air Force procurement official.[3]

Although the award here was made over eight years ago and the contracts have largely been performed, L-3 contends that this action is timely because it could not have known the basis of its protest until the Department of Defense Inspector General (IG) issued a report relating the involvement of Druyun in this procurement. The IG Report indicated that Druyun had appointed herself the Source Selection Authority (SSA) for the C-5 AMP procurement without justification and "adjusted the Advisory Council's ratings to better support the higher cost proposal presented by Lockheed." Am. Compl., Ex. A at 13. Boeing was not involved in the C-5 AMP procurement. Nonetheless, Plaintiff claims that Druyun favored Lockheed Martin in this procurement because she also had been negotiating with Lockheed Martin and had a "handshake agreement" to join Lockheed Martin prior to negotiating with Boeing.

Plaintiff has raised several grounds of protest, claiming that through Druyun's unauthorized assumption of the SSA duties and her change of evaluation ratings to justify the selection of Lockheed Martin's higher cost proposal, the Air Force improperly compromised the integrity of the procurement process, breached its implied contract to treat proposals fairly, honestly, and in good faith, and violated a panoply of procurement statutes and regulations.[4] L-3 further claims that Druyun was biased in favor of Lockheed Martin and acted in bad faith in the C-5 AMP procurement. Finally, L-3 asserts that the Air Force acted arbitrarily and capriciously in making award to Lockheed Martin.

This matter comes before the Court on Defendant's and Intervenor's motions to dismiss this action as untimely under the applicable six-year statute of limitations, 28 U.S.C. § 2501, on the

---

[2] L-3 does not seek injunctive relief.

[3] Druyun was convicted of conspiracy to commit an act affecting a personal financial interest while acting as a government official in violation of 18 U.S.C. § 371 and 18 U.S.C. § 208(a). Druyun's conviction was not related to this procurement or to her interaction with Lockheed Martin.

[4] Specifically, L-3 claims the Air Force violated 10 U.S.C. § 2304(a)(1)(A), requiring full and open competition, FAR 15.303(b)(6), requiring that the SSA select the best value proposal, FAR 15.303(a), AFFARS AA-105 and AA-203, governing the appointment of the SSA, and FAR 3.101, Standards of Conduct, requiring avoidance of conflict of interest and prohibiting Government employees from soliciting gifts, favors, or anything of monetary value from a contractor or vendor. Am. Compl. ¶¶ 41-47. L-3 further claims that the Air Force failed to sufficiently document the source selection process in violation of FAR 15.308, AFFARS AA-107(a)(6) and AA-316(b). Id. ¶ 46.

ground that the challenged award was made in 1999, more than six years before L-3 filed suit. Because this protest is challenging Druyun's alleged improper manipulation of the evaluation and selection process to favor Lockheed Martin in the C-5 AMP procurement, Plaintiff could not have known of Druyun's alleged illegal conduct until this conduct was revealed in the IG Report in February of 2006. As such, L-3's cause of action accrued at that time, and this action is timely. Alternatively, the accrual suspension doctrine applies, and the accrual of L-3's cause of action was suspended until it had reason to know of its claim.[5]

Intervenor has also moved to dismiss this action for failure to state a claim upon which relief can be granted, arguing that Plaintiff cannot meet its burden of proving by clear and convincing evidence that Druyun failed to act in good faith. The Court does not weigh the evidence or determine the likelihood of a plaintiff ultimately prevailing in resolving a Rule 12(b)(6) motion, but rather assesses whether a plaintiff has alleged facts, which if proven, would entitle it to the relief sought. Because L-3 has alleged conduct which, if proven, would entitle it to an award of bid and proposal preparation costs, this motion is denied.

## Background[6]

On August 18, 1998, the United States Air Force issued solicitation number F33657-98-R-0006, requesting proposals to assist with a program to modernize the C-5 Galaxy aircraft. Am. Compl. ¶ 2. More specifically, the solicitation sought proposals for the Engineering and Manufacturing Development (EMD) and Contractor Operated Supply Support (COSS) phases of the C-5 Avionics Modernization Program (AMP). Id. The C-5 AMP had two components: the All-Weather Flight Control System and Global Air Traffic Management compliance. L-3's predecessor-in-interest, Raytheon E-Systems Inc. (Raytheon), and Lockheed Martin were the only contractors which submitted proposals. Am. Compl. ¶ 3.

---

[5] Plaintiff also urged the Court to apply the doctrine of equitable tolling, but, given this disposition, the Court does not reach this thorny issue. The Federal Circuit has not yet decided whether Section 2501 is subject to equitable tolling. Further, the issue of whether Section 2501 is jurisdictional is presently pending before the Supreme Court in John R. Sand & Gravel Co. v. United States, 457 F.3d 1345 (Fed. Cir. 2006), cert. granted, 127 S. Ct. 2877 ( May 29, 2007) (No. 06-1164). The Court's resolution of John R. Sand & Gravel could impact the equitable tolling analysis, as there is precedent suggesting that truly jurisdictional statutes may not be equitably tolled. Bowles v. Russell, 127 S. Ct. 2360, 2365-66, (2007). There is also precedent indicating that there is a presumption that equitable tolling is available in suits against the Government. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95-96 (1990).

