# JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 2977) to reauthorise alternative means of dispute resolution in the Federal administrative process, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The Senate amendment to the text of the bill struck all of the House bill after the enacting clause and inserted a substitute text.

The House recedes from its disagreement to the amendment of the Senate with an amendment that is a substitute for the House bill and the Senate amendment. The differences between the House bill, the Senate amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clerical changes.

The conferees incorporate by reference in this Statement of Managers the legislative history reflected in both House Report 104–597 and Senate Report 104–245. To the extent not otherwise inconsistent with the conference agreement, those reports give expression to the intent of the conferees.

Section 3—House recedes to Senate amendment with modifications. This section clarifies that, under 5 U.S.C. section 574, a dispute resolution communication between a party and a neutral or a neutral and a party that meets the requirements for confidentiality in section 574 is also exempt from disclosure under FOIA. In addition, a dispute resolution communication originating from a neutral and provided to all of the parties, such as Early Neutral Evaluation, is protected from discovery under 574(b)(7) and from disclosure under FOIA. A dispute resolution communication originating from a party to a party or parties is not protected from disclosure by the ADR Act.

The Managers recognize that the intent of the Conference Agreement not to exempt from disclosure under FOIA a dispute resolution communication given by one party to another party could be easily thwarted if a neutral in receipt of a dispute resolution communication agrees with a party to in turn pass the communication on to another party. It is the intent of the Managers that if the neutral attempts to circumvent the prohibitions of the ADR Act in this manner, the exemption from FOIA would not apply.

As with all other FOIA exemptions, the exemption created by section 574(j) is to be construed narrowly. The Managers would not expect the parties to use the new exemption as a mere sham to exempt information from FOIA. Thus, for example, we would not ex-

pect litigants to resort to ADR principally as a means of taking advantage of the new exemption. In such a case the new exemption would not apply.

Section 7—Senate recedes to House with a modification. This section requires the President to designate an agency or to designate or establish an interagency committee to facilitate and encourage the use of alternative dispute resolution. The Managers encourage the President to designate the same entity under this provision as is designated under section 11 (regarding Negotiated Rulemaking). This would promote the coordination of policies, enhance institutional memory on the relevant issues, and make more efficient the use of ADR and Negotiated Rulemaking.

Section 8—House recedes to Senate amendment with modifications. This section permits the use of binding arbitration under certain conditions, and clarifies that an agency cannot exceed its otherwise applicable settlement authority in alternative dispute resolution proceedings.

The head of an agency that is a party to an arbitration proceeding will no longer have the authority to terminate the proceeding or vacate any award under 5 U.S.C. section 580. However, it is the Managers' intent that an arbitrator shall not grant an award that is inconsistent with law. In addition, prior to the use of binding arbitration, the head of each agency, in consultation with the Attorney General, must issue guidelines on the use and limitations of binding arbitration.

Section 11—House recedes to Senate amendment with modifications. This section permanently reauthorizes the Negotiated Rulemaking Act of 1990. The President is required to designate an agency or interagency committee to facilitate and encourage the use of negotiated rulemaking.

In addition, this section requires the Director of the Office of Management and Budget to take action to expedite the establishment of negotiated rulemaking committees and committees to resolve disputes under the Administrative Dispute Resolution Act. It is the understanding of the Managers that the Federal Advisory Committee Act (FACA) applies to proceedings under the Negotiated Rulemaking Act, but does not apply to proceedings under the Administrative Dispute Resolution Act. The Director also is required to submit recommendations to Congress for any necessary legislative changes within one year after enactment.

The Managers deleted language in paragraph (b)(1)(B) determining that property accepted under this section shall be considered a gift to the United States for federal tax purposes because the Managers determined that the language merely repeated current law.

Secton 12—House recedes to Senate amendment with modifications. This section consolidates federal court jurisdiction for procurement protest cases in the Court of Federal Claims. Previously, in addition to the jurisdiction exercised by the Court of Federal Claims, certain procurement protest cases were subject to review in the federal district courts. The grant of exclusive federal court jurisdiction to the Court of Federal Claims does not affect in any way the authority of the Comptroller General to review procurement protests pursuant to Chapter 35 of Title 31, U.S. Code.

This section also applies the Administrative Procedure Act standard of review previously applied by the district courts (5 U.S.C. sec. 706) to all procurement protest cases in the Court of Federal Claims. It is the intention of the Managers to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims. This section is not intended to affect the jurisdiction or standards applied by the Court of Federal Claims in any other area of the law.

HENRY HYDE,
GEORGE W. GEKAS,
MICHAEL PATRICK FLANAGAN,
JOHN CONYERS, Jr.,
JACK REED,
*Managers on the Part of the House.*

TED STEVENS,
BILL COHEN,
CHUCK GRASSLEY,
JOHN GLENN,
CARL LEVIN,
*Managers on the Part of the Senate.*

○

planted two dogwood trees in honor of Bob Frasure. But by far the most eloquent tribute to his work, and to Joe's and to Nelson's and to Ron's and all those we honor today, has been the return of normal life that I could see all around me in Sarajevo. Every school reopened, every family reunited, every road and factory rebuilt is a monument to the service of these brave Americans.

