**§ 199. Same; what coin receivable.**

No gold or silver other than coin of standard fineness of the United States shall be receivable in payment of dues to the United States, except as provided in section 374 of this title and section 692 of Title 43. (R. S. § 3474.)

DERIVATION

Act Aug. 31, 1852, ch. 108, § 2, 10 Stat. 97, 98; act Feb. 21, 1857, ch. 56, §§ 2, 3, 11 Stat. 163.

COINAGE OF GOLD

The coinage of gold was discontinued and existing gold coins were withdrawn from circulation by section 315b of this title and all laws inconsistent therewith were repealed by section 446 of this title.

POSSESSION OF GOLD COINS AND BULLION

The possession of gold coins and bullion was prohibited except under Goverr ent license by Ex. Ord. No. 6260, Aug. 28, 1933, set out in note under section 95 of Title 12, Banks and Banking.

CROSS REFERENCES

All coins and currency made legal tender for payment of public dues, except gold coins below standard weight made legal tender only at valuation in proportion to actual weight, see section 462 of this title.

Provisions for payment of obligations in gold declared against public policy, see section 463 of this title.

Silver coins coined under laws of Hawaii as receivable in payment of all dues of the United States, see section 513 of Title 48, Territories and Insular Possessions.

**§ 201.[1] Debts of United States; national bank notes receivable for.**

The notes of national banks shall be received at par for all debts and demands owing by the United States to any person within the United States, except interest on the public debt, or in redemption of the national currency. (R. S. § 3475.)

[1] Number 200 was not used for a section in the original United States Code.

DERIVATION

Act June 3, 1864, ch. 106, § 23, 13 Stat. 106, which was part of the National Bank Act. See section 38 of Title 12, Banks and Banking.

CROSS REFERENCE

Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations declared to be legal tender for public debts, see section 462 of this title.

**§ 202. Same; Treasury notes payable for.**

Treasury notes bearing interest may be paid to any creditor of the United States at their face value, excluding interest, or to any creditor willing to receive them at par, including interest. (R. S. § 3476.)

DERIVATION

Act Mar. 3, 1863, ch. 73, § 2, 12 Stat. 710; act June 30, 1864, ch. 172, § 2, 13 Stat. 218.

**§ 203. Assignments of claims; set-off against assignee.**

All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. Such transfers, assignments, and powers of attorney, must recite the warrant for payment, and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment, or warrant of attorney to the person acknowledging the same. The provisions of this section shall not apply to payments for rent of post-office quarters made by postmasters to duly authorized agents of the lessors.

The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: *Provided*, 1. That in the case of any contract entered into prior to October 9, 1940, no claim shall be assigned without the consent of the head of the department or agency concerned; 2. That in the case of any contract entered into after October 9, 1940, no claim shall be assigned if it arises under a contract which forbids such assignment; 3. That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing; 4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with—(a) the General Accounting Office, (b) the contracting officer or the head of his department or agency, (c) the surety or sureties upon the bond or bonds, if any, in connection with such contract, and (d) the disbursing officer, if any, designated in such contract to make payment. Notwithstanding any law to the contrary governing the validity of ass' .nments, any assignment pursuant to this paragrar.. and the following paragraph shall constitute a valic assignment for all purposes.

Any contract entered into by the War Department or the Navy Department may provide that payments to an assignee of any claim arising under such contract shall not be subject to reduction or set-off, and if it is so provided in such contract, such payments shall not be subject to reduction or set-off for any indebtedness of the assignor to the United States arising independently of such contract. (R. S. § 3477; May 27, 1908, ch. 206, 35 Stat. 411; Oct. 9, 1940, ch. 779, § 1, 54 Stat. 1029.)

DERIVATION

Act July 29, 1846, ch. 66, 9 Stat. 41; act Feb. 26, 1853, ch. 81, § 1, 10 Stat. 170.

CODIFICATION

Second paragraph was added to the Revised Statutes section cited to text by act October 9, 1940, also cited.

Third paragraph was from act October 9, 1940, cited to text.



1940 edition

76TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
3d Session } { No. 2925

# PERMITTING ASSIGNMENT OF CLAIMS UNDER PUBLIC CONTRACTS

SEPTEMBER 6, 1940.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. SUMNERS of Texas, from the Committee on the Judiciary submitted the following

## REPORT

[To accompany H. R. 10464]

The Committee on the Judiciary, to whom was referred the bill (H. R. 10464) to assist in the national-defense program by amending sections 3477 and 3737 of the Revised Statutes to permit the assignment of claims under public contracts, having considered the same, report it favorably to the House, with the recommendation that it do pass.

The bill would permit the assignment of a claim of $3,000 or more upon the United States, to a bank, trust company, or other financing institution, including any Federal lending agency, provided that claims under prior contracts shall not be assigned without the consent of the head of the department or agency concerned; that no claim shall be assigned if it arises under a contract which forbids such assignment; that unless expressly permitted by the contract, the assignment shall cover all amounts payable thereunder, not already paid, shall not be made to more than one party, and shall not be subject to further assignment. Assignment may be made to one party as agent or trustee for two or more parties. The assignee is required to file written notice of the assignment with a copy of the assignment, with the following:

1. General Accounting Office;
2. Contracting officer or head of his department or agency;
3. The surety or sureties upon the bond or bonds, if any; and
4. The disbursing officer, if any, designated in the contract to make payment.

