charged on bank loans. The higher rates charged by such companies may be justified in the case of commercial accounts receivable where the factoring company assumes the risk of collection from the purchasers of the goods. Of course, when the accounts receivable are payable by the United States, as in the case of Government contracts, the usual credit risk is absent. Furthermore, since factoring companies ordinarily purchase the entire contract proceeds, including the contractor's profit under the contract, failure to restrict the protection afforded by S. 998 to the principal investment made by assignees would place factoring companies in a preferred position over banks and other financing institutions which make secured loans, and would effectually preclude the Government from reaching any excessive profits of the contractor through withholding from the contract payments in cases where the contract was assigned to a factoring company.

The bill S. 998 would also permit a "no set-off" clause to be included in any contract entered into on or after July 1, 1950, by the Army, Navy, Air Force, General Services Administration, Atomic Energy Commission, and any other governmental department or agency designated by the President. It would appear only just that the benefits of the bill be extended to assignees under all current contracts of such departments and agencies regardless of their date. It has been suggested by the Department of Defense that this could be accomplished by making the bill apply to all contracts entered into by the designated departments and agencies, except those contracts under which full payment might have been made prior to the date of enactment of the bill. It is obvious that financing is not required for the performance of contracts which have been completed except for payment, and it is suggested, therefore, that there be excepted from the purview of S. 998 any contracts under which all work required by the contract has been completed, rather than those under which full payment has been made.

Attention is also invited to the language in lines 24 and 25, page 2, of the bill, which provides that any contract covered by the bill may provide "or be amended to provide" for insertion of a "no set-off" clause therein. As originally proposed by the sponsors of the legislation, the phrase quoted read "or be amended without consideration to provide," and it was suggested by the Bureau of the Budget that the authority to insert a "no set-off" clause in contracts without consideration be removed. In view of this fact, it is apparent that the intended meaning of the present phrase in S. 998 is that contracts may be amended to include the "no set-off" clause only in cases where the Government receives consideration for such amendment. Where consideration is received by the Government, contracts could be amended to include a "no set-off" clause without specific authority therefor in the bill. That being so, the inclusion of the phrase "or be amended to provide" in the bill is unnecessary, and might give rise to the erroneous inference that such amendments could be made without consideration. The deletion of this phrase from the bill would not affect the rights of assignees who now hold assignments under contracts containing the "no set-off" clause permitted by existing law, since lines 2 to 4, page 3, of S. 998 specifically provide that the enlarged "no set-off" provisions shall be applicable to all contracts now containing the old "no set-off" clause. Accordingly, it is suggested that the phrase "or be amended to provide," in lines 24 and 25, page 2, of the bill be deleted.

It would appear that changes should also be made in the parenthetical clause in lines 9 and 10, page 3, of the bill, which states that the "penalties" mentioned in the "no set-off" clause do not include damages for failure of the assignors to perform the work required by the contract. Question might arise as to the Government's right to withhold liquidated damages for delay imposed upon a contractor who performed "the work required by the contract," but failed to perform it on time. Also, your attention is invited to the provisions of the Davis-Bacon Act (40 U. S. C. 276a, 276a–2) which require the insertion in certain Government con-

U.S. DEP
CIVIL DIV
550 11th
WASHING



tracts of a stipulation that there may be withheld from accrued contract payments so much as may be necessary to compensate for the contractor's failure to pay minimum wages, and which direct the Comptroller General to make payments directly to underpaid laborers and mechanics from such withheld accrued payments; to the provisions of the 8-hour law (40 U. S. C. 324) requiring contracts subject to that act to "stipulate a penalty for each violation" of the act, and directing the withholding of such penalty from moneys otherwise due under the contract; and to the provisions of the Walsh-Healey Act (41 U. S. C. 36) which impose liquidated damages for its violation, and authorize the withholding of such damages from any amounts due under a contract and payment thereof in certain cases directly to underpaid employees. I do not believe it is the intention of the sponsors of S. 998 to vitiate the statutory protection thus accorded laborers and mechanics under the statutes mentioned in order to benefit banks and other financing institutions which hold assignments of Government contracts. It is suggested, therefore, that in lieu of the language between the parentheses in lines 9 and 10, page 3, of S. 998, there be substituted the following: "which terms do not include amounts which may be collected or withheld from the assignor in accordance with or for failure to comply with the terms of the contract."

Your attention is also invited to the fact that the proposed amendment as originally submitted to the Bureau of the Budget prohibited reduction or set-off on account of an assignor's liability for taxes and social security contributions, even though such liability arose from the assigned contract. Upon the recommendation of the Bureau of the Budget, this provision was deleted, with the effect that the "no set-off" clause of S. 998 does not prohibit withholding from an assignee on account of any tax liability of the assignor which does not arise independently of the assigned contract. While interest on such taxes apparently could also be withheld since it is neither a fine nor a penalty, it appears doubtful that tax penalties could be withheld, and if it be so intended, the language of the bill should be clarified in that respect.

The bill S. 998, if enacted, will have far-reaching effects upon the contractual and financial transactions of the Government, and I wish to express to your committee my appreciation for the opportunity afforded this Office to comment thereon.

