# ATTACHMENT A

# REMOVED

# ATTACHMENT B

GAO
Accountability • Integrity • Reliability
Comptroller General
of the United States
United States Government Accountability Office
Washington, DC 20548

# Decision

**Matter of:** Department of the Air Force – Clarification Request

**File:** B-295401.13

**Date:** July 16, 2007

## DECISION

The Department of the Air Force requests clarification regarding this Office's prior recommendation that the Air Force reimburse Lockheed Martin Corporation, L-3 Communications, Inc. and BAE Systems, Inc. for proposal preparation costs associated with the C-130 avionics modernization program. See Lockheed Martin Aeronautics Co.; L-3 Comm. Integrated Sys. L.P; BAE Systems Integrated Def. Solutions, Inc., B-295401 et al., Feb. 24, 2005, 2005 CPD ¶ 41. In Lockheed Martin et al., we sustained protests filed by Lockheed Martin, L-3 Communications, and BAE Systems, and recommended that "each of the protesters be reimbursed the costs incurred in preparing and submitting their proposals." Id. at 14-15.

Following our decision and recommendation, each of the protesters filed a claim for proposal preparation costs with the Air Force.[1] Thereafter, the Air Force questioned part or all of the various submissions, suggesting, among other things, that the protesters/claimants had already recovered their proposal preparation costs through their performance of other contracts.[2]

---

[1] Neither the Air Force nor the protesters/claimants have provided this Office with copies of the complete claim submissions, nor has this Office sought such submissions. Accordingly, our response to the Air Force's clarification request does not address any particular quantum that may be properly recoverable by the protesters/claimants.

[2] It appears that the Air Force initially viewed a portion of the claimed costs as recoverable, but subsequently took the position asserted here; that is, that none of the proposal preparation costs are recoverable.

Accordingly, the Air Force has asked our Office to provide further clarification regarding our recommendation.[3] More specifically, the Air Force asserts that all of the protesters/claimants' proposal preparation costs have already been reimbursed, either through application of their indirect rates to cost-reimbursement contracts, or through their reliance on forward-pricing rates to prepare proposals for fixed-price contracts. As discussed below, we agree that the portions of proposal preparation costs for which the protesters/claimants have already been reimbursed pursuant to their performance of cost-reimbursement contracts are not properly included in their claims submitted in response to our recommendation; our recommendation is hereby clarified in that regard. However, the Air Force's assertion that the protesters/claimants have similarly been "reimbursed" for the portions of their proposal preparation costs that correspond to their performance of fixed-price contracts is inconsistent with this Office's prior decisions, and fails to reasonably recognize the fundamental differences between cost-reimbursement and fixed-price contracts.[4]

We have previously considered various issues raised regarding recovery of proposal preparation costs after a protest has been sustained. Specifically, in August 1976, we sustained a protest filed by University Research Corporation (URC). University Research Corp., B-186311, Aug. 26, 1976, 76-2 CPD ¶ 188. Thereafter, we issued a series of decisions which addressed various issues relevant to determining whether URC's recovery of its proposal preparation costs was appropriate.[5] In University Research Corp. – Recon., B-186311, Aug. 16, 1977, 77-2 CPD ¶ 118, we discussed the underlying rational for cost recovery. Therein, we specifically rejected URC's assertions that recovery of proposal preparation costs following a sustained protest has a punitive purpose and that the right to recover such costs "is not affected by the

---

[3] The Air Force's clarification request initially was submitted in connection with only the claim submitted by L-3 Communications. However, since the issues presented, and our responses, are also applicable to the claims of Lockheed Martin and BAE Systems, this Office permitted counsel for those parties, as well as counsel for L-3 Communications, to respond to the Air Force's request.

[4] Part 30 of Federal Acquisition Regulation (FAR) contains relatively detailed definitions regarding "flexibly-priced" and "fixed-priced" contracts. See FAR § 30.001. These FAR definitions appear to provide a reasonable basis for identifying contracts that are generally considered to be "cost-reimbursement" contracts and those that are "fixed-price" contracts. Our reference to these FAR definitions should not be construed as anything other than a reasonable basis for identifying contracts as belonging to one category or the other.

