# In the United States Court of Federal Claims

### No. 06-396C
### (Reissued December 5, 2008)[1]
### (Filed Under Seal November 25, 2008)
### (Bid Protest)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P.,** * | |
| * | |
| **Plaintiff,** * | **Post-Award Bid Protest;** |
| **v.** * | **28 U.S.C. § 1491(a)(1); Subject** |
| * | **Matter Jurisdiction; Anti-** |
| **THE UNITED STATES,** * | **Assignment Act, 31 U.S.C. § 3727,** |
| * | **41 U.S.C. § 15; Operation of Law** |
| **Defendant,** * | **and Recognition Exceptions to** |
| * | **Anti-Assignment Act; Standing of** |
| **and** * | **Successor-in-Interest.** |
| * | |
| **LOCKHEED MARTIN AERONAUTICS** * | |
| **COMPANY,** * | |
| * | |
| **Intervenor.** * | |
| * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\* \* \* \* \*

Paul W. Searles, Haynes and Boone, LLP, 901 Main Street, 3100 Bank of America Plaza, Dallas, TX for Plaintiff.

Domenique Kirchner, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, 1100 L Street, NW, 8th Floor, Washington, DC for Defendant.

Marcia G. Madsen and Luke Levasseur, Mayer Brown, LLP, 1909 K Street, NW, Washington, DC for Intervenor.

---

[1]  This opinion was issued under seal on November 25, 2008.  The Court invited the parties to submit proposed redactions by December 5, 2008.  No redactions having been received, the Court publishes this opinion in toto, correcting erratum.

---

### OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

---

**WILLIAMS,** Judge

In this post-award bid protest, L-3 Communications Integrated Systems, L.P. ("L-3") challenges the Air Force's award of two contracts to Lockheed Martin Aeronautics Company ("Lockheed Martin") to modernize the C-5 Galaxy aircraft ("C-5 AMP"), and seeks its bid preparation and proposal costs.[2] This protest was filed in the wake of the former Principal Deputy Secretary of the Air Force's conviction for violating conflict of interest laws. Specifically, the former Principal Deputy Secretary, Darleen Druyun, admitted that she allowed her personal interest to influence her procurement decisions with respect to the Boeing Company -- she, her daughter and son-in-law negotiated for employment with Boeing while she was a top Air Force procurement official.[3]

Plaintiff has raised several grounds of protest, claiming that through Druyun's unauthorized assumption of the SSA duties and her change of evaluation ratings to justify the selection of Lockheed Martin's higher cost proposal, the Air Force improperly compromised the integrity of the procurement process, breached its implied contract to treat proposals fairly, honestly, and in good faith, and violated a panoply of procurement statutes and regulations.[4] L-3 further claims that Druyun was biased in favor of Lockheed Martin and acted in bad faith in the C-5 AMP procurement. Finally, L-3 asserts that the Air Force acted arbitrarily and capriciously in making award to Lockheed Martin.

---

[2] L-3 does not seek injunctive relief.

[3] Druyun was convicted of conspiracy to commit an act affecting a personal financial interest while acting as a government official in violation of 18 U.S.C. § 371 and 18 U.S.C. § 208(a). Druyun's conviction was not related to this procurement or to her interaction with Lockheed Martin.

[4] Specifically, L-3 claims the Air Force violated 10 U.S.C. § 2304(a)(1)(A), requiring full and open competition, FAR 15.303(b)(6), requiring that the SSA select the best value proposal, FAR 15.303(a), AFFARS AA-105 and AA-203, governing the appointment of the SSA, and FAR 3.101, Standards of Conduct, requiring avoidance of conflict of interest and prohibiting Government employees from soliciting gifts, favors, or anything of monetary value from a contractor or vendor. Am. Compl. ¶¶ 41-47. L-3 further claims that the Air Force failed to sufficiently document the source selection process in violation of FAR 15.308, AFFARS AA-107(a)(6) and AA-316(b). Id. ¶ 46.

2

This matter comes before the Court on Defendant's motion to dismiss on three grounds.[5] First, Defendant contends that this Court lacks jurisdiction under 28 U.S.C. § 1491(a)(1) because the Administrative Dispute Resolution Act of 1996 ("ADRA") displaced this Court's implied-contract jurisdiction in bid protests. This Court put that argument to rest in resolving Defendant and Intervenor's first motion to dismiss, finding that while ADRA obviated the need to premise jurisdiction on breach of a implied-in-fact contract, the Act in no way prohibited a plaintiff from alleging such a breach as a legal theory of recovery. Second, Defendant claims that the action is barred by the Anti-Assignment Act, 31 U.S.C. § 3727, because the Act prohibits L-3 as the successor-in-interest to the bidder on this procurement, Raytheon Systems Corporation, from pursuing its claim for bid and proposal preparation costs. Because L-3 acquired Raytheon Systems Corporation's Aircraft Integration Systems business unit in toto by operation of law, the Act does not bar L-3 from pursuing this claim. By virtue of this acquisition, only L-3 possesses the right to pursue this claim, and the evil the Act was designed to prevent -- subjecting the Government to multiple lawsuits for the same claim -- is not present here. Third, Defendant contends that L-3 lacks standing because it was not an actual or prospective offeror in the C-5 AMP procurement. Because L-3 stands in the shoes of Raytheon Systems Corporation as its successor-in-interest, it is in essence the same entity which submitted the offer and possesses standing to seek bid and proposal preparation costs. As such, Defendant's motion to dismiss is denied.

