# In the United States Court of Federal Claims

No. 06-396C
(Filed: April 6, 2011)
(Bid Protest)
Not for Publication

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS, L.P., | * <br> * <br> * |
| Plaintiff, | * <br> * |
| v. | * <br> * |
| THE UNITED STATES, | * <br> * |
| Defendant, | * <br> * |
| and | * <br> * |
| LOCKHEED MARTIN AERONAUTICS COMPANY, | * <br> * <br> * |
| Intervenor. | * <br> * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

___

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**
___

**WILLIAMS**, Judge.

In this post-award bid protest, L-3 Communications Integrated Systems, L.P. ("L-3") challenges the Air Force's award of two contracts to Lockheed Martin Aeronautics Company, ("Lockheed Martin") to modernize the C-5 galaxy aircraft ("C-5 AMP"), and seeks its bid preparation and proposal costs. This protest was filed in the wake of the former Principal Deputy Secretary of the Air Force's conviction for violating conflict of interest laws. Specifically, the former principal deputy secretary, Darleen Druyun, admitted that she allowed her personal interest to influence her procurement decisions with respect to the Boeing Company -- she, her daughter and son-in-law negotiated for employment with Boeing while she was a top Air Force procurement official.

1

Plaintiff originally raised several grounds of protest, claiming that through Ms. Druyun's unauthorized assumption of the SSA duties and her change of evaluation ratings to justify the selection of Lockheed Martin's higher cost proposal, the Air Force improperly compromised the integrity of the procurement process, breached its implied contract to treat proposals fairly, honestly, and in good faith, and violated a panoply of procurement statutes and regulations. L-3 further claimed that Ms. Druyun was biased in favor of Lockheed Martin and acted in bad faith in the C-5 AMP procurement. Finally, L-3 alleged that the Air Force acted arbitrarily and capriciously in making award to Lockheed Martin. Although the original complaint was filed over six years after the award of the contract to Lockheed Martin, this Court found the complaint timely because Plaintiff could not have known the basis of its protest until the Department of Defense Inspector General ("DoD IG") issued a report relating the involvement of Ms. Druyun in this procurement.

Now, years later, after this Court has resolved three motions to dismiss, a motion to supplement the Administrative Record ("AR"), and a motion for reconsideration, and after Plaintiff has filed a motion for partial judgment on the AR, Plaintiff seeks leave to amend its complaint again to allege two new claims.[1] First, Plaintiff contends that the Air Force engaged in unequal and misleading discussions in 1998. Second, Plaintiff claims that the Air Force violated 10 U.S.C. § 133 because the Secretary of the Air Force failed to consult with the Under Secretary of the Department of Defense prior to delegating certain procurement authority to Darleen Druyun.

Defendant and Intervenor vigorously oppose Plaintiff's motion for leave to file a second amended complaint arguing that Plaintiff has unduly delayed filing the motion and that the amendment would be futile because both new allegations wholly lack merit. Because Plaintiff knew the factual predicate for both new allegations years ago and failed to seek leave to amend its complaint at that time, and because neither new allegation can withstand a motion to dismiss, Plaintiff's motion for leave to file a second amended complaint is denied.[2]

## Discussion

**Alleged Unequal and Misleading Discussions**

Plaintiff seeks to add the following allegations regarding unequal and misleading discussions:

> After initial proposals were received, Druyun directed the Source Selection Evaluation Team to enter into discussions with the offerors to give the offerors their evaluated strengths and weaknesses. During the discussions, L-3 [Raytheon] was told color ratings could not change. Lockheed was given the indication that color ratings could be changed. Lockheed's ratings did improve.

---

[1] Plaintiff filed this action on May 16, 2006, and filed its First Amended Complaint on February 9, 2007.

[2] This opinion memorializes and explains an oral ruling issued on March 29, 2011.

Pl.'s Proposed 2d Am. Compl. ¶ 11.