[6] This background is derived from Plaintiff's Amended Complaint, Defendant's Appendix, the Inspector General Report, the "Druyun Study" conducted by the Air Force, and a Joint Appendix accompanying the pending motions. The appendix includes materials from Druyun's criminal case -- the Assistant United States Attorney's Offer of Proof presented to the United States District Court for the Eastern District of Virginia in conjunction with Druyun's guilty plea on April 20, 2004, and sentencing on October 1, 2004, as well as the Court's comments in United States v. Druyun, No. 1:04-Crim-150. Joint Appendix (J.A.) 28 - 108. The Court takes judicial notice of the District Court proceedings to facilitate consideration of the pending motions. Fed. R. Evid. 201.

On January 22, 1999, the Air Force informed Raytheon that the C-5 AMP contracts had been awarded to Lockheed Martin. On January 28, 1999, the Air Force provided a debriefing to Raytheon at its plant. J.A. 275. Raytheon was advised at the debriefing that Darleen Druyun, then the Principal Deputy Assistant Secretary of the Air Force Acquisition and Management,[7] acted as the Source Selection Authority (SSA) for the C-5 AMP acquisition. Am. Compl. ¶¶ 6-7. As the SSA, Druyun was "responsible for the proper and efficient conduct of the entire source selection process encompassing proposal solicitation, evaluation, selection, and contract award." J.A. 300.

The following written materials were provided to Raytheon at the debriefing: (1) the Debriefing Charts; (2) Druyun's Source Selection Decision Document (SSDD) dated January 21, 1999; and (3) the undated Proposal Analysis Report (PAR) prepared by the Source Selection Advisory Council (SSAC).[8] J.A. 139-249; see also J.A. 275 (AF Memo for Record dated Feb. 4, 1999). The Debriefing Charts reflected that Druyun had disagreed with the following weaknesses assigned by Air Force evaluators to Lockheed Martin's proposal, stating:

[

[7] In this position, Druyun supervised, directed and oversaw the management of the Air Force acquisition program and provided advice on acquisition matters to the Secretary, Assistant Secretary and Chief of Staff of the Air Force.

[8] The Proposal Analysis Report was a report from the Source Selection Evaluation Team to Druyun that "reflect[ed] an integrated analysis of each offeror's proposal and the resulting government evaluation of these proposals." J.A. 139. This report gave a "graphic comparison of the evaluation factors for a side-by-side contrast of offerors," and detailed the Source Selection Advisory Council's comparative analysis of the proposals on the technical, management, and cost evaluation factors. J.A. 139-43.

]

J.A. 198, 209.

Druyun's unredacted SSDD, also provided to Raytheon, stated in pertinent part:

[

[9]

[9] In evaluating mission capability, the SSA gave each subfactor a rating based on a color scheme, blue-excellent, green-good, yellow-satisfactory, and red-unsatisfactory. J.A. 181. The debriefing documents indicated that Druyun upgraded evaluation ratings and lowered risk ratings for Lockheed. Compare J.A. 140 with J.A.147-48, 175, 181. For example, Druyun changed [

]

]

J.A. 145-48.

According to the Air Force Memorandum for Record of the debriefing prepared by the source selection evaluation team co-chairs, Raytheon raised the following issues or concerns at the debriefing:

> 5(b) [
>
> ]
>
> 5(c) [
>
> ]
>
> . . . .
>
> 5(e) [
>
> ]
>
> . . . .
>
> 5(j) [
>
> ]
>
> . . . .
>
> 5(l) [

]

. . . .

5(o) [
]

J.A. 276-77.

Handwritten notes taken by Raytheon officials during the January 28, 1999 debriefing state the following:

- [ ]
- [
]
- SSA made decision. SSET did not.
- [
]
- [ ]
- They verified that the SSA did change color & risk ratings.

J.A. 251, 255, 263, 268, 262, 267, 265 and 270.

During the summer of 2002, Druyun "reached the decision that she would retire from the Air Force late that year." J.A. 59. She did not disclose her decision publicly. In order to explore employment opportunities, Druyun disqualified herself in writing from all Air Force matters involving Lockheed Martin and Raytheon on August 26, 2002. J.A. 60.[10] Druyun then entered into discussions with Lockheed Martin, resulting in her verbal agreement to accept a position at Lockheed Martin which would begin after her retirement. Plaintiff alleged that Druyun had a prior history of dealings with Lockheed Martin, citing her involvement in the 1999 $10.1 billion public-private partnership between Lockheed Martin and the Air Force's Oklahoma City depot for engine repair work, her 1999 advocacy of the F/A-22 manufactured by Lockheed, and her 2001supervision of the

---

[10] In an e-mail dated September 3, 2002, Druyun's daughter advised Boeing that her mother would be retiring, had not announced it publicly and was interviewing with Lockheed Martin. J.A. 62. In an e-mail dated September 23, Druyun's daughter advised the Boeing executive that her mother "wants a COO-like position . . . and said this is what Lockheed is doing for her right now in Bethesda." J.A. 64

award of a $200 billion contract to Lockheed Martin, over its competitor, Boeing, to produce the F-35 Joint Strike Fighter Aircraft. Am. Compl. ¶¶ 11-13. Am. Compl. ¶ 14; J. A. 60.