That monument, of course, is a work in progress. It is being shaped by countless hands—by our diplomats, our soldiers, by our civil servants, and by the people of the region. The memory of our fallen colleagues impels us not to rest—not to rest at all—until this work is completed.

The men and women we honor today, as the President said, will always represent what is best about America. They were generous enough to share their talent and spirits with others. They were dedicated enough to make sacrifices in the cause of public service. They were realistic enough to know that America's fate is inseparable from the fate of the world. And they were optimistic enough to believe that the difficult problems can be solved but only solved when America is determined to overcome them.

Thinking of them, I was reminded of something that one of our visitors this week, Shimon Peres, once said: "Nobody will ever really understand the United States . . . You have so much power, and [yet] you didn't dominate another people; you have problems of your own, and [yet] you have never turned your back on the problems of others."

Anyone who knew these wonderful friends and colleagues understands something very important about America. Anybody who passes through this hall and who pauses to think about the lives behind the names of the people on these plaques will understand something about the American ideal. Here, in the presence of these names, there is not an ounce of cynicism about the country or about the people who represent it.

So even as we mourn, let us keep alive the spirit that gave these lives such meaning. And let these names be a reminder to us all—a reminder of the risks and hardships that dedicated Americans endure for their country, and let it be a reminder of the constant need to carry on their work, our work, until it is finally finished.

Thank you very much.•

---

## ADMINISTRATIVE DISPUTE RESOLUTION ACT OF 1995

Mr. LOTT. Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 350, S. 1224.

The PRESIDING OFFICER. The clerk will report:

The bill clerk read as follows:

A bill (S. 1224) to amend subchapter IV of chapter 5 of title 5, United States Code, relating to alternative means of dispute resolution in the administrative process, and for other purposes.

The PRESIDING OFFICER. Is there objection to the immediate consideration of the bill?

There being no objection, the Senate proceeded to consider the bill which had been reported from the Committee on Governmental Affairs, with an amendment to strike all after the enacting clause and insert in lieu thereof the following:

*SECTION 1. SHORT TITLE.*

*This Act may be cited as the "Administrative Dispute Resolution Act of 1995".*

*SEC. 2. AMENDMENT TO DEFINITIONS.*

*Section 571 of title 5, United States Code, is amended:*

*(1) in paragraph (3)—*

*(A) by striking out "settlement negotiations,"; and*

*(B) by striking out "and arbitration" and inserting in lie thereof "use of ombuds, and binding or nonbinding arbitration,"; and*

*(2) in paragraph (8)—*

*(A) in subparagraph (B) by striking out "decision," and inserting in lieu thereof "decision."; and*

*(B) by striking out the matter following subparagraph (B).*

*SEC. 3. AMENDMENTS TO CONFIDENTIALITY PROVISIONS.*

*(a) TERMINATION OF AVAILABILITY EXEMPTION TO CONFIDENTIALITY.—Section 574(b) of title 5, United States Code, is amended:*

*(1) in paragraph (5) by adding "or" at the end thereof;*

*(2) in paragraph (6) by striking out "; or" and inserting in lieu thereof a period; and*

*(3) by striking out paragraph (7).*

*(b) LIMITATION OF CONFIDENTIALITY APPLICATION TO COMMUNICATION.—Section 574 of title 5, United States Code, is amended—*

*(1) in subsection (a) in the matter before paragraph (1) by striking out "any information concerning"; and*

*(2) in subsection (b) in the matter before paragraph (1) by striking out "any information concerning".*

*(c) ALTERNATIVE CONFIDENTIALITY PROCEDURES.—Section 574(d) of title 5, United States Code, is amended—*

*(1) by inserting "(1)" after "(d)"; and*

*(2) by adding at the end thereof the following new paragraph:*

*"(2) To qualify for the exemption established under subsection (j), an alternative confidential procedure under this subsection may not provide for less disclosure than the confidential procedures otherwise provided under this section.".*

*(d) EXEMPTION FROM DISCLOSURE BY STATUTE.—Section 574 of title 5, United States Code, is amended by striking out subsection (j) and inserting in lieu thereof the following:*

*"(j) A dispute resolution communication which is generated by or provided to an agency or neutral, and which may not be disclosed under this section, shall also be exempt from disclosure under section 552(b)(3).".*

*SEC. 4. AMENDMENT TO REFLECT THE CLOSURE OF THE ADMINISTRATIVE CONFERENCE.*

*(a) PROMOTION OF ADMINISTRATIVE DISPUTE RESOLUTIONS.—Section 3(a)(1) of the Administrative Dispute Resolution Act (5 U.S.C. 581 note; Public Law 101–552; 104 Stat. 2736) is amended by striking out "the Administrative Conference of the United States and".*

*(b) COMPILATION OF INFORMATION—*

*(1) IN GENERAL.—Section 582 of title 5, United States Code, is repealed.*

*(2) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 5 of title 5, United States Code, is amended by striking out the item relating to section 582.*

*(c) FEDERAL MEDIATION AND CONCILIATION SERVICE.—Section 203(f) of the Labor Management Relations Act, 1947 (29 U.S.C. 173(f)) is amended by striking out "the Administrative Conference of the United States and".*

*SEC. 5. AMENDMENTS TO SUPPORT SERVICE PROVISION.*

*Section 583 of title 5, United States Code, is amended by inserting "State, local, and tribal governments," after "other Federal agencies,".*