### STATEMENT

Section 3737 of the Revised Statutes provides that no contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party. Section 3477 of

the Revised Statutes makes assignments of claims against the United States null and void unless they are made after the claims have been allowed and warrants issued. This latter statute is so strictly worded and has been so strictly construed that an attempted assignment which does not comply with the exact terms of the statute has been held void even as between the assignor and the assignee, so that it confers no rights in the assignee as against a trustee in bankruptcy of the assignor (*National Bank of Commerce* v. *Downie*, 218 U. S. 345). As a consequence, banks and other lending agencies which might otherwise be willing to extend credit to finance the performance of contracts with the Government are unable to rely upon assignments of amounts payable under such contracts as security, because they would find themselves in the position of general creditors of the contractors in the case of bankruptcy even though the funds which they advanced may have made the fulfillment of the contracts possible.

There are many manufacturers and other businesses, particularly the smaller ones, which may be deterred from bidding on contracts arising out of the program for national defense because they have inadequate amounts of working capital and may encounter difficulties in financing the performance of such contracts. If such businesses could offer security in the form of assignments of claims against the Government growing out of such contracts, they would in many instances be able to obtain the necessary credit from their own local banks and other financing institutions, which have large amounts of idle funds awaiting employment. In many instances such credit could be obtained more simply and quickly from local institutions than from the lending agencies of the Government, whose commitments usually have to be passed upon in Washington.

## COMMITTEE OPINION

The Committee on the Judiciary are of the opinion that the proposed legislation will facilitate the financing of contracts for national defense, and strongly recommend the bill.

## DEPARTMENTAL OPINIONS

The various Government departments and agencies participated in a hearing upon the legislation and in the drafting of the bill, including the War and Navy Departments and the Advisory Commission to the Council of National Defense. Also the Director of the Bureau of the Budget advises that the legislation is in accordance with the program of the President.

In compliance with clause 2a of rule XIII, existing law is shown below in roman, with new matter proposed to be added printed in italic:

### REVISED STATUTES

SEC. 3477. All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. Such transfers, assignments, and

...claims against the United ...after the claims have been ...statute is so strictly worded ...that an attempted assignment ...terms of the statute has been ...signor and the assignee, so that it ...against a trustee in bankruptcy ...mmerce v. Downie, 218 U. S. 345) ...lending agencies which might ...to finance the performance of ...unable to rely upon assignments ...ntracts as security, because they ...on of general creditors of the con... ...ven though the funds which they ...llment of the contracts possible ...nd other businesses, particularly ...terred from bidding on contracts ...nal defense because they have in... ...l and may encounter difficulties ...h contracts. If such businesses ...ssignments of claims against the ...ntracts, they would in many in... ...ary credit from their own local ...s, which have large amounts of ...n many instances such credit ...quickly from local institutions ...e Government, whose commit- ...in Washington.

...PINION

...of t... nion that the proposed ...o... acts for national de...

...PINIONS

...s and agencies participated in ...e drafting of the bill, including ...e Advisory Commission to the ...Director of the Bureau of the ...accordance with the program

...XIII, existing law is shown ...osed to be added printed in

...ES

...de of any claim upon the United ...rest therein, whether absolute or ...ation therefor, and all powers of ...ing payment of any such claim ...ly null and void, unless they are ...ast two attesting witnesses, after ...nt of the amount due, and the ...Such transfers, assignments, and



powers of attorney must recite the warrant for payment, and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment, or warrant of attorney to the person acknowledging the same.

*The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $3,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: Provided,*

*1. That in the case of any contract entered into prior to the date of approval of this Act, no claim shall be assigned without the consent of the head of the department or agency concerned;*

*2. That in the case of any contract entered into after the date of approval of this Act, no claim shall be assigned if it arises under a contract which forbids such assignment;*

*3. That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing;*

*4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with—*

*(a) the General Accounting Office,*

*(b) the contracting officer or the head of his department or agency,*

*(c) The surety or sureties upon the bond or bonds, if any, in connection with such contract, and*

*(d) the disbursing officer, if any, designated in such contract to make payment.*

*Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this Act shall constitute a valid assignment for all purposes.*

SEC. 3737. No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

*The provisions of the preceding paragraph shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $3,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency: Provided,*

*1. That in the case of any contract entered into prior to the date of approval of this Act, no claim shall be assigned without the consent of the head of the department or agency concerned;*

*2. That in the case of any contract entered into after the date of approval of this Act, no claim shall be assigned if it arises under a contract which forbids such assignment;*

*3. That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing;*

*4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with—*

*(a) the General Accounting Office,*

*(b) the contracting officer or the head of his department or agency,*

*(c) the surety or sureties upon the bond or bonds, if any, in connection with such contract, and*

*(d) the disbursing officer, if any, designated in such contract to make payment.*

*Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this Act shall constitute a valid assignment for all purposes.*

in the War Department or the Navy Department a clerk every now and then who can handle the assignment of claims involving less than $3,000 just as readily as they can those that involve $3,000 or more. I just believe we ought to be square about it and treat everybody alike. A $1,000 claim or a $500 claim under a contract may be just as important to some of these fellows that are going to bid on them as a $100,000 claim bid on by the Du Ponts or some large concern that is engaged in the manufacture of war materials, and therefore I am going to support the amendment offered by the gentleman from Illinois [Mr. SABATH].

[Here the gavel fell.]

The SPEAKER. The question is on the amendment offered by the gentleman from Illinois [Mr. SABATH].

The question was taken; and on a division (demanded by Mr. MASSINGALE) there were—ayes 12, noes 50.

So the amendment was rejected.