In view of the fact that amendment of sections 3477 and 3737 of the Revised Statutes, as amended by the Assignment of Claims Act of 1940 (31 U. S. C. 203; and 41 U. S. C. 15), is now under consideration by your committee, I would like to request favorable consideration of another change in those statutes. The fourth proviso of the second paragraph of sections 3477 and 3737 of the Revised Statutes, as amended, requires assignees to file written notice and true copies of assignments with the General Accounting Office, the contracting officer, sureties, and the disbursing officer. It is requested that the requirement for filing such notice and copy of assignment with the General Accounting Office be deleted. This action is requested for the reason that in an increasing number of instances the audit of governmental expenditures by the General Accounting Office is being conducted on a site audit basis, and in such cases the accounts, contracts, and other records involved are retained by the administrative office, rather than forwarded to this Office. If the requirement for filing copies of assignments with the General Accounting Office is eliminated, it is proposed to take appropriate administrative action in this Office to require the contracting agencies to associate conformed copies of assignments with the contracts involved, which is all that is necessary for a proper audit by this Office.

Sincerely yours,

FRANK L. YATES,
*Acting Comptroller General of the United States.*

This legislation was urged upon your committee by the American Bankers Association, which endorsed the bill originally introduced. The objection of factoring companies that they were covered by the act of 1940 but not by the bill as originally introduced has been met by the amendment mentioned above.

Typical of the attitude of commercial banks toward the pending bill is the letter of March 9, 1951, from the Chemical Bank & Trust Co. to Chairman Maybank which reads as follows:

CHEMICAL BANK & TRUST CO.,
*New York, March 9, 1951.*

Hon. BURNET R. MAYBANK,
*Chairman, Banking and Currency Committee,*
*Senate Office Building, Washington 25, D. C.*

DEAR SENATOR MAYBANK: I understand that your committee has before it for consideration a proposed amendment to the Assignment of Claims Act (S. 998). From the standpoint of furtherance of the defense program, this is, in my opinion, a most important bill. As matters now stand, the rulings of the Comptroller General impose an unwarranted risk upon banks which would ordinarily take assignments of the proceeds of Government contracts as security for loans for financing production for the armed services. The effect of these rulings is to make an assignee bank liable to the United States for any amounts received under an assignment and which the Comptroller General considers to have been excessive and not recoverable from the contractor. It is apparent, therefore, that the banks could be incurring contingent liabilities for repayment of moneys received. These contingent liabilities would not become known until the Comptroller General had completed his investigations of payments under the contracts and such procedure would probably not be finished for several years.

The unwillingness of many banks to make Regulation V loans secured by the assignment of Government contracts can only result in slowing down defense production, for it is only by means of that type of financing that small contractors of limited capital can secure working funds.

We believe that S. 998 is a much-needed improvement to the Assignment of Claims Act. However, we wish to present for your consideration three changes which, in our opinion, will greatly improve the bill:

1. Strike out "on or after July 1, 1950". This change will make the amendment apply to contracts entered into before as well as after that date.

2. We believe that the bill should be amended so as to bar reductions in the amount to be paid to an assignee because of claims against the assignor for taxes and social security contributions.

3. In our judgment the proviso at the end of the bill will prove to be a hardship on small companies. Its effect will be that financing will not be generally available upon the security of assigned contracts after a bank has been put on notice that a claim exists against the assignor and thereafter a set-off can be made by the Government. We therefore urge that the proviso be stricken from the bill.

We are convinced that the only remedy for the present situation is an amendment to the Assignment of Claims Act and we trust, therefore, that your committee will give its approval to S. 998 with the foregoing amendments.

Yours sincerely,

N. BAXTER JACKSON, *Chairman.*

And, typical of the necessity for quick action, is the letter of April 7, 1951, to Chairman Maybank from Joe C. Thomason, of Knoxville, Tenn., reading as follows:

U.S. DEP
CIVIL DI
550 11th
WASHING



KNOXVILLE, TENN., *April 7, 1951.*

Hon. BURNET R. MAYBANK,
*Senate Office Building, Washington, D. C.*

DEAR SENATOR: From a banking service I notice that you have introduced Senate bill 998, which seems to be identical with House of Representatives bill 2947, amending the Assignment of Claims Act of 1940.

I represent a manufacturing institution in Knoxville which has been engaged in defense work for many months. Heretofore it has been able to finance its operations by assigning the contracts to our local bank. Since the recent ruling of the General Accounting Office, with which you are familiar, our banks are refusing to lend us money on these contracts.

Last December my client submitted bids to the Ordnance Department, and a few days ago, as a result of such bids, was awarded contracts in an aggregate amount of in excess of $1,000,000. These bids were firm bids, and now we are obligated to perform under them. The banks, however, will not finance us. The situation is desperate.

Ours is not an isolated case. There are others in this town, and my information is that the same condition is true over the country.

It is hoped that prompt action can be taken in the Senate and in the House on this legislation.

Very truly yours,

J. C. THOMASON.

In view of the fact that all Government agencies concerned and all private lending agencies are in accord with the provisions of the amended bill, and time was of the essence, the committee was of the opinion that public hearings were not necessary.

## BANKRUPTCY—REFEREES—EXPIRATION OF TERM

*For text of Act see p. 41*

Senate Report No. 282, Apr. 23, 1951 [To accompany H.R. 3291]

House Report No. 309, Apr. 10, 1951 [To accompany H.R. 3291]

The Senate Report repeats in substance the House Report.