[5] See University Research Corp. – Recon., B-186311, Aug. 16, 1977, 77-2 CPD ¶ 118; University Research Corp. – Recon., B-186311, Feb. 3, 1978, 78-1 CPD ¶ 98; University Research Corp. – Recon., B-186311, June 22, 1978, 78-1 ¶ 450; University Research Corp., B-186311, B-186311.2, Nov. 30, 1981, 81-2 CPD ¶ 428.

reimbursement of costs under existing contracts." Id. at 2. In rejecting those assertions, we specifically stated:

> We believe that a claim for bid or proposal preparation costs should be denied when a bidder or offeror has been reimbursed the money it expended in preparing its bid or proposal through allocation of such costs to other government contracts. To allow a claim for bid or proposal preparation costs after such a reimbursement would result in a double payment to the claimant and be in the nature of a penalty.

Id. at 3.

Applying the above-stated principle, we denied URC's claim for proposal preparation costs, noting that "about 95 percent of URC's volume of business was Government cost-type contracts and it was URC's accounting practice to recover initial bid and proposal preparation costs as general and administrative (G&A) expenses," concluding that URC "had been reimbursed its proposal preparation costs under its other contracts." Id.; University Research Corp. – Recon., B186311, Feb. 3, 1978, 78-1 CPD ¶ 98 at 2. However, we thereafter modified our decision in that matter to consider whether payment of the limited portion of proposal preparation costs that had not been recovered under URC's cost-reimbursement contracts was appropriate, specifically acknowledging "there is still the remaining 5-percent proposal preparation costs which have not been reimbursed." Id. at 3.

Consistent with our University Research Corp. decisions, along with our recognition of the fundamental differences between cost-reimbursement and fixed-price contracts discussed below, we here conclude that the proposal preparation claims submitted by the protesters/claimants following our decision in Lockheed Martin et al., supra, should not include costs that have already been reimbursed pursuant to their performance of cost-reimbursement contracts; however, application of this limitation regarding prior reimbursement is not applicable to the protesters/ claimants' performance of fixed-price contracts.

The Air Force's assertion that the protesters/claimants' performance of fixed-price contracts has resulted in prior "reimbursement" of a corresponding portion of proposal preparation costs fails to recognize fundamental distinctions between fixed-price and cost-reimbursement contracts. First, there can be no dispute that an offeror's proposed price to perform a fixed-price contract provides no guarantee that the price will, in fact, cover the costs the contractor incurs. In this regard, the FAR specifically provides that, even where cost principles are applied to fixed-price contracts, such application "shall not be construed as a requirement to negotiate agreements on individual elements of cost in arriving at an agreement on the total price," and concludes "[t]he final price accepted by the parties reflects agreement only on the total price." FAR § 31.102. Thus, in return for performance of a fixed-price contract, the contractor is paid an agreed price, which may or may not cover its actual costs– it is not "reimbursed" for its costs, and to conclude otherwise, as a

matter of law, does not appear supportable. Further, the fact that a contractor's actual costs are either greater than, or less than, the costs the contractor expected to incur at the time it submitted its proposal does not itself lead to any adjustment in the amount the contractor is actually paid because, as stated by the FAR, a fixed-price contract "places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss." FAR §16.202-1. Finally, in contrast to cost-reimbursement contracts, in which the total amount the contractor receives is determined only after contract performance is completed, the amount paid under a fixed-price contract is determined prior to award. Accordingly, we are unable to conclude that the protesters/claimants have, in fact, already been "reimbursed" for the portion of proposal preparation costs the agency asserts should be allocated to their performance of fixed-price contracts.

In summary, our recommendation that the agency reimburse the protesters/claimants for proposal preparation costs is hereby clarified to provide that such reimbursement should not include proposal preparation costs for which protesters/claimants have already been reimbursed pursuant to their performance of cost-reimbursement contracts; however, this limitation on the protesters/claimants' recovery of costs is inapplicable to their performance of fixed-price contracts.