## Background[6]

### L-3's Acquisition of Raytheon Company's AIS Business Unit

L-3 Communications Corporation ("L-3 Communications") is a wholly owned subsidiary of L-3 Communications Holdings, Inc. On March 8, 2002, L-3 Communications acquired Raytheon Company's Aircraft Integration Systems (the "AIS Business"). Defendant's Motion to Dismiss ("Def.'s Mot.") at A16, A149-A151. To effect the acquisition, an Asset Purchase Agreement ("the Agreement"), dated January 11, 2002, was executed among Raytheon Company, Raytheon Australia Party Limited ("Raytheon Australia"),[7] and L-3 Communications. Def.'s Mot. at A5-A148.[8] The

---

[5] Intervenor did not join in this motion.

[6] This background is derived from the appendices to the motion sub judice, the parties' pleadings and the underlying record as indicated in this Court's previous opinion which can be found at L-3 Commc'ns Integrated Sys., L.P. v. United States, 79 Fed. Cl. 453, 456-59 (2007) ("L-3").

[7] Raytheon Australia is a wholly owned indirect subsidiary of Raytheon Company.

[8] The Bill of Sale, dated March 8, 2002, was executed and delivered by Raytheon Company, which was identified as the seller, to L-3 Communications Integrated Systems L.P , which was identified as the buyer. Def.'s Mot. at A149-51. All other terms used in the Bill of Sale not otherwise defined were given "the respective meanings ascribed to them in the Asset Purchase Agreement dated as of January 11, 2002, among the Seller, Raytheon Australia Pty Ltd., a

Agreement identified Raytheon Company and Raytheon Australia individually and collectively as the Sellers, and L-3 Communications as the Buyer.  Id. at A16.  The Agreement provided for the purchase of "the assets of the Sellers relating exclusively or primarily to the AIS Business."  Id.

The Agreement defined the AIS Business as follows:

> [T]he "AIS Business" means those operations of Raytheon [Company] or any of its Subsidiaries that are conducted as of the Closing Date through its Aircraft Integration Systems business unit principally at facilities located in Greenville, Texas, Waco, Texas, Lexington, Kentucky, and Avalon, Australia (but expressly excluding any business or operations similar or identical to the type performed by Raytheon [Company] or its Subsidiaries at facilities other than those named above which are managed by personnel other than AIS management, including, but not limited to, the business and operations of the type performed at [Raytheon Company's] Wichita, Kansas, McKinney, Texas, Garland, Texas, El Segundo, California, Goleta, California, Fort Wayne, Indiana, Indianapolis, Indiana, and Falls Church Virginia facilities).

Id.

Article I of the Agreement provided for a transfer of assets at the Closing as follows:

> (a) Transfer of Assets. On the basis of the representations . . . each Seller shall sell, convey, and assign and transfer to the Buyer, and the Buyer shall purchase and acquire from such Seller, all such Seller's right, title and interest in and to the assets, properties and rights of such Seller, of every kind, nature, character and description (accrued, contingent or otherwise), tangible and intangible, real, personal or mixed, wherever located, existing as of the Closing which are utilized exclusively or primarily in the AIS Business (the "Acquired Assets"), including, without limitation, the following assets, properties and rights, in each case to the extent the assets or properties are owned or the rights are held by a Seller as of the Closing and exclusively or primarily utilized in or relating to the AIS Business:
>
> . . . .

_____

corporation organized under the laws of Australia, and L-3 Communications Corporation, a Delaware corporation."  Id. at A149.

4

> (xiv) all actions, claims, causes of action, rights of recovery, choses in action, rights of setoff of any kind, and all rights under and pursuant to all indemnities, warranties, representations and guarantees arising before, on or after the Closing relating exclusively or primarily to the AIS Business, any Acquired Assets or any Assumed Liabilities . . . .

Id. at A17-20.  L-3 also assumed all liabilities and obligations of each Seller, "related exclusively or primarily to the AIS business," at the Closing.  Id. at A22-23.