**The Red Flag Document: An Auditor's Workpaper**

Plaintiff claims that it did not know the factual predicate for this allegation until March 3, 2009, when, in response to a court order, Defendant produced all documents relating to this procurement which it had not included in the AR, including audit workpapers underlying the Inspector General's report. One such workpaper, dated July 29, 2005, was entitled "Discussion with the Offerors," and its stated purpose was to "[d]etermine the purpose for the contracting officer to engage in discussions with the offerors," the role the SSA played in these discussions, and the result of the discussions. Tab 22, Audit of the Contract Award Process for the C-5 AMP, Survey Steps - F.1.PS at 24.[3] Specifically, Plaintiff contends that the following language from the auditor's workpaper was a "red flag," providing notice that the discussions were unequal and misleading:

> **Conclusion:**
>
> Originally, the prospective offerors were informed that the C-5 Avionics Modernization Program contract would be awarded without discussions, aside from administrative clarifications. ("Results" tab, paragraph 1). . . . After the initial proposals from the potential contractors were received, reviewed, and briefed to Ms. Druyun, the Source Selection Authority (SSA), Ms. Druyun, instructed the [SSET] to enter into discussions with the offerors to discuss their evaluated strengths and weaknesses ("Results" tab, paragraph 2; F.1.25, pp. 1-2, paragraph 2). One key result of the discussion was the Source Selection personnel advising Lockheed Martin that it is not the Source Selection Evaluation Team's responsibility to inform the offeror how to get a better color rating in areas of their proposals ("Results" tab, paragraph 4). In discussions held with Raytheon, the Source Selection personnel answered the question of improving color ratings somewhat differently, the Source Selection personnel simply stated that the color rating could not change ("Results" tab, paragraph 5).
>
> Auditor's Note:
>
> The SSA improved Lockheed Martin's color rating (C.4.4, p. 1), even though the SSET told Raytheon that the colors could not change. ("Results" tab, paragraph 5).

Tab 22, Survey Steps - F.1.PS at 26-27.

Paragraphs 4 and 5 referenced in the above-quoted auditor's conclusion were in the workpaper under the heading "Results/Discussion." These paragraphs state:

---

[3] Audit documents contained in Plaintiff's "Appendix of Documents Plaintiff Seeks to Add to the AR," Docket No. 112, are cited according to appendix tab number.

4. On October 14, 1998, Source Selection personnel met with Lockheed Martin to discuss their [sic] C-5 AMP proposal. The purpose of the discussions [was] to go over Lockheed Martin's strengths, deficiencies, and weaknesses based upon the Source Selection Evaluation Team's evaluations. The discussions covered Supportability, Mission Capability, Most Probable Schedule, and other areas that required clarification. During the meeting, the Source Selection Evaluation Team clarified that weaknesses do not lead to the yellow rating color.

If a requirement is exceeded, the color goes up. The Source Selection personnel stated that it is not their responsibility to inform the offeror how to get a better color rating, this is a test case. The Source Selection personnel stated that the only color the offeror needs to be concerned with is red, yellow is acceptable. (F.1.11, pp. 1-2).

5. On October 15, 1998, Source Selection personnel met with Raytheon to discuss their [sic] C-5 AMP proposal. The purpose of the discussions [was] to go over Raytheon's strengths, deficiencies, and weaknesses based on the Source Selection Evaluation Team's evaluations. The discussions covered Avionics, Most Probable Schedule, Developmental Test and Evaluation, and the other areas that required clarification.

During the discussions, the question was raised as to whether the color rating would change if weaknesses were addressed. The Source Selection personnel stated that the risk can change, but not the color rating. Raytheon went on to ask if there are 4 or 5 strengths, why is a factor rated "yellow"? The Source Selection Evaluation Team personnel stated that the rating is based on what item propels [the offeror] into a certain color. Further, "red" is the only significant color that [the offeror] should worry about (F.1.12, pp. 1-2).

Tab 22, Survey Steps - F.1.PS at 25-26.

**Sources Underlying the Auditor's Workpaper**

This auditor's workpaper indicated that there were three sources for the information contained in the workpaper:

1. Teleconference with Assistant Secretary of Air Force (ASAF) for Acquisition Personnel and Former Contracting Officer of the C-5 AMP. The teleconference was held on 22 June 2005, 1000 Hrs.;

2. Minutes from the Lockheed Martin/Source Selection Evaluation Team; October 14, 1998; and

3. Minutes from the Raytheon/Source Selection Evaluation Team; October 15, 1998.

Tab 22, Survey Steps - F.1.PS at 24.