Between September and November, 2002, Druyun, unbeknownst to the Air Force or Plaintiff, engaged in private discussions with a senior Boeing employee, Michael Sears, regarding her future employment by that company. J.A. 57-58, 62-67.[11] While these meetings with Boeing were taking place, Druyun was overseeing Air Force negotiations with Boeing to lease 100 Boeing KC-767A tanker aircraft. J.A. 60. On October 5, 2002, Druyun met with the Boeing executive, and he offered her a position at Boeing -- the salary was to be $250,000 plus a $50,000 bonus. Id.; J.A. 66-67. Druyun and the Boeing executive agreed "to keep their meeting to themselves." J.A. 66. Subsequently, on November 5, 2002, Druyun disqualified herself from any matters involving Boeing and advised the Air Force that she intended to enter into employment negotiations with Boeing. J.A. 67. Druyun retired from the Air Force in November, 2002, and began working for Boeing on January 2, 2003. J.A. 68.

On April 20, 2004, Druyun pled guilty for conspiring to violate 18 U.S.C. § 208(a).[12] Am. Compl., Ex. A at 1. J.A. 28, 136-58. This conspiracy existed from about September 23, 2002, through November 5, 2002, and involved prospective employment discussions between Druyun and a Boeing senior executive that occurred while Druyun participated personally and substantially in Air Force discussions with Boeing concerning the terms and condition of the KC-767A tanker lease. J.A. 15. In her original plea agreement, Druyun acknowledged a conflict of interest in negotiating her employment with Boeing at the same time as negotiating with Boeing on behalf of the Air Force, but "maintained that her relationship with Boeing did not influence her official actions or harm the government." J.A. 110. Several months later, on July 28, 2004, Druyun admitted that she did favor Boeing in certain negotiations and that "Boeing's employment of her future son-in-law and her daughter in 2000, . . . along with her own desire to be employed at Boeing, influenced her government decisions in matters affecting Boeing." Id. In an October 1, 2004 Supplemental Statement of Facts filed in the criminal proceedings, Druyun admitted to favoring Boeing in certain negotiations because of her employment negotiations and other favors provided to her by Boeing. The Government acquisitions with Boeing in which Druyun admittedly harmed the United States due to the "loss of her objectivity," included the following: the lease agreement for 100 Boeing KC-767A tanker aircraft, NATO Airborne Early Warning and Control Program, C-130 AMP, and C-17 negotiations over contract clause H-22. J.A. 109-13. Specifically, Druyun "agreed to a higher price

---

[11] Druyun's daughter was hired by Boeing in November of 2000. J.A. 61.

[12] 18 U.S.C. § 208(a) provides that, "[e]xcept as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States . . . participates personally and substantially as a Government officer or employee, through decision, approval . . . or otherwise, in a . . . proceeding . . . in which . . . he, his spouse, minor child, . . . or any organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest - - shall be subject to the penalties set forth in section 216 of this title." 18 U.S.C. § 216 prescribes fines, prison terms, and civil penalties for wilful and nonwilful violations of section 208.

for the [100 Boeing KC 767A tanker] aircraft than she believed was appropriate," approved of what she believed to be an excessive payment to Boeing concerning the NATO Airborne Early Warning and Control Program, believed that she did not act objectively when she selected Boeing for the C-130 AMP, and acknowledged that her decision to agree to pay approximately $412 million to Boeing in connection with the C-17 H-22 contract clause as a settlement was influenced by her improper dealings with Boeing. J.A. 110-12.

At the sentencing hearing on October 1, 2004, the judge found that Druyun breached her original plea agreement "by not providing full, complete and truthful cooperation as required by that plea agreement," and said that Druyun was "less than candid" and "that came out, in part, because she was polygraphed." J.A. 85-86, 91-92. The Court sentenced Druyun to nine months in prison, followed by seven months of community confinement, and imposed a $5,000 fine. J.A. 85, 104-05.[13]

Once the Air Force was made aware of Druyun's improper personal negotiations with Boeing, the Acting Under Secretary of Defense for Acquisition, Technology, and Logistics commissioned a study of all acquisitions involving Druyun during her nine years as the Air Force's top civilian acquisition official. Am. Compl. ¶ 22; J.A. 131; Druyun Study at 2. The purpose of this Druyun Study was to identify all acquisition actions involving Druyun that might warrant investigation. Druyun Study at 9. The Study, which was conducted from December 2004 to February 2005, examined 407 acquisitions. Id. at 1, 13. Ultimately, the Study concluded that of those 407 acquisitions, eight, including the C-5 AMP procurement at issue here, were "anomalies" that required further investigation. Id. at 1.

The Acting Under Secretary of Defense for Acquisition, Technology, and Logistics then requested that the Department of Defense Inspector General review these eight actions for further investigation. J.A. 119. On February 28, 2006, the IG published his report on the source selection procedures for the C-5 AMP. J.A. 114. The IG report "identified two actions that 'appeared irregular and may not have been conducted in the best interest of the Government,'" -- 1) the reassignment of the Source Selection Authority (SSA) responsibilities and 2) the proposal rating changes made by Druyun in support of her source selection decision. J.A. 119-20. The IG Report indicated the following:

- Air Force personnel did not adequately document the decision process in accordance with the Federal Acquisition Regulation (FAR) Part 15 and Air Force FARS Appendix AA.

- There was inadequate support for the management, technical, and cost data evaluation ratings presented by the Air Force Advisory Council in its Proposal Analysis Report, such that the ratings could not be traced back to detailed analysis, reports, or meeting minutes, and the IG was unable to validate the contract awards to Lockheed Martin.