*SEC. 6. AMENDMENTS TO THE CONTRACT DISPUTES ACT.*

*Section 6 of the Contract Disputes Act of 1978 (41 U.S.C. 605) is amended—*

*(1) in subsection (d) by striking out the second sentence and inserting in lieu thereof: "The contractor shall certify the claim when required to do so as provided under subsection (c)(1) or as otherwise required by law."; and*

*(2) in subsection (e) by striking out the first sentence.*

*SEC. 7. AMENDMENTS ON ACQUIRING NEUTRALS.*

*(a) EXPEDITED HIRING OF NEUTRALS.—*

*(1) COMPETITIVE REQUIREMENTS IN DEFENSE AGENCY CONTRACTS.—Section 2304(c)(3)(C) of title 10, United States Code, is amended by striking out "agency, or" and inserting in lieu thereof "agency, or to procure the services of an expert or neutral for use".*

*(2) COMPETITIVE REQUIREMENTS IN FEDERAL CONTRACTS.—Section 303(c)(3)(C) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253(c)(3)(C)), is amended by striking out "agency, or" and inserting in lieu thereof "agency, or to procure the services of an expert or neutral for use".*

*(b) REFERENCES TO THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES.—Section 573 of title United States Code is amended—*

*(1) by striking out subsection (c) and inserting in lieu thereof the following:*

*"(c) In consultation with other appropriate Federal agencies and professional organizations experienced in matters concerning dispute resolution, the Federal Mediation and Conciliation Service shall—*

*"(1) encourage and facilitate agency use of alternative means of dispute resolution; and*

*"(2) develop procedures that permit agencies to obtain the services of neutrals on an expedited basis."; and*

*(2) in subsection (e) by striking out "on a roster established under subsection (c)(2) or a roster maintained by other public or private organizations, or individual".*

*SEC. 8. ARBITRATION AWARDS AND JUDICIAL REVIEW.*

*(a) ARBITRATION AWARDS.—Section 580 of title 5, United States Code, is amended—*

*(1) by striking and subsections (c), (f), and (g); and*

*(2) by redesignating subsections (d) and (e) as subsections (c) and (d), respectively.*

*(b) JUDICIAL AWARDS.—Section 581(d) of title 5, United States Code, is amended—*

*(1) by striking out "(1)" after "(b)"; and*

*(2) by striking out paragraph (2).*

*SEC. 9. PERMANENT AUTHORIZATION OF THE ALTERNATIVE DISPUTE RESOLUTION PROVISIONS OF TITLE 5, UNITED STATES CODE.*

*The Administrative Dispute Resolution Act (Public Law 101–552; 104 Stat. 2747; 5 U.S.C. 581 note) is amended by striking out section 11.*

*SEC. 10. AUTHORIZATION OF APPROPRIATIONS.*

*(a) IN GENERAL.—Subsection IV of title 5, United States Code, is amended by adding at the end thereof the following new section:*

***"§584. Authorization of appropriations***

*"There are authorized to be appropriated such sums as may be necessary to carry out the purposes of this subchapter.".*

*(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of sections for chapter 5 of title 5, United States Code, is amended by inserting after the item relating to section 583 the following:*

*"Sec. 584. Authorization of appropriations.".*

Mr. COHEN. Mr. President, over the past decades, a consensus has emerged that traditional litigation is an inefficient way to resolve disputes. Not only is litigation costly, but due to its adversarial, contentious nature, litigation often deteriorates working relationships and fails to produce long-term solutions to problems.

Private corporations recognized many years ago that certain types of disputes could be resolved much less expensively and with less acrimony by relying on techniques such as mediation, arbitration, and partnering,

which collectively have become known as alternative dispute resolution or ADR.

In 1990, Congress recognized that the Government lagged well behind the private sector in this field and in response enacted the Administrative Dispute Resolution Act to promote the use of ADR in Government agencies. Senators GRASSLEY and LEVIN led the effort to pass this legislation and bring the benefits of ADR to the Federal Government.

The act authorizes agencies to apply ADR to almost any type of claim involving the Government, requires the appointment of ADR specialists in each agency, establishes procedures for hiring neutral third-parties to help resolve disputes, and provides confidentiality protection to parties participating in ADR.

S. 1224, the bill before the Senate, would permanently reauthorize this important legislation. It would also improve the system for hiring mediators, provide additional confidentiality protections to ADR participants, promote the use of binding arbitration and make a number of other minor adjustments to the act.

The Subcommittee on Oversight of Government Management held a hearing on the bill on November 29. At the hearing, the Department of Justice, the Federal Mediation and Conciliation Service, the Office of Management and Budget, the American Bar Association, and private individuals representing the Heritage Foundation and a consortium of Government contractors all praised the ADR Act and strongly endorsed its reauthorization. On December 12, 1995, the bill was unanimously reported, with an amendment in the nature of a substitute, by the Committee on Governmental Affairs.