Mr. WOLCOTT. Mr. Speaker, I move to strike out the last two words.

Mr. Speaker, this matter had been overlooked for a good many years until recently, when our worthy colleague, the gentleman from Minnesota [Mr. YOUNGDAHL] brought it to the attention of certain members of the Banking and Currency Committee. We had lost sight of the fact that there was a prohibition in existing law against the pledging of Government contracts as security for loans by banks. The matter was presented to the legislative counsel and a bill was drafted and introduced by the gentleman from Minnesota [Mr. YOUNGDAHL] which I think is a better bill than the one before us. However, there will be no attempt on the part of anyone that I know of to embarrass this legislation by moving to substitute the Youngdahl bill for the pending measure, because this is a bill that is very definitely in the right direction.

At the present time there are something over $6,000,000,000 of excess reserves in the banks of the Nation which are frozen tight, due to the fact that the Government has come in competition with private lending to the point where there is no demand upon the banks for this money.

Inasmuch as whatever prosperity we are enjoying or which we shall enjoy in the immediate future is going to be largely dependent upon Government spending, and inasmuch as Government spending is going to be largely through defense contracts, it seems only logical that we take this way of thawing out some of these billions which are now frozen in the banks as excess reserves.

The only opportunity for investment left to private enterprise at the present time is in the Government bonds which raise the money to furnish the cash and credit to carry on this defense program. As I see it, this is a movement to allow private enterprise to get back some of the opportunity to invest private funds which has been constantly taken away from it during the past 7 years.

Mr. SUMNERS of Texas. Will the gentleman yield?

Mr. WOLCOTT. I yield.

Mr. SUMNERS of Texas. As chairman of the Committee on the Judiciary, I want to express appreciation for the gentleman from Minnesota [Mr. YOUNGDAHL] having pioneered the field of the proposed legislation. He introduced the first bill, and it is a fine bill. This bill follows along the line of the Youngdahl bill.

Mr. WOLCOTT. I thank the gentleman.

I think the purpose of the two bills is identical. However, there are certain restrictions in this bill which do not appear in the original proposal which I think might be advantageously eliminated. I do not see any particular reason why an assignee should have to give notice to the contracting officer or head of his department or agency. There may be some justification for giving notice to the surety on the bonds which the contractor has to put up. Of course, as a matter of protection, there is no particular objection to the assignee giving notice to the General Accounting Office, but there is no provision in this bill which authorizes payment directly to the assignee in case of default by the assignor. So it seems to be somewhat redundant unless there is a further provision made in the bill for the further protection of the bank or trust company or individual making the loan.

I think in the main, however, it is good legislation and should be enacted.

[Here the gavel fell.]

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

The SPEAKER. Without objection, House Resolution 605 will be laid on the table.

There was no objection.

RESIGNATION FROM COMMITTEE

The SPEAKER laid before the House the following communication which was read by the Clerk:

SEPTEMBER 18, 1940.

Hon. SAM RAYBURN,
*Speaker of the House of Representatives, U. S.,*
*Washington, D. C.*

MY DEAR MR. SPEAKER: I hereby respectfully tender my resignation as chairman of the Committee on the Public Lands.

It is my intention to remain on the committee as a member.

Respectfully,

RENÉ L. DEROUEN.

The SPEAKER. Without objection, the resignation will be accepted.

There was no objection.

Mr. DOUGHTON. Mr. Speaker, I offer the following resolution, which I send to the desk, and I move its immediate adoption.

The Clerk read as follows:

House Resolution 610

*Resolved,* That J. W. ROBINSON, of Utah be, and he is hereby, elected chairman of the standing committee of the House of Representatives on Public Lands.

The resolution was agreed to.

EXTENSION OF REMARKS

Mr. CANNON of Missouri. Mr. Speaker, I ask unanimous consent to extend my own remarks and to include therein a statement on the Institute of Public Relations maintained by Westminster College.

The SPEAKER. Is there objection?

There was no objection.

Mr. HINSHAW. Mr. Speaker, I ask unanimous consent to revise and extend my remarks and include an address made over the radio by Maj. Gen. William C. Rivers, United States Army, retired.

The SPEAKER. Is there objection?

There was no objection.

Mr. SABATH. Mr. Speaker, I ask unanimous consent that I may insert in the remarks which I just made the article from which I quoted.

The SPEAKER. Is there objection?

There was no objection.

PUNISHMENT FOR DESTRUCTION OF WAR MATERIAL OR WAR PREMISES OR UTILITIES

Mr. SABATH. Mr. Speaker, I call up House Resolution 604 and ask for its immediate consideration.

The Clerk read the resolution, as follows:

House Resolution 604

*Resolved,* That immediately upon the adoption of this resolution it shall be in order to move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of H. R. 10465, a bill to amend an act entitled "An act to punish the willful injury or destruction of war material, or of war premises or utilities used in connection with war material, and for other purposes," approved April 20, 1918. That after general debate, which shall be confined to the bill and shall continue not to exceed 1 hour, to be equally divided and controlled by the chairman and the ranking minority member of the Committee on the Judiciary, the bill shall be read for amendments under the 5-minute rule. At the conclusion of the reading of the bill for amendment, the Committee shall rise and report the same to the House with such amendments as may have been adopted, and the previous question shall be considered as ordered on the bill and amendments thereto to final passage without intervening motion except one motion to recommit.