*Senate Report No. 282*

THE Committee on the Judiciary, to which was referred the bill (H.R. 3291) to amend subdivision a of section 34 of the Bankruptcy Act, as amended, having considered the same, reports favorably thereon, without amendment, and recommends that the bill do pass.

### PURPOSE

The purpose of the proposed legislation is to provide by statute that upon the expiration of the term of office of a referee in bankruptcy such referee shall continue to serve until a successor is appointed and qualifies.

### STATEMENT

Under existing law, referees are appointed (except in a few unusual circumstances) for a term of 6 years. The statute does not contain a saving clause for their continuance in office. In the instances in which the judges empowered to make the appointment of such referees fail to make such appointment promptly, a lapse occurs in the office. There

**Effective: January 28, 2008**

United States Code Annotated Currentness
Title 31. Money and Finance (Refs & Annos)
Subtitle III. Financial Management
Chapter 35. Accounting and Collection (Refs & Annos)
Subchapter V. Procurement Protest System (Refs & Annos)

**→§ 3551. Definitions**

In this subchapter:

**(1)** The term "protest" means a written objection by an interested party to any of the following:

**(A)** A solicitation or other request by a Federal agency for offers for a contract for the procurement of property or services.

**(B)** The cancellation of such a solicitation or other request.

**(C)** An award or proposed award of such a contract.

**(D)** A termination or cancellation of an award of such a contract, if the written objection contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract.

**(2)** The term "interested party"--

**(A)** with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract; and

**(B)** with respect to a public-private competition conducted under Office of Management and Budget Circular A-76 with respect to the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A-76, includes--

**(i)** any official who submitted the agency tender in such competition; and

**(ii)** any one individual who, for the purpose of representing the Federal employees engaged in the performance of the activity or function for which the public-private competition is conducted in a protest under this subchapter that relates to such public-private competition, has been designated as the agent of the Federal employees by a majority of such employees.

**(3)** The term "Federal agency" has the meaning given such term by section 102 of title 40.

CREDIT(S)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(Added Pub.L. 98-369, Div. B, Title VII, § 2741(a), July 18, 1984, 98 Stat. 1199, and amended Pub.L. 99-145, Title XIII, § 1304(d), Nov. 8, 1985, 99 Stat. 742; Pub.L. 103-272, § 4(f)(1)(K), July 5, 1994, 108 Stat. 1362; Pub.L. 103-355, Title I, § 1401, Oct. 13, 1994, 108 Stat. 3287; Pub.L. 104-106, Div. D, Title XLIII, § 4321(d)(1), Feb. 10, 1996, 110 Stat. 674; Pub.L. 107-217, § 3(h)(6), Aug. 21, 2002, 116 Stat. 1300; Pub.L. 108-375, Div. A, Title III, § 326(a), Oct. 28, 2004, 118 Stat. 1848; Pub.L. 110-161, Div. D, Title VII, § 739(c)(1)(A), Dec. 26, 2007, 121 Stat. 2030; Pub.L. 110-181, Div. A, Title III, § 326(a), Jan. 28, 2008, 122 Stat. 62.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1984 Acts. House Report No. 98-432(Part II), and House Conference Report No. 98-861, see 1984 U.S. Code Cong. and Adm. News, p. 697.

1985 Acts. House Report No. 99-81 and House Conference Report No. 99-235, see 1985 U.S. Code Cong. and Adm. News, p. 472.

1994 Acts. House Report No. 103-180, see 1994 U.S. Code Cong. and Adm. News, p. 818.

Senate Report Nos. 103-258 and 103-259, and House Conference Report No. 103-712, see 1994 U.S. Code Cong. and Adm. News, p. 2561.

1996 Acts. House Conference Report No. 104-450, see 1996 U.S. Code Cong. and Adm. News, p. 238.

2002 Acts. House Report No. 107-479, see 2002 U.S. Code Cong. and Adm. News, p. 827.

2004 Acts. House Conference Report No. 108-767, see 2004 U.S. Code Cong. and Adm. News, p. 1961.

Statement by President, see 2004 U.S. Code Cong. and Adm. News, p. S37.

2007 Acts. House Report No. 110-197, see 2007 U.S. Code Cong. and Adm. News, p. 661.

Statement by President, see 2007 U.S. Code Cong. and Adm. News, p. S34.

Amendments

2008 Amendments. Par. (2). Pub.L. 110-181, § 326(a), rewrote par. (2), which formerly read:

"**(2)** The term 'interested party'--

"**(A)** with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract; and

"**(B)** with respect to a public-private competition conducted under Office of Management and Budget Circular A-76 regarding performance of an activity or function of a federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under OMB Circular A-76, includes--

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"**(i)** any official who submitted the agency tender in such competition; and

"**(ii)** any one person who, for the purpose of representing them in a protest under this subchapter that relates to such competition, has been designated as their agent by a majority of the employees of such Federal agency who are engaged in the performance of such activity or function."

2007 Amendments. Par. (2). Pub.L. 110-161, Div. D, § 739(c)(1)(A), rewrote par. (2), which formerly read:

"**(2)(A)** The term 'interested party', with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.

"**(B)** The term includes the official responsible for submitting the Federal agency tender in a public-private competition conducted under Office of Management and Budget Circular A-76 regarding an activity or function of a Federal agency performed by more than 65 full-time equivalent employees of the Federal agency."