Gary L. Kepplinger
General Counsel

# ATTACHMENT C

STATE OF TEXAS §
§
COUNTY OF HUNT §

**AFFIDAVIT OF GORDON WALSH**

Before me, the undersigned authority, on this day personally appeared Gordon Walsh who, being by me duly sworn, did state as follows:

1. My name is Gordon Walsh. I am over 21 years of age and am competent to give this affidavit. I have personal knowledge of the matters stated herein.

2. I am currently employed by L-3 Communications Integrated Systems L.P. (the "Company"), 10001 Jack Finney Boulevard, Greenville, Texas, as its Chief Financial Officer. My duties and responsibilities for the Company involve, among other matters, dealing with audits performed by the Defense Contract Audit Agency.

3. This affidavit is being made in support of the Company's prosecution of a bid protest before the U.S. Court of Federal Claims, docket number 06-396C.

4. In a decision issued by the Comptroller General on February 24, 2005, the GAO recommended that the Company be reimbursed the costs incurred in preparing and submitting a proposal for the U.S. Air Force's C-130 AMP program. In a decision dated July 16, 2007, the GAO responded to the Air Force's request for clarification of the GAO's recommendation as to whether the Company had already been reimbursed for that portion of the proposal preparation costs corresponding to the performance of fixed-price contracts. In its decision, the GAO responded:

> In summary, our recommendation that the agency reimburse the protesters/claimants for proposal preparation costs is hereby clarified to provide that such reimbursement should not include proposal preparation costs for which protesters/claimants have already been reimbursed pursuant to their performance of cost-reimbursement contracts; however, this limitation on the

> protesters/claimants' recovery of costs is inapplicable to their performance of fixed-price contracts.

(Attachment 1 at 4).

5. During the period 2006-2008, DCAA audited the Company's claim for proposal costs associated with the C-5 AMP program. The first report on this audit is dated July 28, 2006 and numbered 9741-2006B17200001 (the "First C-5 Audit Report"). On April 8, 2008, DCAA issued a second audit report numbered 9741-2008317200002 (Revised) on its audit of the costs associated with the preparation of the proposal for the C-5 AMP program (the "Second C-5 Audit Report"). (Attachment 2).

6. The Second C-5 Audit Report identifies the GAO's July 16, 2007 "clarification that protesters be reimbursed B&P on FFP contracts only" as a "Significant Event". (Attachment 2 at 21).

7. In the Second C-5 Audit Report, DCAA stated that the Company's "percentage of FFP and FPIF contracts was previously calculated and addressed in the [First C-5 Audit Report]." Attachment 2 at 8. DCAA goes on to state that the Company's "percentage of FFP and FPIF contracts is [redacted] percent. . . ." Attachment 2 at 8. However, in applying the FFP/FPIF percentage to the unreimbursed bid and proposal costs incurred for the C-5 AMP proposal, DCAA did not use the [redacted] per cent factor but instead applied a percentage of only [redacted]. Attachment 2 at 10.

8. After reviewing the Second C-5 Audit Report I met with William K. Faanes, the DCAA's Branch Manager on the C-5 AMP audit reports, and asked him why DCAA did not follow the GAO's guidance and apply [redacted] per cent to calculate the Company's unreimbursed bid and proposal costs on its fixed-price contracts. Mr. Faanes said that he was told by the Government's lawyer (I think he said the Air Force lawyer) not to use the GAO's guidance in his audit report. I told him that his audit report states that it is an independent audit and asked how

could it be independent if he is agreeing to exclude guidance he knows about at the direction of the person requesting the audit. I suggested that this was more of an agreed-upon procedure than an independent audit report. I told him that if DCAA was being independent, he should at least address the GAO's specific guidance in his audit report and preferably state that he is not using the GAO guidance that was issued on the Company's C-130 AMP bid and proposal cost claim. He agreed that he would amend his report in the "Scope" section and the "Conclusions" section to add the fact that he was not applying the GAO guidance. He agreed to complete this amendment by the Wednesday of the following week, and we agreed to have a teleconference to discuss his revision.