Article II of the Agreement included the following paragraph in the  "Representations and Warranties of Sellers":

> 2.14  Entire Business.  Except for (i) the Excluded Assets, (ii) any services or functions provided to the Buyer under the Transition Services Agreement, (iii) any Assigned Contracts covered by Section 1.5 and (iv) those items listed in Schedule 2.14, (x) the Acquired Assets are, when utilized by a labor force substantially similar to that employed by the Sellers in connection with the AIS Business, adequate to conduct the AIS Business in all material respects as currently conducted, and (y) no material assets used exclusively or primarily in the AIS Business (other than assets leased or licensed by a Seller) are owned by a party other than the Sellers.

Id.  at A58-59.  The Agreement was to be governed by Delaware law.  Id. at A143.

By letter agreement dated March 8, 2002, the Sellers and the Buyer amended the Agreement to provide that L-3 Communications assigned its rights, interests and obligations under the Agreement to Plaintiff, L-3, a Delaware limited partnership and a wholly-owned subsidiary of L-3 Communications, and to L-3 Communications Australia Pty Ltd., a wholly-owned subsidiary of L-3 Communications.  Id. at A152.  L-3 Communications Australia Pty Ltd. was to acquire the assets of Raytheon Australia as of the closing of the Agreement.  Id. at A153.  Pursuant to the same letter agreement, Plaintiff L-3 was to acquire all of the assets acquired by the Buyer under the Agreement other than the real estate leases and the assets owned or held by Raytheon Australia.  Id.  Further, Plaintiff was to assume all of the liabilities other than the liabilities of Raytheon Australia and those associated with the real estate leases.  Id.  With the exception of some additional changes not pertinent here, the letter agreement did not otherwise alter the Agreement which remained in full force and effect.  Id. at A156.[9]

---

[9] The Buyer and the Sellers agreed to amend provisions of the Agreement relating to, among other things, employee retention, a subcontract and transition services.  Id. at A152.

**The C-5 Procurement**

Several years before L-3's acquisition of Raytheon Company's AIS business unit, on August 18, 1998, the Air Force issued solicitation number F33657-98-R-0006, requesting proposals to assist with a program to modernize the C-5 Galaxy aircraft.  Am. Compl. ¶¶ 1-2.  "Raytheon E-Systems, Inc. - Waco," submitted an offer.  Plaintiff's Supplementation of the Record ("Pl.'s Supp.") at A344. Specifically, Raytheon Company's AIS operations in Waco "submitted the C-5 AMP proposal" and incurred the bid and proposal preparation costs that Raytheon Company expended for the C-5 AMP procurement.  Id. at A335-36.  At the time of the proposal, the AIS operations were a part of the Intelligence Information and Aircraft Integration Systems ("IIAIS") segment of Raytheon Systems Company ("RSC").  Id. at A335.[10]

L-3's predecessor-in-interest, Raytheon E-Systems, Inc. and Lockheed Martin Aeronautical Systems were the only contractors that submitted proposals.  Am. Compl. ¶ 3.  On January 22, 1999, the Air Force awarded the C-5 AMP contracts to Lockheed Martin Aeronautical Systems.  Id. ¶ 5.[11] During the debriefing on these awards the Air Force referred to Raytheon Systems Company and Raytheon's E-Systems, Inc. - Waco as one and the same offeror.  Pl.'s Supp. at A346-48.

**Druyun's Guilty Plea**

On April 20, 2004, Druyun pled guilty for conspiring to violate 18 U.S.C. § 208(a).  L-3, 79 Fed. Cl. at 457.  This conspiracy existed from about September 23, 2002, through November 5, 2002, and involved prospective employment discussions between Druyun and a Boeing senior executive that occurred while Druyun represented the Air Force in discussions with Boeing concerning the terms and conditions of the KC-767A tanker lease.  Id.  In her original plea agreement, Druyun acknowledged a conflict of interest in negotiating her employment with Boeing at the same time as negotiating with Boeing on behalf of the Air Force, but maintained that her relationship with Boeing did not influence her official actions.  Id. at 457-58.  However, several months later, on July 28, 2004, Druyun admitted that she did favor Boeing in certain negotiations and that "'Boeing's employment of her future son-in-law and her daughter in 2000, . . . along with her own desire to be employed at Boeing, influenced her government decisions in matters affecting Boeing.'"  Id. at 458 (citation omitted).  Druyun admitted to favoring Boeing in certain negotiations because of her employment negotiations and other favors provided to her by Boeing.  The Government acquisitions with Boeing in which Druyun admittedly harmed the United States as a

---

[10]   According to a Virginia "Certificate of Assumed Name" Raytheon E-Systems, Inc. "embrace[s] . . . Raytheon Systems Company."  Pl.'s Supp. at A341-42.  The Certificate further states that Raytheon E-Systems, Inc. "conducts business under the assumed or fictitious name of RAYTHEON SYSTEMS COMPANY."  Id. at A341.