### Notes of Auditor's Telephonic Interview

The referenced teleconference was memorialized in a note recapping an interview by the auditors with the Assistant Secretary of the Air Force for Acquisition Personnel and the former contracting officer. The document stated the following regarding discussions:

> Next, Mr. Burger [an auditor] inquired about Ms. Druyun requesting the SSET enter into discussions with the offerors once their proposals were received. Mr. Burger asked if this was typical. Mr. Meyer [the former contracting officer] stated that the offerors were told not to sign their proposals until after they were reviewed by Source Selection Personnel. Once the unsigned proposals were received, Ms. Druyun was briefed and discussions took place with the offerors. Once the discussions occurred, both Lockheed Martin and Raytheon provided their final offers.

Def.'s Notice of Filing Regarding DoD IG Document, Attach. at 3. This was the entirety of the entry regarding discussions. Id.

### Contemporaneous Minutes of the Discussions

The referenced minutes of the face-to-face discussions with Raytheon contained only the following information regarding potential changes to the color rating:

> - Raytheon's questions and SSET's responses to our briefing:
>
> - If we address a slide's weaknesses, will the color change. No, the risk can change but not the color.
>
> - If there are 4 or 5 strengths, why is the color yellow? It's based on what item propels you into that color. Red is the only significant color that you should worry about.

AR 1-02914 to 1-02915 (Raytheon Face-to-Face Discussions, Oct. 15, 1998). The referenced minutes of the face-to-face discussions with Lockheed Martin contained only the following regarding potential changes to color ratings:

> C.5 Mission Capability: SSET clarified that weaknesses do not lead to yellow color. It is strengths that drive color. If you meet the requirements, it is yellow. If you exceed the requirements, then the color goes up. What could we do to move the color rating up (Mr. Arndt)? We are not here to tell you how to get a better color. This is a test case. The color you really need to concern yourself with is red. Yellow is acceptable.

AR 1-02917 (Lockheed Face-to-Face Discussions, Oct. 14, 1998).

**Standards For Granting Leave to Amend**

To amend its complaint, L-3 must obtain leave of court.  The decision to grant leave to amend is within the sound discretion of the trial court.  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971).  Rule 15 of the Rules of the Court of Federal Claims ("RCFC") provides that this Court "should freely give leave when justice so requires."  RCFC 15(a)(2).  In discussing the substantively-identical Rule 15 of the Federal Rules of Civil Procedure, the Supreme Court stated that leave may be withheld for reasons such as undue delay, bad faith or dilatory motives, prejudice to the opposing party, or futility.  Foman v. Davis, 371 U.S. 178, 182 (1962).  "The existence of any one of these criteria is sufficient to deny a motion to amend, the theory being that the amendment would not be necessary to serve the interests of justice under such circumstances."  Spalding & Son, Inc. v. United States, 22 Cl. Ct. 678, 680 (1991).

**Undue Delay**

Though the term "undue delay" defies categorical definition, the Federal Circuit recognizes that "courts have not hesitated to deny motions to amend that have been filed after significant delay."  Te-Moak Bands of Western Shoshone Indians of Nevada v. United States, 948 F.2d 1258, 1262 (Fed. Cir. 1991).  "Delay alone, even without a demonstration of prejudice, has thus been sufficient grounds to deny amendment of pleadings."  Id.  The "party seeking to amend its complaint after significant delay bears the burden of justifying the delay."  Cupey Bajo Nursing Home, Inc. v. United States, 36 Fed. Cl. 122, 132 (1996) (citing Te-Moak Bands, 948 F.2d at 1263).  A significant delay may be unjustified when the party seeking leave delayed despite having relevant information to make the new allegations.  See E.W. Bliss Co. v. United States, 77 F.3d 445, 449-50 (Fed. Cir. 1996) (stating that leave to amend requested by disappointed bidder after a significant delay was not justified by recent receipt of the winning bidder's technical proposal, because protester could have obtained that information much earlier).

In the instant case, Plaintiff acknowledges that it received the auditor's workpaper on March 3, 2009, and that it did not file its motion for leave to file a second amended complaint adding its new allegation based on the information in that document until almost two years later, on February 2, 2011.

Plaintiff further acknowledges that it received documents referenced in the auditor's workpapers -- the minutes of the discussions -- in January 2008, when Defendant served the original Administrative Record.  Plaintiff contends, however, that it could not "connect the dots" and understand that the Air Force had entered into unequal and misleading discussions until it received the auditor's conclusory comment stating that "the Source Selection personnel answered the question of improving color ratings somewhat differently" for Raytheon.  Tab 22, Survey Steps - F.1.PS at 26-27.