- There was no support for delegation of source selection duties to Druyun.

---

[13] The Government had requested "the upper end" of the range of the 16-month term of incarceration. J.A. 102.

- A proposal for a training system upgrade by Lockheed Martin was noted by Druyun in her source selection decision as a "significant modification," but this modification was not previously identified by the program office as an objective of the C-5 AMP.

- Druyun ignored performance/capability and risk proposal ratings presented by the Air Force Advisory Council without sufficient justification for her decision, changed ratings in the area of avionics quality/integration, software development, and system management to favor Lockheed Martin without justification in her source selection decision, introduced new strengths for Lockheed Martin, and cited Raytheon for a weakness while other documents showed that Lockheed Martin had this same weakness.

- The Air Force failed to provide adequate oversight of the source selection process.

J.A. 124-25.

Further, the IG Report identified "material management control weaknesses" in the source selection process as defined by DoD Instruction 5010.40, i.e., that the Air Force did not have controls in place to ensure that source selection decisions were adequately documented and justified. J.A. 121.

Plaintiff alleged that Druyun concealed her manipulation of the C-5 AMP procurements, citing publications in 2004 and 2005:

> After Druyun's confession, the Air Force acquisition chief stated that Druyun "hoarded information and kept the decisionmaking process a secret." Her concealment was acknowledged by her superiors. Marvin R. Sambur, Long Fall for Pentagon Procurement Star (Nov. 14, 2004), http://corpwatch.org/article.php?id=11680.
>
> The Commander of the Air Force's Materiel Command indicated that no one suspected what Druyun was doing, stating, "It was a surprise." Procurement Scandal Spawns 48 Air Force Reviews (Apr. 13, 2005), http://www.spacemart.com/reports/Boeing Procurement Scandal Spawns 48 Air Force Reviews General.html.
> The Under Secretary of Defense for Acquisition, Technology and Logistics stated that the Air Force was "stunned" to learn that Druyun had manipulated some contracts. Roundtable with Mike Wynne (Feb. 14, 2005), www.dod.mil/transcripts/2005.

Am. Compl. ¶¶ 19-21.

On May 16, 2006, less than three months after the IG Report was released, L-3 filed its complaint in this action, protesting the 1999 award of the C-5 AMP contract to Lockheed Martin. L-3 filed an amended complaint on February 9, 2007.

## Discussion

Defendant and Intervenor have moved to dismiss L-3's action for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims, claiming that the action is untimely.

In ruling on a motion to dismiss under Rule 12(b)(1), usually the Court must accept as true the facts alleged in the complaint, and jurisdiction is decided on the face of the pleadings. Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572 (Fed. Cir. 1996); see generally 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2004). However, when a Rule 12(b)(1) motion challenges the factual basis for this Court's subject-matter jurisdiction, the allegations in the complaint are not controlling, and the Court may review evidence outside the pleadings in determining whether it has jurisdiction to hear the case. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).

When a defendant challenges this court's jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden to show by a preponderance of the evidence that jurisdiction is proper. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). Where the motions to dismiss for lack of subject-matter jurisdiction dispute jurisdictional facts, the Court may consider other relevant evidence to resolve the factual dispute. Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (citing Reynolds, 846 F.2d at 747).

The Tucker Act waives sovereign immunity and allows the Court of Federal Claims to hear certain suits against the Government. See Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005). The Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), defines this Court's bid protest jurisdiction as follows:

> [T]he Court of Federal Claims . . . shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals . . . or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement. . . . [T]he United States Court of Federal Claims . . . shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2000).

Actions under the Tucker Act are subject to the statute of limitations set forth in 28 U.S.C. § 2501, which provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501; Chambers v. United States, 417 F.3d 1218, 1223 (Fed. Cir. 2005). The Federal Circuit has characterized the statute of limitations in 28 U.S.C. § 2501 as jurisdictional,

reasoning that compliance with this statute's timeliness requirement is a condition of the United States Government's waiver of sovereign immunity. John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354-55 (Fed. Cir. 2006), cert. granted, 127 S.Ct. 2877 (May 29, 2007) (No. 06-1164).[14] The Federal Circuit noted that section 2501 has enjoyed a "longstanding pedigree as a jurisdictional requirement," harking back to the Supreme Court's 1883 decision in Kendall v. United States, 107 U.S. 123, 125 (1883) -- which has consistently been applied to prevent waiver of the statute of limitations in this court. Id. at 1355.

Plaintiff asks this Court to deem the filing deadline in 28 U.S.C. § 2501 nonjurisdictional on the basis of the Federal Circuit's recent opinion in Kirkendall v. Department of the Army, 479 F.3d 830, 842 (Fed. Cir. 2007), and treat Defendant's and Intervenor's motions as motions to dismiss under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. However, Kirkendall addressed a different statute of limitations, 5 U.S.C. § 3330a, and held that this statute of limitations could not be characterized as jurisdictional. Kirkendall, 479 F.3d at 842-43. Kirkendall did not alter John R. Sand & Gravel's holding that section 2501 is jurisdictional, a holding which binds this Court.[15]

---

[14] The Supreme Court granted certiorari in John R. Sand & Gravel, on the issue of whether the statute of limitations in section 2501 is jurisdictional. The Court heard oral argument on November 6, 2007.