The most significant change this bill makes to the original ADR Act is the repeal of a provision known as the arbitration escape clause. During consideration of the ADR Act in 1990, this provision was included to accommodate the Department of Justice's view that agencies lacked constitutional authority to refer disputes to binding arbitration. Although many scholars and the sponsors of the bill disagreed with this view, to satisfy the Department of Justice [DOJ], a provision was added that enabled Federal agencies to opt-out of arbitral awards. Unfortunately, this unilateral provision has deterred private parties from entering into arbitration with the Government. As one witness testified at the hearing on this reauthorization legislation, unless the escape clause is eliminated, "arbitration likely will never become a viable alternative for the Federal Government."

This would be unfortunate. Throughout the private sector, companies are saving money and reducing litigation costs by using arbitration to resolve commercial disputes instead of resorting to litigation. If we want the Government to enjoy the efficiencies of the private sector, it must have the flexibility to operate as a private business, especially when the Government is acting as a commercial entity. Indeed, the Government achieves a double benefit when a case is resolved through arbitration rather than litigation because not only are agency litigation costs and attorneys fees reduced, but judicial resources are freed to pursue criminal cases or other civil matters.

Last year, DOJ's Office of Legal Counsel issued a detailed opinion concluding that Federal agencies could submit disputes to binding arbitration without violating the Constitution. Since the constitutional objection to binding arbitration has been removed, there is no longer any reason to reauthorize the agency escape clause.

There are two amendments to S. 1224 before the Senate for consideration. The first amendment is designed to increase the efficiency of our procurement system by consolidating jurisdiction over bid protest claims in the Court of Federal Claims. The amendment would reverse the decision of the D.C. Circuit in Scanwell Lab., Inc. versus Shaffer (1969), that permitted bid protests to be filed in any district court across the country. Providing district courts with jurisdiction to hear bid protest claims has led to forum shopping and the fragmentation of Government contract law. Consolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum. Congress established the Claims Court—now the Court of Federal Claims—for the specific purpose of improving the administration of the law in the areas of patents, trademarks, Government contracts, Government employment, and international trade. Scanwell jurisdiction frustrates this purpose and deprives litigants of the substantial experience and expertise the Court of Federal Claims has developed in the Government contracting area.

The Information Technology and Management Reform Act of 1996, which I authored, eliminated the authority of the General Services Board of Contract Appeals to entertain bid protests on information technology contracts and left the General Accounting Office as the single extra-agency administrative forum for such actions. My amendment to S. 1224 follows this path of reform by creating a single forum for all bid protest litigation, which will lead to the development of more uniform, and thus more predictable, law.

Identical legislation passed the Senate as part of the Federal Acquisition Streamlining Act, but was rejected in conference. The Department of Justice and Office of Management and Budget strongly support the addition of this legislation to the ADR Act.

I also want to express my support for the Levin-Grassley amendment to S. 1224, which would reauthorize the Negotiated Rulemaking Act. This legislation establishes a framework for agencies to convene interested parties for the purpose of developing consensus-based regulation. When it is used, negotiated rulemaking can improve the quality, acceptability, and timeliness of regulations, reduce litigation, and enhance industry compliance, thereby reducing the costs of regulations to both private industry and the Government. Over the past 5 years negotiated rulemaking has been an unqualified success; there is no reason not to reauthorize this legislation while we are dealing with the closely related ADR Act.

In sum, reauthorization of the ADR and Negotiated Rulemaking Acts and the elimination of Scanwell jurisdiction represent cost-saving, commonsense improvements to the Federal regulatory and administrative processes. These reforms are good for the taxpayer, good for our courts, and good for the parties that have disputes with the Government.

I congratulate Senators GRASSLEY and LEVIN for the success of the original pieces of legislation and commend them for their work on this reauthorization bill.

I urge my colleagues to support this bill and sincerely hope that it may be enacted into law during this session of Congress.

I ask unanimous consent that the letter from the Department of Justice I referred to be printed in the RECORD.

There being no objection, the letter was ordered to be printed in the RECORD, as follows:

U.S. DEPARTMENT OF JUSTICE,
OFFICE OF LEGISLATIVE AFFAIRS,
*Washington, DC, April 12, 1996.*

Hon. WILLIAM S. COHEN,
*Chairman, Subcommittee on Oversight of Government Management and the District of Columbia, Committee on Governmental Affairs, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Administration supports your efforts to enact legislation that would make one small but vital improvement to the handling of bid protests arising from the award of Federal contracts—the elimination of district court jurisdiction over bid protests (the so-called Scanwell cases).[1] In disputes between an agency and a contractor after the award of a contract, Congress has previously recognized the need for a uniform national body of law to guide both Federal procurement officials and Federal contractors. The same need for nationwide uniformity exists for bid protests. The current forum shopping between the Federal district courts and the Court of Federal Claims only encourages needless litigation in a search for the most hospitable forum, and results in disparate bodies of law between the circuits. There is simply no need to have multiple judicial bodies to review bid protests of federal contacts.

In the past, Congress has recognized the need for nationwide uniformity in several areas of the law, and established the Claims

[1] *Scanwell Lab., Inc.* v. *Shaffer*, 424 F.2d 859, 869, 137 U.S. App. D.C. 371, 381 (1969) (held, a contractor making a prima facie showing alleging arbitrary or capricious action, or an abuse of discretion, by an agency or contracting officer in making the award of a contract, has standing to sue in district court under the Administrative Procedure Act).