Mr. SABATH. Mr. Speaker, I yield 30 minutes to the gentleman from Michigan [Mr. MICHENER], as is usual. I, myself, will take only a minute.

reserves based on original cost or on appraised values as authorized in section 181a (a) (2) of this title; (d) afford full disclosure with respect to the financial condition and operations of the fund according to the accrual method of accounting; and (e) supply on the basis of accounting results the data for the annual budget of the Bureau with respect to the last completed fiscal year. The system of accounting shall conform to principles and standards prescribed by the Comptroller General of the United States to accomplish the purposes of this section, and shall be subject to such review by the Comptroller General as may be necessary to assure its conformance with the principles and standards prescribed and its effectiveness in operation. (Aug. 4, 1950, ch. 558, § 5, 64 Stat. 409.)

EFFECTIVE DATE

Section as effective July 1, 1951, see note set out under section 181 of this title.

TRANSFER OF FUNCTIONS

All functions of all officers of the Department of the Treasury, and all functions of all agencies and employees of such Department, were transferred, with certain exceptions, to the Secretary of the Treasury, with power vested in him to authorize their performance or the performance of any of his functions, by any of such officers, agencies, and employees, by 1950 Reorg. Plan No. 26, §§ 1, 2, eff. July 31, 1950, 15 F. R. 4935, 64 Stat. 1280, set out in note under section 241 of Title 5, Executive Departments and Government Officers and Employees. The Bureau of Engraving and Printing, referred to in this section, is an agency in the Treasury Department.

### § 181d. Annual audits.

The financial transactions, accounts, and reports of the fund shall be audited on an annual basis by the General Accounting Office and a copy of each report on audit shall be furnished promptly to the President, the Congress, and the Secretary. (Aug. 4, 1950, ch. 558, § 6, 64 Stat. 410.)

EFFECTIVE DATE

Section as effective July 1, 1951, see note set out under section 181 of this title.

### § 181e. Delegation of authority by Secretary of the Treasury.

Any power or authority conferred upon the Secretary by sections 181—181e of this title may be delegated by him to any officer or employee of the Treasury Department. (Aug. 4, 1950, ch. 558, § 7, 64 Stat. 410.)

EFFECTIVE DATE

Section as effective July 1, 1951, see note set out under section 181 of this title.

## Chapter 6.—DEBTS DUE BY, OR TO, THE UNITED STATES

Sec.
238. Settlement of damage claims of Federal penal and correctional institutions' employees [New].

### § 191. Priority established.

CROSS REFERENCES

Penalty for overstatement of claims under Contract Settlement Act of 1944 as debt due United States under this section, see section 108 of Title 41, Public Contracts.

### §§ 194, 195.

TRANSFER OF FUNCTIONS

All functions of all officers of the Department of the Treasury, and all functions of all agencies and employees of such Department, were transferred, with certain exceptions, to the Secretary of the Treasury, with power vested in him to authorize their performance or the performance of any of his functions, by any of such officers, agencies, and employees, by 1950 Reorg. Plan No. 26, §§ 1, 2, eff. July 31, 1950, 15 F. R. 4935, 64 Stat. 1280, set out in note under section 241 of Title 5, Executive Departments and Government Officers and Employees.

### § 203. Assignments of claims; set-off against assignee.

* * * * *

4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with (a) the contracting officer or the head of his department or agency; (b) the surety or sureties upon the bond or bonds, if any, in connection with such contract; and (c) the disbursing officer, if any, designated in such contract to make payment.

Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this section, shall constitute a valid assignment for all purposes.

In any case in which moneys due or to become due under any contract are or have been assigned pursuant to this section, no liability of any nature of the assignor to the United States or any department or agency thereof, whether arising from or independently of such contract, shall create or impose any liability on the part of the assignee to make restitution, refund, or repayment to the United States of any amount heretofore since July 1, 1950, or hereafter received under the assignment.

Any contract of the Department of Defense, the General Services Administration, the Atomic Energy Commission, or any other department or agency of the United States designated by the President, except any such contract under which full payment has been made, may, in time of war or national emergency proclaimed by the President (including the national emergency proclaimed December 16, 1950) or by Act or joint resolution of the Congress and until such war or national emergency has been terminated in such manner, provide or be amended without consideration to provide that payments to be made to the assignee of any moneys due or to become due under such contract shall not be subject to reduction or set-off, and if such provision or one to the same general effect has been at any time heretofore or is hereafter included or inserted in any such contract, payments to be made thereafter to an assignee of any moneys due or to become due under such contract, whether during or after such war or emergency, shall not be subject to reduction or set-off for any liability of any nature of the assignor to the United States or any department or agency thereof which arises independently of such contract, or hereafter for any liability of the assignor on account of (1) renegotiation under any renegotiation statute or under any statutory renegotiation article

## DEFENSE CONTRACTS—BANKS, ETC.—FINANCING

*See Legislative History, p. 1414*

### CHAPTER 75—PUBLIC LAW 30

[S. 998]

An Act to facilitate the financing of the defense contracts by banks and other financing institutions, to amend the Assignment of Claims Act of 1940, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Section 1 of the Assignment of Claims Act of 1940, approved October 9, 1940 (54 Stat. 1029),[1] is amended by striking out all after clause 3 of the proviso and inserting in lieu thereof the following:

"4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with (a) the contracting officer or the head of his department or agency; (b) the surety or sureties upon the bond or bonds, if any, in connection with such contract; and (c) the disbursing officer, if any, designated in such contract to make payment.

"Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to the Assignment of Claims Act of 1940, as amended, shall constitute a valid assignment for all purposes.