2004 Amendments. Par. (2)(A). Pub.L. 108-375, § 326(a)(1), inserted "(A)" after "(2)".

Par. (2)(B). Pub.L. 108-375, § 326(a)(2), added subpar. (B).

2002 Amendments. Par. (3). Pub.L. 107-217, § 3(h)(6), struck out "section 3 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 472)" and substituted "section 102 of title 40".

1996 Amendments. Pub.L. 104-106, § 4321(d)(1), substituted a colon for a dash following "In this subchapter" in the introductory phrase and, in par. (2), substituted "or a solicitation or other request for offers" for "or proposed contract".

1994 Amendments. Par. (1). Pub.L. 103-272, § 4(f)(1)(K), substituted "a Federal" for "an Federal".

Pub.L. 103-355, § 1401(a), substituted introductory text "The term 'protest' means a written objection by an interested party to any of the following:" for "'protest' means a written objection by an interested party"; substituted subpar. (A) "A solicitation or other request by a Federal agency for offers for a contract for the procurement of property or services" for "a solicitation by a Federal agency for bids or proposals for a proposed contract for the procurement of property or services"; added subpar. (B); substituted subpar. (C) "An award or proposed award of such a contract" for "a written objection to a proposed award or the award of such a contract"; added subpar. (D); and substituted a period for a semicolon at the end.

Par. (2). Pub.L. 103-355, § 1401(b)(1)(A), (B), substituted "(2) The term" for "(2)" and a period for "; and".

Par. (3). Pub.L. 103-355, § 1401(b)(2), substituted "(3) The term" for "(3)".

1985 Amendments. Par. (1). Pub.L. 99-145 substituted "Federal" for "executive".

Effective and Applicability Provisions

2008 Acts. Subpar. (B) of par. (2) of this section applicable to a protest or civil action that challenges final selection of the source of performance of an activity or function of a Federal agency that is made pursuant to a study initiated under Office of Management and Budget Circular A-76 on or after January 1, 2004, and any other protest or civil action that relates to a public-private competition initiated under Office of Management and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Budget Circular A-76, or to a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A-76, on or after Jan. 28, 2008, see Pub.L. 110- 181, Div. A, § 326(d), set out as a note under 28 U.S.C.A. § 1491.

2007 Acts. Amendments by Pub.L. 110-161, Div. D, § 739, applicable with respect to fiscal year 2008 and each succeeding fiscal year, see Pub.L. 110-161, Div. D, § 739(e), set out in a note under 31 U.S.C.A. § 501.

Amendments by Pub.L. 110-161, Div. D, § 739, applicable to protests and civil actions that challenge final selections of sources of performance of an activity or function of a Federal agency that are made pursuant to studies initiated under Office of Management and Budget Circular A-76 on or after Jan. 1, 2004; any other protests and civil actions that relate to public-private competitions initiated under Office of Management and Budget Circular A-76, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A-76, on or after Dec. 26, 2007, see Pub.L. 110-161, Div. D, § 739(c)(3), set out in a note under 31 U.S.C.A. 501.

2004 Acts. Pub.L. 108-375, Div. A, Title III, § 326(d), Oct. 28, 2004, 118 Stat. 1848, provided that: "The amendments made by this section [amending this section and 31 U.S.C.A. §§ 3552 and 3553] shall apply to protests filed under subchapter V of chapter 35 of title 31, United States Code [this chapter], that relate to studies initiated under Office of Management and Budget Circular A-76 on or after the end of the 90-day period beginning on the date of the enactment of this Act [Oct. 28, 2004]."

1996 Amendments. Amendment by Pub.L. 104-106 effective Feb. 10, 1996, except as otherwise provided, see section 4401 of Pub.L. 104-106, set out as a note under section 251 of Title 41, Public Contracts.

1994 Amendments. Amendment by section 1401 of Pub.L. 103-355 effective Oct. 13, 1994, except as otherwise provided, see section 10001 of Pub.L. 103-355, set out as a note under section 251 of Title 41, Public Contracts.

Effective Date

Section applicable with respect to any protest filed after Jan. 14, 1985, see section 2751 of Pub.L. 98-369, set out as a note under section 251 of Title 41, Public Contracts.

Rule of Construction

Pub.L. 108-375, Div. A, Title III, § 326(e), Oct. 28, 2004, 118 Stat. 1849, provided that: "The amendments made by this section [amending this section and 31 U.S.C.A. §§ 3552 and 3553] shall not be construed to authorize the use of a protest under subchapter V of chapter 35 of title 31, United States Code [this subchapter], with regard to a decision made by an agency tender official."

31 U.S.C.A. § **3551, 31** USCA § **3551**

Current through P.L. 110-201 approved 4-18-08

Copr. © 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

"(A) increase competition for contracts with the executive agency on the basis of cost and other significant factors; and

"(B) reduce the number and dollar value of noncompetitive contracts entered into by the executive agency; and

"(2) a summary of the activities and accomplishments of the advocate for competition of the executive agency during the preceding fiscal year.".

(b)(1) Section 6(e) of such Act (41 U.S.C. 405(e)) is amended by striking out "subsection (c)" and inserting in lieu thereof "subsection (d)". 97 Stat. 1326.