9. On the next Wednesday, we had the teleconference, and Mr. Faanes stated that he would not change or amend his report, on the direction of counsel. He would not explain it any further. When I reminded him that this was not acting independently, he said that he received legal guidance on that issue and would not change the report.

STATE OF TEXAS §
§
COUNTY OF HUNT §

BEFORE ME, the undersigned authority, on this day personally appeared Gordon Walsh, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purpose herein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this 5th day of May 2008.

Carol S. Langford
Notary Public in and for the State of Texas

My commission expires:
July 9, 2009

CAROL S. LANGFORD
MY COMMISSION EXPIRES
July 9, 2009

**ATTACHMENT D**

g. Auditors should be knowledgeable in the AICPA general attestation standard related to "criteria," the AICPA attestation standards for field work and reporting, and the related Statements on Standards for Attestation Engagements (SSAE). They should also be competent in applying these standards and SSAEs to the task assigned. Similarly, when performing financial audits, auditors should be knowledgeable in Generally Accepted Accounting Principles (GAAP), the AICPA's Generally Accepted Auditing Standards (GAAS) for field work and reporting, and the related Statements on Auditing Standards (SAS). Again, they should also be competent in applying these standards and SASs to the task assigned.

**2-203 Independence (GAGAS 3.03)**

In all matters relating to the audit work, the audit organization and the individual auditor, whether Government or public, should be free both in fact and appearance from personal, external, and organizational impairments to independence.

a. As an employee of DCAA, the contract auditor's primary responsibility is to protect the interests of the Government. However, the auditor's effectiveness depends on the ability to develop and evaluate facts and arrive at sound conclusions objectively (based on unbiased judgments) and independently (not subject to influence or control by others). The matter of independence and objectivity also requires that the auditor not identify so closely with contractor personnel that practices or decisions of the contractor go unexamined or are examined only cursorily.

b. Each auditor has an obligation to refrain from entering into any relationship (financial, social, or other) with contractors and their officers and employees, that would impair his or her objectivity or reflect discreditably on him/her or the DoD. It is essential that the auditor observe the prescribed Joint Ethics Regulations (DoD 5500.7-R) to ensure compliance with the ethical standards demanded of all public servants.

c. To comply with the standard, an auditor should avoid situations that could lead reasonable third parties with knowledge of the relevant facts and circumstances to conclude that the auditor is not able to maintain independence and, thus, is not capable of exercising objective and impartial judgment on all issues associated with conducting and reporting on the work. In this connection, there are three general classes of impairments that the auditor should consider: personal, external, and organizational. If one or more of these impairments affect an auditor's capability to perform the work and report impartially, that auditor should either decline to perform the work, or in those situations in which the Government auditor, because of a legislative requirement or for other reasons, cannot decline to perform the work, the impairment(s) should be reported in the scope section of the audit report. DCAA policy (see 2-S103.1b(5)) does not allow auditors with a personal or external impairment to work on any assignment affected by the impairment. Therefore, although GAGAS provides for a scope restriction, such restriction will not be used in DCAA reports.

**2-203.1 Personal Impairments**

a. Personal impairments result from relationships and beliefs that might cause an auditor to limit the extent of the inquiry, limit disclosure, or weaken or slant audit findings in any way. Auditors are responsible for notifying the appropriate officials within DCAA if they have any personal impairment to independence (see 2-S103.1). Examples of personal impairments of individual auditors include, but are not limited to, the following:

(1) immediate family or a close family member who is a director or officer of the audited entity, or as an employee of the audited entity, is in a position to exert direct and significant influence over the entity or the program under audit (immediate family member is a spouse, spouse equivalent, or dependent (whether or not related); a close family member is a parent, sibling, or nondependent child);

(2) financial interest that is direct, or is significant/material though indirect, in the audited entity or program;

(3) responsibility for managing an entity or for decision-making that could affect operations of the entity or program being audited, for example as a director, officer, or other senior position of the entity, activity, or program being audited, or as a member of management in any decision-making, supervisory, or ongoing monitoring function for the entity, activity, or program under audit (The auditor's independence is impaired if the auditor performed nonaudit services for a contractor that affect information that is the subject of audit and management does not take responsibility for this information. The auditor needs to be free from this personal impairment for the period covered by the audit, and for the period in which the audit is being performed and reported.);