[11]   The contracts were awarded to "Lockheed Martin Aeronautical Systems," which subsequently changed its name to "Lockheed Martin Aeronautics Company."  Lockheed Martin's Motion to Intervene at 1.

result of her "loss of her objectivity," included the following: the lease agreement for 100 Boeing KC-767A tanker aircraft, NATO Airborne Early Warning and Control Program, C-130 AMP, and C-17 negotiations over contract clause H-22.  Id.  On October 1, 2004, the Court sentenced Druyun to nine months in prison, followed by seven months of community confinement, and imposed a $5,000 fine.  Id. (citation omitted).

## The Air Force's Investigation of Acquisitions Involving Druyun

Once the Air Force was made aware of Druyun's improper personal negotiations with Boeing, -- several years after the C-5 AMP award -- the Acting Under Secretary of Defense for Acquisition, Technology, and Logistics commissioned a study of all acquisitions involving Druyun during her nine years as the Air Force's top civilian acquisition official.  Am. Compl. ¶ 22; Joint Appendix ("J.A.") 119, 131.  The study, which was conducted from December 2004 to February 2005, examined 407 acquisitions.  Druyun Study at 1, 13.  Ultimately, the study concluded that eight of those 407 acquisitions, including the C-5 AMP procurement at issue here, were "anomalies" that required further investigation.  Id. at 1, 4.

The Acting Under Secretary of Defense for Acquisition, Technology, and Logistics then requested that the Department of Defense Inspector General ("IG") review these eight actions for further investigation.  J.A. 119.  On February 28, 2006, the IG published his report on the source selection procedures for the C-5 AMP.  J.A. 114.  The IG report "identified two actions that 'appeared irregular and may not have been conducted in the best interest of the Government,'" -- 1) the reassignment of the Source Selection Authority ("SSA") responsibilities, and 2) the proposal rating changes made by Druyun in support of her source selection decision.  J.A. 119-20 (quoting C-5 AMP portion of the Druyun Study).  The IG Report indicated the following:

- Air Force personnel did not adequately document the decision process in accordance with the Federal Acquisition Regulation (FAR) Part 15 and Air Force FARS Appendix AA.

- There was inadequate support for the management, technical, and cost data evaluation ratings presented by the Air Force Advisory Council in its Proposal Analysis Report, such that the ratings could not be traced back to detailed analysis, reports, or meeting minutes, and the IG was unable to validate the contract awards to Lockheed Martin.

- There was no support for delegation of source selection duties to Druyun.

- A proposal for a training system upgrade by Lockheed Martin was noted by Druyun in her source selection decision as a "significant modification," but this modification was not previously identified

by the program office as an objective of the C-5 AMP.

- Druyun ignored performance/capability and risk proposal ratings presented by the Air Force Advisory Council without sufficient justification for her decision, changed ratings in the area of avionics quality/integration, software development, and system management to favor Lockheed Martin without justification in her source selection decision, introduced new strengths for Lockheed Martin, and cited Raytheon for a weakness while other documents showed that Lockheed Martin had this same weakness.

- The Air Force failed to provide adequate oversight of the source selection process.

L-3, 79 Fed. Cl. at 458-59.  The IG Report identified "material management control weaknesses" in the source selection process as defined by DoD Instruction 5010.40, i.e., that the Air Force did not have controls in place to ensure that source selection decisions were adequately documented and justified.  J.A. 121.

**The Raytheon Component Which Incurred the Bid and Proposal Costs for the C-5 AMP Procurement**

According to the uncontroverted testimony of Raytheon Company's Vice President and Assistant General Counsel, Rebecca B. Ransom, and Acting General Counsel and Vice President, Contracts of L-3 Communications Integrated Systems L.P, W. Lee Estes, Raytheon's AIS Business unit incurred the bid and proposal costs claimed here in 1998.  Subsequently, Raytheon Company sold that business unit to Plaintiff's predecessor, L-3 Communications Corporation and transferred all its claims relating exclusively or primarily to that business unit arising before or after the transfer to L-3 Communications.  In turn, L-3 Communications transferred the business unit to its wholly owned subsidiary, L-3, the plaintiff herein.  Affidavit of Rebecca B. Ransom dated September 19, 2008 ("Ransom Aff.") ¶¶ 2-8.[12]  Raytheon Company's Vice President and Assistant General Counsel testified:

---

[12]  By order dated July 8, 2008, this Court directed the parties to supplement the record, "addressing the issue of whether Raytheon's Aircraft Integration Systems Business Unit was the unit that submitted the proposal in the C-5 AMP procurement and incurred the bid and proposal preparation (B&P) costs at issue."  In response to this Order, Plaintiff filed the affidavit of the Acting General Counsel and Vice President, Contracts of L-3 Communications Integrated Systems L.P, W. Lee Estes.  On September 5, 2008, the Court ordered Plaintiff to file "a notice to the Court and Parties apprising them of its consultation with Raytheon" regarding whether Raytheon might pursue this claim.  In response to this later Order, Plaintiff filed the Ransom affidavit.