In addressing whether there is undue delay on Plaintiff's part in seeking to amend its complaint again, the Court notes that a plaintiff has an obligation to seek leave to amend its complaint in a reasonable timeframe, not years after it became aware of the factual predicate for

its new allegations.  See Te-Moak Bands, 948 F.2d at 1262 (a "litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend" (quoting Carson v. Polley, 689 F.2d 562, 584 (5th Cir. 1982))).  This is particularly true in a bid protest.  Here, Plaintiff contends that it was not aware of the factual predicate of its unfair discussions claim until it received the auditor's worksheets on March 3, 2009, but Defendant and Intervenor point out that Plaintiff received the contemporaneous minutes of the discussions as part of the AR in January of 2008.  In addition, handwritten notes taken by Raytheon officials during the January 28, 1999 debriefing stated that "the SSA did change color and risk ratings."  If Raytheon believed that color ratings could not change based on information provided in the October 1998 discussions but learned in January of 1999 that color ratings had in fact changed, Raytheon had sufficient information at that time to conclude that the guidance it received during discussions may have been incorrect and/or misleading.

Even if the Court were to accept Plaintiff's assertion that it could not have known of the allegedly problematic discussions until March of 2009, Plaintiff still waited almost two years until February 2, 2011, to seek leave to file an amended complaint.  This constitutes "undue delay" in a bid protest.  See e.g., E.W. Bliss, 77 F.3d at 449-50.  As Intervenor's counsel pointed out in oral argument, in protests before the Government Accountability Office, protestors are only allowed 10 days to amend their protests once they become aware of facts giving rise to a new ground of protest.  While this Court has not adopted a hard and fast timeframe for the filing of amended complaints in bid protests, 23 months after learning the factual predicate for an amendment is far too long.

Plaintiff's counsel believed it was appropriate to allow the Court an opportunity to rule on the motion for reconsideration on supplementing the AR before it sought leave to amend its complaint.  However, the fact that the issue of supplementation of the AR was sub judice is not cause for failing to amend a complaint.  While Plaintiff did not know whether the auditor's worksheets containing the "red flag" about discussions would remain in the record, that had no bearing on whether Plaintiff could use the information gleaned from those worksheets to amend its complaint.  In bid protests, as in any civil litigation, as long as a plaintiff has a good faith basis for raising an allegation, it is free to do so.  There is no need for a document to be in the record in order for a plaintiff to rely on it as a factual predicate for amending a pleading.

**Futility**

To survive a charge that its amendment is "futile," a "party must demonstrate that its pleading states a claim on which relief could be granted . . . ."  Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V., 464 F.3d 1339, 1354-55 (Fed. Cir. 2006).  This standard is the same standard of legal sufficiency that applies under Rule 12(b)(6).  Merck & Co., Inc. v. Apotex, Inc., 287 Fed. Appx. 884, 888 (Fed. Cir. 2008) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)).  A complaint will survive a 12(b)(6) motion if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Thus, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1940.

7

The only contemporaneous record of discussions, the minutes of the face-to-face discussions the Air Force had with Raytheon and Lockheed Martin, do not suggest that the discussions were in any way problematic. Rather, it appears that what gave rise to the "red flag" prompting Plaintiff to add this new allegation complaining about discussions was the auditor's unwarranted drawing of inferences from those minutes to surmise that Raytheon was told that color ratings could not go up, while Lockheed Martin was told color ratings could go up. Both the Government and Lockheed Martin characterize the auditor's conclusion as a mistake.

Regardless of whether the auditor's worksheets contain an erroneous conclusion, this Court believes it is appropriate to give more weight to the contemporaneous documents prepared by Air Force personnel during the discussion process than to an auditor's conclusions derived years later primarily from those same contemporaneous minutes. The only other source cited by the auditor, an interview with the Assistant Secretary of the Air Force and former contracting officer some seven years later, sheds no light on the content of discussions -- it simply references the fact that Ms. Druyun had directed that discussions be held. The Court recognizes that earlier procurement documents had advised offerors that it was the intention of the agency not to conduct discussions. However, it is often the case that despite an agency's stated intention not to conduct discussions, it later decides that discussions are warranted. Plaintiff has not alleged that the substance of the discussions were unwarranted or unnecessary. In contrast, the only evidence of record -- the minutes of discussions -- indicates that both offerors had raised questions which needed to be addressed prior to submission of final proposals.