[15] As pointed out by the dissent in John R. Sand & Gravel, the characterization of the statute as jurisdictional can have a dramatic effect on litigants, operating to place the burden of proof regarding the timeliness of the action on the plaintiff, while ordinarily under RCFC 8(c), the statute of limitations is an affirmative defense, requiring the defendant to prove that the action is time-barred. See John R. Sand & Gravel, 457 F.3d at 1362 (Newman, J., dissenting). Further, affirmative defenses may be waived. In addition, applying the "jurisdictional" moniker to Section 2501 arguably precludes this Court from equitably tolling that statute. In Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96 (1990), the Supreme Court established the presumption that equitable tolling is available in suits against the Government. See also Kirkendall, 479 F.3d at 836. However, it is unclear whether Irwin's presumption survives the Court's more recent statement in Bowles v. Russell, 127 S.Ct. 2360, 2366 (June 14, 2007) that the "Court has no authority to create equitable exceptions to jurisdictional requirements" -- language suggesting that if a statutory time limit is truly jurisdictional, the doctrine of equitable tolling cannot be applied. Prior to Bowles, the Federal Circuit opined that a jurisdictional statute of limitations might be equitably tolled, construing Supreme Court precedent and stating:

> It is well established that statutes of limitations against the United States . . . are jurisdictional in nature. . . . That does not mean that courts may never recognize equitable tolling of statutory limitations periods in suits against the government. Instead, the Court has made clear that whether equitable tolling is available in suits against the government turns on congressional intent, i.e., whether Congress intended the particular statute of limitations at issue to be subject to tolling and, if so, under what circumstances.

"[T]he burden of establishing jurisdiction, including jurisdictional timeliness, must be carried by the [plaintiff]." Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998). The unusual circumstances of this case present an issue of first impression regarding when Plaintiff's bid protest cause of action accrued.

**L-3's Cause of Action Accrued When the IG Report Was Issued**

A claim first accrues when "all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (emphasis in original); see also Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004) (quoting Nager Elec. Co. v. United States, 177 Ct. Cl. 234, 368 F.2d 847, 851 (1966)). "[D]iscovery of the injury, not discovery of other elements of a claim, is what starts the clock." Rotella v. Wood, 528 U.S. 549, 555 (2000).

Defendant and Intervenor argue that Plaintiff's action accrued on January 22, 1999, when its proposal was rejected and the Government awarded the C-5 AMP contracts to Lockheed Martin. J.A. 139, 144-50. In the alternative, Defendant argues that L-3's claim accrued on January 28, 1999, the date its predecessor Raytheon received the debriefing from the Air Force, and was put on inquiry that it had a potential bid protest against the Government. J.A. 275-77. Under either scenario, the instant action would be untimely because the award and debriefing occurred in January 1999, and this action was not filed until May, 2006.

Defendant and Intervenor have too narrowly characterized the instant cause of action. This is not a typical post-award bid protest where the primary goal of the plaintiff is to undo the contract award and secure a recompetition, re-evaluation, or, in rare instances, the award itself. Because of the unique circumstances here, it is too late for such injunctive relief, as the contract has been largely performed. Instead, citing Druyun's alleged bad faith, bias and favoritism toward Lockheed Martin, Plaintiff contends that the Air Force breached its obligation to fairly consider its offer and seeks its bid and proposal preparation costs as its sole remedy. Am. Compl. ¶¶ 42, 51.[16]

Before enactment of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104-320, 110 Stat. 3870 (1996) (ADRA), the Court of Federal Claims' jurisdiction over a bid protest was predicated on the implied contract between the Government and prospective bidders to treat the bidder's proposal fairly, equally, and consistently with the agency's solicitation of bids. Keco Indus.,

---

Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004) (emphasis added) (citations omitted).

[16] The Federal Circuit has not had occasion to address whether the implied contract theory survives the Administrative Dispute Resolution Act. See Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1083 n.9 (Fed. Cir. 2001); Impresa Construzioni Geom. Domenica Garufi v. United States, 238 F.3d 1324, 1332 n.6 (Fed. Cir. 2001).

Inc. v. United States, 192 Ct. Cl. 773, 780 (1970); Heyer Prods. Co. v. United States, 147 Ct. Cl. 256, 177 F. Supp. 251, 252 (1959) ("If in the instant case the [agency], in rejecting plaintiff's bid, did not act in good faith, but arbitrarily and capriciously, it breached its implied promise when it solicited bids, for the breach of which plaintiff may recover the expenses it had incurred in submitting its bid."). Although ADRA obviated the need to base the COFC's protest jurisdiction on a breach of this implied-in-fact contract to consider bids fairly, the statute in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or an unfair evaluation, which would also constitute a breach of the implied contract of fair dealing. See, e.g., Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004); Unified Architecture & Eng'g, Inc., 46 Fed. Cl. 56, 60-61, aff'd, 251 F.3d 170 (Fed. Cir. 2000).[17] Section 1491(b) expressly provides that this Court has jurisdiction over "an action by an interested party objecting . . . to the award of a contract." 28 U.S.C. § 1491(b) (2000). The statute does not limit the legal theories on which such an "objection" to a contract award might be based. Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest.

Plaintiff's claim of a breach of the implied duty to consider its proposal fairly and honestly is quintessentially a challenge to the procurement process. The factual underpinnings of this cause of action could not have been divined at the time of award. Plaintiff claims that the selection process was manipulated and tainted by a high ranking government official, whose actions in this regard were concealed not only from Plaintiff but from the Air Force itself -- until the IG Report revealed what Plaintiff claims are irregularities in this procurement.