Court (now the Court of Federal Claims) and the Court of Appeals for the Federal Circuit to achieve that result. Federal Courts Improvement Act of 1982 (FCIA) Pub. L. No. 97–164. The purpose of the FCIA was to improve "the administration of the law in the areas of patents, government contracts, merit system protection, trademarks and international trade." H. Rep. No. 97–312, 97th Cong., 1st Sess. 17 (1981). As a result of the enactment of the FCIA, the Court of Federal Claims was made the sole judicial forum for resolution of contract disputes between the contractor and the agency. The very same need exists for nationwide uniformity in the handling of bid protests.

By eliminating the authority of the General Services Board of Contract Appeal to entertain bid protests of the award of information technology contracts, the recently-enacted defense authorization bill for fiscal year 1996 (Pub. L. No. 104–106) took a significant step forward in the handling of bid protests by leaving the General Accounting Office as the sole remaining extra-agency administrative forum. The process of procurement reform should continue by eliminating Scanwell jurisdiction, and by creating a single judicial forum to govern all bid protest litigation, both prior to and after award. While there is good reason to apply local state law, as district courts are required to do when they adjudicate torts under the Federal Tort Claims Act, it is simply inappropriate to have different interpretations of Federal contracts applied, depending upon where the contractor resides or where the contract will be performed. This results in inconsistent application of legal principles and an unwieldy body of procurement law.

Our concerns about varying results in the district courts is not hypothetical. For example, the district court in *Advanced Seal Tech., Inc.* v. *Perry*, 873 F. Supp. 1144 (N.D. Ill. 1995), disagreed with the district court's holding in *Abel Converting, Inc.* v. *United States*, 679 F. Supp. 1133 (D.D.C. 1988), regarding the burden of proof borne by the protestor to establish grounds for injunctive relief. Similarly, the district court in *Washington Mechanical Contractors, Inc.* v. *United States Dept. of the Navy*, 612 F. Supp. 1243 (N.D. Cal. 1984), disagreed with the district court's decision in *Robert E. Dereckto of Rhode Island, Inc.* v. *Goldschmidt*, 506 F. Supp. 1059 (D. R.I. 1980), regarding the quantum of proof necessary to invalidate an award of a contract. In addition, the district court in *Metric Systems Corp.* v. *United States Dept. of the Air Force*, 673 F. Supp 439 (N.D. Fla. 1987), disagreed with the holding in *Acme of Precision Surgical Co., Inc.* v. *Weinberger*, 580 F. Supp. 490 (E.D. Pa. 1984), that Federal district courts have both pre- and post-award bid protest jurisdiction. These cases show that, since Federal district court judges rarely have the opportunity to review bid protests, as might be suspected, the results vary from court-to-court.

Legislation should seek to accomplish three important goals. First, it should achieve a uniform and consistent body of precedent governing bid protests, by providing interested parties with a choice of only one administrative and one judicial forum for the resolution of bid protests. Second, it should discourage forum shopping between the remaining tribunal and court by imposing a similar, if not identical, standard and scope of review in both fora. Finally, it should impose a standard and scope of review which both recognizes the deference to the contracting agency in conducting procurements and also limits expensive, time-consuming and resource-intensive discovery.

As Mr. Steven Kelman, Administrator for Federal Procurement Policy, testified before your subcommittee last July:

"With its nationwide jurisdiction and contract expertise, the Court of Federal Claims could effectively and efficiently serve as a unified judicial forum operating in the national interest. This would avoid the unfairness of forum shopping. At the same time, it would not prevent small businesses from having their day in court inasmuch as the Court of Federal Claims is authorized to hold hearings throughout the country to minimize inconvenience and expense to litigants."

In summary, the problems associated with district court bid protest activity can be effectively avoided by vesting judicial bid protests authority, both pre- and post-award, exclusively in the Court of Federal Claims and imposing a deferential standard of review and limited scope of review similar to that used by the General Accounting Office. With national jurisdiction, this court would effectively serve as a unified judicial forum with contract expertise, eliminating forum shopping and promoting the application of consistent legal principles.

We urge Congress to take immediate action to eliminate Scanwell jurisdiction in the district courts. We would be happy to work with you to ensure enactment of legislation that would meet this important objective. The Office of Management and Budget has advised that there is no objection from the standpoint of the Administration's program to the presentation of this report.

Sincerely,

ANDREW FOIS,
*Assistant Attorney General.*

Mr. LEVIN. Mr. President, we all want a Government that works better and costs less, and I am pleased that the Senate is considering today legislation authored by myself and Senator CHUCK GRASSLEY to encourage faster, less costly ways to resolve disputes with the Federal Government.

It's a fact of life that many people have disputes with the Federal Government. In the late 1980's, of the 220,000 civil cases filed on Federal court, more than 55,000 involved the Federal Government in one way or another. Resolving these disputes costs taxpayers billions of dollars.

Resolving them before they become courtroom dramas is one way to make a dent in this billion-dollar drain on taxpayer funds. Mediation, arbitration, mini-trials, and other methods offer cheaper, faster alternatives to courtroom battles.

That's why, 6 years ago, Senator GRASSLEY and I cosponsored the Administrative Dispute Resolution Act of 1990. It is why we have teamed up again this year on legislation to reauthorize that act and ensure that alternative dispute resolution techniques, which those familiar with it call ADR, remain a cost-effective tool that Federal agencies can use to resolve disputes.