"In any case in which moneys due or to become due under any contract are or have been assigned pursuant to this section, no liability of any nature of the assignor to the United States or any department or agency thereof, whether arising from or independently of such contract, shall create or impose any liability on the part of the assignee to make restitution, refund, or repayment to the United States of any amount heretofore since July 1, 1950, or hereafter received under the assignment.

"Any contract of the Department of Defense, the General Services Administration, the Atomic Energy Commission, or any other department or agency of the United States designated by the President, except any such contract under which full payment has been made, may, in time of war or national emergency proclaimed by the President (including the national emergency proclaimed December 16, 1950) or by Act or joint resolution of the Congress and until such war or national emergency has been terminated in such manner, provide or be amended without consideration to provide that payments to be made to the assignee of any moneys due or to become due under such contract shall not be subject to reduction or set-off, and if such provision or one to the same general effect has been at any time heretofore or is hereafter included or inserted in any such contract, payments to be made thereafter to an assignee of any moneys due or to become due under such contract, whether during or after such war or emergency, shall not be subject to reduction or set-off for any liability of any nature of the assignor to the United States or any department or agency thereof which arises independently of such contract, or hereafter for any liability of the assignor on account of (1) renegotiation under any renegotiation statute or under any statutory renegotiation article in the contract, (2) fines, (3) penalties (which term does not include amounts which may be collected or withheld from the assignor in accordance with or for failure to comply with the terms of the contract), or (4) taxes, social security contributions, or the withholding or nonwithholding of taxes or social security contributions, whether arising from or independently of such contract.

1. 31 U.S.C.A. § 203; 41 U.S.C.A. § 15.



1951 U.S.C.C.A.N. 40, 82d Cong. 1st Sess.

Case 1:06-cv-00396-MCW Document 69-8 Filed 05/05/2008 Page 8 of 15



"Except as herein otherwise provided, nothing in this Act, as amended, shall be deemed to affect or impair rights or obligations heretofore accrued."

Approved May 15, 1951.

## BANKRUPTCY—REFEREES—EXPIRATION OF TERM

*See Legislative History, p. 1424*

### CHAPTER 81—PUBLIC LAW 31

[H. R. 3291]

An Act to amend subdivision a of section 34 of the Bankruptcy Act, as amended.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Subdivision a of section 34 of the Bankruptcy Act, as amended,[2] is hereby amended by adding at the end thereof the following additional sentence: "Upon the expiration of his term, a referee in bankruptcy shall continue to perform the duties of his office until his successor is appointed and qualifies provided the filling of the vacancy has been authorized by the Conference as provided in subdivision b of section 43 of this Act."

Approved May 16, 1951.

## BANKRUPTCY—CREDITORS—MEETINGS

*See Legislative History, p. 1426*

### CHAPTER 82—PUBLIC LAW 32

[H. R. 3292]

An Act to amend subdivision a of section 55 of the Bankruptcy Act, as amended.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Subdivision a of section 55 of the Bankruptcy Act, as amended,[3] is hereby amended to read as follows:

"a. The court shall cause the first meeting of the creditors of a bankrupt to be held not less than ten nor more than thirty days after the adjudication, at the place or at one of the places designated by the conference pursuant to paragraph (1) of subdivision b of section 37 of this Act as a place at which court shall be held within the judicial district in which the proceeding is pending or if that place would be unreasonably inconvenient as a place of meeting for the parties in interest, the court shall fix a place for the meeting within said judicial district which is not unreasonably inconvenient for the parties in interest. If such meeting should by any mischance not be held within such time, the court shall fix the date as soon as may be thereafter, when it shall be held."

Approved May 16, 1951.

2. 11 U.S.C.A. § 62.
3. 11 U.S.C.A. § 91.

U.S. DE
CIVIL D
550 11
WASHIN



## DEFENSE CONTRACTS—BANKS, ETC.—FINANCING

*For text of Act see p. 40*

Senate Report No. 217, ———, 1951 [To accompany S. 998]

No House Report was submitted with this legislation.

*Senate Report No. 217*

THE Committee on Banking and Currency, to whom was referred the bill (S. 998) to facilitate the financing of defense contracts by banks and other financing institutions, to amend the Assignment of Claims Act of 1940, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill, as amended, do pass.

### GENERAL STATEMENT

The Assignment of Claims Act of 1940 provides, among other things that—

any contract entered into by the War Department or the Navy Department may provide that payments to an assignee of any claim arising under such contract shall not be subject to reduction or set-off, and if it is so provided in such contract, such payments shall not be subject to reduction or set-off for any indebtedness of the assignor to the United States arising independently of such contract.

The purpose of this enactment was to encourage the participation of banks in the financing of Government contractors under the defense program of that time. It permitted contractors to assign to financing institutions moneys due or to become due under their Government contracts, and it assured the assignee banks that, when payments were made to them by the Government pursuant to such assignments, such payments would not be subject to reduction or set-off on account of any claims the Government might have against the contractor arising independently of the assigned contract.

Under this statute banks were in a position to finance defense contractors on the security of assignments of claims for moneys due or to become due under their contracts where other forms of collateral were not available, especially in the case of the so-called marginal contractor with relatively small tangible assets. Such assignments of claims were the principal form of security for loans made by banks to war contractors under the very successful V-loan program of World War II.

Since the end of the war, however, certain interpretations of the statute by the Comptroller General have created such uncertainty as to the rights of assignee banks as to defeat in large measure the purpose of the statute. It had been the understanding of banks that amounts paid to them as assignees would not be subject later to recovery by the Government.