(2) Section 16(1) of such Act (41 U.S.C. 414(1)) is amended to read as follows: 97 Stat. 1330.

"(1) increase the use of full and open competition in the procurement of property or services by the executive agency by establishing policies, procedures, and practices that assure that the executive agency receives a sufficient number of sealed bids or competitive proposals from responsible sources to fulfill the Government's requirements (including performance and delivery schedules) at the lowest reasonable cost considering the nature of the property or service procured;".

## Subtitle D—Procurement Protest System

PROCUREMENT PROTEST SYSTEM

SEC. 2741. (a) Chapter 35 of title 31, United States Code, is amended by adding at the end thereof the following new subchapter:

"SUBCHAPTER V—PROCUREMENT PROTEST SYSTEM

**"§ 3551. Definitions**

"In this subchapter— 31 USC 3551.

"(1) 'protest' means a written objection by an interested party to a solicitation by an executive agency for bids or proposals for a proposed contract for the procurement of property or services or a written objection by an interested party to a proposed award or the award of such a contract;

"(2) 'interested party', with respect to a contract or proposed contract described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract; and

"(3) 'Federal agency' has the meaning given such term by section 3 of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 472).

**"§ 3552. Protests by interested parties concerning procurement actions** 31 USC 3552.

"A protest concerning an alleged violation of a procurement statute or regulation shall be decided by the Comptroller General if filed in accordance with this subchapter. An interested party who has filed a protest under section 111(h) of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 759(h)) with respect to a procurement or proposed procurement may not file a protest with respect to that procurement under this subchapter. *Ante*, p. 1182.



1984 USCCAN

31 USC 3553.

**"§ 3553. Review of protests; effect on contracts pending decision**

Post, p. 1202.

"(a) Under procedures prescribed under section 3555 of this title, the Comptroller General shall decide a protest submitted to the Comptroller General by an interested party.

"(b)(1) Within one working day of the receipt of a protest, the Comptroller General shall notify the Federal agency involved of the protest.

Report.

"(2) Except as provided in paragraph (3) of this subsection, a Federal agency receiving a notice of a protested procurement under paragraph (1) of this subsection shall submit to the Comptroller General a complete report (including all relevant documents) on the protested procurement—

"(A) within 25 working days from the date of the agency's receipt of that notice;

"(B) if the Comptroller General, upon a showing by the Federal agency, determines (and states the reasons in writing) that the specific circumstances of the protest require a longer period, within the longer period determined by the Comptroller General; or

"(C) in a case determined by the Comptroller General to be suitable for the express option under section 3554(a)(2) of this title, within 10 working days from the date of the Federal agency's receipt of that determination.

Post, p. 1201.

"(3) A Federal agency need not submit a report to the Comptroller General pursuant to paragraph (2) of this subsection if the agency is sooner notified by the Comptroller General that the protest concerned has been dismissed under section 3554(a)(3) of this title.

"(c)(1) Except as provided in paragraph (2) of this subsection, a contract may not be awarded in any procurement after the Federal agency has received notice of a protest with respect to such procurement from the Comptroller General and while the protest is pending.

"(2) The head of the procuring activity responsible for award of a contract may authorize the award of the contract (notwithstanding a protest of which the Federal agency has notice under this section)—

"(A) upon a written finding that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General under this subchapter; and

"(B) after the Comptroller General is advised of that finding.

"(3) A finding may not be made under paragraph (2)(A) of this subsection unless the award of the contract is otherwise likely to occur within 30 days thereafter.

"(d)(1) If a Federal agency receives notice of a protest under this section after the contract has been awarded but within 10 days of the date of the contract award, the Federal agency (except as provided under paragraph (2)) shall, upon receipt of that notice, immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract. Performance of the contract may not be resumed while the protest is pending.

"(2) The head of the procuring activity responsible for award of a contract may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section)—

"(A) upon a written finding—

"(i) that performance of the contract is in the best interests of the United States; or

"(ii) that urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; and

"(B) after the Comptroller General is notified of that finding.

"(e) The authority of the head of the procuring activity to make findings and to authorize the award and performance of contracts under subsections (c) and (d) of this section may not be delegated.

"(f) Within such deadlines as the Comptroller General prescribes, upon request each Federal agency shall provide to an interested party any document relevant to a protested procurement action (including the report required by subsection (b)(2) of this section) that would not give that party a competitive advantage and that the party is otherwise authorized by law to receive.

**"§ 3554. Decisions on protests** 31 USC 3554.

"(a)(1) To the maximum extent practicable, the Comptroller General shall provide for the inexpensive and expeditious resolution of protests under this subchapter. Except as provided under paragraph (2) of this subsection, the Comptroller General shall issue a final decision concerning a protest within 90 working days from the date the protest is submitted to the Comptroller General unless the Comptroller General determines and states in writing the reasons that the specific circumstances of the protest require a longer period.

"(2) The Comptroller General shall, by regulation prescribed pursuant to section 3555 of this title, establish an express option for deciding those protests which the Comptroller General determines suitable for resolution within 45 calendar days from the date the protest is submitted. *Post*, p. 1202.

"(3) The Comptroller General may dismiss a protest that the Comptroller General determines is frivolous or which, on its face, does not state a valid basis for protest.