(4) concurrent or subsequent performance of an audit by the same individual who maintained the official accounting records (specifically, when such services involved preparing source documents or originating data; posting transactions; authorizing, executing, or consummating transactions; maintaining an entity's bank account or having custody of the audited entity's funds; or exercising or having authority on behalf of the entity);

(5) preconceived ideas toward individuals, groups, organizations, or objectives of a particular program that could bias the audit;

(6) biases, including those induced by political, ideological, or social convictions, that result from employment in, or loyalty to, a particular group, organization, or level of Government; and

(7) seeking employment with an audited organization during the conduct of the audit.

b. Audit organizations should include as part of their internal quality control system requirements to identify personal impairments and assure compliance with GAGAS independence requirements. At a minimum, audit organizations should:

- Establish policies and procedures that will enable the identification of personal impairments to independence, including whether performing nonaudit services affects the subject matter of audits and applying safeguards to appropriately reduce that risk.
- Communicate the audit organization's policies and procedures to all auditors in the organization and ensure understanding of requirements through training or other means, such as auditors periodically acknowledging their understanding.
- Establish internal policies and procedures to monitor compliance with the audit organization's policies and procedures.
- Establish a disciplinary mechanism to promote compliance with the audit organization's policies and procedures.
- Stress the importance of independence and the expectation that auditors will always act in the public's interest.

DCAA's current system to comply with these requirements is described in 2-S10.

c. GAGAS 3.06 states that in using the work of a specialist, auditors need to consider the specialist as a member of the audit team and, accordingly, assess the specialist's capability to perform the work and report the results impartially. [Specialists to whom this section applies include, but are not limited to, actuaries, appraisers, attorneys, engineers, environmental consultants, medical professionals, statisticians, and geologists. This section also applies to external consultants and firms performing work for the audit organization. This section does not apply to DCAA technical audit specialists.] In conducting this assessment, auditors should provide the specialist with the GAGAS independence requirements and obtain representations from the specialist regarding their independence from the activity or program under audit. If the specialist has an impairment to independence, the auditor should not use the work of that specialist. In obtaining representations from specialists employed by DCAA, follow the guidance in 2-S103.1. Representations from specialists external to DCAA should be in accordance with GAGAS 3.06 (see D-204).

d. When the audit organization identifies a personal impairment to independence, the impairment needs to be resolved in a timely manner. In situations where the personal impairment is applicable only to an individual auditor on a particular assignment, the audit

organization may be able to mitigate the personal impairment by requiring the auditor to eliminate the personal impairment. For example, the auditor could sell a financial interest that created the personal impairment, or the audit organization could remove that auditor from any work on that audit assignment. Auditors participating in the audit assignment, including those who perform reviews of a report, and all others within the audit organization, who can directly influence the outcome of the audit, need to be free from personal impairments. If the personal impairment cannot be mitigated, the audit organization should withdraw from the audit. In situations in which Government auditors cannot withdraw from the audit because of a legislative requirement or for other reasons, the impairment should be reported in the scope section of the audit (see 2-203c).

e. Nonaudit services. GAGAS Sections 3.10 through 3.18 contain guidance for audit organizations that provide nonaudit services. Audit organizations may perform nonaudit services that do not violate two overarching principles:

- They should not provide nonaudit services that involve performing management functions or making management decisions.
- They should not audit their own work or provide nonaudit services in situations where the nonaudit services are significant/material to the subject matter of audits.

Nonaudit services that do not violate the two overarching principles are divided into routine and non-routine nonaudit services.