As of January 11, 2002, Raytheon Company and Raytheon Australia Pty Ltd. (collectively Sellers or Raytheon) and L-3 Communications Corporation (Buyer) entered into an Asset Purchase Agreement. Pursuant to the terms of that Agreement, Sellers sold to Buyer the assets of Sellers relating exclusively or primarily to the "AIS Business," i.e., those operations of Raytheon or any of its Subsidiaries conducted as of the Closing Date through its Aircraft Integration Systems business unit principally at facilities located in Greenville, Texas; Waco, Texas; Lexington, Kentucky; and Avalon, Australia.

The transfer of assets from Sellers to Buyer included, among other things, "all actions, claims, causes of action, rights of recovery, choses in action, rights of setoff of any kind, and all rights under and pursuant to all indemnities, warranties, representations and guarantees arising before, on or after the Closing relating exclusively or primarily to the AIS Business, any Acquired Assets or any Assumed Liabilities."

By letter agreement of March 8, 2002, L-3 Communications Corporation assigned its rights, interest and obligations under the Asset Purchase agreement to L-3 Communications Integrated Systems L.P., making it a Buyer under the Agreement.

In August 1998, Raytheon's Aircraft Integration Systems business unit in Waco, Texas, submitted a proposal to the United States Air Force for the C-5 Avionics Modernization Program (AMP).

The proposal named Raytheon E-systems, Inc. - WACO as the offeror because that is the corporate entity that directed the operations of Raytheon's Aircraft Integrations Systems business unit in Waco.

Raytheon's Waco Aircraft Integration Systems business unit incurred all of the bid and proposal costs associated with the preparation of that C-5 AMP proposal, including overhead and other costs that were allocated to the Waco business unit.

When Raytheon sold the AIS Business to L-3 Communication Corporation (which, in turn, transferred the business unit to L-3 Communications Integrated Systems L.P.), it transferred any claim for bid and proposal costs incurred by Raytheon's Waco Aircraft Integration Systems business unit.

9

<u>Id.</u>  Ms. Ransom further represented that Raytheon Company would not assert a claim for the bid and proposal costs at issue as it had transferred that claim to L-3:

> Raytheon understands that L-3 Communications Integrated Systems L.P. asserts a claim in this Court for bid and proposal costs incurred by Raytheon's Waco Aircraft Integration Systems business unit as a result of the preparation of the C-5 AMP proposal (the "Claim").  Raytheon understands that this Court has ruled that that Claim accrued in February 2006.

> Raytheon does not intend to and will not assert a claim against the United States for the bid and proposal costs incurred by Raytheon's Waco Aircraft Integration Systems business unit in preparation of the C-5 AMP proposal.  That Claim belongs to L-3 Communications Integrated Systems, Inc. as a result of the transfers made in the January 11, 2002 Asset Purchase Agreement and the March 8, 2002 letter agreement.

Ransom Aff. ¶¶ 9-10; <u>see also</u> Pl.'s Supp. at A334-55 (Affidavit of W. Lee Estes dated July 17, 2008).

<u>**Discussion**</u>

Defendant has moved to dismiss L-3's action for lack of jurisdiction on three grounds.  First, Defendant reiterates its previously rejected argument that ADRA eliminated this Court's jurisdiction over bid protests alleging a breach of the implied contract of fair dealing.  Second, Defendant contends that L-3's action is barred by the Anti-Assignment Act.  Finally, Defendant contends that L-3 lacks standing because it was not an actual or prospective offeror in the C-5 AMP procurement.

<u>**ADRA Jurisdiction**</u>

Defendant argues that the Court lacks jurisdiction because ADRA eliminated the implied-in-fact contract bid protest jurisdiction of this Court.  The Court addressed this issue in its November 16, 2007 opinion denying Defendant and Intervenor's motions to dismiss, holding that ADRA "in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or unfair evaluation, which would also constitute a breach of the implied contract of fair dealing." <u>L-3</u>, 79 Fed. Cl. at 461 (citations omitted).  This Court explained:

> Before enactment of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104-320, 110 Stat. 3870 (1996) (ADRA), the Court of Federal Claims' jurisdiction over a bid protest was predicated on the implied contract between the Government and prospective bidders to treat the bidder's proposal fairly, equally, and consistently with the