In addition, the auditor's more detailed description of what transpired during discussions in the body of the workpaper did not suggest that the discussions were unequal or misleading. Those entries -- which summarized the minutes accurately -- indicated that the Source Selection Evaluation Team told Lockheed Martin that "weaknesses do not lead to the yellow rating color." If a requirement is exceeded, the color goes up. In Raytheon's case, both the minutes and the auditor's description of those minutes indicate that during discussions Raytheon asked whether the color rating would change <u>if weaknesses were addressed</u>. The Source Selection personnel advised that the color rating could not change, but that the risk rating could. AR 1-02914 (Raytheon Face-to-Face Discussions, Oct. 15, 1998); Tab 22, Survey Steps - F.1.PS at 26.

These comments by the Air Force tracked Section M of the solicitation, which indicated that the listed technical evaluation sub-factors were to be rated by color scoring, and that risk was to be assessed as a separate evaluation factor to be assigned a high, moderate, or low rating. In particular, the solicitation provided that "[e]ach of the mission capability [technical] sub-factors, except schedule, will receive a color/adjectival rating." AR 1-1096. By contrast, "[t]he proposal risk will be assigned at the subfactor level, with the exception of the schedule assessment, as high, moderate, or low proposal risk ratings." <u>Id.</u> With regard to the "Proposal Risk" factor, the solicitation stated that "Proposal Risk assesses the risks associated with the offeror's proposed approach, <u>weaknesses</u> in the proposed approach, and <u>weaknesses</u> in the proposal itself." AR 1-01101 (emphasis added). Thus, under the solicitation, addressing a "weakness" could impact risk, but would not improve the color rating (the technical score).

In discussions, the Government simply informed Raytheon that while the color evaluation could <u>not</u> be improved <u>if weaknesses were addressed</u>, its risk evaluation could be improved.

8

That advice was pertinent only to Raytheon's question whether "[i]f we address a slide's weakness, will the color change." Because Raytheon did not ask whether as a general matter color ratings could be improved, the Government was under no obligation to provide this information. It is well established that discussions are to be tailored to individual proposals.[4]

Further, L-3 has made no allegation regarding how its failure to be told its color ratings impacted its revision of its final proposal. Although counsel for Plaintiff made generalized claims at oral argument that Raytheon would have revised its final proposal differently if it had been told its color rating could have gone up, L-3 made no such allegation in its proposed Second Amended Complaint. Plaintiff was unable to identify any specific aspect of Raytheon's proposal that would have been revised differently if it had been told that color ratings could be improved.

Because Plaintiff's allegation of unequal discussions is predicated on an auditor's unwarranted and mistaken inference that the discussions may have been unequal regarding color ratings, the contemporaneous evidence of record does not support this allegation, and L-3 has not alleged any prejudice, this proposed amendment would be futile.

**Alleged Violation of 10 U.S.C. § 133**

Plaintiff next seeks to amend its complaint to add an allegation that the Air Force violated 10 U.S.C. § 133 because the Secretary of the Air Force failed to consult with the Under Secretary of DoD prior to delegating and consolidating certain procurement authority in Darleen Druyun. Specifically, Plaintiff seeks to add the following allegations:

> 7. After the departure of the ASAF(A), the Acting Secretary of the Air Force, F. Whitten Peters, announced on February 23, 1998, that he would assume the authorities and duties of the Air Force Acquisition Executive, Senior Procurement Executive and Head of Contracting Activity for Air Force acquisition programs. He directed Darleen Druyun to report to him.
>
> 9. In March 1998, without consulting the Undersecretary of Defense for Acquisition, Technology and Logistics, Peters consolidated essentially all acquisition authorities, oversight, and management with Druyun, including acting as the SSA for all procurement actions that require an SSA at the SAF/AQ level. Peters did not rescind the ASAF(A)'s SSA delegation nor give Druyun the authority to rescind it.

---

[4] Moreover, as a practical matter it would be odd if the Government had discussions with offerors, advised them of strengths and deficiencies, and gave offerors an opportunity to revise their technical proposals, but did not reevaluate those revised proposals and change the technical color ratings as appropriate. The minutes of Raytheon's discussions reflect that in response to a question on amendment -- whether documents were to be turned in whether there was a "tech change" or not -- the Government stated: "If you elect to change something, we will evaluate it. Schedule is not a technical change." AR 1-02915 (Raytheon Face-to-Face Discussions, Oct. 15, 1998).