Although Plaintiff knew that Druyun was appointed the SSA and changed ratings, these actions by Druyun were not illegal on their face. Druyun clearly possessed the stature and capability to serve as an SSA in a major procurement, and Plaintiff would not have had reason to know she had appointed herself. Nor would Druyun's alteration of the ratings have necessarily raised a red flag. While unusual, the SSA's changing of SSAC's scoring is permissible. The FAR requires the SSA to exercise independent judgment and permits the SSA to test and disagree with the evaluators'

---

[17] See also S.K.J. & Assocs., Inc. v. United States., 67 Fed. Cl. 218, 225-26 (2005) (in the context of a discussion on jurisdiction, stating that the implied-in-fact contract theory "no longer serves a basis of recovery" in bid protest actions); Lion Raisins, Inc. v. United States, 52 Fed. Cl. 115, 120 (2002) ("To state that section 1491(b)(1) supersedes the implied-contract theory of bid protest jurisdiction under section 1491(a)(1) is merely to say that, because section 1491(b)(1) encompasses all claims that could have been brought under the former statute and more, it obviates the need for the implied-contract theory."). This Court interprets SKJ and Lion Raisins to mean that the breach of the implied-in-fact contract is no longer necessary as a predicate for this Court's bid protest jurisdiction, not to eliminate this theory as a basis for recovery. But see Block v. United States, 66 Fed. Cl. 68, 76-77 (2005) ("the plaintiff's implied-in-fact contract claim fails because objections to the procurement process must be based on claims identified in the Tucker Act, 28 U.S.C. § 1491(b)(1). The plaintiff's theory of an implied-in-fact contract to fairly and honestly consider this proposal no longer gives rise to a potential claim.")

conclusions. FAR 15.308.[18] As GAO has explained:

> Source selection officials are not bound by the recommendations of lower-level evaluators, and as a general rule, we will not object to the higher-level official's judgment, absent unreasonable or improper action, even when the official disagrees with an assessment made by a working-level evaluation board or individuals who normally may be expected to have the technical expertise required for such evaluations.

Speedy Food Service Inc., B-258537, May 2, 1995, 95-2 CPD ¶ 111 (citing Sarasota Measurements & Controls, Inc., B-252406.3, July 15, 1994, 94-2 CPD ¶ 32).[19]

It is the law of this Circuit that a government procurement official exercises discretion under a presumption of good faith. See Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002) ("The presumption that government officials act in good faith is nothing new to our jurisprudence."). Bidders in 1999 were entitled to presume that the second in command over Air Force acquisitions, the Source Selection Authority on a major procurement, exercised her duties in good faith. Plaintiff did not have reason to question Druyun's integrity at the time of award. As the Supreme Court recognized in another context:

> All of the class members who permitted their administrative or judicial remedies to expire were entitled to believe that their Government's determination of ineligibility was the considered judgment of an agency faithfully executing the laws of the United States. Though they knew of the denial or loss of benefits, they did not and could not know that those adverse decisions had been made on the basis of a systematic procedural irregularity that rendered them subject to court challenge.

Bowen v. City of New York, 476 U.S. 467, 480-81 (1986) (emphasis added) (internal citation omitted). So too, Plaintiff had, at the time of award, no basis to question that Druyun's selection of Lockheed Martin was anything other than her "considered judgment" and faithful execution of the procurement laws.

It was only the issuance of the IG Report in February 2006, which put L-3 on notice of

---

[18] Under the FAR, "[w]hile the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment." FAR 15.308.

[19] To be sure, Plaintiff could have filed a prophylactic protest against this award in 1999 knowing what it knew then and hoping to go on a fishing expedition and unearth some illegality -- a disruptive practice not to be encouraged. However, there is no assurance that such a 1999 protest would have revealed alleged conduct that did not come to light until years later with the IG investigation.

Druyun's conduct which would have given L-3 the basis to allege an unfair competition due to bad faith, bias and favoritism in the C-5 AMP award.[20] Accordingly, this cause of action accrued when Plaintiff knew or should have known that it did not receive fair consideration of its offer - a circumstance which was not revealed until the IG Report disclosed Druyun's alleged irregularities in connection with this procurement.[21] Because its cause of action for bid and proposal preparation costs accrued in February 2006, Plaintiff has demonstrated that its action is timely.[22]

**Alternatively, the Accrual Suspension Rule Applies Here**

In Martinez, 333 F.3d at 1319, the Federal Circuit recognized that the accrual suspension rule may be applied to Section 2501. The Martinez Court explained:

> Mr. Martinez invokes authority from this court holding that the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed. That legal principle is well settled in our cases. See, e.g., Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1482 (Fed. Cir. 1994); Catawba Indian Tribe v. United States, 982 F.2d 1564, 1571-72 (Fed. Cir. 1993); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988); Kinsey v. United States, 852 F.2d 556, 557 n. * (Fed. Cir. 1988); Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985); Giesler v. United States, 230 Ct. Cl. 723, 725, 1982 U.S. Ct. Cl. Lexis 95 (1982). The government agrees with that legal rule, which is based on a construction of the term "accrues" in section 2501. That rule is distinct from the question whether equitable tolling

---

[20] Lockheed Martin argues that these allegations of bias and favoritism are wholly speculative and that the timing of Druyun's handshake deal with Lockheed Martin came well after her involvement in the C-5 AMP procurement. While the proof in this case ultimately may not support a finding of bias, favoritism or bad faith, the Court cannot dismiss these allegations out of hand or discount them completely for purposes of assessing the timeliness of L-3's action.