Since the passage of the ADR law in 1990, Federal agencies have increasingly used alternatives to courtroom litigation to save time and money. The Army Corps of Engineers, for example, successfully resolved 53 of 55 contract disputes with ADR over a 5-year period, including settling a $55 million claim in 1994 for $17.3 million in 4 days. The Resolution Trust Corporation saved legal costs of approximately $115 million from 1991 through 1994, by using ADR instead of litigation. The Navy shortened dispute resolution times in some cases from 4 years to 3 months by replacing formal litigation with informal, abbreviated proceedings. Not all Federal agencies have used ADR extensively, but those agencies that have tried it report both savings and satisfaction with the process.

In these times of tight Federal budgets and shrinking Government, we need more of the savings that ADR offers, not less. That's why the ADR Act should become a permanent fixture in Federal law. The act's unfortunate lapse in October of last year due to the press of business before Congress shows why this step is necessary.

The bill that Senator GRASSLEY and I have introduced, S. 1224, would fill the current statutory void by permanently reauthorizing the ADR law. It would also fine-tune the law in several ways.

First and most importantly, the bill would eliminate a 30-day escape hatch that allowed Federal agencies unilaterally to vacate an arbitration award that disadvantaged the Government. In the 5 years this one-way escape clause has been on the books, no one has ever agreed to an arbitration proceeding with the Government on this basis. Eliminating this unilateral escape clause—which allows the Government but not its opponent to nullify an arbitration decision—is expected to encourage parties to agree to use binding arbitration as a cost-saving alternative to civil litigation. Other bill provisions make it clear that Federal agencies also retain the option to use nonbinding arbitration, when they so choose.

Second, the bill would encourage use of ADR methods by clarifying the confidentiality of ADR proceedings in several respects. The bill would make it clear that confidential documents prepared for purposes of an ADR proceeding are also exempt from disclosure under the Freedom of Information Act. The bill would also strike overly broad language which, if taken literally, would prohibit ADR neutrals and parties from disclosing any information concerning an ADR proceeding, even whether an ADR proceeding took place. The bill would also eliminate a provision that ended confidentiality protections for any document given to all parties, since this provision discourages open communications among all the parties to a dispute. Together, these changes clarify, focus and strengthen the law's confidentiality protections for ADR negotiations.

Third, the bill would encourage ADR by making it easier to use and improving coordination with other dispute resolution procedures. Specifically, the bill would clarify agency authority to hire mediators and other ADR neutrals on an expedited basis; allow agencies to accept donated services from State, local and tribal governments to support an ADR proceeding; add an explicit authorization for such sums as may be necessary to implement the ADR law; remove a provision which

barred Federal employees from electing to use ADR methods to resolve certain personnel disputes; and eliminate special paperwork burdens on contractors willing to use ADR to resolve small claims against the Government under the Contract Disputes Act.

Finally, the bill would reassign the tasks of encouraging and facilitating agency use of ADR methods from the Administrative Conference of the United States, which no longer exists due to a lack of appropriations, to the Federal Mediation and Conciliation Service, which has experience in this area.

Mr. President, I would also like to urge my colleagues to support a Levin-Grassley amendment to the ADR bill which would also reauthorize the Negotiated Rulemaking Act of 1990. The Negotiated Rulemaking Act became law back in 1990, at the same time as the ADR Act—in fact, for a time, the two laws shared the same United States Code cites—so it would be fitting to reauthorize both laws in the same piece of legislation.

Like the ADR law, the Negotiated Rulemaking Act is a reform effort that seeks to interject common sense and cost savings into the way the Federal Government does business. In essence, it allows a regulated community to form an advisory committee with all other interested parties to work with the Federal Government to draft regulations that everyone will then have to live by.

An its name implies, the point of the law is to get parties to negotiate with each other and the Federal Government to devise sensible, cost effective rules. No one is required to participate in a negotiation, and no one gives up their rights by agreeing to negotiate. It is a voluntary, rather than a mandatory, process.

The pleasant surprise is that it works. Since the Negotiated Rulemaking Act was enacted 6 years ago, agencies across the Government have tried it and liked it.

Over the past 6 years, negotiated rulemaking has been used to issue regulations under the Clean Air Act to produce cleaner burning gasoline and to clear haze from the Grand Canyon. The Coast Guard has used it to improve ships' oilspill fighting capabilities, while the Federal Railroad Administration has used it to improve railway worker safety. The Farm Credit System has negotiated a rule to apportion its administrative expenses among banks and other parties, while the FCC has used it to apportion data messaging services on satellites.

President Clinton has embraced the concept with an Executive order that encourages all agencies to try negotiated rulemaking at least once per year. Some agencies, like the Federal Aviation Administration, have found it so rewarding that they have established standing negotiated rulemaking committees and routinely invoke negotiated rulemaking to resolve difficult regulatory problems.

These agencies and others have discovered that, in many rulemaking situations, negotiation beats confrontation in terms of cost, time, aggravation, and the ability to develop regulations that parties with very different perspectives can accept. One industry participant in the clean air negotiations put it this way, "It's a better situation when people who are adversaries can sit down at the table and talk about it rather than throwing bricks at each other in courtrooms and the press." An environmental journal came to the same conclusion, summing up the Grand Canyon negotiation with the headline, "See You Later, Litigator." The Washington Post has called negotiated rulemaking plainly a good idea, while the New York Times has called it an immensely valuable procedure that ought to be used far more often.