In an opinion dated May 17, 1949, the Comptroller General held that, in the event of a price revision under a Government contract, any amount



1951 U.S.C.C.A.N. 1414, 82d Cong., 1st Sess.

ready paid." Generally, when any payment is received by an assignee bank, it is immediately applied to the contractor's loan, and the excess is released to the borrower. In several instances, long after full payment of a bank's loan to a contractor, the Comptroller General has made claims for recovery of payments previously made to the bank assignee.

It had also been the understanding of banks that the statute protected them against set-off by the Government on account of any claims by the Government against the contractor arising outside of the terms of the assigned contract. However, in an opinion dated May 15, 1950, the Comptroller General ruled that claims by the Government against a contractor on account of unpaid social-security contributions and withheld income taxes were claims which did not arise independently of the assigned contract.

These and other similar rulings of the Comptroller General to the same effect have operated to deter banks from making loans to Government contractors on the security of assignments of claims because of uncertainty as to the nature and extent of other indebtedness of a contractor to the Government, such as liability resulting from renegotiation or unpaid income taxes, on account of which the Government might later reduce payments due to the assignee bank, or recover payments already made. As a result, the current V-loan program has been seriously retarded; and many of the smaller contractors having a large volume of Government contracts but a small net worth are presently unable to obtain the financing necessary to enable them to perform their contracts.

Enactment of S. 998, with committee amendments, would make it clear that a bank or other financing institution taking an assignment of claims pursuant to the act would not be subject to later recovery by the Government of amounts previously paid to the bank as assignee, except, of course, that it would not prevent the Government from obtaining restitution of amounts which may have been paid as the result of fraud.

Secondly, the amendment would continue the provision of the present law that, if an assigned contract contains a "no set-off" clause, payments made by the Government to the assignee bank will not be subject to reduction or set-off because of any claims of the Government against the contractor which arise independently of the contract, but it would also be made clear that the assignee would be protected against set-off on account of claims of the Government against the contractor arising from renegotiation, fines, and penalties—claims which are ordinarily regarded as arising outside of the assigned contract. In any event, however, where the Government has claims against the contractor, the Government would be allowed to withhold, out of payments due to an assignee bank, any amounts in excess of the bank's interest in loans secured by such assignments.

Finally, the authority for including the "no set-off" clause in Government contracts, which is now restricted to the Departments of the Army,

U.S. DEP
CIVIL DI
550 11th
WASHIN



Navy, and Air Force, would be extended to contracts entered into by the General Services Administration, the Atomic Energy Commission, and such other agencies of the Government as the President may designate. However, authority for the inclusion of the clause would not be mandatory —it would be permissive in all cases at the discretion of the Government agencies concerned.

## VIEWS OF GOVERNMENT AGENCIES

The bill (S. 998) was suggested by the Board of Governors of the Federal Reserve System. In a letter dated February 13 the Board, in transmitting the text of the proposed bill, wrote:

> The Board of Governors wishes to recommend for the consideration of your committee an amendment to existing law which is of vital importance to the defense production program.
>
> Many defense contractors—especially the smaller manufacturers and producers—are presently unable to obtain necessary financing for the performance of their defense contracts because of the widespread reluctance of banks to make loans to them on the security of assignments of proceeds under their Government contracts. The reluctance of banks to provide such financing arises from the fact that certain recent rulings of the Comptroller General of the United States under the Assignment of Claims Act of 1940 have made it hazardous for private financing institutions to accept assigned contracts as collateral for loans. This situation has created a serious impediment to the success of the current V-loan program, authorized by the Defense Production Act of 1950, for the guaranteeing of loans by banks to defense contractors.
>
> In order to meet this problem, the Board believes that the Assignment of Claims Act of 1940 should be amended to the extent necessary to remove the existing deterrent to participation by banks in the financing of defense contractors. A suggested draft of such an amendment is enclosed, together with a memorandum explaining the amendment and a memorandum evidencing the need for this legislation. While it is believed that the enclosed draft would be generally acceptable to lending financial institutions, it is possible that they may wish to offer some suggestions regarding its provisions.
>
> We have been advised by the Bureau of the Budget that, after clearance with the interested agencies, it has no objection to the submission of this proposal to the Congress. Since the matter is one of great urgency, the Board hopes that this proposal will receive early consideration and favorable action by your committee.

The bill was submitted to the various Government agencies which might be interested in its enactment, with the request that they indicate their views. Excerpts from their replies are appended.

Office of Defense Mobilization, March 8, 1951:

> The defense production effort is confronted with a problem of the most serious and urgent nature because defense contractors are finding themselves unable to finance their defense production contracts through commercial banking channels.
>
> As you know, the size and volume of defense production contracts are usually disproportionate to contractors' working capital and/or net worth. This situation applies not only to large corporations, but is particularly applicable to smaller manufacturers and producers.
>
> This problem was recognized in 1940, at which time the Assignment of Claims Act was passed by the Congress in order to permit private financing institutions to accept assigned contracts as collateral for loans. Subsequently, the principle of guaranteed financing was established dur-

ing the early part of 1942 by Executive Order 9112, which initiated the so-called V-loan program. The procedure worked very well during the balance of World War II and through the contract termination period following immediately thereafter.

However, certain recent rulings by the Comptroller General, which have in effect limited the intended scope of the Assignment of Claims Act, have resulted in a general unwillingness on the part of commercial banks to undertake defense production financing. One such ruling relates to the right of the Government to recover payments previously made to the assignee bank. Another creates some uncertainty concerning the right of set-off on the part of the Government. The banks do not consider such matters as the usual commercial risks which they are willing to accept. Accordingly, they feel they should not be held liable for actions beyond their control or for amounts not commensurate with the risk.