"(b)(1) With respect to a solicitation for a contract, or a proposed award or the award of a contract, protested under this subchapter, the Comptroller General may determine whether the solicitation, proposed award, or award complies with statute and regulation. If the Comptroller General determines that the solicitation, proposed award, or award does not comply with a statute or regulation, the Comptroller General shall recommend that the Federal agency—

"(A) refrain from exercising any of its options under the contract;

"(B) recompete the contract immediately;

"(C) issue a new solicitation;

"(D) terminate the contract;

"(E) award a contract consistent with the requirements of such statute and regulation;

"(F) implement any combination of recommendations under clauses (A), (B), (C), (D), and (E); or

"(G) implement such other recommendations as the Comptroller General determines to be necessary in order to promote compliance with procurement statutes and regulations.

"(2) If the head of the procuring activity responsible for a contract makes a finding under section 3553(d)(2)(A)(i) of this title, the Comp- *Ante*, p. 1200.

troller General shall make recommendations under this subsection without regard to any cost or disruption from terminating, recompeting, or reawarding the contract.

"(c)(1) If the Comptroller General determines that a solicitation for a contract or a proposed award or the award of a contract does not comply with a statute or regulation, the Comptroller General may declare an appropriate interested party to be entitled to the costs of—

"(A) filing and pursuing the protest, including reasonable attorneys' fees; and

"(B) bid and proposal preparation.

"(2) Monetary awards to which a party is declared to be entitled under paragraph (1) of this subsection shall be paid promptly by the Federal agency concerned out of funds available to or for the use of the Federal agency for the procurement of property and services.

"(d) Each decision of the Comptroller General under this subchapter shall be signed by the Comptroller General or a designee for that purpose. A copy of the decision shall be made available to the interested parties, the head of the procuring activity responsible for the solicitation, proposed award, or award of the contract, and the senior procurement executive of the Federal agency involved.

"(e)(1) The head of the procuring activity responsible for the solicitation, proposed award, or award of the contract shall report to the Comptroller General, if the Federal agency has not fully implemented those recommendations within 60 days of receipt of the Comptroller General's recommendations under subsection (b) of this section.

Report.

"(2) Not later than January 31 of each year, the Comptroller General shall transmit to Congress a report describing each instance in which a Federal agency did not fully implement the Comptroller General's recommendations during the preceding fiscal year.

31 USC 3555.

**"§ 3555. Regulations; authority of Comptroller General to verify assertions**

"(a) Not later than January 15, 1985, the Comptroller General shall prescribe such procedures as may be necessary to the expeditious decision of protests under this subchapter, including procedures for accelerated resolution of protests under the express option authorized by section 3554(a)(2) of this title. Such procedures shall provide that the protest process may not be delayed by the failure of a party to make a filing within the time provided for the filing.

*Ante*, p. 1201.

"(b) The Comptroller General may use any authority available under chapter 7 of this title and this chapter to verify assertions made by parties in protests under this subchapter.

31 USC 701 *et seq.*

31 USC 3556.

**"§ 3556. Nonexclusivity of remedies; matters included in agency record**

"This subchapter does not give the Comptroller General exclusive jurisdiction over protests, and nothing contained in this subchapter shall affect the right of any interested party to file a protest with the contracting agency or to file an action in a district court of the United States or the United States Claims Court. In any such action based on a procurement or proposed procurement with respect to which a protest has been filed under this subchapter, the reports required by sections 3553(b)(2) and 3554(e)(1) of this title with respect to such procurement or proposed procurement and any decision or recommendation of the Comptroller General under this subchapter

*Ante*, p. 1200.

with respect to such procurement or proposed procurement shall be considered to be part of the agency record subject to review.".

(b) The analysis for such chapter is amended by adding at the end thereof the following:

"SUBCHAPTER V—PROCUREMENT PROTEST SYSTEM

"3551. Definitions.
"3552. Protests by interested parties concerning procurement actions.
"3553. Review of protests; effect on contracts pending decision.
"3554. Decisions on protests.
"3555. Regulations; authority of Comptroller General to verify assertions.
"3556. Nonexclusivity of remedies; matters included in agency record.".

## Subtitle E—Effective Date; Regulations; Study

EFFECTIVE DATES

SEC. 2751. (a) Except as provided in subsection (b), the amendments made by this title shall apply with respect to any solicitation for bids or proposals issued after March 31, 1985. 41 USC 251 note.

(b) The amendments made by section 2713 and subtitle D shall apply with respect to any protest filed after January 14, 1985. *Ante*, pp. 1182, 1199.

MODIFICATION OF FEDERAL ACQUISITION REGULATIONS

SEC. 2752. Not later than March 31, 1985, the single Government-wide procurement regulation referred to in section 4(4)(A) of the Office of Federal Procurement Policy Act (41 U.S.C. 403(4)(A)) shall be modified to conform to the requirements of this title and the amendments made by this title. 41 USC 403 note. *Ante*, p. 1195.

STUDY OF ALTERNATIVES

SEC. 2753. (a) Not later than January 31, 1985, the Administrator of the Office of Federal Procurement Policy, in consultation with the Secretary of Defense, the Administrator of General Services and the Administrator of the National Aeronautics and Space Administration, shall complete a study of alternatives and recommend to the Committee on Governmental Affairs of the Senate and the Committee on Government Operations of the House of Representatives a plan to increase the opportunities to achieve full and open competition on the basis of technical qualifications, quality, and other factors in the procurement of professional, technical, and managerial services. 41 USC 407 note.