(1) Routine nonaudit services. DCAA's nonaudit services consist primarily of providing routine advice and recommendations, which does not impair the auditor's independence. Auditors may participate on committees or task forces with the contractor and/or other Government agency personnel in a purely advisory capacity to provide advice on issues related to the knowledge and skills of the auditor without impairing their independence (see 1-800 and 15-305.1). However, auditors should not make management decisions or perform management functions. For example, auditors can provide routine advice to the audited entity and management to assist them in activities such as establishing internal controls or implementing audit recommendations, answering technical questions, and/or providing training. The decision to follow the auditor's advice remains with management of the audited entity. These types of interactions are normal between the auditor and the management of the audited entity, given the auditor's technical expertise and the knowledge the auditor gains of the audited entity's operations. An auditor may also provide tools and methodologies, such as best practice guides, benchmarking studies, and internal control assessment methodologies that may be used by management.

(2) Non-routine nonaudit services. Non-routine nonaudit services may impair independence as they require the auditor to go beyond providing routine advice (e.g., participating in IT system design and installation). Therefore, DCAA auditors generally should not perform non-routine nonaudit services. In rare instances where the FAO believes non-routine nonaudit services may be warranted, the matter should be elevated to Headquarters (PAS) through the region, prior to agreeing to provide such services.

### 2-203.2 External Impairments

a. External impairments to independence occur when an auditor is deterred from acting objectively and exercising professional skepticism by pressures, actual or perceived, external to the audit organization, such as from management and employees of the audited entity or outside organizations. In the DCAA environment, some of the external factors that can restrict the audit or infringe on the auditor's ability to form independent and objective opinions and conclusions include: procurement or contracting officers' interference in the scope and character of the audit that could modify audit results; denial of access to sources of information, such as books, records, and supporting documents or officials and employees of the contractor under audit; external interference in the assignment of personnel to the audit task; actions by contractors significantly influencing the auditor's judgment

regarding the content of the audit report; and unreasonable restrictions on the time allowed to competently complete the audit assignment.

b. An audit organization's internal quality control system for compliance with GAGAS independence requirements should include internal policies and procedures for reporting and resolving external impairments (see 2-S10).

**2-203.3 Organizational Impairments**

Government audit organizations' capability to perform the work and report the results impartially can be affected by their place within Government and the structure of the Government entity to which the audit organization is assigned to audit. Government auditors can be presumed to be free from organizational impairments to independence when reporting externally to third parties if their audit organization is organizationally independent from the audited entity. To achieve maximum independence, auditors and their audit organizations not only should report to the highest echelon within their Governmental component, but should be organizationally independent. DoDD 5105.36 (see Supplement 1-1S1) established DCAA as an independent agency of DoD; accordingly, an environment exists where DCAA can function in an independent, objective manner in performing its contract audit services.

**2-204 Professional Judgment (GAGAS 3.33)**

a. Professional judgment should be used in planning and performing audits and attestation engagements and in reporting the results. This standard requires auditors to exercise reasonable care and diligence, to observe the principles of serving the public interest, and to maintain the highest degree of integrity, objectivity, and independence in applying professional judgment to all aspects of their work. This standard also imposes a duty on each professional within an audit organization to observe GAGAS.

b. The matter of professional judgment concerns what the auditor does and how well he or she does it. For example, professional judgment in the matter of working papers requires that their content support the auditor's opinion. Auditors should use professional judgment in determining the type of audit to be performed and in establishing the scope, selecting the methods, and choosing tests and procedures for the audit.

c. Every auditor assumes the duty to exercise such skill as he or she possesses, with reasonable care and diligence. The auditor must be fully aware of the purpose of the audit and be mentally alert, inquisitive, and responsible while performing the tests and procedures and in evaluating and reporting the audit results. However, because no auditor can guarantee that the audit will be performed without fault or error, exercise of professional judgment guarantees good faith and integrity, not infallibility.

d. Audit assignments and supervision should be commensurate with the auditor's level of knowledge, skill and ability. Final responsibility for audit quality rests with the supervisory auditor and FAO manager, who are expected both to know the relevant accounting and auditing standards and to familiarize themselves with significant aspects of the contractor and submission being evaluated. Responsibility for assignment of audits to field auditors rests with the supervisor.

e. Professional judgment requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses his or her knowledge, skill, and ability to diligently perform the gathering and objective evaluation of evidence.

f. Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.