10

agency's solicitation of bids.  Keco Indus., Inc. v. United States, 192 Ct. Cl. 773, 780, 428 F.2d 1233 (1970); Heyer Prods. Co. v. United States, 147 Ct. Cl. 256, 177 F. Supp. 251, 252 (1959) ("If in the instant case the [agency], in rejecting plaintiff's bid, did not act in good faith, but arbitrarily and capriciously, it breached its implied promise when it solicited bids, for the breach of which plaintiff may recover the expenses it had incurred in submitting its bid."). Although ADRA obviated the need to base the COFC's protest jurisdiction on a breach of this implied-in-fact contract to consider bids fairly, the statute in no way eliminated a protestor's ability to challenge arbitrary and capricious conduct, such as bias or an unfair evaluation, which would also constitute a breach of the implied contract of fair dealing.  See, e.g., Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004); Unified Architecture & Eng'g, Inc., 46 Fed. Cl. 56, 60-61, aff'd, 251 F.3d 170 (Fed. Cir. 2000).

Id. (emphasis in original) (additional citation omitted).

Further, this Court's parsed ADRA's jurisdictional grant:

Section 1491(b) expressly provides that this Court has jurisdiction over "an action by an interested party objecting . . . to the award of a contract." 28 U.S.C. § 1491(b) (2000).  The statute does not limit the legal theories on which such an "objection" to a contract award might be based.  Whether conduct be characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly, such conduct is actionable in a bid protest.

Id. at 461-62. Judge Merow in Biltmore Forest Board FM Inc. v. United States, 80 Fed. Cl. 322, 334 (2008), applied this Court's holding in L-3, stating "the statute [ADRA] enables a protestor to challenge arbitrary and capricious conduct in the context of a contract award–the same cause of action previously considered under the rubric of a breach of an implied contract."  (citing L-3 Commc'ns Integrated Sys. v. United States, 79 Fed. Cl. 453 (2007)).  Biltmore reaffirmed that this Court can review a bid protest challenging conduct characterized as an arbitrary and capricious agency action or a breach of the implied duty to consider proposals fairly.  80 Fed. Cl. at 334; L-3, 79 Fed. Cl. 461-62.

**Anti-Assignment Act**

Defendant further argues that L-3's cause of action is barred by the Anti-Assignment Act (the "Act").  The Act is comprised of two statutes: 41 U.S.C. § 15(a) and 31 U.S.C. § 3727.  Section 15(a) of Title 41 prohibits the assignment of contracts, and § 3727 of Title 31, implicated here, prohibits the assignment of claims.  See Delmarva Power & Light Co. v. United States, 542 F.3d

889, 892 (Fed. Cir. 2008). Section 3727 of Title 31 defines an "assignment" as "a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim" or "the authorization to receive payment for any part of the claim." 31 U.S.C. § 3727(a). Subsection 3727(b) of Title 31 provides, in relevant part, that "[a]n assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." 31 U.S.C. § 3727(b).

As the Supreme Court recognized in United States v. Aetna Casualty & Surety Company, 338 U.S. 366, 373 (1949), "[t]he rigor of this [anti-assignment] rule was very early relaxed in cases which were thought not to be productive of the evils which the statute was designed to obviate." The Act was intended to benefit the Government in two ways. First, the statute prevented persons of influence from buying up claims against the United States, "which might then be improperly urged upon officers of the Government." Aetna Casualty, 338 U.S. at 373. Second, the Act enabled "the United States to deal exclusively with the original claimant instead of several parties, thus obviating the necessity of having to inquire into the validity of specific transfers or assignments of the claim, minimizing subjection to successive litigation upon the same claim, and eliminating the risk of double payment or multiple liability." Patterson v. United States, 354 F.2d 327, 329, 173 Ct. Cl. 819, 823 (1965). "When an assignment, or class of assignments, has been found not to pose those risks, the Act has ordinarily been held inapplicable." Keydata Corp. v. United States, 504 F.2d 1115, 1119, 205 Ct. Cl. 467, 474 (1974). Courts have held that assignments fall outside the statute's prohibition where a transfer is effected by "operation of law," or where the assignment is recognized by the Government. E.g., Delmarva Power, 542 F.3d at 894; Tuftco Corp. v. United States, 614 F.2d 740, 745-46, 222 Ct. Cl. 277, 285 (1980); Bailey v. United States, 78 Fed. Cl. 239, 265-66 (2007).[13]

**Operation of Law**

The "operation of law" exception to the Anti-Assignment Act most often applies to transfers by intestate succession or testamentary disposition, judicial sale, the process of subrogation to an insurer, and where the assignment or transfer of a claim is effected through consolidation or merger.[14] Not surprisingly, the "operation of law" exception generally involves situations where,

---

[13]  It is well settled that despite the bar of the Anti-Assignment statute, the Government, if it chooses to do so, may recognize an assignment, thereby nullifying the statute's effect. Delmarva Power, 542 F.3d at 894; accord Tuftco, 614 F.2d at 745, 222 Ct. Cl. at 285. Governmental recognition of an assignment or transfer will be upheld when it is either express as by novation or implicit as by ratification or waiver. Westinghouse Elec. Co. v. United States, 56 Fed. Cl. 564, 569 (2003).