Pl.'s Proposed 2d Am. Compl. ¶¶ 7, 9.

**Undue Delay**

Plaintiff claims it became aware of the Secretary of the Air Force's violation of this statute when it received the Defense Science Board Task Force Report, a document the Court later removed from supplementation to the AR on reconsideration. Plaintiff claims that it received the full Defense Science Board Task Force Report on March 3, 2009, but it referenced the Report in its First Amended Complaint filed on February 9, 2007. The Defense Science Board Task Force Report, issued in March 2005, stated that the Secretary of the Air Force issued a March 18, 1998 memorandum that consolidated essentially all acquisition authorities oversight and management with Ms. Druyun. The Report stated: "[c]learly this was a major change to the Air Force's acquisition process but the senior acquisition executive in the DoD . . . was not consulted." Tab 47, Report of the Defense Science Board Task Force on Management Oversight in Acquisition Organizations, at 13.

Not only did Plaintiff have actual notice of the Report in February 2007, but Plaintiff also had actual notice of the underlying March 18, 1998 memorandum in March of 2007, when Defendant filed the document in an appendix to its supplemental brief and motion to dismiss Plaintiff's first amended complaint. Nevertheless, Plaintiff waited until February 2011, to seek to add an allegation that this lack of consultation violated 10 U.S.C. § 133. E.g., E.W. Bliss, 77 F.3d at 449-50. This constitutes undue delay. Plaintiff clearly had a way of accessing this report as early as February 2007, when it cited the public electronic version of the Report in its First Amended Complaint. The fact that Plaintiff did not seek leave to amend at that time because it did not realize that this failure to consult was a statutory violation is not grounds for injecting this new issue into this litigation years later.

**Futility**

In any event, it is clear as a matter of law that the failure of the Secretary of the Air Force to consult the Under Secretary of the Department of Defense in assigning duties to Ms. Druyun is not a violation of 10 U.S.C. § 133. 10 U.S.C. § 133 provides in pertinent part:

> Under Secretary of Defense for Acquisition, Technology, and Logistics
>
> (a) There is an Under Secretary of Defense for Acquisition, Technology, and Logistics, appointed from civilian life by the President, by and with the advice and consent of the Senate. . . .
>
> (b) . . . the Under Secretary of Defense for Acquisition, Technology, and Logistics shall perform such duties and exercise such powers relating to acquisition as the Secretary of Defense may prescribe, including –
>
>> (1) supervising Department of Defense acquisition;

> (2) establishing policies for acquisition (including procurement of goods and services, research and development, developmental testing, and contract administration) for all elements of the Department of Defense;
>
> (3) establishing policies for logistics, maintenance, and sustainment support for all elements of the Department of Defense;
>
> (4) establishing policies of the Department of Defense for maintenance of the defense industrial base of the United States; and
>
> (5) the authority to direct the Secretaries of the military departments and the heads of all other elements of the Department of Defense with regard to matters for which the Under Secretary has responsibility.

10 U.S.C. § 133(b). That statute appears to be administrative in nature as it details the responsibilities of the Under Secretary of Defense vis-à-vis the Secretaries of the Military departments. Id.

While the statute does state that the Under Secretary of DoD "shall perform such duties and exercise such powers relating to acquisition as the Secretary of Defense may prescribe" including "supervising Department of Defense Acquisition," the statute does not mandate that the Secretary of the Air Force consult with the Under Secretary regarding the management and consolidation of Air Force procurement functions he assigned to Ms. Druyun via the March 1998 memorandum. Although the Defense Science Board Task Force criticized the Secretary's actions in failing to consult with the Under Secretary of DoD, the Secretary's action did not constitute a violation of 10 U.S.C. § 133. Indeed, the only requirement for consultation in that statute provides that "[i]n carrying out this subsection, the Under Secretary shall consult with the Inspector General of the Department of Defense." Id. § 133(d)(2).

## Conclusion

It would not be in the interest of justice to permit Plaintiff to add two late and legally deficient claims at this juncture of the litigation. Plaintiff's motion for leave to file a second amended complaint is **DENIED**. Plaintiff shall file a revised Motion for Partial Judgment on the Administrative Record to delete all references to 1) unequal and misleading discussions, and 2) the violation of 10 U.S.C. § 133 by **April 11, 2011.**

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**