[21] Defendant argues that the Court may not consider the IG Report in ruling on the pending motions because the Report contains hearsay. The Court disagrees. Under Fed. R. Evid. 801(c) hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In the context of the instant motion to dismiss, the IG Report is not offered for the truth of the matter asserted but is merely offered to show that the report was issued -- disclosing certain information heretofore undisclosed which triggered the accrual of the instant cause of action. The information in the IG Report is not being accepted as fact for the purposes of resolving this motion.

[22] Even if the proper date for triggering the accrual of the cause of action were April 2004, when Druyun confessed to a conflict of interest involving Boeing, this action would be timely.

> is available under that statute, although the term "tolling" is sometimes used in describing the rule.

Martinez, 333 F.3d at 1319. As the Martinez Court noted, "[t]he 'accrual suspension' rule is 'strictly and narrowly applied: . . . [plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date.'" Id. (citing Welcker, 752 F.2d at 1580).

Here, it is undisputed that L-3 did not know at the time of award that Druyun appointed herself SSA, allegedly was biased in favor of Lockheed Martin, manipulated the procurement, or changed Lockheed Martin's ratings to, in the words of the IG Report, "better support the higher cost proposal presented by Lockheed Martin." J.A. 131. This is a classic case for application of the accrual suspension rule in that Druyun, an agent of Defendant, concealed her actions from the world. It was not until Druyun's other procurement illegalities came to light that the IG investigated this procurement, identified it as a candidate for potential wrongdoing by Druyun and prompted L-3 to suspect that something may have been amiss in the C-5 AMP procurement.

**Failure to State a Claim Upon which Relief Can Be Granted**

Intervenor Lockheed Martin argues that even if timely, L-3's bid protest fails to state a claim upon which relief can be granted and thus should be dismissed under RCFC 12(b)(6).[23] Lockheed Martin contends that Plaintiff failed to allege any facts that would overcome the presumption of good faith applied to the actions of government officials by the Federal Circuit, citing Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). In Am-Pro, the Federal Circuit, in rejecting a contractor's claim of duress allegedly caused by the contracting officer's threats, recognized "a strong presumption that government contract officials exercise their duties in good faith." Further, under Am-Pro, a plaintiff can only rebut this presumption of good faith by clear and convincing evidence. Am-Pro, 281 F.2d at 1239. However, the Federal Circuit expressly limited that presumption as used in Am-Pro to "the situation where a government official allegedly engaged in fraud or some other quasi-criminal wrongdoing." 281 F.3d at 1239. See also Tecom, Inc. v.

[23] L-3 contends that by referencing "the Supplemental Statement of Facts filed by Druyun on October 1, 2004, in its failure to state a claim argument," which relate to Druyun's guilty plea, Lockheed Martin converted its motion into "one for summary judgment." Pl. Opp. 15. The Court disagrees. It is well settled that "courts routinely take judicial notice of documents filed in other courts." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); Fed. R. Evid. 201; see also Taylor v. Charter Med. Group, 162 F.3d 827, 829-30 (5th Cir. 1998). The Court has no basis to question the accuracy of the transcription of Druyun's criminal hearings, and what was said on the record in those proceedings is properly the subject of judicial notice. Consideration of "public records," such as court filings and the transcript of proceedings of the District Court for the Eastern District of Virginia relating to Druyun's criminal proceedings, "do[es] not convert [a party's] motion under 12(b)(6) to one for summary judgment." Stockton E. Water Dist. v. United States, 62 Fed. Cl. 379, 381 n.1 (2004); see Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999); Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994).

United States, 66 Fed. Cl. 736, 769 (2005) (acknowledging that this presumption applies to situations "when a government official is accused of fraud or quasi-criminal wrongdoing in the exercise of his official duties.").[24] Thus, intervenor correctly asserts that under Federal Circuit precedent the presumption applies to the unusual conduct alleged here.

Seizing upon the heavy burden of proof -- clear and convincing evidence -- needed to overcome the presumption of good faith required to be applied to Druyun's conduct, intervenor seeks dismissal of this action. Lockheed Martin contends:

> [P]laintiff failed to allege any facts that would overcome the presumption of good faith applied to the actions of Government officials by the Federal Circuit and there is no legal basis under which plaintiff can leverage Ms. Druyun's conviction for participating in a conspiracy to violate 18 U.S.C. § 208(a) during the post-2000 period into a basis to attack the January 1999 procurement in which Boeing was not involved.

Intervenor's Reply at 18-19. While Plaintiff's allegations of Druyun's connections to Lockheed Martin at the time of the C-5 AMP procurement are indirect, they are there. Plaintiff alleged that Druyun had dealings with Lockheed in 1999, and that "she apparently had been focused on Lockheed as her employer for some time" prior to August 2002, when she actually had a handshake agreement to join that firm.