The goal of the Levin-Grassley amendment is exactly that—to reauthorize the Negotiated Rulemaking Act to ensure continued agency use of this rulemaking procedure.

The amendment itself is straightforward. Like the ADR bill, it reauthorizes the 1990 law and makes it a permanent part of the U.S. Code. Like the ADR bill, it facilitates agency hiring of neutrals, called convenors and facilitators; provides an authorization for appropriations; and reassigns the responsibility of facilitating and encouraging agency use of negotiated rulemaking from the Administrative Conference of the United States, which has been terminated, to an agency or interagency committee to be designated by the President.

This amendment has been circulated extensively among negotiated rulemaking practitioners and is supported by the administration and the American Bar Association. It has been cleared by both sides of the aisle. It is being offered now to avoid a lapse in the law which is scheduled to expire in November.

Mr. President, I would like to thank Senator GRASSLEY for his leadership on both ADR and negotiated rulemaking; Senator COHEN, chairman of the Government Affairs Oversight Subcommittee, for his continuing support; and Senator STEVENS, Governmental Affairs Committee chairman, for his cooperation in getting this legislation to the floor despite a crowded calendar.

Alternative dispute resolution methods and negotiated rulemaking provide new and better ways to conduct Government business. They cost less, they're quicker, they're less adversarial, they develop sensible solutions to problems, and they free up courts for other business. They are two success stories in creating a government that works better and costs less. I urge my colleagues to join Senator GRASSLEY and myself in voting for the reauthorization of both laws.

Mr. GRASSLEY. Mr. President, the Administrative Dispute Resolution Act before us, sponsored by myself and Senator LEVIN, is an amendment to title 5 of the United States Code. This is a law which I originally sponsored back in 1989 with Senator LEVIN. That 1989 law, also titled the "Administrative Dispute Resolution Act," was crafted to encourage Federal agencies to streamline dispute resolution processes by use of alternative dispute resolution techniques rather than by litigation. These techniques are often collectively referred to as ADR, and include mediation, arbitration, conciliation, fact-finding, and minitrials.

Since the enactment of that law, most Federal agencies have formulated ADR programs and consequently have saved significant amounts of time and money by avoiding litigation of claims. At the same time, agencies haven't sacrificed fairness or party satisfaction. Overall, agencies have recognized the benefits of ADR's efficiency. As an example of the success of these programs, the Environmental Protection Agency utilizes mediation and arbitration to resolve Superfund, Clean Water Act, and Resource Conservation and Recovery Act disputes. The EPA has expressed great satisfaction with the results of these techniques in their resolution of complex regulatory enforcement issues.

In addition, ADR techniques are far less costly than litigation. The Federal Deposit Insurance Corporation estimated a savings of $13 million in legal costs in the last 3 years alone because of its ADR program. The Resolution Trust Corporation estimated it saved $114 million over the last 4 years using ADR techniques. These examples are proof of ADR's efficiency.

The judiciary has also benefited from adoption of ADR techniques. The U.S. District Court for the Northern District of California estimated savings of almost $44,000 in administrative costs per case after it implemented an early neutral evaluation program. Although the bill before us doesn't include the judiciary, we are in the process of drafting a bill that would encourage the judiciary to adopt ADR programs, which have been in existence on a limited basis. Representative MOORHEAD's subcommittee has already held hearings on the House side regarding this issue, and I expect to pursue this initiative in my Judiciary Subcommittee this year.

Despite the benefits that both the executive and judiciary branches have derived from adopting ADR programs, improvements can still be made to promote ADR. Many ADR programs haven't been integrated into the daily routines of their agencies. Agencies have had legitimate concerns about confidentiality, fairness, and quality assurance. Further, the original law expired in October of last year, and by not extending this law, progress in agency adoption of ADR techniques has been stalled. The new ADR bill seeks to address these concerns by modifying and clarifying the original act to make ADR more attractive to the agencies in the resolution of their disputes.

The Governmental Affairs Committee, Subcommittee on Oversight of Government Management and the District of Columbia, held a hearing on this bill on November 16, 1995. At the hearing, the bill enjoyed strong bipartisan support. A number of changes were made to further improve the bill. I'd like to briefly summarize the bill as it presently is being proposed and how it will accomplish our goals of promoting the use of ADR techniques.

First of all, the bill removes the term "settlement negotiations" from the group of ADR techniques listed in the 1989 act. This won't decrease the effectiveness of the act as settlement negotiations are not and have never been covered by the act as they do not use third party neutrals in resolving conflicts. Abolition of the term merely eliminates agency confusion as to whether settlement negotiation is a statutorily supported ADR technique. It doesn't decrease the scope of the original act. The bill also clarifies ADR techniques by substituting the term "arbitration" with "Use of Ombuds, and Binding or Nonbinding Arbitration."

The bill addresses agency confidentiality concerns by exempting all dispute resolution communications from Freedom of Information Act disclosure. Although these communications have always been confidential by implication, the proposed bill makes this confidentiality express and clear.