The Board of Governors of the Federal Reserve System has recommended to you an amendment to the Assignment of Claims Act of 1940, which amendment is designed not only to remove these lending obstacles but also to preserve the appropriate rights of the Government. The Office of Defense Mobilization is deeply concerned by the paralysis spreading throughout the defense effort and strongly recommends your favorable consideration of the remedies which have been proposed.

Defense Transport Administration, March 12, 1951:

While the amendment enclosed with your letter would appear to be an improvement over the present provision of law, our interest in the Assignment of Claims Act is so slight as not to warrant the expression of position on the proposed legislation.

Reconstruction Finance Corporation, March 13, 1951:

While the proposed legislation has the effect of putting an assignee in a position superior to that of his assignor and may make the collection of such an assignor's debts due the Government more difficult, the representations made by various interested organizations and agencies that the legislation will materially facilitate the financing of defense contracts by banks and other financing institutions have, I understand, been found by the Bureau of the Budget to be of controlling importance. Under the circumstances this Corporation interposes no objection to the passage of this legislation.

Federal Deposit Insurance Corporation, March 7, 1951:

We have no objection to the proposed amendment.

Recently our views on a similar proposal were requested by the Bureau of the Budget and we indicated no objection to the proposal.

Federal Reserve Board, February 20, 1951:

In accordance with the usual procedure, before making this recommendation to Congress the Board on January 10, 1951, submitted a draft of the proposed bill to the Bureau of the Budget for clearance. We understand that the Bureau then requested comments on the proposal from the Departments of the Treasury, Defense, Justice, Interior, Agriculture, and Commerce, the General Accounting Office, Federal Deposit Insurance Corporation, Reconstruction Finance Corporation, General Services Administration, Defense Transport Administration, and National Security Resources Board.

In the light of the comments received by it from the above-mentioned interested agencies, the Bureau of the Budget advised the Board on February 7 that it would give the bill final clearance if it were resubmitted to the Bureau with certain specified changes in language. Such a revised bill was resubmitted to the Bureau by the Board on February 9 and the Budget Bureau advised us on February 12 that it would have

CIVIL DIV
550 11th
WASHING



no objection to the submission of the bill to Congress in its revised form. It was in that form that the proposed bill was presented by the Board to the Senate Banking and Currency Committee and to the Judiciary Committee of the House of Representatives on February 13.

As indicated in our letter to you of February 15 the Board feels that this is a matter of considerable importance in connection with the financing of defense production contractors by banks and other private institutions; and there is an increasing number of cases in which loans to defense contractors are being held up pending clarification of the law on this subject. Consequently, we hope that the proposed bill will be introduced at an early date and receive prompt consideration by your committee.

Department of Agriculture, March 20, 1951:

This Department was given an opportunity by the Bureau of the Budget to submit comments on the proposed amendment. The draft of the proposed amendment attached to your letter incorporates the more important legislative changes in which this Department is interested.

This Department does not have any additional comments to make on the proposed legislation at this time.

We understand that the Bureau of the Budget advised the Federal Reserve Board that there was no objection to the submission of the draft bill for the consideration of the Congress.

National Security Resources Board, March 27, 1951:

The views of the Resources Board with respect to this matter were fully considered at the time the proposed legislation was being cleared through the Bureau of the Budget.

The Resources Board has no further comment to make at this time.

General Services Administration's approval of the bill is expressed in a letter under date of April 4:

To the end that the defense mobilization effort may be accelerated and facilitated, this Administration recommends favorable report by your committee on S. 998 and the early enactment thereof by the Congress.

This report is being submitted without prior referral to the Bureau of the Budget for the reason that a legislative proposal similar to S. 998 has previously been the subject of Bureau advice to this Administration. Under date of March 5, 1951, the Bureau forwarded to us for our information a copy of the final draft of proposed bill to amend the Assignment of Claims Act which was identical in its text with S. 998 save as to a few minor details.

The Acting Secretary of the Treasury wrote the committee chairman as follows:

TREASURY DEPARTMENT,
*Washington, April 9, 1951.*

Hon. BURNET R. MAYBANK,
*Chairman, Committee on Banking and Currency,*
*United States Senate, Washington, D. C.*

MY DEAR MR. CHAIRMAN: Further reference is made to the letters requesting the views of this Department with respect to the proposed amendment to the Assignment of Claims Act of 1940. It is stated that the purpose of the amendment is to encourage financial institutions to participate in the financing of the current defense mobilization program.

It is noted that, if the proposed amendment were enacted, under a contract entered into after July 1, 1950 containing a "no set-off" clause payments made to an assignee of such contract may not be reduced or set off "(1) for any liability of any nature of the assignor to the United States or any department or agency thereof which arises independently

of such contract, or (2) for any liability of the assignor on account of renegotiation, fines, or penalties (which term does not include damages for failure of the assignor to perform the work required by the contract), whether or not such liability arises from or independently of such contract."

As you know, the Comptroller General has recently ruled that set-off from amounts due under the contract might be made for tax liability of the contractor representing unpaid withholding and Federal unemployment taxes, and taxes, levied under the Federal Insurance Contributions Act which became due, subsequent to the assignment, on account of wages paid under the contract. In the view of this Department, such holding is correct. It is assumed that the proposed amendment is not intended to affect that result and that under the language such taxes would not be held to arise independently of the contract. In order to resolve any doubts, however, it might be desirable for the language of the statute or the committee report thereon to so indicate.