(b) Such plan shall provide for testing the recommended alternative and be developed in accordance with section 15 of the Office of Federal Procurement Policy Act (41 U.S.C. 413), and be consistent with the policies set forth in section 2 of such Act (41 U.S.C. 401). 97 Stat. 1329. 97 Stat. 1325.

# TITLE VIII—FEDERAL CREDIT UNION ACT AMENDMENTS

SEC. 2801. Section 201(b)(8) of the Federal Credit Union Act (12 U.S.C. 1781(b)(8)) is amended to read as follows:

"(8) to pay and maintain its deposit and to pay the premium charges for insurance imposed by this title; and".

98th Congress, 2d Session | HOUSE OF REPRESENTATIVES | Report 98-861

# DEFICIT REDUCTION ACT OF 1984

---

## THE COMMITTEE OF CONFERENCE

SUBMITTED THE FOLLOWING

## CONFERENCE REPORT

[To accompany H.R. 4170]

June 23, 1984.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE
35-426 O WASHINGTON : 1984

DEPT. OF JUSTICE
DEC 23 1987
LIBRARY

*Conference agreement*

The conference agreement follows the Senate amendment.

## TITLE VII—COMPETITION IN CONTRACTING

The Senate amendment, which is identical to S. 338, the Competition in Contracting Act of 1983, is designed to increase the use of competition in Government contracting and to impose more stringent restrictions on the awarding of noncompetitive—sole-source—contracts. Agencies are required under the Senate amendment to use competitive procedures, whether by inviting sealed bids or requesting competitive proposals, unless a statutory exception allowing the use of noncompetitive procedures is met. S. 338 had been reported unanimously by the Senate Governmental Affairs and Armed Services Committees and passed unanimously by the Senate.

The Senate amendment builds on the two primary procurement statutes—the Armed Services Procurement Act, which governs the Department of Defense, the Coast Guard, and the National Aeronautics and Space Administration, and the Federal Property and Administrative Services Act, which generally applies to civil agencies—to establish a uniform framework which distinguishes between competitive and noncompetitive procedures. The amendments proposed to both statutes are largely identical.

The conferees adopted a substitute to the Senate amendment which represents a compromise between S. 338 and two House measures—H.R. 5184, the Competition in Contracting Act of 1984, which was ordered reported by the House Government Operations Committee, and H.R. 2545, the Defense Procurement Reform Act of 1983, which is under consideration by the House Armed Services Committee.

The conference substitute retains the major provisions of the Senate amendment, incorporates "full and open" as the required standard for competition, strengthens the justification, approval, and notice requirements to safeguard against unnecessary sole-source contracts, establishes competition advocates to enhance accountability, and strengthens the bid protest process.

While the conference substitute adopts the statutory framework of the Senate amendment, the conferees agree further to amend the Office of Federal Procurement Policy Act and the Budget and Accounting Act. The OFPP Act, a statute which governs all federal agencies, is amended to define certain procurement terms, such as "full and open competition" and "responsible source," to establish notice and reporting requirements, and to create competition advocates in all procuring activities. The Budget and Accounting Act is amended to provide the General Accounting Office with a statutory base for its bid protest function.

## MAJOR PROVISIONS

### Subtitle A—Amendments to the Federal Property and Administrative Services Act

### Section 2711—Procurement Procedures

#### (1) Competition Requirements

*Senate amendment*

The Senate amendment establishes "effective" competition as the standard for awarding federal contracts for property or services. In Government contracting, effective competition is a marketplace condition which results when two or more contractors, acting independently of each other and of the Government, submit bids or proposals in an attempt to secure the Government's business.

*Conference substitute*

The conference substitute uses "full and open" competition as the required standard for awarding contracts in order to emphasize that all responsible sources are permitted to submit bids or proposals for a proposed procurement. The conferees strongly believe that the procurement process should be open to all capable contractors who want to do business with the Government. The conferees do not intend, however, to change the long-standing practice in which contractor responsibility is determined by the agency after offers are received.

The conference substitute retains the requirement from the Senate amendment that executive agencies shall use competitive procedures—whether by soliciting sealed bids and making award without discussions or by requesting competitive proposals and making award with discussions—when entering into a contract for property or services.

In effect, the substitute, like the Senate amendment, removes the restriction from—and the written justification required for—competitive proposal procedures and places them on par with sealed bid procedures. The substitute maintains minimum criteria for sealed bid procedures to ensure their use when appropriate. The purpose served by substituting the new terms "sealed bid" and "competitive proposal" procedures for "formal advertising" and "negotiation" is to eliminate the competitive and noncompetitive connotations associated, respectively, with past terminology.

The substitute defines the term "competitive procedures" to mean procedures under which an executive agency enters into a contract pursuant to full and open competition, thereby permitting all responsible sources to compete. This term also recognizes as competitive the procurement of architectural and engineering services conducted in accordance with title IX of the Federal Property

evaluation of the design proposals and the qualifications of all offerors. After the selection of the most qualified offeror, the government then negotiates a contract at a fair and reasonable price not to exceed six percent of the estimated cost of the project. If an agency is unable to negotiate such a contract, then the agency is required to negotiate a contract with the next most qualified firm. The principle behind this procedure is to ensure that the government receives quality, up-front design work in its procurement of architectural and engineering services. This is particularly important since such design work has a major impact on the overall cost of the project.