[14]  See United States v. Shannon, 342 U.S. 288, 292 (1952) (recognizing that voluntary transfers by will and voluntary assignments for the benefit of creditors are exceptions to the Act). The Supreme Court has also long considered the "operation of law" exception to include transfers as a result of bankruptcy, assignments of claims to a receiver under the order of a court and voluntary assignments of an insolvent debtor's assets for the benefit of his or her creditors. See e.g., Erwin

for all intents and purposes, the contract with the Government continues with essentially the same entity, which has undergone a change in its corporate form or ownership.  See Westinghouse Elec. Co. v. United States, 56 Fed. Cl. 564, 569 (2003), aff'd, 97 Fed. Appx. 931 (Fed. Cir. 2004); accord Tuftco, 614 F.2d at 745,  222 Ct. Cl. at 285.  As the Court of Federal Claims recognized in Westinghouse:

> [T]ransfers or assignments occurring by operation of law are exempt from the statutes' application. Johnson Controls World Servs., Inc. v. United States, 44 Fed. Cl. 334, 343 (1999). See Seaboard Air Line Ry. v. United States, 256 U.S. 655, 657, 41 S. Ct. 611, 65 L.Ed. 1149 (1921); see also Rel- Reeves, Inc. v. United States, 221 Ct. Cl. 263, 606 F.2d 949, 954 n.7 (1979). Transfers by operation of law include corporate mergers, consolidations, and reorganizations, where in essence the contract continues with the same entity, but in a different form. Johnson Controls, 44 Fed. Cl. at 343; See Tuftco Corp., 222 Ct. Cl. at 285, 614 F.2d 740.[15]

 56 Fed. Cl. at 569.

Where a transfer is incident to the sale of an entire business or the sale of an entire portion of a business, the transfer is considered to have occurred "by operation of law," and the assignment is exempted from the anti-assignment statute.  Lyons Sec. Servs. Inc. v. United States, 38 Fed. Cl. 783, 786 (1997) (citing McNeil Techs. Inc., B-254909, Jan. 25, 1994, 94-1 CPD ¶ 40 and J.I. Case Co., B-239178, Aug. 6, 1990, 90-2 CPD ¶ 108).  So too, a bid or proposal may be assigned to an offeror's complete successor-in-interest.  As the Comptroller General has recognized:

> [T]he transfer or assignment of rights and obligations arising out of a bid or proposal is permissible where the transfer is to a legal entity which is the complete successor in interest to the bidder or offeror by virtue of merger, corporate reorganization, the sale of an entire business or the sale of an entire portion of a business embraced by the bid or proposal.  Ionics Inc., B-211180, Mar. 13, 1984, 84-1 CPD ¶ 290.

---

v. United States, 97 U.S. 392, 397 (1878); Hager v. Swayne, 149 U.S. 242, 247 (1893); Price v. Forrest, 173 U.S. 410, 422-23 (1899); Western Pac. R. Co. v. United States, 268 U.S. 271, 275 (1925); Goodman v. Niblack, 102 U.S. 556, 560-62 (1881).

[15] In Westinghouse an assignment resulting from a sale of assets did violate the Act, but that case is distinguishable because the entire business unit was not sold, and the Government was left vulnerable to additional claims -- the very situation the Anti-Assignment Act is aimed at preventing. 56 Fed. Cl. at 570.

Harnischfeger Corp., B-224371, Sept. 12, 1986, 86-2 CPD ¶ 296.

Here, Raytheon Company's AIS Business unit transferred to L-3 was the same business unit that incurred the bid and proposal costs for the C-5 AMP proposal. While "Raytheon E-Systems, Inc. - Waco" was the nominal offeror, the AIS business unit was the segment of Raytheon E-Systems that submitted the proposal and incurred the bid and proposal costs.[16]  Raytheon Company later transferred to L-3 its AIS Business, including ". . . all actions, claims, causes of action, rights of recovery, choses in action, rights of setoff of any kind, . . . arising before, on or after the Closing relating exclusively or primarily to the AIS Business. . . ."  Def.'s Mot. at A20.  As the Vice President and Assistant General Counsel of Raytheon Company testified, Raytheon Company, in selling the AIS Business unit to  L-3, transferred any claim for bid and proposal costs that business unit had incurred to L-3.  Ransom Aff. ¶¶ 8,10.  Further, Raytheon Company's Vice President represented that Raytheon Company would not assert a claim for the bid and proposal costs at issue as that claim belonged to L-3, thus eliminating the risk of exposing the United States to multiple claimants.  Id. ¶¶ 9-10.