In its amended complaint L-3 alleged:

> 11. Also in 1999, Druyun concluded the largest public-private partnership in Air Force history. The partnership, worth $10.1 billion,

---

[24] In Tecom, Judge Wolski followed the Am-Pro Court's limitation of this presumption to cases of this ilk, stating:

> this Court is unwilling to extend this strong presumption [of good faith on the part of government contracting officials] beyond the bounds set by the Federal Circuit in Am-Pro, to settings where the rationale does not apply. When a government official acts under a duty to employ discretion, granted formally by law, regulation, or contract, and a lack of good faith is alleged that does not sink to the level of fraud or quasi-criminal wrongdoing, clear and convincing evidence is not needed to rebut the presumption. Instead, this may be inferred from a lack of substantial evidence, gross error, or the like.

66 Fed. Cl. at 769. Here, the allegation that Druyun manipulated the C-5 AMP procurement to ensure Lockheed Martin would win because she wanted to curry favor with that company in the hope of securing employment there, rises to the level of quasi-criminal conduct.

was between Lockheed Martin and the Air Force's Oklahoma City depot for engine repair work. . . .

12. Also in 1999, Druyun emerged as the Pentagon's top advocate of the F/A-22, manufactured by Lockheed. . . .

13. Then in 2001 Druyun made history by supervising the award of the largest contract ever let by the Department of Defense---a $200 billion deal in which Lockheed Martin won the contract over Boeing to produce the F-35 Joint Strike Fighter Aircraft. . . .

14. In August 2002 Druyun entered into employment discussions with Lockheed that resulted in a "handshake agreement" to join the ranks of Lockheed. She had apparently been focused on Lockheed as her future employer for some time. . . .

15. Druyun later reneged on her agreement with Lockheed and accepted a position at Boeing after it had employed her daughter and son-in-law.

16. On April 20, 2004, Druyun entered a plea of guilty for conspiring to violate 18 U.S.C. § 208(a). She pled guilty to allowing personal interests to affect acquisition decisions. She was sentenced to prison on October 1, 2004.

17. . . . She acknowledged that, as a result of her loss of objectivity in acquisition actions, she took actions that harmed the United States.

. . . .

34. Darleen Druyun rescinded the properly authorized appointment of the Commander of the Aeronautical System Center and made a unilateral and unjustified appointment of herself as SSA. She then proceeded to change ratings to favor Lockheed Martin to justify the selection of its higher cost proposal. By manipulating the procurement in this fashion, Druyun acted in bad faith. Both the appointment, not authorized by the Secretary of the Air Force, and the motivation for changing the ratings were concealed from L-3. L-3 was the victim of a manipulated source selection process directed by an unauthorized SSA.

35. By these actions, effectively predetermining Lockheed Martin as the awardee, the Air Force acted in bad faith.

Am. Compl. at 3-4 and 7-8 (citations omitted). These allegations, read together, paint a portrait of a procurement official who apparently had her eye on a job with Lockheed Martin while she was acting as the SSA here and skewed the C-5 AMP ratings to ingratiate herself with Lockheed Martin.[25]

Although under Am-Pro L-3 will be required to muster "clear and convincing" evidence to overcome the presumption that Druyun acted in good faith, this heavy burden does not warrant dismissal of the complaint at this juncture. The likelihood of Plaintiff overcoming the presumption is not the issue before the Court in the context of the pending motion. Under Rule 12(b)(6), the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low. In Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007), the Supreme Court recently articulated the general standards applicable to resolution of a Rule 12(b)(6) motion as follows:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [citing Conley v. Gibson, 355 U.S. 41,47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (CA7 1994); a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Neitzke v. Williams, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

---

[25] The Court notes that these serious allegations of wrongdoing are limited to Druyun herself and in no way implicate Lockheed Martin. There is not one hint of an allegation that Lockheed Martin was aware of Druyun's alleged intentions or possible misconduct or that Lockheed itself did anything other than compete in an honest fashion.

Thus, the issue "'is not whether a plaintiff is likely to prevail ultimately, but whether [it] . . . is entitled to offer evidence to support the claims.'" Woodford v. Cmty. Action Agency of Greene County, Inc., 239 F.3d 517, 526 (2d Cir. 2001) (internal citation omitted).

Applying these standards to the instant complaint, L-3 has alleged conduct which could warrant monetary relief. Plaintiff's allegations of Druyun's unilateral misfeasance here, would, if proven, potentially warrant an award of bid and proposal preparation costs, because if Plaintiff's allegations are true, L-3's predecessor, Raytheon, would not have had a fair shake in this procurement. As such, Plaintiff has stated a claim upon which relief can be granted.[26]

## Conclusion

1. Defendant's and Intervenor's motions to dismiss pursuant to Rule 12(b)(1) are **DENIED**.
2. Intervenor's Motion to Dismiss pursuant to Rule 12(b)(6) is **DENIED**.
3. The parties shall file proposed redactions to this opinion by **November 21, 2007.**
4. The Court will conduct a status conference to schedule further proceedings on **November 26, 2007, at 11:00 a.m. E.S.T.**

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

[26] Lockheed Martin cites this Court's opinion in Four Points by Sheraton v. United States, 66 Fed. Cl. 776, 784 (2005), arguing that this Court has rejected allegations consisting of "manifold scattershot challenges" to an award which involved criticisms of decisions by the source selection authority followed by "bald allegation of bias." Four Points, 66 Fed. Cl. at 784; Intervenor's Reply at 20. While this Court did characterize Four Points' protest in that fashion, it did not dismiss Four Points' complaint out of hand under Rule 12(b)(6). Instead, the Court denied the plaintiff's motion for judgment on the Administrative Record.