The bill also deletes the Administrative Conference of the United States from the promulgation of agency policy addressing the use of ADR and case management. This acknowledges the unfortunate demise of the Administrative Conference and its consultation with agencies in developing and promulgating agency ADR policies, and the maintenance of rosters of neutrals and arbitrators.

The bill makes it easier for agencies to acquire neutrals by eliminating the requirement of full competitive procedures in obtaining expert services and by allowing the acquisition of neutrals from nonprofit organizations. It also amends the Code to provide that agencies will consult with the Federal Mediation and Conciliation Service on encouraging and facilitating agency use of ADR and developing procedures on obtaining services of neutrals.

The bill expands agency use of services to include services and facilities of State, local, and tribal governments. This will allow agencies to take advantage of all available support services in order to implement their ADR activities in the most effective and efficient manner possible.

The bill eliminates the requirement that the validity of all contract claims under $100,000 be certified by the contractor. This change brings the 1989 ADR Act into conformance with the certification levels in the Contracts Disputes Act, thus encouraging the use of ADR techniques in many small disputes where they may be particularly appropriate.

In addition, the bill deletes the so-called escape clause for binding arbitration. Under the 1989 law, a Federal agency had the right to override an ADR decision after it had been entered. These provisions were inserted in the original act because the Department of Justice believed there was a constitutional problem regarding agency ability to ultimately override ADR decisions. In essence, DOJ felt that it was necessary to protect agency interests from the whim of non-judicial decisionmakers. The Administrative Conference argued that parties were reluctant to go through ADR because they believed that an agency could opt out of a final decision and that effectively ADR rulings were nonbinding on the Government. Recently, DOJ has dropped these constitutional concerns. Deletion of these provisions from the law will ultimately further facilitate and promote the use of ADR, by making ADR techniques more attractive to the private sector for solving agency disputes.

Finally, the bill permanently authorizes the ADR Act by striking the sunset provision presently in the law and authorizing such sums as may be necessary to carry out the act.

Mr. President, there has been much progress in the implementation and use of ADR techniques in the Federal Government since I first introduced the Administrative Dispute Resolution Act back in 1989. Passage of this amendment to the act will further this progress by eliminating statutory barriers to ADR use and clarifying statutory language. I hope my colleagues will support this initiative.

Mr. JOHNSTON. Mr. President, I would like to add my support for this bill and in particular for a provision, in the amendment providing permanent reauthorization of the Negotiated Rulemaking Act of 1990, that addresses what I and others perceive to be the redundancy between the requirements of this act and the Federal Advisory Committee Act [FACA].

The Negotiated Rulemaking Act, in section 3(a) (5 U.S.C. 564(a)) mandates a specific procedure for public notification of the establishment of each negotiated rulemaking committee. This includes publication "in the Federal Register and, as appropriate, in trade or other specialized publications" of a notice of intent to form the committee, along with "a description of the subject and scope of the rule to be developed, and the issues to be considered; a list of the interests likely to be significantly affected by the rule; a list of the persons proposed to represent such interests and the person or persons proposed to represent the agency; a proposed agenda and schedule for completing the work of the committee, including a target date for publication by the agency of a proposed rule for notice and comment; a description of the administrative support for the committee to be provided by the agency, including technical assistance; a solicitation for comments on the proposal to establish the committee, and the proposed membership of the negotiated rulemaking committee; and an explanation of how a person may apply or nominate another person for membership on the committee." After publication of this notice, there is a public comment period of at least 30 days.

In addition to these statutory requirements, negotiated rulemaking committees are subject to regulatory review requirements of Presidential Executive orders. Section 3(e) of President Clinton's Executive Order No. 12866 defines "regulatory action" as "any substantive action by an agency (normally published in the Federal Register) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking." The notice of intent to establish a negotiated rulemaking committee, required by 5 U.S.C. 564(a)(1), would appear to be completely within this definition, as it is analogous to an advanced notice of proposed rulemaking, and certainly a more "substantive action by an agency * * * expected to lead to the promulgation of a final rule" than a mere notice of inquiry. Thus, even a plan to publish such a notice, for a "significant regulatory action," must be disclosed to the Office of Management and Budget [OMB] under section 6(a)(3)(A) of the Executive Order. Given the very broad definition of "significant regulatory actions" in the Executive order, OMB is effectively capable of capturing for review any negotiated rulemaking committee that it wants.

Quite apart from these requirements and reviews, negotiated rulemaking committees must meet a second, parallel set of disclosure and review requirements contained in section 9 of FACA, because negotiated rulemaking committees are within the definition of an "advisory committee" under FACA. Thus, the FACA requirements in section 9 for "consultation with the Administrator" of the General Services Administration [GSA], "timely notice in the Federal Register," and filing of a charter containing a list of specific topics that closely resembles the topics in section 3(a) of the Negotiated Rulemaking Act, quoted above, also apply to the negotiated rulemaking committees.

There is clearly duplication of effort here, without, in my opinion, much value added. First of all, if the President has put in place a mechanism, via Executive order, by which the Office of Information and Regulatory Affairs in OMB must be apprised of a mere plan to form a negotiated rulemaking committee, what is the added value of a mandate for a separate consultation with the GSA under FACA? Surely the President's designee for Government-