The Director, Bureau of the Budget, has advised the Treasury Department that there is no objection to the presentation of this report.

Very truly yours,

THOMAS J. LYNCH,
*Acting Secretary of the Treasury.*

A most extensive analysis of the bill was made by the Comptroller General who suggested some appropriate amendments which the committee adopted. The full text of the Comptroller General's letter is as follows:

COMPTROLLER GENERAL OF THE UNITED STATES,
*Washington 25, March 15, 1951.*

Hon. BURNET R. MAYBANK,
*Chairman, Committee on Banking and Currency,*
*United States Senate.*

MY DEAR MR. CHAIRMAN: Receipt is acknowledged of your letter dated March 2, 1951, inviting my comments on a proposed amendment to the Assignment of Claims Act of 1940, which was introduced on March 1, 1951, as S. 998.

The purpose of S. 998, as stated in the enacting clause thereof, is to facilitate the financing of defense contracts, but without prejudice to any rights accrued under the Assignment of Claims Act of 1940 as heretofore existing. If the prime objective of the bill is to assist in the financing of the current defense production program, the language of the bill should receive careful consideration to insure that it does not also extend to financing institutions or to Government contractors, at the expense of the Government, benefits or protection beyond that necessary to accomplish the stated purpose of the bill. It is self-evident that financing is not required for such part of the total consideration to be paid under a contract as represents the contractor's profit. It is also evident that the interest of a bank or other financing institution which accepts an assignment of all moneys due under a contract is limited to the amount of money which it lends on the security of the assignment, plus interest and other charges. To the extent, therefore, that the proposed legislation may prohibit the satisfaction of a contractor's just debts to his Government out of that part of the contract proceeds which is in excess of amounts owed to an assignee, it benefits the contractor rather than the assignee, and is, in effect, an invitation to all contractors to assign their Government contracts if for no other reason than to insure that the Government could not refuse to pay profits made under such contracts, even if excessive.

It is in precisely this respect that the present language of S. 998 appears to be unnecessarily broad. Although the desired objective of the bill, as stated by its sponsors, is merely to remove certain risks to which financing institutions feel they may be exposed under the present

U.S. DEPA
CIVIL DIV
550 11th
WASHING



law in order to facilitate the financing of small marginal businesses in defense production, it appears that the bill in its present form might have the additional and undesirable result of increasing the possibilities for unscrupulous or insolvent contractors to delay or evade payment of amounts owed to the United States by the simple expedient of assigning their Government contracts. The present "no set-off" clause of the Assignment of Claims Act of 1940 prohibits the withholding of any part of the proceeds of an assigned contract on account of debts owed by the contractor at the time the contract is entered into, since such debts necessarily arose independently of the contract. It also prohibits withholding on account of debts of the contractor, maturing subsequent to an assignment, which arise independently of the contract. The bill S. 998 would enlarge the scope of the "no set-off" clause to prohibit withholding on account of fines, penalties, or renegotiation debts of the contractor, whether arising from or independently of the contract. It would also provide that once any amounts were paid under an assignment, they could not be recovered from the assignee on account of any liability of any nature of the contractor to the Government. The undesirable feature of these provisions is that in many cases they afford protection in excess of the assignee's interest in the assignment, and thereby benefit the contractor to the detriment of the Government. This is due to the fact that the prohibitions against withholding or recovery apply to all assigned payments, whether such payments are used by the assignee to reduce the loan secured by the assignment or are merely turned over to the contractor. If an assignee were required to apply all payments received in reduction of the amount loaned to the assignor, and to release its assignment when such loan was paid, the assignee's interest in the assignment would still be protected, and the contractor could not utilize an assignment as a means of evading payment of his debts to the Government. This could be accomplished by inserting the words "except payments in excess of amounts paid or loaned to the assignor under any factoring arrangement, loan, discount, or advance made in connection with or secured by the assignment" between the words "assignee" and "shall" in line 18, page 2; by inserting the same words immediately before the word "shall" in line 4, page 3; and by deleting the present proviso beginning in line 12, page 3, of the bill.

It will be noticed that the insertions immediately hereinbefore suggested contemplate the participation of factoring companies in the financing of contracts covered by S. 998. Inasmuch as factoring companies have heretofore been considered as "financing institutions" to whom assignments could be made under the Assignment of Claims Act of 1940, it would appear that they should be brought within the scope of the present bill. This could be accomplished by the insertion of the words "in connection with a factoring arrangement or" between the words "Act" and "as" in line 15, page 2, of the bill. It will also be noticed that the suggested insertions limit the prohibitions against recovery and withholding to the principal amount of an assignee's investment under an assignment. This restriction is based on the following reasons: The interest charged on loans made to finance a Government contract must be included by the contractor as a part of his costs, and is ultimately paid by the Government as a part of the contract price. If the Government, to its own detriment, removes some of the risks which are borne by an assignee, it should receive a corresponding benefit in reduced interest charges to the contractor. This is done under the V-loan guaranty program by prescribing maximum interest rates commensurate with the percentage of the loan guaranteed. Under the provisions of S. 998, however, there is no control over the interest rates which may be charged by assignees, and it seems only equitable that assignees should pay for the right to charge uncontrolled interest rates by assuming risks in connection therewith. It should also be noted in this connection that factoring companies ordinarily purchase the entire proceeds of a contract at a discount often substantially in excess of interest rates usually