The conferees also recognize the competitive selection of basic research, which is directed toward increasing knowledge of a subject apart from any clear or necessary practical application of that knowledge, to be a competitive procurement procedure. These basic research procurements are unique in that the agency's solicitations are general in nature, identifying areas of research interest, criteria for selecting proposals (including scientific merit), and the method of evaluating proposals. Proposals received are then competitively evaluated through a peer review process before contracts are awarded. By recognizing such procurement of basic research as competitive, the conferees intend to promote the participation of all individuals or companies capable of supporting the government's needs in this important area. Any agency procurement which cannot meet this standard and, in fact, restricts participation, must be justified and approved under the requirements in this substitute for other than competitive procurement procedures.

The substitute also contains a provision that preserves the multiple a wards schedule programs administered by the General Services a administration. Although agency implementation of these programs has been criticized in the past, the conferees believe that schedule contracts are a worthwhile method of meeting agency needs for a broad range of commercial products, while imposing a minimum administrative burden on the using agencies. Schedule contracts should be used when GSA can negotiate quantity-discount contracts, with delivery to be made directly to the using agencies in small quantities at diverse locations. The GSA Federal Supply Schedule is an example of this program.

By providing the GSA multiple awards schedule programs with a statutory base, the conferees intend that any responsible vendor wishing to compete for this business is, in fact, allowed and encouraged to compete. As long as the schedule contracts managed by GSA maintain this objective, GSA is complying with the intent of this substitute and should be supported. The conferees believe, however, that the availability of ADP schedule contracts should not preclude the requirement for agencies to seek lower prices if there are responsible alternative sources available.

The conferees also intend that where competition is conducted among all sources that have been prequalified, in accordance with statute and regulations, and where prequalification is essential to ensure satisfaction of an agency's needs, such procedures shall be considered full and open competitive procedures, provided all responsible sources are given a reasonable opportunity to qualify.

35-426 O - 84 - 90

### (2) Dual-Sourcing Authority

*Senate amendment*

The Senate amendment authorizes executive agencies to establish or maintain an alternative source or sources of supply for a particular property or service by using competitive procedures to allow all sources to compete while excluding the incumbent contractor from competition. Executive agencies are authorized to use this "dual-sourcing" authority only when it would (1) increase or maintain competition and likely result in reduced overall costs, (2) be in the interest of national defense in case of a national emergency or industrial mobilization, or (3) be in the interest of national defense in establishing or maintaining an essential engineering, research, or development capability to be provided by an educational or non-profit institution or a federally funded research and development center.

*Conference substitute*

The conference substitute substantially incorporates the provisions of the Senate amendment.

### (3) Small Business Set-Aside Competition

*Senate amendment*

The Senate amendment recoginzes various existing set-aside programs by authorizing an executive agency to include in its solicitations restrictive provisions which would designate only specified categories of offerors, such as small business concerns, as "authorized by law," for example, the Small Business Act (15 U.S.C. § 631, *et seq.*).

*Conference substitute*

The conferees seek to give more precise recognition to set-aside programs authorized by statute. For example, Congress has historically provided assistance through the Federal procurement process to small businesses. In recognition of this policy, the conferees include a provision in the conference substitute which authorizes agencies to limit competition to small business concerns or socially and economically disadvantaged small business concerns as long as all such firms within the categories are allowed to compete. The conferees specifically note the Small Business Innovation Research (SBIR) Program, established under P.L. 97-219, as an example of a statutorily authorized small business set-aside program that would be included in this provision.

Further, the set-aside procurements must be made in accordance with the competitive procedures required by the conference substitute and with the statutory requirements of the Small Business Act. Finally, procurements conducted under Section 8(a) of the Small Business Act are exempt from the procurement procedures mandated by the substitute.

### (4) Exceptions to Comp

*Senate amendment*

The Senate amendment provide
procedures which parallel the co
General has historically recogniz
awarding contracts on a sole-sourc
shifts the emphasis from having t
which can be either competitive o
on those contract which are nego
restricting sole-source contracting
The award of a contract on a sole
time constitute a clear violation of
be authorized unless permitted by
These exceptions are considera
present exceptions to formal adve
priately, in many cases, to justify
broad exceptions to formal advert
to obtain competition" exception,
petitive, agencies have avoided st
awarding a sole-source contract. W
be necessary in certain situations,
bility are needed to ensure its pro

*Conference substitute*

The conference substitute reta
sole-source contracts provided in
quires agencies to obtain competi
exception to the maximum extenc
term "noncompetitive procedures'
has been changed to "procedure
dures" in the conference substit
from awarding a contract nonco
sixth exceptions (which concern u
tions) when conditions dictate tha

In addition, the conference sub
tion which allows the head of an
to determine when it is necessary
cedures other than competitive pr
ment. This waiver is to be exer
basis, rather than for a class o
agency is required to notify both
his or her intention to use this
contract is awarded.

The conference agreement als
resulting from certain unsolicit
tracts fall under the first excep
award when the property or se
available from only one respons
property or services will satisfy t
however, is this exception to be u
tion for going sole source.

The use of the first excepti
follow-on contracts is limited in h