As the Supreme Court has recognized, the Act does not restrict assignments where there is no probability that the United States could suffer injury.  Seaboard Air Line Ry. v. United States, 256 U.S. 655, 657 (1921).  The Court explained:

> We cannot believe that Congress intended to discourage, hinder or obstruct the orderly merger or consolidation of corporations as the various states might authorize for the public interest.  There is no probability that the United States could suffer injury in respect of outstanding claims from such union of interests and certainly the result would not be more deleterious than would follow their passing to heirs, devisees, assignees in bankruptcy, or receivers, all of which changes of ownership have been declared without the ambit of the statute.  The same principle which required the exceptions heretofore approved applies here.

Id.  In the instant case, the sale of Raytheon Company's AIS business unit to L-3 is precisely the type

---

[16] The Court accepts Raytheon Company's Assistant General Counsel's testimony that "[t]he proposal named Raytheon E-Systems, Inc.-WACO as the offeror because that is the corporate entity that directed the operations of Raytheon's Aircraft Integrations Systems business unit in Waco."  Ransom Aff.  ¶  6.  There is no evidence to refute this representation or to suggest that some entity other than the AIS business unit actually submitted the proposal and incurred the bid and proposal costs.  The Court rejects Defendant's suggestion that the C-5 AMP offer was submitted by a different entity -- Raytheon E-Systems, Inc.-WACO, and that the bid and proposal preparation costs were incurred by that entity.  See Def.'s Response to July 8, 2008 Order at 4.  This suggestion is based solely upon Defendant's interpretation of the proposal documents, which Plaintiff subsequently clarified.

of corporate transfer which is not deleterious to the Government's interest.  The claim was passed to a single successor-in-interest, and the predecessor entity has expressly abjured any claim for these costs, acknowledging that such claim belongs to L-3.

In sum, Raytheon Company's sale of its AIS business unit to L-3 and concomitant transfer of any claims occurred by "operation of law," and Plaintiff's instant claim is not precluded by the Anti-Assignment Act.[17]

**Standing**

The Government contends that L-3 does not have standing and that this Court lacks jurisdiction because L-3 is not an interested party under the ADRA.  The Federal Circuit has construed the term "interested party" in the ADRA to have the same meaning that it has under the Competition and Contracting Act, 31 USC § 3551-56 ("CICA").  E.g., Rex Service Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); American Federation of Government Employees v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  CICA defines the term "interested party" to mean "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A).  Defendant contends that L-3 fails to qualify as an interested party because it was not an actual or prospective offeror and did not submit a proposal -- indeed it did not even exist when its predecessor submitted its offer.  While this is true, this argument ignores the reality that L-3 is the complete successor-in-interest to the actual offeror, Raytheon Company, and embraces the identical business unit which submitted Raytheon Company's bid in the C-5 AMP procurement.  As such, L-3 stands in the shoes of Raytheon Company in the instant case and has standing to pursue this claim.  See Alabama Aircraft Industries, Inc. v. United States, 83 Fed. Cl. 666, 682 (2008) (holding that successor-in-interest to the original offeror, was in effect, the same legal entity which had submitted its proposal and was an interested party under ADRA); accord, Coggeshall Dev. Corp. v. United States, 23 Cl. Ct. 739, 743 (1991) (holding that successor-in-interest under Government deed had a contractual relationship with the United States and could maintain a breach of contract action); Harnischfeger Corp., B-224371, 86-2 CPD ¶ 296.  As such, L-3 is an interested party under ADRA and has standing to pursue this protest.

---

[17] Plaintiff also contends that the Government recognized the assignment of the instant claim and thereby waived its right to invoke the Anti-Assignment Act.  However, the record does not establish such Governmental recognition or waiver.  Plaintiff points to the Government's recognition and payment of a different claim to L-3 -- a claim for bid and proposal costs incurred in the C-130 AMP procurement.  However, the Government in recognizing that Raytheon had assigned a different claim for costs incurred in a wholly separate procurement, did not thereby expressly or implicitly recognize the assignment of the instant claim for bid and proposal costs incurred in the C-5 AMP procurement.

Plaintiff also suggests that the Air Force counsel in the GAO matter recognized the assignment of the C-5 AMP in a series of cryptic e-mails, but the record is insufficient to establish waiver on this ground.

## __Conclusion__

1.  Defendant's Motion to Dismiss is **DENIED**.

2.  The parties shall propose redactions to this Opinion by **December 5, 2008.**

3.  The Court will convene a telephonic status conference on **December 15, 2008, at 3:30 p.m.**


<u>s/Mary Ellen Coster Williams</u>
**MARY ELLEN COSTER WILLIAMS**
**Judge**